**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**
**SOUTHERN DIVISION**

| | |
|---|---|
| IN RE: MARRIOTT INTERNATIONAL, INC., CUSTOMER DATA SECURITY BREACH LITIGATION | MDL No. 8:19-md-2879-PWG<br><br>Judge Paul W. Grimm |
| This Document Relates To:<br><br>DENNIS MCGRATH, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>MARRIOTT INTERNATIONAL, INC., ARNE M. SORENSON, KATHLEEN KELLY OBERG, BAO GIANG VAL BAUDUIN, BRUCE HOFFMEISTER, MARY K. BUSH, FREDERICK A. HENDERSON, LAWRENCE W. KELLNER, AYLWIN B. LEWIS, and GEORGE MUÑOZ,<br><br>Defendants. | This document relates to Case No. 8:19-cv-00368-PWG<br><br>**JURY TRIAL DEMANDED** |

**THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS**

# TABLE OF CONTENTS

Page

I. NATURE OF THE CLAIM ..... 2

A. Marriott Seeks to Merge with Starwood, Attracted by Its Clientele and Data ..... 3

B. Marriott Was Obligated to Protect Starwood's Data and to Perform Due Diligence on Starwood's Systems ..... 5

C. Marriott Assured the Market that It Conducted Extensive Due Diligence and That Starwood's Customer Data Was Secure ..... 6

D. Starwood's Systems Were Outdated and Unprotected ..... 8

E. Defendants Either Knew That Starwood's Systems Were Extremely Vulnerable to an Attack, or Were Severely Reckless in Disregarding the Risk ..... 11

F. The Data Breach ..... 17

G. Events Following the Data Breach and Documentary Evidence Confirm Defendants Made False and Misleading Statements About Marriott's Due Diligence ..... 20

II. JURISDICTION AND VENUE ..... 23

III. PARTIES ..... 24

A. Lead Plaintiff ..... 24

B. Defendants ..... 25

1. The Individual Defendants ..... 25

2. The Audit Committee Defendants ..... 27

IV. CONFIDENTIAL WITNESSES ..... 31

V. CONTROL PERSON ALLEGATIONS ..... 33

VI. SUBSTANTIVE ALLEGATIONS ..... 36

A. Nature of Marriott's Business ..... 36

1. The Importance of Customer Data to Marriott ..... 36

2. The Data That Marriott Collects ..... 40

3. Marriott Understood the Importance of Keeping this Valuable Data Secure ..... 44

4. Rules and Regulations that Required Marriott to Keep Data Secure ..... 46

B. Marriott Seeks to Maximize Value by Merging with Hotel Giant Starwood ..... 49

1. Marriott's M&A Activity Prior to Acquiring Starwood ..... 49

C. The Massive Starwood Acquisition ..... 51

1. Analyst and Market Reaction to the Deal Underscores the Importance of the Acquisition of Starwood Customer Data to Marriott's Business ..... 54

2. Marriott Conducts Inadequate Due Diligence at the Time of the Merger and Fails to Detect Numerous Vulnerabilities In Starwood's System—Including a Massive Data Breach ..... 59

a. Marriott's Assurances to the Market ..... 60

3. Unbeknownst to the Market, Starwood Was Suffering from Massive Security Vulnerabilities That Left Customer Data Unsecured, and This Data Continued to be Unsecure After Marriott Acquired Starwood ..... 63

a. Oracle Deficiencies Lead to Security Vulnerabilities ..... 64

b. Starwood's Security Deficiencies Expose Valuable Data ..... 66

4. Defendants Either Knew That Starwood's Systems Were Vulnerable to an Attack or Were Severely Reckless in Disregarding the Risk ..... 73

a. Confidential Witnesses Confirm Defendants Were Made Aware of the Severe Security Deficiencies in Starwood's Systems ..... 73

b. After the Deal Closed, Marriott Misled the Market About the Effectiveness of the Integration Process and Failed to Safeguard its Valuable Customer Data ..... 79

(i) The Integration Process ..... 79

(ii) Marriott Encountered Problems of Its Own Making While Integrating Starwood's Troubled Networks ..... 80

(iii) The Integration Was Too Big to Handle and Too Expensive to Successfully Implement ..... 86

5. Marriott Was Put on Explicit Written Notice of Security Vulnerabilities in Starwood's Systems After It Commissioned Several Assessments of Starwood's Cybersecurity Risks ........................ 91

6. Marriott Ignored Obvious Red Flags Alerting Them to Cybersecurity Risks and Data Breaches ................................................. 94

a. Successful Cyberattacks of Starwood's Systems Put Defendants on Notice of Data Security Risks.................................. 94

b. Marriott Ignored Numerous High-Profile Data Breaches in the Hotel Industry ..................................................................... 96

c. The Equifax Data Breach Was Another Red Flag for Defendants ......................................................................... 102

D. The Data Breach ........................................................................................ 104

1. Marriott's Discovery of the Data Breach and the Initial Revelation to the Public .......................................................................... 104

2. Marriott's Response to the Data Breach ................................................ 112

E. Post-Class Period ....................................................................................... 114

F. Litigation and Regulatory Action Against Marriott.......................................... 118

1. The Multi-District Litigation in the District of Maryland ...................... 118

2. The Court Has Already Determined That Marriott Made Material Omissions About Its Due Diligence and Data Security and Knew the Company's Due Diligence and Data Security Was Inadequate........ 119

3. Evidence Produced to Plaintiffs in Parallel Derivative Litigation.......... 127

4. Regulatory Proceedings ......................................................................... 134

5. Experts' Reaction to the Data Breach.................................................... 135

G. The PFI Report Provides Conclusive Evidence That Marriott Misled the Market About Its Due Diligence and Security Risks Associated With Starwood's Systems ....................................................................................... 137

1. PCI DSS ................................................................................................. 137

2. Marriott Commissions a PFI Report ..................................................... 138

3. Threat Actor's Activity in Starwood's Systems ................................... 140

4. Verizon's Conclusions and General Timeline of the Data Breach ......... 140

5. Malware Installation and Execution ......... 149

6. Suspicious Queries ......... 151

7. Other Affected Servers ......... 152

a. Staging & Exfiltration of Database Tables ......... 153

8. RAM-Scraper Malware in the Starwood CDE ......... 155

9. PCI DSS Violations ......... 157

10. Causes of Data Breach Identified in the PFI Report ......... 159

11. Timing of Response to Data Breach and Remediation Efforts ......... 161

H. In Addition to the PCI Violations Detailed Above, Marriott Violated Various IT and Security Standards During Its Due Diligence of Starwood's IT Systems, During the Integration Process, and During the Operation of the Starwood Database ......... 164

1. Due Diligence and Integration Standards ......... 167

2. COSO Framework ......... 168

3. The FTC ACT and NIST-CSF ......... 173

4. GDPR ......... 182

5. Privacy Shield and Safe Harbor Principles ......... 184

6. ISACA Publication on Technology Due Diligence and Risk ......... 187

7. Standards for Risk Assessment ......... 192

8. SEC Guidance Regarding Cybersecurity Risks and Incidents ......... 197

VII. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD ......... 202

A. November 16, 2015 – Prospectus Containing a Letter to Marriott Associates Regarding the Merger ......... 202

B. December 22, 2015 – Registration Statement; January 27, 2016 – First Amendment to the Registration Statement; February 16, 2016 – Second Amendment to the Registration Statement; and February 17, 2016 – Prospectus ......... 204

C. February 18, 2016 – Q4 2015 Earnings Call ..... 207

D. February 18, 2016 – 2015 Form 10-K ..... 209

E. March 21, 2016 – Conference Call to Discuss Amended Merger Agreement; and Defendant Sorenson's LinkedIn Post ..... 214

F. March 21, 2016 – Prospectus Containing an Updated Letter to Marriott Associates ..... 216

G. March 21, 2016 – Form 8-K ..... 218

H. March 31, 2016 – Press Release from Marriott in Support of the Merger ..... 218

I. April 1, 2016 – Marriott and Starwood M&A Conference Call ..... 219

J. April 27, 2016 – Form 8-K ..... 220

K. April 28, 2016 – Q1 2016 Form 10-Q ..... 221

L. July 28, 2016 – Q2 2016 Earnings Call ..... 225

M. July 28, 2016 – Q2 2016 Form 10-Q ..... 227

N. September 23, 2016 – Marriott's Privacy Statement ..... 231

O. November 7, 2016 – Form 8-K ..... 233

P. November 9, 2016 – Q3 2016 Form 10-Q ..... 233

Q. February 21, 2017 – 2016 Form 10-K ..... 238

R. May 9, 2017 – Q1 2017 Form 10-Q ..... 244

S. August 7, 2017 – Form 8-K ..... 249

T. August 8, 2017 – Q2 2017 Form 10-Q ..... 250

U. October 5, 2017 – Privacy Statement ..... 254

V. November 8, 2017 – Q3 2017 Form 10-Q ..... 255

W. November 8, 2017 – Q3 2017 Earnings Call ..... 259

X. January 12, 2018 – Defendant Hoffmeister Interview ..... 260

Y. February 14, 2018 – 2017 Form 10-K ..... 262

Z. May 10, 2018 – Q1 2018 Form 10-Q ..... 266

AA. August 7, 2018 – Q2 2018 Form 10-Q ........ 272

BB. September 19, 2018 – Marriott's Global Privacy Statement ........ 277

CC. September 25, 2018 – Salesforce's The Future of Travel & Hospitality........ 280

DD. October 10, 2018 – Skift Global Forum 2018 ........ 282

EE. October 20, 2018 – Interview with Richmond Times Dispatch ........ 283

FF. November 5, 2018 – Form 8-K........ 284

GG. November 6, 2018 – Q3 2018 Form 10-Q........ 284

VIII. ADDITIONAL ALLEGATIONS SUPPORTING SCIENTER ........ 289

A. CW Allegations Regarding Starwood and Marriott's IT Systems Support a Strong Inference of Scienter ........ 289

B. Defendants' Violations of Data Security Standards Including Those Detailed in the PFI Report Support a Strong Inference of Scienter........ 291

C. Defendants' Knowledge or Reckless Disregard of Cybersecurity Risks, Including Those Specific to Starwood, Support a Strong Inference of Scienter ........ 293

D. Defendants Had Access to Reports and Assessments Detailing Deficiencies in Starwood's and Marriott's Systems throughout the Class Period........ 295

E. Numerous Data Security and Cybersecurity Red Flags Throughout the Class Period Support Scienter........ 296

F. Defendants' Public Statements Regarding the Merger Support a Strong Inference of Scienter........ 298

G. The Magnitude of the Breach Supports a Strong Inference of Scienter ........ 298

H. Defendant Sorenson, as CEO and a Board Member, Acted With Scienter ........ 299

I. Defendant Oberg, as CFO and Presenter to the Board, Acted With Scienter..... 301

J. The Audit Committee Defendants Acted With Scienter........ 302

K. Defendant Hoffmeister Was Responsible for Marriott's IT Function ........ 303

L. Defendant Bauduin Acted With Scienter........ 305

M. Defendant Marriott Acted With Scienter Through Its Agents........ 305

IX. LOSS CAUSATION ........................................ 305

X. APPLICATION OF PRESUMPTION OF RELIANCE ........................................ 308

XI. NO SAFE HARBOR ........................................ 309

XII. CLASS ACTION ALLEGATIONS ........................................ 310

COUNT I Violation of §10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants ........................................ 313

COUNT II Violation of §20(a) of the Exchange Act Against the Individual Defendants and the Audit Committee Defendants ........................................ 315

XIII. PRAYER FOR RELIEF ........................................ 317

XIV. DEMAND FOR TRIAL BY JURY ........................................ 317

By and through its undersigned counsel, Construction Laborers Pension Trust for Southern California ("Southern California Laborers" or "Lead Plaintiff") brings this Complaint individually, and on behalf of a class of similarly situated persons and entities, against Defendant Marriott International, Inc. ("Marriott" or the "Company") and Defendants Arne M. Sorenson, Kathleen Kelly Oberg, Bao Giang Val Bauduin, Bruce Hoffmeister (together, the "Individual Defendants"), Mary K. Bush, Frederick A. Henderson, Aylwin B. Lewis, Lawrence W. Kellner, and George Muñoz (the "Audit Committee Defendants," and together with Marriott and the Individual Defendants, the "Defendants").[1]

Lead Plaintiff alleges the following based upon personal knowledge as to those allegations concerning Lead Plaintiff and, as to all other matters, based upon the investigation of counsel, which included, without limitation: (a) review and analysis of public filings made by Marriott and Starwood Hotels and Resorts Worldwide, Inc. ("Starwood") with the U.S. Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications, including those disseminated by certain of the Defendants and other related non-parties; (c) review of news articles; (d) review of materials and evidence produced by Marriott in other state and federal litigation arising out of the data breach that is the subject of this litigation; (e) interviews with former employees of Marriott and Starwood, its affiliates and predecessors, and other third parties; (f) the review and analysis of a confidential forensic report commissioned by Marriott following the data breach that is the subject of this litigation (the "Data Breach"); and (g) consultation with individuals with expertise in cybersecurity, information technology systems, and damages. While multiple sources of evidence are already

---

[1] Lead Plaintiff files this Third Amended Consolidated Complaint (the "Amended Complaint") pursuant to the Court's March 13, 2020 Letter Order (ECF No. 550) and the schedule set forth in the parties' joint letter to the Court (ECF No. 555). *In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, No. 8:19-md-2879-PWG (D. Md.).

pleaded in this Complaint that adequately support the claims alleged herein, Lead Plaintiff believes that substantial additional evidentiary support exists for the allegations herein that will be revealed after Lead Plaintiff has a reasonable opportunity to conduct discovery.

## I. NATURE OF THE CLAIM

1. This is a federal securities class action brought on behalf of all persons and entities who purchased or otherwise acquired Marriott's publicly traded securities during the period from November 16, 2015 to November 29, 2018, inclusive (the "Class Period"), and were damaged as a result. On November 15, 2015, Marriott announced that it had reached an agreement to acquire Starwood for what would be a more than $13 billion price tag (the "Merger"). In announcing the Merger, Marriott assured investors that the transaction was in the Company's, and thus investors', best interests. Throughout the due diligence and integration process, Defendants repeatedly assured investors that the Company performed adequate due diligence, planned for and dedicated adequate resources to the integration of the two companies (the "Integration"), and that Defendants' prior experience with exponentially smaller acquisitions adequatey prepared them for the transformational (and debt-heavy) purchase of Starwood. But when speaking to the market about the Merger and Integration, Defendants omitted material information regarding the risks and deficiencies related to Starwood's cybersecurity practices and IT systems—which negatively impacted, and put at risk, the valuable customer data that Marriott was purchasing as part of the Merger. Buoyed by these statements, and more importantly these omissions, Marriott's share price rose to a Class Period high of $147 per share. However, as confirmed by former employees, a forensic investigation, and various reports and assessments created by and for Marriott, Defendants knew, or were at least severely reckless in not knowing, of the deficiencies in Starwood's cybersecurity practices and IT systems, and related risks. On November 30, 2018, before the market opened, Marriott finally revealed to

investors that Starwood's, and thus Marriott's, systems had been compromised by hackers for the entire Class Period, exposing the sensitive personal information of hundreds of millions of guests, and resulting in the theft of the personal information of more than 380 million guests. This news sent Marriott's share price plummeting, causing Lead Plaintiff and Marriott's other investors to incur significant losses. Through this action, Lead Plaintiff intends to hold Marriott and its executives and directors accountable for those losses on behalf of Marriott's investors.

**A. Marriott Seeks to Merge with Starwood, Attracted by Its Clientele and Data**

2. Marriott is now the largest hotel company in the world. But in 2015, Marriott's growth was waning and its share price was slumping. At the time, there was a downward trend in the hotel industry fueled by the emergence and dominance of two sources of pressure. First, online travel companies like Airbnb or VRBO were competing with Marriott—allowing customers to book non-traditional, hotel-like properties at lower rates. Second, online travel agencies ("OTA"), such as Expedia and Travelocity, were renting hotel rooms for a fee, and these sites competed with Marriott for direct bookings. Marriott also negotiated with OTA sites to have some of its rooms available on these websites, but this also cut into profits. Analysts covering the hotel industry focused on the risks these disruptive companies posed.

3. In response to these market pressures, in mid-2015, Marriott sought to consolidate power and grow its business by merging with another hotel company—Starwood. Starwood was known for its younger, high-end clientele, and ability to attract business travelers. Starwood was also famous for its loyalty program, which provided customers with rewards—such as free nights—for staying at Starwood properties. Thus, a crucial feature of the proposed merger with Starwood was Marriott's acquisition of the legacy Starwood guest reservation database and loyalty program data. The information within the Starwood reservation database was extremely valuable to Marriott because Marriott wanted to target Starwood's prized customer base, thereby

broadening Marriott's dominance and reach among a larger range of customers. Marriott hoped to harness the power of these customers and leverage the customer data it purchased from Starwood to gain market share and drive revenue growth.

4. Marriott's Merger with Starwood was the biggest the hotel industry had seen, and the largest and most significant acquisition Marriott ever attempted. Before the Merger, Marriott acquired smaller hotel chains in "tuck-in" purchases of approximately $100 to $200 million with hotel chains that had, at most, 160 hotels. The acquisition of Starwood, however, was massive, and ***valued at $13 billion, with Starwood's properties numbering in the thousands.***

5. Analysts were excited about the Merger and recognized that the acquisition of Starwood's customer data was good for investors because it would drive growth. As an analyst at Macquarie explained, "[i]nvestors should [ ] acknowledge that access to a more diverse client base will generate even more valuable customer data and should improve marketing efforts, especially towards younger and more tech savvy groups." Similarly, analysts at Susquehanna stated that "[c]ombining the SPG and Marriott Rewards programs will broaden [Marriott's] and [Starwood's] distribution and capture more share of wallet from their customers."

6. Marriott also touted the importance of Starwood's data to its investors, characterizing the data as a "tremendous asset." Moreover, Marriott acknowledged the importance of keeping Starwood's valuable data secure, assuring the market that "the integrity and protection" of customer data was "critical" to the Company. Furthermore, Defendant Sorenson admitted that a primary motivation for the Starwood Merger was the acquisition of Starwood's customer data—stating during an interview on September 25, 2018, that "while [the $13 billion Merger] isn't at its core maybe a technology bet, it was a bet on the loyalty program."

### B. Marriott Was Obligated to Protect Starwood's Data and to Perform Due Diligence on Starwood's Systems

7. Through the Merger, Marriott subsumed all of Starwood and its operations, including Starwood's computer systems, reservation software, and databases, as well as all the sensitive personal information in those databases. Because the customer data and the guest reservation database were focal points of the Merger, and were of critical importance to both Marriott and the market, Marriot was expected to conduct due diligence on Starwood's systems to ensure this valuable information was secure. Indeed, it is standard practice in any acquisition of this size for the acquirer to perform cybersecurity due diligence, which includes researching undisclosed or unknown data breaches, as well as identifying IT security risks and operational or governance deficiencies of the target company. According to a cybersecurity expert consulted by Lead Plaintiff, both legal and technology members of M&A teams have recognized for decades that IT due diligence should include data privacy and Information Security reviews. Moreover, the acquiring company in any merger involving publicly traded companies must focus on the aspects of the deal that are most important to the transaction. It was therefore crucial that Marriott perform adequate due diligence by investigating and examining Starwood's internal systems—including its reservation system and database—and ensuring that the assets that Marriott was purchasing were intact and secure.

8. Marriott was also legally and contractually ***obligated*** to perform cybersecurity due diligence. Marriott was subject to numerous regulations and standards that required it to protect its customer data. These regulations and standards included the FTC Act, the Payment Card Industry Data Security Standards ("PCI DSS") that Marriott had agreed to abide by, the EU's General Data Protection Regulation ("GDPR"), and the Internal Control-Integrated Framework

issued by the Committee of Sponsoring Organizations of the Treadway Commission[2] (2013 Framework) (the "COSO Framework"), among others. These statutes and cybersecurity standards all follow a simple security paradigm; First, **protect**. If you cannot protect, then **detect** breaches that arise. If you cannot protect—and detection fails—then once the attack is discovered, **respond**. Because Marriott housed sensitive customer data, such as credit card and passport information, it was obligated to abide by these practices.[3] Yet, as became readily apparent later—Marriott failed to abide by these practices and violated ***all*** of the above statutes and standards when it: (1) performed (or failed to perform) merger due diligence; and (2) took over operation of Starwood's IT systems.

### C. Marriott Assured the Market that It Conducted Extensive Due Diligence and That Starwood's Customer Data Was Secure

9. Throughout the Merger process Defendants assured the market that the Company was performing "extensive" due diligence on Starwood's systems and operations. For example, Marriott told the market on December 22, 2015, that based on "***the results of Marriott's due diligence review of Starwood, the prospects for the combined company [were] favorable.***"[4] As Marriott's purported diligence progressed, Defendants' statements grew more definite. On February 18, 2016, for example, Marriott acknowledged that "the integrity and protection of customer, employee, and company data ***is critical to us***" and Marriott's customers "***also have a***

---

[2] Committee of Sponsoring Organizations of the Treadway Commission ("COSO"), Internal Control - Integrated Framework: Executive Summary, Framework and Appendices, and Illustrative Tools for Assessing Effectiveness of a System of Internal Control (3 volume set), First issued in 1992 and most recently updated in May 2013. Note: COSO Members include: American Accounting Association, American Institute of Certified Public Accountants, Financial Executive Institute, Institute of Internal Auditors, Institute of Management Accountants.

[3] Importantly, this Court already held in its motion to dismiss Order in the Consumer Track that Section 5 of the FTC Act imposed an affirmative duty on Marriott regarding protecting customers' sensitive personal information. ECF No. 540 at 47 (Court's Memorandum Opinion on Defendants' Motion to Dismiss) (hereinafter "Consumer MtD Opinion").

[4] Emphasis is added unless otherwise indicated.

***high expectation that we, as well as our owners, franchisees, licensees, and service providers, will adequately protect their personal information***." Over the course of the next several months, Defendants continued to reiterate the ***"extensive due diligence"*** and ***"joint integration planning"*** with Starwood and the "***exhaustive planning***" surrounding the Merger and Integration. Further, Defendants' statements emphasized that the Board of Directors (the "Board"), which included Sorensen and the Audit Committee Defendants, was continuously updated on the due diligence process. Notably, Defendant Oberg provided the Board with at least three presentations on cybersecurity risk during the Class Period. *See, e.g.*, ¶¶ 305 & 312.

10. Defendants similarly led the market to believe that Starwood's customer data was secure. On October 5, 2016, for example, Marriott updated the Online Privacy Statement it presented to the public on starwoodhotels.com following the Merger. In that statement, Marriott informed the public that:

> ***Starwood recognizes the importance of information security, and is constantly reviewing and enhancing our technical, physical, and logical security rules and procedures. All Starwood owned web sites and servers have security measures in place to help protect your personal data against accidental, loss, misuse, unlawful or unauthorized access, disclosure, or alteration while under our control. Although "guaranteed security" does not exist either on or off the Internet, we safeguard your information using appropriate administrative, procedural and technical safeguards, including password controls, "firewalls" and the use of up to 256-bit encryption based on a Class 3 Digital Certificate issued by VeriSign, Inc. This allows for the use of Secure Sockets Layer (SSL), an encryption method used to help protect your data from interception and hacking while in transit.***

Unfortunately for Marriott's customers and investors, these statements were not true.

11. All of the alleged false and misleading statements and omissions at issue in this case, touting Marriott's due diligence and data security, were important to investors. Specifically, Marriott's securities holders recognized that the customers Marriott was inheriting

from Starwood, along with their valuable data, was a critical element of the deal that was going to drive growth. And, in making statements about due diligence and data security, Defendants publicly conveyed to the market three important facts that investors relied on: (1) Marriott understood the importance of securing the customer data they were purchasing; (2) Marriott was working hard to evaluate Starwood's systems; and (3) that there were no issues identified or risks posed that would impede the Merger or the successful and financially beneficial Integration of the two companies. But this could not be further from the truth.

**D. Starwood's Systems Were Outdated and Unprotected**

12. Even a cursory look at Starwood's IT infrastructure through Marriott's purported due diligence would have revealed that Starwood's systems were severely outdated and had virtually no security measures in place to **protect** against, **detect**, or **respond** to a cybersecurity threat. As multiple witnesses and a postmortem forensic report make plain, the problems with Starwood's systems were not obscure, minor or difficult to detect—they were fundamental security concerns plaguing an IT system that was housing data worth billions of dollars.

13. Numerous former employees and contractors for both Starwood and Marriott collectively confirmed that Starwood's network was extremely vulnerable and at risk. For example, a Confidential Witness ("CW"), CW 2, who was a Senior Global Cyber-Security Consultant at Starwood explained that Starwood used a very antiquated version of the Oracle application portal[5] for its information technology ("IT") business applications, which contained over 150 applications, including the Starwood's Reservation and SPG Loyalty Points systems.

---

[5] An Oracle application portal is a web-based application that enables users to access content areas, external websites, and other applications. Multiple confidential witnesses corroborate that the Oracle portal that Starwood used for its applications was antiquated, at capacity, beyond being patched (meaning it could no longer accept necessary system updates), and extremely vulnerable to hackers.

But Starwood refused to pay Oracle for maintenance support for years, so "nothing was updated or patches implemented to prevent hacking." This left Starwood's Oracle application portal seven years past its end of life and very vulnerable to attack by hackers. This witness (CW 2) further revealed that customer user and employee user IDs and passwords were stored in the Starwood databases "in the free and clear" and "all their passwords were not encrypted at all." Starwood's failure to encrypt sensitive information was a cause of the data breach that was later confirmed in a finding within an internal forensic report (the "PFI Report").[6]

14. CW 2 also explained that Starwood was not properly providing security log monitoring for its more than 800 servers. According to a cybersecurity expert, as a necessary security step, Starwood, and later, Marriott were ***required*** to log this activity so that it would know what was happening within its systems. The PFI report confirms CW 2's allegations that this was not done. This was a critical security deficiency that would have been revealed through adequate due diligence.

15. Other witnesses corroborated the poor state of Starwood's IT systems. For example, CW 5, a former employee who was part of senior leadership at Marriott and a Senior Director at Marriott's corporate headquarters in Bethesda, Maryland (and who ultimately reported to Defendant Hoffmeister) said that the general consensus among Marriott's leadership

---

[6] Lead Plaintiff fought to have the PFI Report publicly unsealed after a sealed version was filed on the public docket. Following a data breach, a compromised company must hire a Payment Card Industry Forensic Investigator ("PFI"). The PFI conducts a forensic investigation and writes a report detailing its investigation, the PFI Report. If the investigation finds evidence of a data breach, the Report explains how the attack was carried out. Marriott hired Verizon to conduct a forensic investigation into the Data Breach. Verizon conducted an investigation and authored a report detailing its industry-standard investigation and findings in the PFI Report. The findings of this report are discussed in detail herein, and a copy of the PFI Report is attached hereto as Exhibit A.

was that there was a high "likelihood of a threat." He[7] confirmed that Starwood's Oracle stack was beyond being patched, and it would have cost hundreds of millions of dollars to fix. According to the former Senior Director, this was the primary reason that Starwood was looking to be acquired, ***and Marriott knew it***. He explained that the Oracle stack was at capacity and could no longer be patched or expanded upon.

16. Furthermore the PFI Report, along with congressional testimony, reveals just how bad Starwood's, and thus Marriott's, security failures were. Importantly, ***at the time of the Merger, Starwood's system had already been breached***. Stretching back to at least July 28, 2014, Starwood's systems were infected with malware that allowed attackers to steal highly sensitive personal information from millions of guests. According to the PFI Report, during Marriott's due diligence, and continuing for years through the closing and Marriott's ownership of Starwood, Starwood's systems were infected with variants of the Mimikatz, remote access Trojan ("RAT"), and RAM-scraper malware. These malware programs allowed attackers to access and control Starwood's networks, and steal the sensitive personal information of Starwood's customers. The pervasive installation and execution of malware progressed on Starwood's systems for over four years—from July 2014 through at least September 26, 2018, and perhaps beyond. Notably, the PFI Report detailed how the RAM-scraper malware, in particular, was found on 480 systems spread out across 58 Starwood locations following the Data Breach. The affected locations included corporate, data centers, customer contact centers, and hotel property locations.

17. Marriott would have known that RAM-scraper software could still be present on Starwood's systems at the time it was conducting due diligence because, just five days after

[7] All CWs will be described and referred to in the masculine to protect their identities.

Marriott signed the merger agreement, Starwood revealed publicly that 54 of its hotels in North America were infected by RAM-scraper malware. According to Starwood's disclosure, this malware was first active in Starwood's systems from November 2014 to October 2015 and enabled unauthorized parties to access its customers' credit card information, including cardholders' names, payment card numbers, security codes, and expiration dates. After that breach, Starwood commissioned an investigation by a PFI, and that investigator found two of the same PCI DSS violations that were later detailed in the PFI Report as causes of the Data Breach.

### E. Defendants Either Knew That Starwood's Systems Were Extremely Vulnerable to an Attack, or Were Severely Reckless in Disregarding the Risk

18. Evidence from CWs and excerpts from internal Marriott Board minutes show Defendants either knew of the poor state of Starwood's IT systems during the due diligence process, or else were severely reckless in disregarding obvious risks.

19. First, CW allegations reveal that Defendants were made aware that Starwood's systems had severe security vulnerabilities. For example, CW 5, a Senior Director employed by Marriott from the start of the Class Period to early 2017, said "I knew all about it, I was in leadership." He explained that as a part of the leadership team, he participated in various conversations during the due diligence process, where concerns about Starwood's systems were outlined and discussed. CW 5 said that he attended many due diligence meetings prior to and during the sale and "all the senior technical leadership participated." According to CW 5, ***"Marriott was aware of the security flaws both before, during, and after the acquisition."*** CW 5 said that Marriott wanted to "isolate any problems Starwood had" and that because of the concerns about Starwood's security posture, the decision was made to keep Starwood's systems separate until they could dispose of the majority of their systems because it could not "mesh" with Marriott's. CW 5 added that Kathy Memenza, who was a Senior VP, Information

Protection and IT Security, "saw this as too much of a risk" and ultimately left Marriott because of the Starwood acquisition.

20. CWs also confirmed that Defendants were put on notice regarding the scope of the cybersecurity threat at Starwood by Marriott's consultant PricewaterhouseCoopers ("PwC"). Specifically, PwC was shockingly able to infiltrate and breach Marriott's systems following the Merger, notwithstanding the fact that Marriott's systems were significantly more secure than Starwood's vulnerable network. CW 1 explained that in March 2016, he attended a presentation from PwC detailing the findings of an unexpected audit that had been commissioned by the Audit Committee. CW 1 described PwC's March 2016 audit as an "elaborate process" to evaluate if Marriott's systems could be penetrated. He explained that PwC auditors conducted a successful "penetration test" in which PwC was able to steal user credentials and gain access to the system. PwC's presentation was described as "not a good meeting" and CW 1 said that everyone was made aware of the findings from this audit, including the Board, Defendant Sorensen, and Defendant Hoffmeister, and that a formal report would have been created. CW 1 added that the Board, including Defendant Sorensen, and Defendant Hoffmeister also knew that Starwood's IT systems were even ***worse*** than Marriott's systems.

21. Second, documentary evidence produced in a parallel derivative action, that Lead Plaintiff here gained access to,[8] shows that Defendants were made aware of Starwood's data security problems, or else were severely reckless in ignoring the obvious risks. Documents

---

[8] Lead Plaintiff gained access to the content of the unredacted allegations in the Derivative Complaint (which were based on documents received and reviewed by derivative counsel pursuant to a § 220 demand) by challenging redactions made to the complaint in a parallel derivative action filed in Delaware Chancery Court. *See* Verified Amended Stockholder Derivative Complaint, *Firemen's Ret. Sys. of St. Louis v. Sorensen, et al.*, C.A. No. 2019-0965-AGB (Del. Ch. filed July 10, 2020), Transaction ID 65758726 (hereinafter the "Chancery Court Complaint").

show, for example, that at a meeting of the Marriott Board on August 7, 2014, Defendant Sorenson and other board members discussed "some recent publicized [data breach] incidents," and received a presentation titled "Security Overview" detailing recent cybersecurity incidents at other hospitality companies.[9] Similarly, in connection with Marriott's February 12, 2016 meeting of the Board—three months into the Class Period, and just seven months before the Merger closed—Defendant Oberg, the Company's Chief Financial Officer ("CFO"), distributed a slide presentation to the Board, including the Audit Committee Defendants and Defendant Sorenson. The presentation included a slide titled "Overall Company Risk Ranking" that ranked the top risks facing Marriott in 2016. One slide showed that the Board itself ranked cybersecurity as ***the number one risk facing Marriott in 2016***. Another slide presented to Defendant Sorenson and the Board, including the Audit Committee Defendants, stated that "the Board of Directors and Management both view [cybersecurity] risk as having increased from 2015 to 2016" and "[c]ybersecurity is an enterprise-wide risk that continues to make headlines and present challenges for many large organizations due to the sophistication of cyber events and the related costs . . . . Large-scale cybersecurity breaches can quickly erode customer confidence and result in significant brand damage."

22. Documents also show that Defendants were repeatedly informed of the threat of a cybersecurity incident throughout the Class Period, while they were touting the supposed "extensive due diligence" Marriott was conducting. About three months after the close of the Merger, at a December 2016 meeting among the Audit Committee Defendants, the Company's Independent Registered Public Accounting Firm ("External Auditor"), Ernst & Young ("E&Y"), reminded the Audit Committee that "[w]hile cybersecurity has historically been a topic of

[9] *See id.* at ¶96.

discussion in board rooms, the increase in the volume and severity of attacks, coupled with the increased scrutiny by regulators, has significantly elevated its importance."

23. The Board and its committees, including the Audit Committee Defendants, met again on February 8, 2017. The Audit Committee Defendants were informed by their External Auditor, E&Y, that the audit committee was "now expected to have an understanding of the business implications of cyber risks" and that "cybersecurity has emerged to prominence as a massive risk area for the hospitality industry," as well as the appropriateness of the Company's risk disclosures related to cybersecurity. Even Marriott's own internal Audit Department rated Marriott as "Needs Improvement" in cybersecurity.

24. Two days later, on February 10, 2017, Defendant Sorenson and the Audit Committee Defendants were reminded about the level of cybersecurity risk facing Marriott, including through a presentation on data breaches in the hospitality industry. Notably, Defendant Sorenson and the Audit Committee Defendants were explicitly informed of the cybersecurity risks involving Starwood's legacy systems—including risks regarding the database still in use after the Merger. PwC was brought in to present on this topic to the Board and explained that Starwood's ***"[b]rand standards did not mandate <u>PCI compliance, tokenization, or point-to-point encryption</u>.***" Importantly, ***Marriott was contractually required to be PCI compliant because of its role as credit card processor***. Further, being PCI compliant required encryption of credit card information, *e.g.*, tokenization or point-to-point encryption. Point-to-point encryption means card data is encrypted immediately upon use. Similarly, tokenization is the process of replacing payment card data with a non-sensitive equivalent, such as a string of random numbers and characters. Without encryption, credit card numbers were readily observable to anyone accessing Starwood's network—a massive security flaw. Thus, the Board,

including Defendant Sorensen and the Audit Committee Defendants, were specifically informed on February 10, 2017, that credit card information on Marriott's systems was extremely vulnerable to theft and that Starwood's systems were non-compliant with standards Marriott was contractually obligated to follow. Importantly, Defendants Oberg and Hoffmeister were present at that meeting. Yet, the Defendants did nothing in response. PwC also reported that Starwood's "[d]ecentralized technology management model created a different risk profile than Marriott's centralized approach" which "[a]llowed for greater opportunity for deviation from the expected published standard, and led to an unusually high number of associates with elevated access to systems." Defendant Sorenson and the Audit Committee Defendants would have known all of this if a proper due diligence investigation was conducted at the time of the Merger and thereafter. Further, if Defendants did not know before the February 2017 Board meeting, they definitely knew that Starwood was not PCI DSS compliant as of this date. Notably, according to CWs and pleadings filed in parallel litigation, Marriott protected its own systems using tokenization.

25. Finally, in August 2018, Defendant Sorenson and the Board, including the Audit Committee Defendants, were informed that Marriott found "[m]alware on a legacy-Starwood server used by the Marriott Law Department back in January 2018." And at the same August 2018 meeting of the Board, Defendant Sorenson and the Audit Committee Defendants learned about additional security incidents, including a malicious legacy-Starwood domain registered in September 2017. Still, Defendants and the Board did nothing to improve cybersecurity controls in its legacy Starwood system, and disclosed nothing to investors.

26. Additionally, the Individual Defendants and the Audit Committee Defendants had access to several reports and assessments throughout the Class Period detailing the deficiencies

in Starwood's systems. For example, a Marriott internal report dated July 28, 2016—a date just under two months before the Merger closed (and more than eight months after the Class Period started)—detailed significant issues with Starwood's systems, including that Starwood lacked a Security Incident Event Management ("SIEM")[10] process, did not monitor or report on the "state of security" of its systems, and did not use tokenization or point-to-point encryption. In January 2017, PwC informed Marriott of the results of PwC's "Starwood Cybersecurity Assessment," which detailed several critical vulnerabilities in Starwood's systems, including that Starwood: (1) lacked an enterprise-wide security governing body; (2) lacked adequate network segmentation; (3) consistently failed to comply with baseline configuration standards, leaving the systems vulnerable; and (4) did not mandate PCI DSS compliance.

27. Similarly, an assessment performed by PwC in mid-2017 on the state of the Integration up to that point indicated that the combined network required enhanced network segmentation, two-factor authentication, and other vulnerability remediation activities.

28. In mid-2018, Marriott retained Protiviti, a consulting firm, to conduct a penetration test of Starwood's systems during which Protiviti was able to capture Starwood domain administrator credentials and take complete control of Starwood's systems, including accessing the Starwood cardholder data environment ("CDE").[11] These documents show that the

---

[10] SIEM software collects and aggregates log data generated throughout the organization's technology infrastructure, from host systems and applications to network and security devices such as firewalls and antivirus filters. Depending on the features available and enabled in the SIEM software, it may then automatically analyze data across multiple log sources to identify and categorize incidents and events.

[11] The cardholder data environment, or CDE, refers to "a computer system or networked group of IT systems that processes, stores and/or transmits cardholder data or sensitive payment authentication data. A CDE also includes any component that directly connects to or supports this network." Margaret Rouse, *SearchSecurity*, SEARCHSECURITY.TECHTARGET.COM, https://searchsecurity.techtarget.com/definition/cardholder-data-environment-

Company was explicitly put on notice of severe IT security deficiencies plaguing Starwood's systems, and leaving valuable customer data at risk.

29. Marriott was also put on notice of the high risk of a security breach because of similar cybersecurity incidents that occurred in the hotel industry in general and at Starwood in particular, as well as other breaches (*e.g.*, Equifax and Target). In fact, both Starwood and Marriott, among many other high-profile hotel chains, were targeted in other data breaches by hackers in the months and years before the Data Breach was discovered. Before the Data Breach, between 2015 and 2017, Starwood was affected by at least five different cybersecurity incidents of varying degrees of severity. And only days after the Merger was announced, Starwood disclosed that the point-of-sale ("POS") systems at some of its hotels in North America had been infected with malware, and that the software had been infected from November 2014 to October 2015. The malware allowed cybercriminals to access the payment card data of Starwood customers.

30. Based on this factual record, Defendants thus either discovered the obvious deficiencies with Starwood's system which exposed customer's sensitive data, or were severely reckless in not detecting these glaring and obvious deficiencies.

**F. The Data Breach**

31. In September 2018, Marriott finally discovered that the legacy Starwood guest reservation database had been hacked. But despite discovering the Data Breach, Marriott kept quiet and continued to operate Starwood's breached guest reservation system, putting millions of customers at further risk.

---

CDE#:~:text=A%20cardholder%20data%20environment%20(CDE,to%20or%20supports%20this%20network (last visited July 21, 2020).

32. On September 7, 2018, the IBM Guardium database alert tool[12] discovered the Data Breach. Accenture, Marriott's third party IT contractor tasked with running the legacy Starwood guest reservation database, alerted Marriott's IT department the following day. On September 10, 2018, Marriott brought in third party investigators (the consulting firm CrowdStrike, Inc.) to perform a review of their hacked systems.

33. As a result of that investigation, Defendant Sorenson, the Audit Committee Defendants, and the Board were informed of the details of the Data Breach more than two months before Marriott finally disclosed the Data Breach to the public.

34. On September 17, 2018, Defendant Sorenson was specifically informed that the attackers had installed webshells, VPN tools, and malware, including RAT variants, on Starwood's systems, and the Audit Committee Defendants were informed the following day. Despite having knowledge of specific details of the Data Breach, and that customer data continued to be at risk, Defendants not only failed to inform the public that their information had been compromised and was still at risk, but continued to make misleading statements to investors.

35. On October 29, 2018, Marriott contacted the FBI to notify them of the tools used by the hackers, the timelines of the intrusion, and the forensic findings the Company and/or its third-party investigators had made.

36. In early November 2018, Marriott learned that the Data Breach stretched all the way back to at least July 2014, meaning the hack existed at the time Marriott supposedly conducted "**extensive**" and "**exhaustive**" due diligence. This was not a surprise internally at

---

[12] According to IBM, the Guardium database tool: "provides automated sensitive data discovery and classification, real-time data activity monitoring and cognitive analytics to discover unusual activity around sensitive data. It protects against unauthorized data access by learning regular user access patterns and can provide real-time alerts on suspicious activities."

Marriott, of course, given the unsecure state of the Starwood IT systems, which one former consultant at Starwood says was “wide open,” “a joke,” and “Swiss cheese.”

37. Notably, on September 25, 2018, Defendant Sorenson gave an interview at a hospitality conference hosted by SalesForce where he discussed the Merger without disclosing the Data Breach, and did the same at another forum hosted by Skift on October 10, 2018. On October 20, 2018, Marriott’s Senior Vice President of Global Loyalty David Flueck gave an interview to the Richmond Times Dispatch discussing the Integration without disclosing the Data Breach. On November 5, 2018, Defendants Bauduin and Sorenson issued a press release discussing the Integration without disclosing the Data Breach. Finally, on November 6, 2018, Marriott filed its Form 10-Q without disclosing the fact that it had experienced a serious data breach on a critical customer-serving platform. Defendant Sorenson and the Board had already been informed on September 18, 2018, that the legacy Starwood guest reservation database had been breached. Based on the evidence of the Data Breach and the known vulnerabilities, management knew that its customers’ sensitive personal data had been exposed to attackers. Notwithstanding the Data Breach, Marriott continued to operate the hacked Starwood guest reservation database, even going so far as to continue to encourage customers to book reservations with the corrupted reservation database.

38. On November 29, 2018 (83 days after the Data Breach was discovered), Marriott provided notice of the Data Breach to the four major payment card networks and their credit processing vendors, regulators in over 20 foreign countries and territories, state Attorneys General, the FTC, the SEC, and the three major credit reporting agencies.

39. Marriott finally came clean to the public on November 30, 2018, nearly three months after discovering the Data Breach.[13] The Company revealed to the market that attackers had stolen: (1) names; (2) passport numbers; (3) dates of birth; (4) credit card information; (5) home addresses; and (6) other valuable, sensitive personal information[14] ***from over 500 million customers.*** The Company explained that it had only just begun notifying guests that their personal information had been compromised. Marriott finally admitted to the market that they had failed to discover the Data Breach for the past two years, and had failed to discover it during the "extensive" due diligence process as well. The market was shocked. As a result of these revelations, Marriott's share price dropped by $6.81 from a close of $121.84 per share on November 29, 2018, to $115.03 per share on November 30, 2018, a decline of 5.59%, which harmed investors.

### G. Events Following the Data Breach and Documentary Evidence Confirm Defendants Made False and Misleading Statements About Marriott's Due Diligence

40. Following the massive Data Breach, Marriott commissioned Verizon to conduct a forensic investigation into the causes of the Data Breach. The PFI Report, which memorialized the investigation, importantly identified four causes:

> (1) the legacy Starwood system allowed for insecure remote access, meaning the network itself was not protected from simple attacks;

---

[13] Notably, the average data breach lasts only 266 days before identification and containment but the Data Breach at Starwood and then Marriott went undetected for a total of more than 1,500 days, including going undetected for 715 days and was not resolved for at least 733 days after Marriott took ownership and control of the legacy Starwood guest reservation database. *See* Rob Sobers, *Data Breach Response Times: Trends and Tips*, VARONIS (Mar. 13, 2019).

[14] The hackers also stole phone numbers, email addresses, Starwood Preferred Guest account information, date of birth, gender, arrival and departure information, reservation date, and communication preferences.

> (2) Marriott either lacked or had insufficient access/query and firewall logging, meaning there were insufficient, or a lack of, data logs on cybersecurity for Accenture or Marriott to monitor;
>
> (3) the legacy Starwood system lacked monitoring and logging of remote access, meaning that there was no one assigned to monitor who was accessing the systems; and
>
> (4) Marriott inadvertently stored payment account numbers on systems and in databases that were not designated for the storage of payment account numbers, which meant Marriott was leaving sensitive data for attackers to easily access.

41. Further, the PFI Report explained that Marriott unnecessarily stored large quantities of payment card information in violation of known data privacy standards under GDPR (and its precursor the EU-US Privacy Shield, effective from 2016 through 2018), and in contradiction of the guidance on data security provided by the FTC. Moreover, Marriott had ***visible*** payment card data on its system dating all the way back to 2002, indicating a systemic failure by the Company to delete payment card data when there is no longer a legal basis for processing such information in violation of the FTC's guidance on data security. If Marriott performed even the most cursory due diligence on Starwood's Systems—as it claimed in its public statements—Defendants would have discovered that these critical safety standards were violated.

42. Articles following the Data Breach also raised serious doubt about the cybersecurity due diligence that Marriott conducted on Starwood. On November 30, 2018, for example, a New York Times article noted that, according to privacy advocates, there "was no excuse for a breach to go unnoticed for four years." Gus Hosein, the executive director of Privacy International, was quoted stating that a company could claim to take security seriously, "but they don't if you can be hacked over a four-year period without noticing." Similarly, on December 4, 2018, Forbes published an article, questioning whether Marriott had put "customers

at risk because it assumed the cost of a breach would be less than the cost of better security?" Forbes questioned "why [the Company] only now detected a problem that evidently began four years ago." And the article quoted a technology privacy expert who explained that "many companies opt for inadequate data security because it's cheaper than the consequences of a data breach."

43. Cybersecurity experts were also surprised that Marriott did not identify the Data Breach during its due diligence. For example, Ollie Whitehouse, Global Chief Technology Officer at IT security company NCC Group, stated that: "Marriott Hotels should have identified this breach through their cyber due diligence of Starwood in 2016 when it acquired the company" and "[h]ad [Marriott] performed a detailed compromise assessment as part of its due diligence activity, the organization's board would have been informed of the breach and been able to make a decision based on risk or put other warranties in place."

44. On March 7, 2019, Defendant Sorenson testified before the Senate Permanent Subcommittee on Investigations. During that hearing, Senator Tom Carper noted that "Marriott acquired a company ***that it knew*** had serious cybersecurity challenges and had actually been attacked before" and that "[d]espite this, Marriott chose to initially leave Starwood's security system in place after acquiring the company." The committee was interested in "learn[ing] more about the priority that Marriott executives chose to place on addressing security flaws at Starwood as it worked to integrate its systems into its own."

45. As a result of the Company's actions, Marriott is being investigated by the Attorneys General of all fifty states and the District of Columbia, the FTC, and the SEC. Further, on July 9, 2019, the European Union's Information Commissioner's Office ("ICO"), an agency in the UK that regulates European data privacy laws, announced its intention to fine

Marriott more than **$120 million** for failure to comply with GDPR. The ICO damningly found after its investigation that ***"Marriott failed to undertake sufficient due diligence when it bought Starwood and should also have done more to secure its systems.***" This Court has also already made several important rulings and findings in parallel proceedings that apply to Lead Plaintiff's allegations here. For example, the Court already held in a decision on the defendants' motion to dismiss in the parallel Consumer Track, based on substantially the same facts, that plaintiffs there met the heightened pleading requirements of Rule 9(b) with regard to (1) "their allegations of reliance on material omissions by Defendants," and (2) their "extensive allegations that Marriott knew or should have known about its allegedly inadequate data security practices and the risk of a data breach." Consumer MtD Opinion at 60-61, 64. Consistent with this Court's prior rulings, and the ICO's findings, Lead Plaintiff and the class were harmed by Defendants' actions in this case.

## II. JURISDICTION AND VENUE

46. This complaint alleges claims which arise under: (1) Section 10(b) of the Securities Exchange Act (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5; and (2) Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

47. This Court has subject matter jurisdiction over this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331. During the Class Period, as defined below, Marriott was incorporated in the state of Delaware, listed its shares on the NASDAQ and Chicago Stock Exchange, and maintained its global headquarters in Bethesda, Maryland. During the Class Period: (1) Defendant Sorenson was, and continues to be, the Chief Executive Officer ("CEO") of Marriott; (2) Defendant Oberg was, and continues to be, the CFO of Marriott and was named a Manager of Starwood; (3) Defendant Bauduin was, and continues

to be, the Chief Accounting Officer ("CAO") of Marriott and was named a Vice President ("VP") and Manager of Starwood; (4) Defendant Hoffmeister was, and continues to be, Marriott's Chief Information Officer ("CIO"); (5) Defendant Bush was, and continues to be, a director on Marriott's Board and a member of the Audit Committee; (6) Defendant Henderson was, and continues to be, a director on Marriott's Board and Chair of the Audit Committee; (7) Defendant Lewis became a director on Marriott's Board and a member of the Audit Committee on September 23, 2016, and continues in both of those roles; (8) Defendant Kellner was, and continues to be, a director on Marriott's Board, and was a member of the Audit Committee from prior to the Class Period until September 23, 2016; and (9) Defendant Muñoz was, and continues to be, a director on Marriott's Board, and joined the Audit Committee on September 23, 2016 and continues in that role.

48. Venue is proper in this judicial district pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b). Marriott maintains its global headquarters in Bethesda, Maryland, which includes the Company's executive offices. During the Class Period, each of the Individual Defendants and the Audit Committee Defendants were a member of Marriott's senior management. In connection with the acts alleged in this Complaint, Defendants, directly, or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, interstate email communications, and the facilities of the NASDAQ and the Chicago Stock Exchange.

## III. PARTIES

### A. Lead Plaintiff

49. Lead Plaintiff Southern California Laborers is a multi-employer pension plan with more than 34,000 participants, and approximately $1.9 billion in assets, located in El Monte, California. As set forth in its Certification previously filed in this action, (ECF No. 210), which

is incorporated by reference herein, Lead Plaintiff acquired thousands of shares of Marriott's securities and incurred substantial losses as a result of Defendants' actions.

**B. Defendants**

50. During the Class Period, Defendant Marriott was a publicly traded company, listed on the NASDAQ and the Chicago Stock Exchange under the ticker MAR. It is incorporated in Delaware, with its headquarters in Bethesda, Maryland, and has offices in Gaithersburg, Maryland. Marriott is a worldwide operator, franchisor, and licensor of hotel, residential, and timeshare properties. As of the time it released its 2018 Annual Report, Marriott had over 2,000 properties with more than 550,000 rooms operating under thirty different brands. In Fiscal Year ("FY") 2018, the Company had annual revenues of more than $20.7 billion, as well as operating income of more than $2.3 billion. As a result of the Merger, Starwood became a wholly owned subsidiary of Marriott. Accordingly, on September 23, 2016, Marriott subsumed Starwood's assets, liabilities, and operations.

**1. The Individual Defendants**

51. Defendant Arne M. Sorenson ("Sorenson") is Marriott's CEO and President. Defendant Sorensen has been CEO since March 2012 and President since May 2009. Defendant Sorenson has been a member of Marriott's Board since 2011 and currently serves on the Board's Committee for Excellence[15] and the Executive Committee.[16] Prior to becoming CEO, Defendant Sorenson was Marriott's Chief Operating Officer ("COO") from May 2009 to March 2012 and was CFO from 1998 to May 2009. Defendant Sorenson started working at Marriott in 1996 and

---

[15] Marriott has tasked the Committee for Excellence with encouraging diversity in Marriott's hiring process, as well as in its customer, owner, and supplier base, and with encouraging and assisting the Company with communicating those efforts to the public.

[16] Marriott's Executive Committee is authorized to exercise the powers of Marriott's Board between regular meetings of the entire Board when Board action is necessary but convening a special Board meeting is not. The Executive Committee did not meet during the Class Period.

has served in a number of additional roles with the Company, including Senior Vice President of Business Development, working on M&A, and Principal Accounting Officer. Defendant Sorenson's relationship with Marriott goes back to at least 1992 when he worked with the Company during his time as an M&A attorney with Latham and Watkins. During the Class Period, Defendant Sorenson signed SEC filings and made public statements to the market about Marriott's operations and the Company's acquisition of Starwood.

52. Defendant Kathleen Kelly Oberg ("Oberg") is Marriott's CFO and an Executive VP. Defendant Oberg has been in these roles since January 2016. Prior to becoming CFO of Marriott, Defendant Oberg was CFO of the Ritz-Carlton Hotel Company LLC, a Marriott subsidiary. Defendant Oberg started working at Marriott in 1999 and has served in a number of roles with the Company, including Senior VP, Corporate and Development Finance and Senior VP of International Project Finance and Asset Management. Defendant Oberg has also been Manager of Starwood since September 2016, when Marriott acquired Starwood. During the Class Period, Defendant Oberg signed SEC filings and made public statements to the market about Marriott's operations and the Company's acquisition of Starwood.

53. Defendant Bao Giang Val Bauduin ("Bauduin") is Marriott's Global CAO and Controller. Defendant Bauduin has been in these roles since June 2014. Prior to becoming CAO of Marriott, Defendant Bauduin was a partner at Deloitte & Touche LLP. Defendant Bauduin has also been Vice President and Manager of Starwood since September 2016. As a part of his role as CAO, Defendant Bauduin is responsible for oversight of Financial Reporting and Analysis, Accounting Policy, Governance, Risk Management, Accenture Hospitality Services, and Corporate Finance Business Partners. During the Class Period, Defendant Bauduin signed

SEC filings on behalf of Marriott and made public statements to the market about Marriott's operations and the Company's acquisition of Starwood.

54. Defendant Bruce Hoffmeister ("Hoffmeister") is Marriott's CIO.[17] Defendant Hoffmeister has been in his current role with the Company since April 2011. Prior to assuming his current role, Defendant Hoffmeister was a Senior VP: IR Shared and Application Services and a Senior VP, Global Revenue Management, in addition to holding various other finance and accounting roles within the Development, Information Resources, and Lodging areas. In these roles, Defendant Hoffmeister directed Marriott's process for replacing and updating its Sales and Marketing, Event Management, and Revenue Management systems. During the Class Period, Defendant Hoffmeister made public statements to the market about Marriott's operations and the Company's acquisition of Starwood.

### 2. The Audit Committee Defendants[18]

55. Marriott's Board's Audit Committee (the "Audit Committee") met at least seventeen times throughout the Class Period.[19] At the start of the Class Period, the Audit Committee had three members: Defendants Bush, Henderson (also the Chair of the Audit Committee), and Kellner. On September 23, 2016, when the Merger closed, the Audit

---

[17] CIO is generally the most senior IT position within a company. The CIO is typically tasked with creating value for the business through the IT function, and ensuring that the company's IT systems and procedures are aligned with the company's business goals. A CIO's responsibilities also typically include the company's information risk management function, managing the IT department and its personnel, and establishing IT policies, strategies, and standards.

[18] The composition of the Audit Committee changed during Class Period. From the start of the Class Period until September 23, 2016, the defined term Audit Committee Defendants includes Defendants Bush, Henderson, and Kellner. From September 23, 2016 through the end of the Class Period, inclusive, the defined term Audit Committee Defendants refers to Defendants Bush, Henderson, Lewis, and Muñoz.

[19] According to Marriott's Annual Proxy Statements, the Audit Committee met seven times during the 2015 fiscal year, seven times during the 2016 fiscal year, ten times during the 2017 fiscal year, and eight times during the 2018 fiscal year. Marriott's fiscal year is the same as the calendar year.

Committee expanded to four members, including a former member of Starwood's Board of Directors. Defendants Bush and Henderson remained on the Audit Committee, with Henderson retaining his position as Chair, and were joined by Defendants Muñoz and Defendant Lewis—the former member of Starwood's board.

56. During 2015, 2016, and 2017, the Audit Committee's responsibilities included: (1) overseeing the Company's accounting, reporting, and financial practices, including the integrity of the financial statements; (2) overseeing the Company's internal control environment and compliance with legal and regulatory requirements; (3) appointing, retaining, overseeing, and determining the compensation for and terms of the agreement with the Company's independent auditor; and (4) overseeing the Company's internal audit function and the internal auditor. At the start of 2018, in addition to the responsibilities just listed, the Audit Committee was also tasked with "[a]ssisting the Board in overseeing and monitoring the Company's information security and data privacy practices." According to Marriott's Annual Proxies in each of 2015, 2016, 2017, and 2018: "There is unrestricted access between the Audit Committee and the independent auditor and internal auditors." In the Audit Committee Charter during the relevant period, the Audit Committee was required to "periodically review and discuss the Company's business and financial risk management and risk assessment policies and procedures with senior management, the Independent Auditor, and the Chief Audit Executive."

57. The Audit Committee Defendants signed the Company's Form 10-Ks during the Class Period. Additionally, Defendants Bush, Henderson, Kellner, and Muñoz signed the Company's Recommendation Statement for the Merger.

58. Defendant Mary K. Bush ("Bush") is a Director on Marriott's Board, as well as a member of the Board's Audit Committee and a member of the Board's Compensation Policy

Committee. Defendant Bush has been on Marriott's Board since 2008, and was a member of the Audit Committee and Compensation Policy Committee throughout the Class Period. According to Marriott, Defendant Bush has "extensive financial, international and U.S. government experience, her knowledge of corporate governance and financial oversight gained from her membership on the boards of other public companies, knowledge of public policy matters and capital markets and her significant experience in international arenas." During the Class Period, Defendant Bush made public statements to the market about Marriott's operations and the Company's acquisition of Starwood.

59. Defendant Frederick A. Henderson ("Henderson") is a Director on Marriott's Board, as well as the Chair of the Board's Audit Committee and the Nominating and Corporate Governance Committee. Defendant Henderson has been on Marriott's Board since 2013, the Chair of the Audit Committee since May 2014 and throughout the Class Period, and began serving on the Nominating and Corporate Governance Committee in 2018. According to Marriott, Defendant Henderson has "significant accounting skills, experience in leading the initial public offering of a subsidiary of a public company, and expertise in large organization management and emerging markets." During the Class Period, Defendant Henderson made public statements to the market about Marriott's operations and the Company's acquisition of Starwood.

60. Defendant Aylwin B. Lewis ("Lewis") is a Director on Marriott's Board, as well as a member of the Board's Audit Committee and the Compensation Policy Committee. Defendant Lewis has been on Marriott's Board since September 2016, having previously been on Starwood's Board of Directors since 2013, and became a member of the Audit Committee in September 2016, and remained on the Audit Committee through the end of the Class Period.

According to Marriott, Defendant Lewis has "significant expertise in corporate branding, franchising and management of complex global businesses." During the Class Period, Defendant Lewis made public statements to the market about Marriott's operations and the Company's acquisition of Starwood.

61. Defendant Lawrence W. Kellner ("Kellner") is the Lead Director on Marriott's Board, and a member of the Board's Executive Committee and Nominating and Corporate Governance Committee. Defendant Kellner was also a member of the Board's Audit Committee from the beginning of the Class Period until September 2016, and a member of the Board's Finance Committee in 2015, 2016, and 2017. Defendant Kellner has been on Marriott's Board since 2002. According to Marriott, Defendant Kellner has experience "with significant management, strategic and operational responsibilities in the travel and leisure industry," as well as "extensive knowledge in the fields of finance and accounting." During the Class Period, Defendant Kellner made public statements to the market about Marriott's operations and the Company's acquisition of Starwood.

62. Defendant George Muñoz ("Muñoz") is a Director on Marriott's Board, as well as a member of the Board's Audit Committee and the Committee for Excellence. Defendant Muñoz was also on the Board's Finance Committee in 2015. Defendant Muñoz has been on Marriott's Board since 2002, became a member of the Audit Committee in September 2016 and remained on the Audit Committee and the Committee for Excellence throughout the Class Period. According to Marriott, Defendant Muñoz has "extensive knowledge in the fields of finance and accounting, [] knowledge of international markets, legal experience, corporate governance experience and audit oversight experience gained from his membership on the boards and audit committees of other public companies." Defendant Muñoz made public

statements to the market about Marriott's operations and the Company's acquisition of Starwood.

## IV. CONFIDENTIAL WITNESSES

63. The Amended Complaint relies upon numerous former employees and consultants of Starwood and Marriott in support of Lead Plaintiff's allegations. These CWs are described in detail below and their allegations appear throughout the Complaint.

64. Confidential Witness 1 ("CW 1") was employed by Marriott from May 2005 to March 2018. He[20] was a Software Developer and Technical Lead at Marriott's Gaithersburg, Maryland office. CW 1 reported to End User Computing & Collaboration Technical Architect Tom Simmons, who first reported to Senior Director-Systems Engineering Randy Hughes, and then to Senior Director – Workplace Engineering Darren McMahon and Senior Director-IT Workplace & End User Technology Service Delivery Brian Dishong. Through this role in Marriott's IT department, CW 1 was primarily responsible for designing, implementing, and supporting applications and solutions for Marriott's Microsoft-based systems. CW 1 was directly involved with Marriott's due diligence investigation of Starwood prior to and during the merger process, as well as the integration of the two companies' systems.

65. Confidential Witness 2 ("CW 2") was employed by Starwood from September 2014 to December 2015. He was a Senior Global Cyber-Security Consultant at Starwood's Stamford, CT location. CW 2 reported to Director of Project Management Office, Brian McCaffrey. CW 2 was hired by Starwood to study the security of Starwood applications and provide recommendations for the rollout of a Digital Identity Access Management (IAM) system to protect Starwood's various Applications and Databases worldwide.

[20] All CWs will be described and referred to in the masculine to protect their identities.

66. Confidential Witness 3 ("CW 3") was employed by Starwood from August 2013 to September 2016. He was a Threat and Incident Manager at Starwood's Tustin, California office. CW 3 reported to Associate Director of Threat Data Analytics Penny Hogue, who reported to Shamla Naidoo, the former Chief Information Security Officer ("CISO") at Starwood. Through this role in Starwood's IT department, CW 3 was primarily responsible for investigating threats and breaches to Starwood's computer systems.

67. Confidential Witness 4 ("CW 4") was employed by Marriott from September 2008 to May 2018. He held various positions, including Technical Consultant, Performance Engineer, and Performance Architect. During his first few years with Marriott, CW 4 was located at the RIO Washingtonian Center Facility in Gaithersburg, Maryland and later moved to Marriott's corporate offices in Bethesda, Maryland. CW 4 reported to Director of System Performance Sanjay Srinivasan, who now reports to VP, Enterprise Solutions Mark Stocksdale. Through his role in Marriott's IT department as a Performance Architect, CW 4 was primarily responsible for reviewing software designs and updates and designing solutions to aid in the implementation of those new designs and updates, and much of his responsibilities included maintaining Marriott's IT systems capacity and chasing IT problems.

68. Confidential Witness 5 ("CW 5") was employed by Marriott from the start of the Class Period through early 2017. He was a part of senior leadership at Marriott and a Senior Director at Marriott's corporate headquarters in Bethesda, Maryland. CW 5 ultimately reported to Defendant Hoffmeister. Through his role in Marriott's IT department, CW 5 was primarily responsible for defining Marriott's enterprise IT strategies and multi-year implementation road maps for various core and critical systems.

69. Confidential Witness 6 ("CW 6") was employed by Marriott from February 2014 to March 2018. He was a Director, Network Services at the Company's Gaithersburg, Maryland location. CW 6 reported first to Vice President, Network Engineering and then to Vice President of Infrastructure Technology. Through his role in Marriott's IT Department, CW 6 was primarily responsible for working on integrating Marriott's and Starwood's IT systems both during and after the Merger.

70. Confidential Witness 7 ("CW 7") was employed by Marriott throughout the Class Period. His most recent title, starting in 2016, was Director of Engineering/IT at one of Marriott's overseas locations. CW 7 reported directly to the General Manager of that location, and also reported on a dotted line to IT VP of that Region, who in turn reported to CIO—Americas Page Petry, who in turn reported to Defendant Hoffmeister. Through his role in Marriott's IT department, CW 7's responsibilities included ensuring that the IT systems at his location met Marriott's standards, that the computers at those locations were in good working order, and ensuring IT network security.

## V. CONTROL PERSON ALLEGATIONS

71. The Individual Defendants, by virtue of their senior positions at Marriott, directly participated in the management of the Company, and were directly involved in day-to-day operations of the Company at the highest levels. The Audit Committee Defendants by virtue of their roles on Marriott's Board and the Audit Committee were directly involved in the filing of the Recommendation Statement for the Merger and the filing of the Company's Form 10-Ks during the Class Period. The Individual Defendants and the Audit Committee Defendants were privy to confidential, proprietary information concerning the Company and its business, operations, internal controls, growth, IT operations, budget, and procedures, the Merger, merger and acquisition policies and procedures, financial statements, and financial condition, as alleged

herein. As set forth below, the distribution of misleading information and the failure to convey material information to the public was the result of their collective actions and inactions.

72. Defendant Sorenson signed all of Marriott's Form 10-Ks during the Class Period, as well as the relevant Merger-related documents. Additionally, Defendant Sorenson made public statements about the Merger and Marriott's operations during the Class Period as a regular participant in Marriott's conference calls, as well as other interviews and public appearances. As President and CEO, Defendant Sorenson had control over the day-to-day operations of the Company. Defendant Sorenson is also a member of the Board and two Board committees, the Committee for Excellence and Executive Committee. Marriott listed Defendant Sorenson as one of its Executive Officers in the Company's 2018 Form 10-K. As alleged herein, Defendant Sorenson made false and misleading statements to investors during the Class Period.

73. Defendant Oberg signed all of Marriott's Form 10-Ks during the Class Period. Additionally, Defendant Oberg made public statements about the Merger and Marriott's operations during the Class Period as a regular participant on Marriott's conference calls. In her role as Executive VP and CFO, Defendant Oberg had control over the Company during the Class Period and had heightened control of the Company's statements to the market. Marriott listed Defendant Oberg as one of its Executive Officers in the Company's 2018 Form 10-K. As alleged herein, Defendant Oberg made false and misleading statements to investors during the Class Period.

74. Defendant Bauduin signed all of the Company's Form 10-Qs, Form 8-Ks, and Form 10-Ks during the Class Period. In his role as Controller and CAO, Defendant Bauduin had control over the Company during the Class Period and had heightened control over the content of Marriott's SEC filings. Marriott listed Defendant Bauduin as one of its Executive Officers in the

Company's 2018 Form 10-K. As alleged herein, Defendant Bauduin made false and misleading statements to investors during the Class Period.

75. Defendant Hoffmeister made public statements about Marriott's review of Starwood's IT systems and the post-Merger Integration. In his role as CIO, Defendant Hoffmeister had control over Marriott's IT budget and oversaw the IT department. Additionally, Defendant Hoffmeister oversaw many of the executives that handled the day-to-day operation of Marriott's IT department. Defendant Hoffmeister had control over the Company during the Class Period.

76. The Audit Committee Defendants signed the Registration Statement for the Merger, as well as the Company's Form 10-Ks during the Class Period. As signatories of those documents, and in their roles as Directors[21] and members of the Audit Committee, the Audit Committee Defendants had control over Marriott's statements to the market during the Class Period regarding the Merger, Marriott's due diligence, and the Integration.

77. The Individual Defendants and the Audit Committee Defendants were aware, or were at least severely reckless in not being aware, of the deficiencies in the Company's Merger due diligence related to the security of the legacy Starwood guest reservation database, the deficiencies in Marriott's operation of the legacy Starwood guest reservation database, and the deficiencies in the plan to move and/or merge the data from the legacy Starwood guest reservation database into Marriott's. Through their roles as Executive Officers, and Directors with the Company, and as members of the Audit Committee, the Individual Defendants and the Audit Committee Defendants had ample insight into, and substantial control over Marriott's

---

[21] As noted above in ¶ 61, Defendant Kellner was the Lead Director on the Board throughout the Class Period.

policies and operations, including the Company's Merger due diligence and its core operations, such as the reservation system and the legacy Starwood guest reservation database.

## VI. SUBSTANTIVE ALLEGATIONS

### A. Nature of Marriott's Business

78. Marriott is the largest hotel company in the world. Marriott currently operates its hotels and other lodging business under 30 different brands in more than 130 countries and territories worldwide. Marriott's operations are massive. It has over 2,000 properties containing more than 566,000 rooms. It also has over 4,700 franchised and licensed properties with more than 729,000 rooms. The Company has approximately a 15% share of the domestic hotel market. As part of its "asset-light" business strategy, Marriott today earns the bulk of its revenue from franchise and management fees rather than from properties the Company actually owns.

79. The hotel and lodging industry is enormous. In 2017, the U.S. hotel industry alone generated more than $208 billion in revenue. In that year, the ten largest hotel chains accounted for more than $53 billion in revenue with Marriott responsible for more than $22 billion (over 41%) of that revenue. The hotel and lodging industry is also extremely competitive. Marriott vies for guests with traditional hotel chains like Hilton, Intercontinental Hotels Group, Hyatt, and Wyndham. Additionally, companies like Airbnb and VRBO—which allow people to rent out their properties or spare rooms to guests via an online portal—compete with the hotel chains and have caused significant disruptions in the traditional hotel industry.

#### 1. The Importance of Customer Data to Marriott

80. Though Marriott is primarily a hotel operator, the Company is also in the data business. Marriott collects volumes of personal data from its hundreds of millions of customers through its reservation system, loyalty programs, and directly from customers at POS locations in hotels, like gift shops. Marriott uses this customer data to engage in extensive marketing and

advertising including direct marketing to its existing customer base. In order to effectively market its rooms and services, Marriott needs to gain access to information – like personal email addresses, and detailed demographic data. The more personal data Marriott is able to collect, the wider it can accurately cast its net for marketing purposes, and the more revenue it can generate.

81. As a part of obtaining and retaining customer data, Marriott has a loyalty program, which subsumed Starwood's loyalty program at the closing of the Merger, which customers sign up for by providing their personal information as well as their credit card information. Hotel loyalty programs allow hotel companies to obtain and store customers' personal data and payment information to facilitate easy and quick transactions. Customers can also earn points that they can redeem for free or discounted stays at hotel properties, or other rewards. Loyalty programs thus encourage repeat business.

82. Additionally, Marriott stores personal data on every single guest who made a reservation or stayed at one of their hotels, including its Starwood properties—regardless of whether they signed up to be a member of a loyalty program—including their names, addresses, the properties where they have stayed, the amount of money they spent at the property, and more. Marriott also pays a customer analytics company to analyze this data.

83. Marriott then uses this information to continue to engage the customer with the brand and obtain important information about the properties themselves. Customers' personal data was also used to enhance a customer's stay. If a customer had a preference for a type of room, for example, Marriott already knew this. Customers' personal data is also used to engage with Marriott's affiliated companies, like airlines and rental car agencies, assist with revenue forecasting, and to determine whether to undertake renovations and make capital expenditures on

certain properties. For example, after a customer stayed at a property, Marriott might send an email asking for feedback about the experience.

84. Because this customer information was used to market to customers, engage with affiliates, and provide intelligence on its properties, it was extremely valuable to Marriott. But it was also valuable because this information was personal information, and could be used for nefarious purposes if it was not kept secure. Thus, the customer reservation data which contained this information should have been stored on a secure reservation database.

85. Marriott has itself acknowledged the importance of its customer data, stating that Marriott "leverage[s] the data" it collects, and that "data is a tremendous asset for us." As part of processing the data, Marriott has a "dedicated team of marketers review social data conversations in real-time" to identify opportunities for the Company.

86. Defendant Hoffmeister detailed the importance of its customer data during an interview with Forbes in July 2014, explaining:

> There's so much information and data that's available. We need to work very closely with our Marketing department and say, "Help us understand what the most effective data is, and we will help you structure the systems so that we have that data available and feed it up to the right people at the right time. We need to work with you [the Marketing department] to tell us what data should we be collecting; how we should be looking at it and how are we going to use that data to really impact our guests?"

87. During this same interview, Defendant Hoffmeister also described his "responsibility . . . to make sure our systems are efficient and they're up and running, and we keep our information and our data secure."

88. Marriott's then-Global Chief Commercial Officer Stephanie C. Linnartz ("Linnartz")[22] also highlighted the importance of customer data during a video published by Oracle Hospitality on January 27, 2016, in which Ms. Linnartz stated:

> We've collected a lot of data and insights on our customers, and we're using this data for their benefit. So it's not about pushing what we want them to know, but it's really rather giving them what they're looking for.

89. The Company has also acknowledged the value of its data to investors. For example, on a March 21, 2017, conference call for Marriott's 2017 Security Analyst Meeting, Ms. Linnartz discussed how guest data allowed Marriott to conduct direct marketing and attract customers to join its loyalty program. Ms. Linnartz highlighted the extent of the Company's direct marketing efforts, and also discussed the importance of technology to Marriott's operations, stating: "data shows that at many of our brands, the mobile experience drives a nearly 4 points premium in our guest satisfaction surveys." Ms. Linnartz continued that Marriott believed "members are willing to share a lot of information with us, a lot of data about themselves but they expect us to do something with it, right, to enhance their guest experience." As part of that same discussion, a Marriott Senior Vice President, David Flueck, described customer data as "***a tremendous asset for us***," which allows the Company "to personalize [its] member experiences."

90. Marriott also uses customer data to enhance the Company's bottom line. In addition to traditional marketing, Defendant Sorenson has even suggested previously that

---

[22] Ms. Linnartz was Marriott's Chief Commercial Officer ("CCO") and Executive VP. Ms. Linnartz was in that role with the Company since March 2013 through the end of the Class Period, and also serves on the Board's Committee for Excellence. In that role, Ms. Linnartz had a range of responsibilities, including sales, marketing, revenue management, consumer insights and innovation, overseeing the operation of the Company's websites, and providing strategic leadership for Marriott's IT worldwide.

Marriott would use guest data to charge higher prices to certain guests if the individual data Marriott collected suggested the Company could get away with it.

91. Analysts also underscored the importance of customer data to Marriott and its investors. For example, analysts at Credit Suisse, in a June 17, 2015 report, pointed to Marriott's "50m member rewards database," which "allows [Marriott] to ***target*** new audiences, getting them in the system as their lifestyle/travel needs change." In a June 25, 2015 report, analysts at Brean Capital discussed Marriott's "valuable reservations and marketing platform, including the Marriott Rewards loyalty program."

### 2. The Data That Marriott Collects

92. According to Marriott's Online Privacy Statement posted to its website during the Class Period, and the privacy statement that was posted to Marriott's now-defunct starwoodhotels.com and spg.com domains, Marriott collected and continues to collect a myriad of personal data[23] from its guests, including:

- Name
- Gender
- Postal address
- Telephone number
- Email Address
- Credit and debit card number or other payment data
- Financial information in limited circumstances
- Language preference
- Date and place of birth

[23] Marriott defines "personal data" as data that identifies a person as an individual or relates to an identifiable individual.

- Nationality, passport, visa or other government-issued identification data
- Important dates, such as birthdays, anniversaries and special occasions
- Membership or loyalty program data (including co-branded payment cards, travel partner program affiliations)
- Employer details
- Travel itinerary, tour group or activity data
- Prior guest stays or interactions, goods and services purchased, special service and amenity requests
- Geolocation information
- Social media account ID, profile photo and other data publicly available, or data made available by linking your social media and loyalty accounts
- Data about family members and companions, such as names and ages of children
- Biometric data
- Images and video and audio data
- Room Preferences
- Names and ages of children

93. Marriott collects this data through a variety of means, including:

- Online Services – when guests: (1) make a reservation; (2) purchase goods and services from the Company's websites and apps; (3) communicate or otherwise connect or interact with the Company through social media; (4) sign up for a newsletter; or (5) participate in a survey, contest, or promotional offer;
- Property Visits and Offline Interactions – when guests: (1) visit the Company's properties; (2) frequent the Company's restaurants, concierge services, health clubs, child care services, and spas; or (3) attend promotional events that the Company hosts or in which it otherwise participates;

- Customer Care Centers - when guests: (1) make a reservation over the phone; (2) communicate with the Company via email, fax, or online chat; or (3) contact customer service;

- Owners and Franchisees – owners of Marriott branded properties, that are managed and franchised by the Company, provide the Company with personal data from their guests;

- Strategic Business Partners – third parties that have partnerships with Marriott provide the Company with personal data from their customers to use for direct marketing;

- Other Sources – such as: (1) public databases; (2) joint marketing partners; and (3) other third parties;

- Internet-Connected Devices – e.g., a smart home assistant may monitor your activity during your stay; and

- Physical and Mobile Location-Based Services – when guests download the Company's app, Marriott "may collect the precise physical location of [the] device by using satellite, cell phone tower, WiFi signals, or other technologies" when guests are in or near the Company's properties.

94. Marriott also collects data from the Department of Commerce, third party booking companies like TripAdvisor, and credit card companies.

95. Once Marriott has collected this personal and other data from the Company's guests, Marriott utilizes that data for a variety of business purposes, including:

- facilitating reservations and payments, completing reservations, and processing payments;

- sending reservation confirmations or other pre-arrival messages;

- accommodating personal preferences;

- providing guests with information about the location they are visiting and the surrounding area;

- direct marketing, such as personalized service recommendations and other promotions;

- managing the Company's loyalty program; and

- data analysis, audits, [purported] security and fraud monitoring and prevention, developing new goods and services, improving or modifying current services, identifying usage trends, and determining the effectiveness of marketing campaigns and expansion of business activities.

96. In addition to using guests' personal and data for its own purposes, Marriott also discloses that personal information to a number of third parties.[24] Along with a catch-all disclosure stating that Marriott may use guests' other data "for any purpose, except where [Marriott] is not allowed under applicable law," the Company discloses guests' personal data to a number of third parties, including:

- third party advertisers;
- subsidiaries of the Company;
- the Company's owners and franchisees;
- authorized licensees;
- strategic business partners;
- service providers, *e.g.*, website hosting, data analysis, payment processing, information technology and related infrastructure provision, marketing, and others; and
- "linked accounts," *i.e.*, accounts that allow guests to login using their Marriott rewards number or Marriott online services login and social media accounts connected to Marriott's online services account.

[24] The data broker industry is worth approximately $200 billion. David Lazarus, "Shadowy data brokers make the most of their invisibility cloak," LOS ANGELES TIMES (Nov. 5, 2019) https://www.latimes.com/business/story/2019-11-05/column-data-brokers; see also Kari Paul, "Americans' data is worth billions—and you soon might be able to get a cut of it," MarketWatch (Oct. 9, 2018) https://www.marketwatch.com/story/americans-data-is-worth-billions-and-you-soon-might-be-able-to-get-a-cut-of-it-2018-10-09. If Marriott was selling consumer data to third party advertisers, the Company likely made a substantial amount of money.

### 3. Marriott Understood the Importance of Keeping this Valuable Data Secure

97. Marriott understood how important it was to protect its guests' data, which senior executives referred to as "a **tremendous asset** for us," and that protecting this asset was a critical function of the Company. In each of the Company's Form 10-Ks for years ending 2015, 2016, 2017, and 2018, Marriott stated that "***the integrity and protection of customer . . . data is critical to us*** as we use such data for business decisions and to maintain operational efficiency."

98. In each of the Company's Form 10-Ks for years ending 2015, 2016, 2017, and 2018, Marriott also stated that it used "sophisticated technology and systems in [the Company's] reservation, revenue management, and property management systems," and that "[k]eeping pace with developments in technology is important for [Marriott's] competitive position."

99. Additionally, through the website it acquired and owns as part of the Merger—at starwoodhotels.com—Marriott made statements to the public regarding the Company's data retention and protection policies.[25] Marriott stated that the Company retained customers' sensitive personal information only long enough to serve the purpose it was collected for, and that it did not "give physical possession of [customers'] personal data to unaffiliated third parties outside the Starwood system." Further, Marriott assured the public on this website that the Company "***recognizes the importance of information security***, and is constantly reviewing and enhancing our technical, physical, and logical security rules and procedures."

[25] The legacy Starwood guest reservation database contained detailed personal information from guests that made reservations at Starwood properties online, over the phone, and through third-party travel sites such as Expedia or Travelocity, as well as information collected at Starwood properties. *Bank of Louisiana v. Marriott Int'l, Inc.*, No. 18-cv-3833, 19-md-2879 ECF Nos. 306, 328, & 603-1 (D. Md.) (Bank of Louisiana's First Amended Complaint) (cited as Financial Institution Complaint at ¶__) at ¶ 31. From that database, Starwood's applications were able to retrieve personal guest information, cardholder data, and reservation details and transmit that information to individual properties for processing. *Id.*

100. Marriott is also an active member of Hospitality Technology Next Generation ("HTNG"), which is a global nonprofit organization that fosters relationships between technology and hospitality companies that is "run by and for the benefit of hospitality IT executives."[26] Going back to at least 2012, HTNG has provided technical specifications for the industry, including numerous whitepapers specific to central reservations systems. As a part of its mission, HTNG hosts the Travel Information Sharing and Analysis Center ("Travel ISAC"), formerly known as the Chief Information Security Officer Forum, which has been described as the "global travel industry's new platform for security messaging, collaboration, and partnerships."

101. According to the CIO of HTNG Patrick Dunphy, the Travel ISAC is designed to help protect guests, staff, and corporate assets by facilitating confidential communication about security threats between high level IT executives. HTNG stated the Travel ISAC fulfills its mission by: (1) sharing relevant and critical information regarding information security issues in a confidential manner; (2) coordinating responses to threats "to achieve best-in-class capabilities"; (3) developing best practices specific to the hospitality industry; and (4) engaging government agencies, including law enforcement. As an active member of HTNG during the Class Period and a participant in the organization's forum, Marriott was keenly aware of the numerous cybersecurity threats facing the industry (described in Section (VI)(C)(6)(b)), as well as its reservation database and IT systems generally.

102. Additionally, on August 2, 2016, the NYSE Governance Services ("NYSE Governance") published an article titled *Cybersecurity and the M&A Due Diligence Process,*

[26] Marriott's Chief IT Officer, Americas, Page Petry is the Vice President of HTNG's Board of Governors.

which highlighted the importance of data security in context of a merger or acquisition.[27] There, NYSE Governance noted that **"[b]uying a company translates to buying data,"** and that the "economic impact of a transaction can shift dramatically if, after the deal is consummated, past or ongoing data breaches are coming to light." Further, they explained that most corporate officers at that time understood the impact of an acquisition target's cybersecurity vulnerabilities on the resulting entity's "brand and reputation," and that "the highly publicized consequences of recent breaches on affected companies have served to boost that awareness." NYSE Governance specifically noted PCI DSS as a set of existing regulations that should be used for security audits during due diligence. They also pointed out that "software assets are a critical part of what is being acquired" in mergers. NYSE Governance also stated that "the only way for the board to uncover latent risks and mitigate future hits to the company's reputation is to conduct a comprehensive audit of the target's cybersecurity protocols."

#### 4. Rules and Regulations that Required Marriott to Keep Data Secure

103. As discussed in further detail below in Section (VI)(H), Marriott was (and still is) also subject to rules and regulations that govern the maintenance, use, and security of personal and financial information.

104. As a credit card payment merchant and processor, Marriott was subject to PCI DSS, which is an Information Security standard for organizations that handle branded credit cards from the major credit card companies. The standard was created to increase controls around cardholder data to reduce credit card fraud. PCI DSS is a proscriptive standard that sets requirements for the manner in which companies protect, store, and transmit data. For example,

---

[27] *Cybersecurity and the M&A Due Diligence Process*, NYSE GOVERNANCE SERVICES (Aug. 2, 2016), https://www.nyse.com/publicdocs/Cybersecurity_and_the_M_and_A_Due_Diligence_Process.pdf.

companies are required to build firewalls to restrict connections between untrusted networks and the company's systems. Notably, companies are also required to prevent "unauthorized outbound traffic from the cardholder data environment to the Internet." These standards and requirements put the onus on companies to design effective data security procedures. Marriott has been subject to these requirements since 2004.

105. Marriott was also required to comply with the FTC Act. The FTC Act, which prohibits unfair or deceptive practices affecting commerce, applies to a company's data security practices. The FTC has also provided guidance in various forms for companies--essentially providing instructions on how to comply with Section 5 of the FTC Act. For example, the computer systems of Wyndham Hotels Group, LLC ("Wyndham Hotels") were breached on three separate occasions in 2008 and 2009. Following those breaches, the FTC initiated an enforcement action on June 26, 2012, for violations of the FTC Act including unfair and deceptive practices concerning Wyndham Hotels' data security practices. In its settlement with Wyndham Hotels, announced on December 9, 2015, the FTC provided guidance on conducting risk assessments and monitoring internal safeguards and controls—in essence providing a road map for hotel chains to assess their own cybersecurity measures. Additionally, the FTC has released a memo endorsing the National Institute of Standards and Technology ("NIST") Cybersecurity Framework ("NIST-CSF") because the FTC said the NIST-CSF is aligned with the FTC's own standards in enforcing the FTC Act. NIST-CSF guidance provides the set of standards for recommended security controls for information systems at federal agencies. However, it is also used worldwide at major companies as a standard for protecting valuable information.

106. Marriott was also required to comply with GDPR, the European regulation that provides data protection and privacy for all individuals within the European Union ("EU") and the European Economic Area. GDPR was approved by the European Parliament in April 2016 and became effective on May 25, 2018. GDPR regulates the storage, transmission, and processing of personal information of EU residents. Marriott is subject to the GDPR because it collects data from EU residents. For the purposes of GDPR, Marriott is considered to be both a data processor and a data controller. Violations of GDPR can subject a company to a fine of up to 4% of its annual global revenue.

107. Marriott also claimed that it complied with the Safe Harbor Privacy Principles. The Safe Harbor Privacy Principles were designed to assist companies in complying with EU privacy regulations that preceded GDPR. Marriott stated that it complied with principles that required companies to, among other things: (1) transfer data only to authorized parties; (2) take reasonable measures and precautions to secure customer data; and (3) take reasonable steps to keep data current. Additionally, Marriott has certified compliance with the EU-U.S. Privacy Shield Framework, which became effective on July 12, 2016, and the Swiss-U.S. Privacy Shield Framework which became effective on January 12, 2017. Those frameworks require companies to take reasonable and appropriate measures to protect personal data and require companies to retain personal information for no longer than is necessary.

108. Marriott also represented that it was in compliance with the COSO Framework. The COSO Framework was designed to help businesses establish, assess and enhance their internal controls. COSO requires companies to design controls that adequately protect customer data. COSO was designed to be broader than helping to certify the reliability of financial

reporting. COSO is also designed to ensure the effectiveness and efficiency or operations, and compliance with applicable laws and regulations.

109. As discussed in further detail below in Sections (VI)(G)-(H), Marriott failed to comply with numerous PCI DSS requirements, NIST-CSF and NIST guidance, GDPR requirements (and previous Safe Harbor Privacy Principles and the two privacy shield frameworks noted above), and the COSO Framework when it failed to safeguard customer data on its IT systems.

## B. Marriott Seeks to Maximize Value by Merging with Hotel Giant Starwood

110. The subject of this Complaint is the Data Breach that Marriott was severely reckless in failing to detect (or knowingly disregarded) that existed on Starwood's obviously deficient IT systems at the time Marriott acquired Starwood through the Merger. However, in order to understand the magnitude of the massive Merger, and to provide context for Marriott's fraudulent conduct and statements related thereto, a brief description of Marriott's prior small-scale merger and acquisition activity, prior to acquiring Starwood, is provided.

### 1. Marriott's M&A Activity Prior to Acquiring Starwood

111. Between 2012-2015, Marriott purchased several smaller hotel chains in transactions known as "tuck-in acquisitions." In these transactions, Marriott folded smaller companies into its operations to enhance the Company's business in a particular geographic area or with a certain type of clientele. Thus, over the three years preceding the Starwood acquisition, Marriott purportedly gained experience integrating operations of much smaller businesses.

112. For example, on May 31, 2012, Marriott announced that the Company signed an agreement to acquire Gaylord Entertainment Company ("Gaylord") for approximately $210 million. Gaylord was an American company that had 4 hotels with approximately 7,800 rooms spread across the Southeast. The acquisition allowed Marriott to have a greater presence in the

major-event market and increased Marriott's total hotel count by a mere 0.1% and the Company's total room count by just over 1%.

113. On January 22, 2014, Marriott announced that the Company signed an agreement to acquire Protea Hospitality Holdings ("Protea") for approximately $186 million. Protea was a South African company that had 116 hotels with approximately 10,000 rooms in seven different African countries. The acquisition roughly doubled Marriott's relatively small presence in the Middle East and Africa region but only increased Marriott's total hotel count by approximately 3% and the Company's total room count by approximately 1.5%. Under the terms of the agreement, Marriott would manage approximately half of Protea's legacy properties and franchise and lease the remaining half.

114. On January 27, 2015, Marriott announced that the Company signed an agreement to acquire Delta Hotels Limited Partnership ("Delta") for approximately $135 million. Delta was a British Columbian company that had 38 hotels with approximately 10,000 rooms in Canada. The acquisition made Marriott the largest full-service hotel company in Canada. However, the acquisition increased Marriott's total hotel count by less than 1% and its total room count by only approximately 1.4%. Under the terms of the agreement, Marriott only acquired Delta's management and franchise businesses, as well as Delta's brand and intellectual property rather than Marriott taking ownership of any properties.

115. In these three acquisition, Marriot spent just over $420 million and increased the number of hotels under its control by fewer than 160 hotels, about 30,000 rooms, and, perhaps most importantly, without taking ownership of a single property.

116. Analysts viewed these tuck-in acquisitions favorably and as an indication that Marriott was capable of successfully executing other acquisitions and integrating new brands.

For example, in a May 4, 2015 report, analysts at RBC Capital Markets noted that, as a result of the Protea and Delta acquisitions, "Marriott ha[d] experience integrating brands." Also, on November 16, 2015, the day the Merger with Starwood was announced, UBS noted that Marriott was using the tuck-in acquisitions discussed above as a sort of benchmark by which to measure the Starwood acquisition. Additionally, an analyst report published by JP Morgan noted that Marriott cited to its recent acquisitions, "(Protea, Gaylord, etc)" as "good practice" for Marriott to complete the Starwood acquisition without harming the Company's business. However, these "tuck-in acquisitions" did nothing to prepare Marriott to nearly double its size (and its debt).

**C. The Massive Starwood Acquisition**

117. In response to shifting competitive forces in 2015, Marriott pursued the Starwood acquisition to (1) consolidate power in the hotel industry; and (2) pursue growth by attracting younger and wealthier clientele, as well as business travelers. Marriott aimed to acquire these customers and leverage Starwood's valuable customer data.

118. Marriott's share price was slumping throughout 2015, along with most of its competitors. From the end of Q1 2015 to the end of Q4 2015, Marriott's share price fell by approximately 16.5%, while Hyatt's fell by more than 20%. Hilton's share price suffered even worse, dropping nearly 28%. Two main factors contributed to this downward trend in the hotel industry. First, travel companies operating online such as Airbnb or VRBO were allowing consumers to book their own property reservations directly with other individuals or property managers, at houses, condominiums or other non-traditional hotel-like properties, oftentimes at a lower rate than traditional hotels.[28] Second, online travel agencies, or OTAs, make agreements

---

[28] Additionally, property owners that utilize sites like Airbnb are not subject to the same lodging laws as traditional hotels like Marriott, leaving them free to get creative in offering unique experiences to attract guests to their homes and apartments.

with traditional hotel companies to offer their rooms on those booking sites—for a fee. Marriott competed with these sites for direct bookings *and* negotiated with them so at least some of the Company's rooms would be available on the OTAs. These forces put downward pressure on traditional hotel companies like Marriott.

119. Analysts were focused on the negative impact that these disruptive companies were having (and would continue to have) on the hotel industry, including Marriott. For example, analysts at Barclays, in an August 12, 2015 report, characterized Airbnb as a "long-term threat" to hotel company revenues. Specifically, Barclays explained that because it was estimating moderate economic growth for 2016, price sensitive customers would likely turn to Airbnb: "When faced with price increases, some portion of customers may choose to not take trips or seek out alternative accommodations, including Airbnb." Barclays also explained in this same report that "the growth of Airbnb potentially lessens the ability of hotels to raise prices during certain 'compression' periods as some customers may use Airbnb instead of paying higher hotel rates." Likewise, analysts at Susquehanna Financial Group explained in an October 26, 2015 report that "lodging stocks have given up all of their earlier gains and are now down ~13% YTD," generating "fears that the U.S. lodging cycle is waning, and what little incremental demand is left will be absorbed by Airbnb."

120. Given this pressure, and while the hotel industry as a whole trended down, Marriott viewed the Starwood acquisition as an opportunity to consolidate power and grow the Company's business. Marriott was particularly attracted to Starwood's guest reservation database and loyalty program information. Starwood traditionally attracted a younger and wealthier clientele, as well as business travelers. Marriott aimed to acquire these customers and leverage Starwood's valuable customer data to not only gain market share, but also drive revenue

growth. But this acquisition would be nothing like the $100 million to $200 million in tuck-in acquisitions of Gaylord, Protea, or Delta. The Starwood acquisition was massive—***valued at $13 billion***.

121. In mid-to-late July 2015, Marriott entered into a confidentiality agreement with Starwood in relation to the Merger negotiations. At a regularly scheduled meeting, held on August 6, 2015, Defendant Sorenson briefed Marriott's Board on a potential combination with Starwood. On October 26, 2015, Marriott began to conduct due diligence into the potential acquisition during multiple sessions leading up to the announcement of the Merger.

122. The parties executed the agreement for the Merger (the "Merger Agreement") on November 15, 2015, and the parties announced the deal on the morning of November 16, 2015—the start of the Class Period. The transaction was structured as a Marriott takeover of Starwood and the total consideration was originally supposed to be approximately $12 billion. The parties initially agreed to a price of 0.92 shares of Marriott and $2 for every outstanding share of Starwood. As one of the closing conditions, a Marriott subsidiary was buying a Starwood subsidiary to provide Starwood's shareholders with an additional $7.80 per share in compensation. However, the total compensation paid by Marriott increased to $13 billion before the closing of the Merger, as well as the amount of cash Marriott would have to pay as a part of that compensation.

123. On December 22, 2015, Marriott filed the Company's Registration Statement recommending that its shareholders vote in favor of the Merger, which was signed by Defendants Sorenson and Bauduin, and the Audit Committee Defendants. Marriott informed its shareholders that the Board consulted with Marriott's senior management, legal advisors, financial advisors, and other advisors, and "reviewed a significant amount of information" in

coming to its decision to recommend the Merger to Marriott's shareholders. Additionally, Marriott informed its investors that following the closing of the Merger, Marriott's Board would expand from 11 members to 14, with three individuals from Starwood's Board of Directors joining. That amendment also touted both Marriot's and Starwood's "strong track records in merger integration," and that the former Starwood directors were bringing a "deep knowledge of Starwood" to the combined entity, which would "enhanc[e] the Marriott Board's understanding of the integration process." In addition to touting the Board's enhanced knowledge of the Integration, Marriott also highlighted the benefits the Company would realize from "integrat[ing] the skill sets and capabilities of each of the companies' management and associate teams."

124. On March 14, 2016, Starwood announced it received a non-binding proposal from a Chinese consortium led by Anbang Insurance Group ("Anbang"). The offer was all-cash and valued Starwood's shares at $76/share and the subsidiary's shares at $5.50/share for a total offer of $81.50/share. At this time, Marriott's nearly all-stock offer was worth only $69.24/share. However, by March 30, 2016, Anbang had withdrawn its offer and the deal with Marriott to proceeded.

125. The Merger was supposed to take six to eight months to complete (closing in mid-2016) but was also subject to various regulatory approvals before the deal could be completed.

### 1. Analyst and Market Reaction to the Deal Underscores the Importance of the Acquisition of Starwood Customer Data to Marriott's Business

126. Analysts were excited about the deal, and that the Merger would make Marriott the top hotel company in the industry. Analysts described the deal as "growth oriented" for Marriott and commented on the scale of the acquisition. For example, on November 16, 2015, analysts at Jeffries stated:

> The rationale is framed as being growth-oriented, combining the distribution and strengths of both businesses to create the world's

> largest hotel company, with pro- forma fee revenue of $2.7bn from 5,500 hotels and 1.1m rooms. The deal is expected to deliver at least $200m cost synergies p.a. in the second full year after closing and be earnings accretive by the second year post- merger… MAR[29] expects to return at least as much as the $2.2bn in dividends/buybacks announced this year, in the first year post-merger.

127. Credit Suisse championed the Merger in two reports in the days following the announcement of the Merger. First in a November 16, 2015, analyst report touting the "considerable upside" of the Merger, and again in a November 18, 2015, analyst report, stating:

> We believe MAR will be able to unlock ***significant value*** from the acquisition, leveraging increased economies of scale, as well as an opportunity to redefine some brand aspects across the chain scale. To this point, we believe there is upside to the $200m synergy target, which consists entirely of cost reductions, and does not take into account the considerable upside potential from revenue synergies associated with increased scale.

128. In that same report, Credit Suisse stated:

> Lifestyle Powerhouse: The integration of the W brand alongside MAR's broad range of brands in lifestyle should boost its presence in this category. While growth of the Edition has been gradual, we believe the brand power and growing international distribution of the W will be significant to accelerate MAR's market share. Recently, MAR has invested in building its presence among millennials and we believe the integration of the W will help to solidify its relevance.

129. The report also predicted that the Merger would allow Marriott to more effectively compete with Airbnb and also give the Company greater leverage in its negotiations with OTAs:

> Increased Leverage with OTAs: Given the company's enhanced scale with 1.1m rooms and 75m combined loyalty program

[29] MAR is the ticker symbol for Marriott and used by analysts as a shorthand reference for the Company.

> members; we see the HOT[30] transaction as a strong offset to market concerns around positioning versus the OTA's and Airbnb's continued emergence. Further, this industry consolidation should give the company strong pricing leverage with other OTA's, as they cannot afford to lose this platform. . . . ***There is no disputing that a combined MAR/HOT entity will create a strong #1 player in the industry.***

130. Other analysts echoed this sentiment. On November 30, 2015, for example, an analyst at Susquehanna stated that "the merger will generate revenue synergies by making Marriott even more global, allowing the company to be in the right place, with the right product, at the right price, across the globe." Likewise, a Macquarie analyst on February 18, 2016, observed: "The two companies together would form a global lodging powerhouse with more rooms than anyone else in the world." On March 3, 2016, an analyst with RBC commented that "MAR's robust select service offering and HOT's loyal members ***should drive immediate value creation***." That report also noted that "technology and marketing costs are major areas where synergies can be found."

131. News outlets specifically commented on the value that purchasing Starwood's customer data would bring to the table, emphasizing the importance of this data in the acquisition. According to Bloomberg, Marriott's "aim was to have a bigger company that could compete with Google, Amazon and other online firms that use their knowledge of consumer preferences to gain primacy with customers." Likewise, on July 25, 2016, Macquarie noted that as a result of the Merger, "[i]nvestors should also acknowledge that access to a more diverse client base will generate ***even more valuable customer data*** and should improve marketing efforts, especially towards younger and more tech savvy groups." On November 26, 2015, shortly after the Merger was announced, Wow Siew Ying for *The Strait Times*, an English

---

[30] HOT was the ticker symbol for Starwood and used by analysts as a shorthand reference for Starwood.

language daily newspaper in Singapore, noted that the Merger would "expand [Marriott's] customer database," which would lower costs. On December 1, 2015, *HospitalityBiz*, a trade publication, noted that Marriott would be a stronger force in the marketplace due, in part, to the "'larger guest database'" it acquired through the Merger. Additionally, on September 22, 2016, Ashlee Kieler published an article for Consumerist titled *Marriott Preparing to Battle Expedia, Priceline With New Starwood Assets*, in which she said the Merger would ***"allow Marriott and its brands to acquire more customer data."***

132. Analysts also highlighted the benefits associated with combined loyalty programs and access to greater customer data. For example, analysts at Susquehanna, in a March 22, 2016, report, stated: "Although the revised deal is not as accretive as the original one, ***after four months of due diligence, [Marriott] has a much greater appreciation of the revenue synergy opportunities and the power that could be driven by the combined loyalty platforms***." Further, on April 4, 2016, these same analysts noted that Marriott would be able to raise its revenues, "which is an example of the merits of a more powerful loyalty program post the merger." That report stated: "We believe the revenue and cost synergies as cited by management are real." The report continued: "***A major strategic consideration of the deal is revenue upside from loyalty programs. Combining the SPG and Marriott Rewards programs will broaden MAR's and HOT's distribution and capture more share of wallet from their customers."***

133. Over the months that followed, analysts continued to tout the synergies associated with Marriott acquiring Starwood's loyalty program and the impact it would have on the Company's revenue. On May 10, 2016, UBS analysts highlighted anticipated "revenue synergy from improved Starwood brand index from combined rewards program." Likewise, Macquarie stated on July 25, 2016, "The merger allows Marriott to increase brand loyalty amongst its Baby

Boomer Road Warriors and grow its database of affluent Gen Y and Asian customers."

Macquarie also emphasized the importance to investors, stating:

> Investors should also acknowledge that access to a more diverse client base will generate even more valuable customer data and should improve marketing efforts, especially towards younger and more tech savvy groups. We also see combined marketing and sales strategies as being a strong advantage over OTAs and other hotels. With a larger marketing budget, MAR can attract a wider range of customers to join its loyalty program and to book directly from its website.

So too did analysts at Susquehanna, who, in a July 29, 2016, report, pointed to "the merits of a more powerful loyalty program post the merger."

134. After the close of the Merger in September 2016, analysts continued to discuss Marriott's competitive advantage resulting from the Merger. On September 26, 2016, analysts at RBC issued a report that stated: **"*The rewards program is a high priority. In addition to scale, the SPG member base was viewed as a key benefit of the merger for MAR.*"** Likewise, in an October 11, 2016, report, UBS analysts pointed to "revenue synergy from improved Starwood brand index from combined rewards program." In that same report, UBS analysts reported that "it could be late '17 or early '18 before the reward programs are combined, [in part] because of the program terms and IT integration required."

135. Further, on November 9, 2016, Susquehanna published an analyst report that noted Marriott "expect[s] to see savings on OTA contracts in '17 simply by applying Marriott's more favorable contract terms to Starwood hotels even assuming no change in OTA usage, and more to come in 2018." On November 10, 2016, an analyst report from SunTrust Robinson Humphrey noted that, as a result of the Merger, Marriott "will soon be able to negotiate better OTA contracts." On May 16, 2017, Susquehanna published an analyst report stating that: "lower OTA fees should foster support for additional 3rd party financed (and developed) unit growth."

### 2. Marriott Conducts Inadequate Due Diligence at the Time of the Merger and Fails to Detect Numerous Vulnerabilities In Starwood's System—Including a Massive Data Breach

136. As part of the Merger, Marriott was required to conduct due diligence into Starwood to determine if Starwood was an appropriate acquisition. Analysts repeatedly noted that a primary driver of the Merger was accessing the data contained in the legacy Starwood guest reservation database, and joining both loyalty programs so that Marriott would be able to capitalize on the customer data it was acquiring from Starwood. Defendants repeatedly assured the market that Marriott was conducting adequate due diligence to protect that data. For example, during the time between the Merger was announced and when it closed, Marriott stated the Company was performing "extensive due diligence" regarding Starwood's IT systems. Further, once the Merger was completed Marriott would own all that data and technological infrastructure from Starwood as its own and be responsible for safeguarding it. As detailed in the Merger Agreement, through a series of transactions, Marriott essentially subsumed all of Starwood and its operations and assets. This included Starwood's computer systems, reservation software and database, as well as all the personal information contained in that database.

137. Data security was important to investors because Marriott was spending so much money on the transformative acquisition, and investors needed to be comfortable that what Marriott was purchasing was both worth the price, and that it would not add any unnecessary risk or liabilities to the Company. Thus, a full and complete due diligence process into Starwood's technology was expected, as technology is typically a major focus of M&A due diligence and cybersecurity is a major consideration in technology due diligence. This is all the more true because a main focus of the acquisition was customer data kept on internal Starwood's IT systems. Further, the due diligence here would have to be massive and extensive—to match the breadth of the acquisition itself.

138. It was therefore crucial that Marriott perform adequate due diligence by investigating and examining Starwood's IT systems, including its reservation system and database, and more broadly, making sure that the assets – both physical and technological – that Marriott was purchasing from Starwood were intact and had adequate cybersecurity measures.

139. Indeed, it is standard practice in any acquisition of this size for the acquirer to perform cybersecurity due diligence, which includes researching undisclosed or unknown data breaches, as well as identifying IT security risks and operational or governance deficiencies of the target company. After all, NYSE Governance stated that "the ***only*** way for [a company's] board to uncover latent risks and mitigate future hits to the company's reputation is to conduct a comprehensive audit of the target's cybersecurity protocols." Marriott therefore supposedly performed (and conveyed to the market they performed) a full and complete cybersecurity assessment in its due diligence process to understand the state of the Starwood's computer networks, systems, and its vulnerabilities. After the Data Breach, Jeff Flaherty, a Senior Director of Global Communications and Public Affairs at Marriott, even confirmed that as part of the company's integration efforts, Marriott conducted an assessment of the legacy Starwood IT systems prior to and after the close of the transaction.[31] Marriott itself also repeatedly confirmed throughout the Class Period that it was performing this important due diligence.

### a. Marriott's Assurances to the Market

140. At the time the Merger was announced, Marriott had already conducted several weeks of due diligence. Between the time the Merger was announced on November 16, 2015 and the Merger closing on September 23, 2016 (nearly a year), Defendants repeatedly informed

---

[31] *Starwood Data Breach: Lessons for the Hotel Industry*, HOTELNEWSNOW.COM (Apr. 9, 2019), http://www.hotelnewsnow.com/Articles/294646/Starwood-data-breach-Lessons-for-the-hotel-industry.

the market they had conducted further due diligence, and touted their efforts in conducting "extensive" due diligence and working on the successful integration of the two companies. They also repeatedly assured investors that Marriott's prior merger experience primed them to also execute this Merger successfully.

141. For example, on the date the Merger was announced, November 16, 2015, Defendant Sorenson filed a letter to investors with the Prospectus. In that letter, Defendant Sorenson stated that the Company had "***successfully completed integrations before***," and that Marriott had "***always emerged stronger, and better positioned, to compete in a rapidly changing marketplace.***" As Marriott's due diligence progressed, Defendants' statements grew in confidence and their statements regarding Starwood's systems became more definite.

142. On January 27, 2016, Marriott further reassured investors that the due diligence process was going well, with no issues to report, and that it was smooth sailing: "Taking into account Starwood's publicly filed information ***and the results of Marriott's due diligence review of Starwood***, the prospects for the combined company are favorable." Just three months after announcing the Merger, on the February 18, 2016, Q4 2015 Earnings Call (and with three additional months of due diligence under his belt), Defendant Sorensen said, ***"[a]nd we are doing everything we can to plan for integration of systems and integration of business units between now and when we close*** so that we can implement those as quickly as possible. ***And we're optimistic at this point that this will go well."***

143. In the Company's 2015 Form 10-K filed on February 18, 2016 (during the midst of the due diligence process), Marriott acknowledged that "the integrity and protection of customer, employee, and ***company data is critical to us***" and Marriott's customers "***also have a high expectation that we, as well as our owners, franchisees, licensees, and service providers,***

***will adequately protect their personal information***." Additionally, Marriott assured the market that the Company used "sophisticated technology and systems in [the Company's] reservation, revenue management, and property management systems."

144. On March 21, 2016, during a conference call to discuss the Merger, Defendant Oberg described the "extensive due diligence" that Marriott continued to conduct and stated: "We have been working intensely since we announced this deal in November to prepare for integration and of course, to understand each other's organizations and structures and start to think about how to meld those into one organization." On that same call, Defendant Oberg told investors that Marriott had done "extensive due diligence" and was "spending a lot of time with the Starwood team and joint integration planning." Also during that conference call, Defendant Sorenson informed the market that since Marriott began its due diligence in October 2015: "In the further diligence we have completed in last five months, we have become even more convinced of the tremendous opportunity presented by this merger."

145. On March 21, 2016, Defendant Sorenson shared a LinkedIn Post stating "Since we announced the merger in November 2015, our integration teams have met on average multiple times a week across disciplines. ***As a result of our extensive due diligence and joint integration planning, we are now even more confident in the potential of cost savings of this transaction."***

146. During the same conference call, approximately seven months prior to the close of the Merger, to discuss Marriott's updated acquisition bid, Defendant Oberg stated, "I think one of the benefits of our time with Starwood over the past four months is being able to, continent by continent, discipline by discipline, go through and look at the way that they are

structured and the way that we are structured, to look at how responsibilities are going to be carried forward."

147. On April 1, 2016, Defendant Sorenson said that in the four months since the Merger was announced, Starwood and Marriott integration teams had met approximately 150 times, "where they are getting to know the organizations." On June 8, 2016, Defendant Oberg said that as part of Marriott's due diligence process, the Company had identified "little things about how you manage the different disciplines on the IT side in a certain geographic area."

148. Over the course of the next several months, Defendants continued to reiterate the "***extensive due diligence,***" the "***joint integration planning" with Starwood,*** and the "***exhaustive planning***" surrounding the Merger and integration process.

149. In short, Defendants conveyed to the market during that time at least three important facts: (1) they understood the importance of securing the customer data they were purchasing; (2) they were supposedly working hard to comprehensively evaluate Starwood's systems; and (3) that there were no issues identified that would impede the Merger or the successful and financially beneficial Integration of the two companies. But this could not have been further from the truth.

### 3. Unbeknownst to the Market, Starwood Was Suffering from Massive Security Vulnerabilities That Left Customer Data Unsecured, and This Data Continued to be Unsecure After Marriott Acquired Starwood

150. Former employees of Starwood and Marriott confirm that Starwood's IT systems and data security practices were woefully inadequate and that this fact became readily apparent to Marriott during the Merger process.

### a. Oracle Deficiencies Lead to Security Vulnerabilities

151. Starwood used an Oracle portal as a mainframe to manage its hundreds of business applications. An Oracle portal[32] is a web-based application that enables users to access content areas, external websites, other applications, newsfeeds, and other useful company information. Multiple CWs corroborate that the Oracle portal that Starwood used for its IT system was antiquated, at capacity, beyond being patched (meaning it could no longer accept necessary system updates), and extremely vulnerable to hackers—a truth that was ultimately borne out by the Data Breach, (*see* Section (VI)(D)), and confirmed by the forensic investigation conducted on Starwood's (and thus Marriott's) systems after the Data Breach was detected, (*see* Section (VI)(G)).

152. CW 5 was employed by Marriott from the start of the Class Period through early 2017 as a Senior Director. He was a part of senior leadership at Marriott, and was primarily responsible for defining Marriott's enterprise IT strategies and multi-year implementation road maps for various core and critical systems.

153. CW 5 said (in reference to the Merger) that Starwood's Oracle stack was beyond being patched and it would have cost hundreds of millions of dollars to fix. He explained that the stack was at capacity and could no longer be patched or expanded upon. According to CW 5, this was the primary reason that Starwood was looking to be acquired and Marriott knew it. He added that he was told that Starwood's system could not add any new hotels to its systems because it had "reached its upper limits." CW 5 also said that the life of Starwood's reservation system could not be extended because Starwood had not properly invested in the system and

[32] Starwood's Oracle portal is also referred to herein by CWs as the "Oracle stack," the "Oracle application portal," and the "Oracle database." For the purposes of this Complaint, those terms are each used interchangeably.

could not afford to upgrade it. CW 5 said the fact that Starwood was "constrained by picking the wrong technology stack" was the primary reason for Starwood's sale, and referred to Starwood's Oracle stack as a "dead end."

154. CW 2, who was a Senior Global Cyber-Security Consultant at Starwood from September 2014 to December 2015, also confirmed that Starwood used a very antiquated version of the Oracle portal for its IT system, which contained over 150 applications, including the Starwood Reservation and SPG Loyalty Points systems. CW 2 explained that Starwood refused to pay Oracle for maintenance support for years - so "nothing was updated or patches implemented to prevent hacking." CW 2 said this left Starwood's Oracle portal seven years past its end of life and very vulnerable to attack by hackers.[33]

155. CW 4, who worked as a Technical Consultant, Performance Engineer, and Performance Architect for Marriott from prior to the Class Period to May 2018, said that hacking methods and techniques for an open system like Starwood's Oracle database were "far more widespread." CW 4 believed that Starwood's Oracle database ran on Linux, and described such open systems as a bigger target for hackers.

156. CW 1 was employed by Marriott from May 2005 to March 2018 as a Software Developer and Technical Lead at Marriott's Gaithersburg office. CW 1 was directly involved with Marriott's due diligence investigation of Starwood prior to and during the merger process, as well as the Integration of the two companies' systems. CW 1 said it was apparent to some that Starwood held back on capital investments in IT because much of Starwood's equipment was

---

[33] Notably, in 2015, the FTC issued guidance which stated ***"[o]utdated software undermines security. The solution is to update it regularly . . . having a reasonable process in place to update and patch third party software is an important step to reducing the risk of a compromise."*** This publicly available guidance for compliance with the FTC Act regarding data security is highly relevant to Marriott's botched due diligence during the Merger and its failure to act or do anything to remedy Starwood's outdated systems.

over ten years old. He continued that IT hardware is supposed to be upgraded at least every five or six years because "the attrition rate goes way up after five or six years."

157. Unsurprisingly, this outdated Oracle portal that Starwood used for its IT systems—that was beyond being patched and was extremely vulnerable to hackers—led to valuable customer data being exposed and stolen.

**b. Starwood's Security Deficiencies Expose Valuable Data**

158. CW 2 described in great detail the various deficiencies that existed in Starwood's systems and the lack of attention and controls as it pertains to security. While CW 2's analysis of the situation is high-level and technical in nature, what follows is a description of a system at Starwood that did not have necessary security controls in place – security controls that were basic and standard in the industry, and security controls that, where lacking, could have easily been discovered with the barest of due diligence processes.

159. CW 2 said that Starwood was conducting business with all their customer user and employee user IDs and passwords stored in the "free and clear" in the Starwood databases"" and "all their passwords were not encrypted at all." CW 2 said this "lack of encryption existed for quite some time (years) before he started in 2014 and involved all their strategic digital assets" and referred to Starwood's systems as "wide open." CW 2 said that Starwood had exposed all their strategic digital assets because all of their passwords were "in the free and clear" with no attempt at encryption until 2015. CW 2 described these digital assets as "Swiss cheese" because of all the open security holes and vulnerabilities for hackers to access.

160. CW 2 said that Starwood utilized Symantec for its SIEM[34] process but CW 2 said he did not think that this was scaled up to provide proper security log monitoring for all of Starwood's more than 800 servers. CW 2 said that without someone monitoring the SIEM System 24 hours a day and seven days per week (at all times), it was ineffective to monitor hackers within Starwood's application servers and databases.[35] CW 2 also said that Starwood had "evidence of unauthorized" access to their systems since July 2014 because they lacked proper SIEM log monitoring for all Starwood applications and databases.

161. CW 2 explained that there was no mention of the SIEM tool being outsourced to another managed service provider. CW 2 said he identified this weakness during his engagement with Starwood and suggested Starwood use IBM's SIEM tool. CW 2 explained that there were no privilege access management ("PAM")[36] tools present to store application and database service account credentials securely like CyberArk or BeyondTrust—none of these tools existed at Starwood to manage service accounts for login to application servers and database servers securely in a PAM vault. CW 2 explained that without proper PAM tools to manage Service accounts—this is where hackers can hack into the "root access"[37] to the IT Applications and Database systems.

---

[34] As noted above, SIEM software collects and aggregates log data generated throughout the organization's technology infrastructure, from host systems and applications, to network and security devices such as firewalls and antivirus filters. Depending on the features available and enabled in the SIEM software, it may then automatically analyze data across multiple log sources to identify and categorize incidents and events.

[35] Notably, the failure to adequately log and monitor activity on Starwood's systems described by CW 2, including the failure to aggregate access and firewall logs to a centralized SIEM process, was identified in the PFI Report as one of the causes of the Data Breach.

[36] Privileged Access Management (PAM) is a solution that helps organizations restrict privileged access within an existing Active Directory environment.

[37] Root access is authorization to execute any command and access any resource on a device.

162. CW 2 further explained the linkage of the Digital Identity Access Management ("IAM")[38] System with the PAM system for service accounts connection to Digital Identity was lacking at Starwood, since there was no PAM System there. CW 2 said there was no IAM Support and 24 x 7 SIEM log monitoring—as there should have been for a worldwide company like Starwood. Moreover, CW 2 said these service accounts were not stored in a PAM system securely—or managed in a secure way manually. CW 2 continued that this is where hackers first look into, and use service accounts to get into IT systems, applications, and databases. CW 2 stated that 95% of all data breaches start through this method whereby hackers gain access to service accounts.[39]

163. CW 2 also stated that the IT and database team mentioned that they used Jump Servers[40] to provide access jump into applications and databases.

164. CW 2 said that Starwood outsourced the development and operations of its IT Systems, reservation system, SPG Loyalty System and other system-related projects, to Accenture Consulting. CW 2 provided that Accenture had approximately 1,500 to 2,000+ workers from India on-site at the Stamford, CT and Braintree, MA Locations, where these IT and

[38] Identity access management , or IAM, in enterprise IT is about defining and managing the roles and access privileges of individual network users and the circumstances in which users are granted (or denied) those privileges.

[39] Notably, as described in further detail below in Sections (VI)(C)(5) and (VI)(F)(2), an internal Marriott report titled "Marriott IT Infrastructure and Security Business Cases," dated July 18, 2016, noted that the legacy Starwood guest reservation database did not have a SIEM system in place to facilitate adequately monitoring for IT-security related issues in real time, and hence it was highly probable that security events would go undetected. That internal report also noted that Starwood did not monitor the state of security enterprise-wide, nor did Starwood have any visibility into its operating systems or potential malicious activity. Additionally, the Board was informed that Starwood, unlike Marriott, did not utilize tokenization across its POS systems.

[40] A jump server, jump host, or jump box is a system on a network used to access and manage devices in a separate network security zone. Notably, jump boxes are intended to serve a security function in only allowing access to authorized users, and keeping unauthorized users from accessing the secure zone. Additionally, that Starwood used jump servers was confirmed in the PFI Report, as detailed below in Section (VI)(G)(5).

security projects were implemented. CW 2 said that throughout his tenure with Starwood, Accenture knew of Starwood's IT security vulnerabilities.

165. CW 2 said that as a result of his system assessment, he told Starwood "to implement an Identity Access Management system to secure their Applications and Databases and PAM Service Accounts." CW 2 said that Starwood knew they had serious vulnerabilities but did not "want to spend $10-$20 million on a system rollout." CW 2 said that instead, Starwood "went on the cheap" and directed CW 2 to implement a program he referred to as "salted hash." CW 2 described "salted hash" as a "quick" and "dirty" fix for encrypting the user passwords that were stored "in the free and clear" in the Starwood databases. According to CW 2, the best that "salted hash" encryption could hope for was to slow down, rather than stop, attackers and hackers from gaining access to these passwords. CW 2 stated that the Starwood database architects knew the "salted hash" algorithm could be hacked eventually on the user passwords in the database.

166. CW 2 said he reported these serious results of his assessment to upper management, including Starwood's then-CIO Martha Poulter,[41] and other Starwood executives (Pat Foley,[42] Brad Carr,[43] Sandy Burgoyne,[44] Glenn Mannke,[45] Kevin McCaffrey[46]). CW 2 said

---

[41] Martha Poulter, according to information from a publicly available database, was an Executive Vice President and the Chief Information Officer of Starwood from June 2014 until October 2016.

[42] Pat Foley, according to information from a publicly available database, was employed at Marriott as VP, IT Security-Risk & Compliance from October 2016 through January 2018. Prior, he held positions at Starwood Hotels & Resorts from August 2007, including Director, Governance Risk and Controls from March 2013 through September 2016.

[43] K. Bradford Carr, according to information from a publicly available database, was employed at Starwood and Marriott for 18 years through December 2017. During the Class Period, Carr was a VP of Enterprise Systems with Starwood, and then Marriot through his departure in December 2017.

"upper management would rather discuss it than do what was necessary." CW 2 said that rather than address the issues in a meaningful way, Starwood settled for a quick solution to try and secure their top digital assets. CW 2 said this quick fix was not significant enough to address all the issues he found in 2014 and 2015. CW 2 attributed the vulnerabilities in the system and lack of remediation to Starwood's thrifty approach towards cybersecurity. CW 2 said that Starwood's applications were built without IT security in mind.

167. CW 2 said he worked closely with Starwood executives, Shamla Naidoo,[47] Glenn Mannke, Kevin McCaffrey, Brad Carr, and Pat Foley. CW 2 said Mr. Foley, who was a Director at Starwood, knew of the serious nature of the neglected system for a number of years prior to CW 2 starting with Starwood, but Mr. Foley did nothing about it (despite his experience working as an expert in IAM for Fidelity) for Foley's eight years there before CW 2 arrived. CW 2 said he brought suggestions for security issues related to external consumers and explained they should be part of the IAM system rollout—but Mr. Foley replied: "'No! Don't even touch external customer IDs.'" ***According to CW-2, this resulted in keeping the external Customer***

---

[44] Sandy Burgoyne, according to information from a publicly available database, was employed at Starwood from April 2001 through April 2015, and was a VP Intranet Services and HR Technology since 2002.

[45] Glenn Mannke, according to information from a publicly available database, was employed at Starwood as a Director of Identity and Access Management with Starwood for 16 years prior to the close of the Merger, and has continued in that same role with Marriott.

[46] Kevin McCaffrey, according to information from a publicly available database, is presently employed by Marriott International as Director Program Management, and was employed at Starwood since 2011. At Starwood, he was a Senior Project Manager from November 2011 through February 2014, and then an Associate Director of IT Portfolio Management with Starwood, and then Marriott, until July 2017.

[47] Shamla Naidoo, according to publicly available information, was Vice President of Information Risk and Security at Starwood Hotels and Resorts beginning in at least 2013. Ms. Naidoo assumed the role of Chief Information Security Officer at IBM in November 2017, shortly after the close of the Merger. Previous roles include Chief Information Officer, Chief Information Security Officer and Chief Risk Officer at leading companies including WellPoint, Northern Trust and ABN AMRO.

***Access perimeter totally unprotected and unsecure for more than 40 million customer users that accessed Starwood systems.*** CW 2 said the vulnerabilities in Starwood's system left both internal employees and customer information exposed.

168. CW 2 summed up Starwood' s cybersecurity issues by stating, "they were post end of life on the entire product line and all their apps were wide open" and "there was no IAM security to keep people out." CW 2 suggested that when Starwood's POS[48] system was hacked, it's possible that the hackers could have dropped Malware into their portal.

169. CW 2 said when he started at Starwood, the IT security staff was only about five people and only one of them might have held a Security CISSP certification.[49] CW 2 said this was an extremely small team and insufficient to protect against vulnerabilities and incidents. CW 2 elaborated and described the cybersecurity group/program at Starwood as a "joke" with only a five member team to support security activities for over 100,000 employees, more than 40 million customer users, more than 150 applications, and thousands of POS systems worldwide.

170. CW 2 said that Starwood's executives were aware of the hackers in Starwood's POS system and a hack of SPG Loyalty System as well. CW 2 said that Starwood was particularly sensitive to data security at this time because of the breaches at Target, Home Depot, and others. CW 2 also said the vulnerabilities led to certain of Starwood's own executives having their SPG accounts hacked a couple of times while CW 2 was at Starwood. CW 2 stated that the initial goal after his hiring was for him to try to secure the applications.

---

[48] POS Means "Point of sale."

[49] The Certified Information Systems Security Professional ("CISSP") certification ensures that an IT professional has the skills to create and implement a security program that will protect companies from hackers that may want to disrupt, expose, or even destroy their networks and data.

171. Interestingly, CW 1 who was employed by Marriott from May 2005 to March 2018 as a Software Developer and Technical Lead, said that Marriott invested a lot of resources into the "tokenization process"[50] with their customers' credit card information. CW 1 said the reason for investing heavily in the tokenization process was because Marriott knew that credit card information was a known high-value target for hackers. However, the PFI Report—the forensic report which describes how the Data Breach occurred, (*see* Section (VI)(G)), damningly states that Starwood had ***no tokenization process at all***—something that would have been readily obvious to Marriott, given its importance in protecting credit card data, and Marriott's own focus on making sure its own systems had tokenization. Even after Starwood's lack of tokenization became known to the Board, including Defendant Sorenson and the Audit Committee Defendants in February 2017, Marriott failed to secure the legacy Starwood guest reservation database.

172. As a result of the deficiencies in Starwood's systems, Starwood was often the target of cyberattacks, was frequently unable to protect its customers' sensitive, personal information, and succumbed to many of the attempted intrusions of its systems.

173. In fact, ***at the time of the Merger Starwood's system had already been breached***. Stretching back to at least July 28, 2014, Starwood had a breach in its guest reservation database that allowed attackers to steal highly sensitive personal information of more than 380 million guests. The names, addresses, payment card information, passport numbers, and other sensitive data were compiled into tables on at least two different occasions, once in 2015 and again prior to the Merger closing in 2016, according to Defendant Sorenson's Congressional testimony and the PFI Report, described herein. According to the PFI Report, during Marriott's due diligence,

[50] Tokenization is the process of replacing payment card data with a non-sensitive equivalent, such as a string of random numbers and characters.

and continuing for years through the Merger's closing and Marriott's ownership of Starwood, Starwood's systems were infected with variants of Mimikatz and various RATs.[51] That allowed attackers to access and control Starwood's systems, and steal the sensitive personal information of Starwood's, and thus Marriott's, customers. However, despite supposedly conducting "***extensive due diligence***" over the course of approximately a year, Marriott failed to detect (or were severely reckless in disregarding) the Data Breach, and would fail to detect it for approximately 2 years after taking control.

### 4. Defendants Either Knew That Starwood's Systems Were Vulnerable to an Attack or Were Severely Reckless in Disregarding the Risk

#### a. Confidential Witnesses Confirm Defendants Were Made Aware of the Severe Security Deficiencies in Starwood's Systems

174. Witnesses confirm that Defendants were put on notice of the poor state of Starwood's IT systems during the due diligence process. Thus, Defendants knew or were at least severely reckless in failing to discover the gross deficiencies in Starwood's systems that former employees of both companies recount.

175. CW 5, a Senior Director employed by Marriott from the start of the Class Period to early 2017 said, in reference to the Merger, "I knew all about it, I was in leadership." CW 5 explained that as a part of the leadership team, he participated in various conversations during the due diligence process where concerns about Starwood's systems were outlined and discussed. CW 5 said that he attended many due diligence meetings prior to and during the sale. CW 5 said that "all the senior technical leadership participated." CW 5 said that the entire IT leadership team sat down and went through every Starwood system before the acquisition. Additionally, CW 5 said that the due diligence process was extremely detailed and ultimately the

---

[51] A RAT or Remote Access Trojan is a malware program that includes a back door for administrative control over the target computer.

decision was made to dispose of almost all of Starwood's system with the "sole exception" being their loyalty rewards system. He explained that the decision to dispose of the majority of the systems was due to Starwood's "tech stack" being "dated" and not meshing with Marriott's systems. According to CW 5, Marriott could not dispose of Starwood's loyalty rewards system because of the "financial viability" of the points.

176. According to CW 5, "Marriott was aware of the security flaws both before, during and after the acquisition." CW 5 said that during the due diligence process, Marriott became aware of a previous hack of Starwood's systems which they were told to disregard because it was Starwood's problem, but ultimately Marriott did not remediate it in a timely manner which led to the 2018 Data Breach. He continued that Marriott's leadership team during the Merger outlined and discussed concerns related to Starwood's IT systems. When asked if Defendant Hoffmeister was involved in the due diligence process and aware of these security concerns, CW 5 said that Defendant Hoffmeister was involved in some of it and that 90% was run by CTO Tagliere.[52] CW 5 added that Mr. Rosa[53] and Ms. Memenza[54] were also very involved, especially in setting up the firewalls and implementing various protections.

177. CW 5 said the due diligence process was "one of the ways we found out" about the weaknesses in Starwood's system. CW 5 said that former CTO "Tagliere orchestrated due diligence, he drilled down and marshaled the resources to make a recommendation." CW 5 said

---

[52] Eric Tagliere, according to information from a publicly available database, was a Senior VP of Enterprise Applications and Architecture and Chief Technology Officer at Marriott, from April 2015 until April 2018.

[53] Alan Rosa, according to information from a publicly available database, was a Senior VP of Infrastructure and Applications Delivery at Marriott from at least 2016 through 2018.

[54] Kathy Memenza, according to information from a publicly available database, was a Senior Vice President of Information Protection and IT Security from July 2013 to June 2016.

that Mr. Tagliere and Mr. Rosa, the SVP for Infrastructure struggled to see eye-to-eye. CW 5 said that Mr. Rosa eventually left the company over his differences with Mr. Tagliere.

178. CW 5 said that when "Marriott said they were buying Starwood they pulled in various people to assess, and said, 'what's your recommendation, take or port?'" CW 5 said that: "As we went through revenue management, the res system, and rewards, rewards was the only system we would keep for even a short time until a new system was built to replace both." CW 5 said that Marriott planned to "compartmentalize" Starwood's weak systems in general, including their security system, and migrate them to a system like Marriott's. CW 5 said Starwood's "infrastructure was going to be migrated to Marriott." CW 5 said the rest of the systems were not salvageable and Marriott intended to scrap them. CW 5 said Marriott had a number of meetings "where we discussed, 'how will we do this?'" before realizing Marriott would have to "build new systems for both." CW 5 clarified that he was referring to either addressing or merging Starwood's loyalty rewards system.

179. CW 5 stated that after Marriott assessed Starwood's reservation system, "it was clear it was going to be a migration, not a merge." CW 5 said that Marriott wanted to "isolate any problems Starwood had" and that Marriott chose to dispose of Starwood's entire system with the exception of their loyalty system which they had wanted to migrate. CW 5 further explained that because of the concerns about Starwood's security posture, the decision was made to keep Starwood's systems separate until they could dispose of the majority of their systems because it could not "mesh" with Marriott's." CW 5 continued that the general consensus amongst Marriott leadership was that there was a high "likelihood of a threat."

180. CW 5 clarified that he was referring to the IT leadership at Marriott who had a concern that Starwood's systems were risky so they decided to "get rid" of them. He went on to

say that after reviewing Starwood's systems prior to the acquisition, it was clear that they were not as protected as Marriott's. CW 5 went on to recall attending an offsite meeting with over 100 of Marriott's leaders, where they had a "scorecard" and reviewed each system, system by system, to identify and "highlighting" issues specific to that system. According to CW 5, this offsite meeting took place prior to the acquisition and they did not tell Starwood their findings.

181. CW 5 added that Kathy Memenza, who was a Senior VP, Information Protection and IT Security,[55] "saw this as too much of a risk" and ultimately left Marriott because of the Starwood acquisition. According to publicly available information, Ms. Memenza left Marriott in June 2016, seven months after Marriott signed the Merger Agreement. Ms. Memenza would have been in a position to know about this Merger-related risk because she was responsible for establishing and maintaining Marriott's global security and privacy program for the purpose of protecting personal information and technical assets, including PCI compliance and developing Marriott's tokenization program. Ms. Memenza was also responsible for keeping Marriott's Board and leaders informed on involving risks and appropriate mitigation strategies. CW 4 also commented on Kathy Memenza's departure. CW 4 said that he believed Marriott's IT security personnel was somewhat understaffed, especially after Senior VP, Information Protection and IT Security, Kathy Memenza, left the Company. He recalled that with Ms. Memenza's departure, Marriott came to rely on consultants for their IT security projects.

182. Other CWs also commented on the due diligence process and what it revealed to Marriott. CW 4 said that during an acquisition by Marriott, there was "typically an audit" based on the "particular security standard" that the newly acquired company used. CW 4 stated there

[55] Kathy Memenza, according to information from a publicly available database, was employed at Marriott as a Senior Vice President of Information Protection and IT Security from June 2013 to June 2016. Ms. Memenza also described herself as Marriott's Chief Information Security Officer during that time period.

were established procedures for auditors to follow to verify that required controls were in place. CW 4 said that these were standard practices at Marriott, and that the Company had an established set of procedures set in place by Ms. Memenza's IT Security team. CW 4 stated that Marriott maintained its main customer database on a mainframe-based system but that Starwood was not as up-to-date with modern security best practices. CW 4 said that a "mainframe system will typically have fewer hacks, so it was a bit more secure than Starwood's Oracle database running on an open system." CW 4 said that hacking methods and techniques for an open system like Starwood's Oracle database were "far more widespread."

183. According to CW 1, a former Software Developer and Technical Lead for Marriott, Marriott's IT systems were superior to Starwood's. He also said that Marriott knew it was vulnerable as a result of the Starwood acquisition and that Starwood's IT department had "poor security hygiene." CW 1 said he believed that Marriott's senior executives should have seen or been aware of weaknesses in Starwood's systems since Starwood's systems were so old. He also said that he did not see how Marriott's senior executives could not have known because replacing IT hardware was a capital expenditure that would have to be approved by senior management.

184. According to CW 1, Marriott knew that "Starwood's network was understood to be vulnerable." Additionally, CW 1 said Marriott "already knew Starwood had an incursion, probably right before the acquisition." CW 1 said there was an internal thought that by not digging too deep into Starwood's systems Marriott could avoid finding anything. CW 1 suggested that the hope at Marriott was that any IT vulnerabilities at Starwood would "wither on the vine."

185. CW 5 also recounted how Marriott's Board should have had a "heightened" sensitivity to being hacked since it was their loyalty points that were stolen in a hack. According to CW 5, around 2013/2014, there was a hack of the Board's loyalty points which was approximately $10 million in value. He reiterated that given the stature of the executives that the hack impacted, their "sensitivity of being hacked [in the future] was very high" following that hack. He added that they were also aware of the White Holdings'[56] hack which are franchises owned by Marriott."

186. According to CW 7, a Director of Engineering/IT at one of Marriott's overseas locations, he and other Vice Presidents and Directors of Marriott's IT department were worried that it was a question of "when, not if" Marriott's IT systems and databases were going to be hacked. He explained that increasingly sophisticated hackers had successfully attacked other high profile hotel chains like Hilton. CW 7 also recalled that two hacking incidents occurred at two of the Marriott hotels he was responsible for—one incident in Venezuela, and one in St. Kitts. CW 7 went on to describe the St. Kitts incident as a "serious" security breach that occurred in either December of 2014 or 2015. CW 7 explained that because of the way the hacking occurred, at the moment of the hacking, not only were the St. Kitts databases jeopardized, but the hackers could have breached all other Marriott hotel locations around the world, as well as Marriott's corporate systems if they had wanted to. According to CW 7, he discovered the breach and reported it to two people on the team of Senior Director of International Privacy IT Security Mark Taylor. But no action was taken to prevent a similar breach from occurring again at his location.

---

[56] As detailed below in Section (VI)(C)(6)(b), properties managed by White Lodging Services Corporation were breached in separate incidences in 2014 and 2015, including Marriott properties.

### b. After the Deal Closed, Marriott Misled the Market About the Effectiveness of the Integration Process and Failed to Safeguard its Valuable Customer Data

#### (i) The Integration Process

187. After Marriott performed its inadequate and severely reckless pre-merger due diligence, the Merger was completed on September 23, 2016. Marriott then continued to work on integrating the Starwood system into Marriott's systems to capitalize on Starwood's customer data. At that point in time, Marriott fully owned and controlled the legacy Starwood IT systems and all of the information contained therein. During this time, while working to integrate the two systems, Marriott continued to operate the legacy Starwood guest reservation system segregated from the Company's other systems.

188. Defendants also continued to mislead the market about the status of the Integration. For example, in an August 7, 2017 press release, Defendant Sorenson assured the market that the Integration was "on track." Additionally, on January 12, 2018, in an interview with Rich Siegel, Defendant Hoffmeister assured the public that Marriott had done a "thorough analysis" of Starwood's systems, and that Marriott would be providing consumers with the "best of both worlds wherever possible." Further, Marriott continued to tout its sophisticated technology and systems (which now also included Starwood), including those used for reservations. Despite warning of some cyber risks, Marriott failed to disclose facts that would have shed light on these risks, including that Starwood's Oracle application portal which housed the reservation system: (1) was past its end of life; (2) could not be patched; and (3) was unsecure, and that during the due diligence process, these threats were obvious and recognized, but ignored.

189. Indeed, former employees confirm that in addition to the poor due diligence completed at the time of the Merger, and the unacceptable condition of Starwood's systems that

Marriott purchased (and failed to fix), the post-Merger integration process was both rushed, underfunded, and ineffective to remedy Starwood's myriad problems.

190. As a starting point, CW 1 said that the driving force behind data security at Marriott was PCI compliance. However, as explained in Section (VI)(G) detailing the findings in the PFI Report, Starwood systems blatantly violated numerous PCI standards. Despite being evident through even a cursory look, these PCI DSS failures were not fixed during the due diligence process, nor during the Integration.

**(ii) Marriott Encountered Problems of Its Own Making While Integrating Starwood's Troubled Networks**

191. CW 6, a former Director, Network Services for Marriott who was primarily responsible for working on integrating Marriott's and Starwood's IT systems both during and after the Merger, said after the Merger it "quickly became apparent" that Marriott's existing systems could not handle the Integration. He added that the project was a "whole big convergence," and required what was essentially "a complete infrastructure overhaul" for Marriott and that the Integration project was a "full data center rebuild." CW 6 said that Marriott either did not forecast the costs of the Integration or the cost was "a lot bigger" than they anticipated. He said that in planning for the Merger and Integration, nobody was thinking past day one but that shortly after the closing of the Merger, the "reality of the magnitude started to hit us." CW 6 also said that the Merger was unique and very difficult, given the size of the two companies and said that Starwood's IT systems and security were not up to Marriott's standards. He added that during the Merger process, Starwood admitted to Marriott that Starwood's IT security was inferior to Marriott's.

192. According to CW 3, who was a Threat and Incident Manager at Starwood's Tustin, California office from August 2013 to September 2016, "a lot of knowledge on the

Starwood network side left," which meant Marriott "lost a lot of subject matter expertise prior to and shortly after the Merger."

193. CW 3 said he learned from former colleagues who remained at the company after he left that, after the acquisition, Marriott treated Starwood's network as less of a priority than Starwood did prior to the Merger. CW 3 stated: "Starwood's network was a little forgotten about." CW 3 said he had discussions with Marriott's acquisition team regarding network security prior to the acquisition being completed. CW 3 said he decided to leave Starwood after the Merger because he did not like the direction the IT department was headed. CW 3 described Starwood's network security team as a "lift and shift" after the acquisition. CW 3 said that Starwood's network security team was told they would be terminated one year after the Merger. He said this lack of job security caused many Starwood employees with knowledge of Starwood's network to leave.

194. CW 6, who was primarily responsible for working on integrating Marriott's and Starwood's IT systems both during and after the Merger, said that Marriott originally treated Starwood as a very large vendor that had systems that needed to be firewalled and kept separate until those systems met Marriott's standards. CW 6 stated that the project to integrate the IT systems of Starwood into Marriott's was called Project Solar, and that he was involved with it from the very beginning. CW 6 said that Project Solar was initially planned in three phases. He stated that Phase One consisted of creating Virtual Private Network ("VPN") tunnels, which CW 6 said were low cost, encrypted connections that allowed individuals to send information from Starwood's primary data center in Arizona to Marriott's primary data center in Gaithersburg, MD. CW 6 said with VPN tunnels "you get what you pay for" and there was some latency in the data transfer. CW 6 also noted that Phase One was a "stop and go project" and that the

connection between Marriott and Starwood had to be shut down and reopened each time Anbang became the leading bidder over Marriott in March or April 2016.

195. CW 6 said that Phase Two was about building circuits between the data centers and controlling the bandwidth that was needed, which included building up the bandwidth to handle the amount of data that would be transferring between the two companies' IT systems. He said that Marriott decided to forego a more secure option for the circuits because of the high price and went with the lower cost, less secure option. CW 6 also stated that Marriott wound up having to spend significantly more money on boosting the bandwidth because of the large amount of data coming from Starwood.

196. CW 6 said that Phase Three involved eventually connecting the Starwood properties after being properly firewalled. CW 6 said that in contrast to the original plan for Phase Three, all but a few of Starwood's properties wound up being connected to Marriott's system without being firewalled. CW 6 said the data centers were firewalled, but the Starwood properties were not. He said the original plan would require Marriott to "build a global network of firewalls." CW 6 continued that a compromise was made at the property level and Starwood's properties were brought into Marriott's system without firewalls. He said the process of integrating the properties without firewalls was still ongoing when he left Marriott.

197. CW 6 said he believed there were two reasons for the changes to the original plans for Project Solar: First, he said there was a "cultural change" within Marriott's IT Department, starting around the time of the announcement of the acquisition. Second, he said Marriott significantly underestimated the amount of money and resources it would take to properly combine the IT systems of two very large corporations, each with a global presence. CW 6 said that regarding the cultural change, the three original principal Marriott leaders of

Project Solar were all gone shortly after the close of the Merger either on their own or because their job responsibilities were made redundant when Starwood staff joined. CW 6 described these changes as “a VP run off shortly after the close” of the Merger and there was “a huge influx of people from Disney and NBC.” CW 6 said he believed that Marriott’s priorities and focus moved away from security with the change in IT leadership during the acquisition and Integration process. In addition to the departure of the three principal leaders, Senior VP – Information Protection IT Security Kathy Memenza left in the summer of 2016 and another key leader in the IT Department, Director of Infrastructure Security Dale Lindsay[57] left in early 2018. CW 6 said that Ms. Memenza and Mr. Lindsay were two of Marriott’s key people with IT security oversight and that the Company’s “whole direction changed” after Ms. Memenza’s departure in the summer of 2016.

198. CW 6 said that the plans for Project Solar changed with the new leadership and that, from his perspective, planning was not as diligent under the new leadership structure compared to Marriott’s previous and usual standards, and that there was not as much focus on IT security. To illustrate this change, CW 6 contrasted the approaches of Mr. Blanchard,[58] who prioritized getting a system to work before using it, and Mr. Rosa, who focused more on scale. CW 6 described the Integration process after the change in leadership as “more chaotic,” “time slowed” in reference to projects falling behind, and that the Integration process was a lot bigger and more expensive than they originally planned for. He said the new leadership in Marriott’s IT

---

[57] Dale Lindsay, according to information from a publicly available database, was employed at Marriott from 2001 until January 2018. His last title with the Company was Director of Infrastructure Security.

[58] Daniel Blanchard, according to information from a publicly available database, was employed at Marriott from the 1994 until June 2016. His last title with the Company was Senior Vice President of IT Infrastructure Delivery.

Department wanted the "biggest, baddest, fastest" systems and expected employees to "build it yesterday."

199. As an example of the shift away from diligent IT security processes that Marriott previously followed, CW 6 detailed Marriott's failure to establish Network Access Governance ("NAG") for Project Solar. CW 6 said that he was tasked with creating the NAG plan, which included planning for the establishment of a Board of Governance for the project, identifying what security applications and networks would be required, what the pass/fail standard would look like regarding the testing of Starwood's IT systems, and how to vet IT security, as some examples. CW 6 said that this plan was never implemented and that if it was replaced by another, he was not aware.

200. CW 1, who was a Software Developer and Technical Lead at Marriott's Gaithersburg, Maryland office from May 2005 to March 2018 stated he was directly involved in the Integration of the two companies' systems. CW 1 said: "The general consensus was there needed to be a way to minimize connectivity between Starwood and Marriott infrastructure." CW 1 said that as a result of this knowledge, Marriott approached the transition with a "low level of trust" with the Starwood network and connected devices. CW 1 described Starwood's network as "basically a foreign network with security problems." CW 1 said that "given the Herculean effort of trying to absorb a huge company" like Starwood, Marriott just wanted to try to keep their heads above water.

201. CW 1 said that another aspect of Marriott's IT that he found to be questionable from an IT security standpoint was the fact that they had Microsoft Active Directory at over 600 properties during his tenure and that he has heard that they are now up to 900 properties. CW 1 continued to recall how frequently properties "exited [the] system" and they would need to locate

where the physical server was and bring it back to Marriott. CW 1 said they referred to this internally as "Operation Donkey Cart."

202. CW 1 said that he and his colleagues encountered a number of "red flags" during the process of converting the Starwood computers to the Marriott system. CW 1 said that the conversion process involves preparation of the server at the local level and installation of the operating system by the local IT department. CW 1 said the local IT department then connects the server to Marriott's network and Marriott's IT department checks the server remotely. CW 1 recalled one "red flag" where two hotels in Jordan used the same IT technician to set up the system. That IT technician was a "former Starwood person" who stayed on with Marriott post-acquisition. CW 1 said that the IT technician had compromised the system prior to connecting it to Marriott's system. CW 1 said that the same IT technician did the same thing two weeks later at a different location.

203. CW 1 also said that he did not recall any formal or official roadmap for the Integration, and stated "the whole thing was so fluid." According to CW 1, as a part of the Integration, Marriott had to "re-image" all of Starwood's desktop computers, including those computers at the front desks of Starwood's hotels and those computers processing Starwood's reservations. CW 1 stated that a significant part of the Integration process "was all the work pre-staging" the computers for the reimaging. According to CW 1, Marriott's "general approach on a technology level is you go into the hotel, all the computers are re-imaged, we put our Marriott system on them, and create user accounts for the associates to log into."

204. CW 1 said that, as to the Merger, "Marriott wanted to do all this crazy stuff." CW 1 said that as a result of the Merger, Marriott was "going to absorb 1,600 or 1,700 hotels, some they were going to spin off due to saturated markets, but they didn't want to spend additional

money." CW 1 said that Marriott could have done more to ensure a safer transition between the systems after the Merger.

205. CW 7 stated that he participated in a conference call in late 2016 or early 2017, soon after Starwood was acquired, that was led by Defendant Hoffmeister. On the call, Defendant Hoffmeister communicated that Marriott did not have a strong strategy to merge the Starwood and Marriott systems within the declared deadline of end of 2018, but that the target date was going to be met no matter what.

206. On August 7, 2018, Macquarie released an analyst report which described the Integration process as "seemingly flawless" and "almost too easy." The latter observation would prove prophetically true.

**(iii) The Integration Was Too Big to Handle and Too Expensive to Successfully Implement**

207. CW 1 said Marriott was "house poor" following the Starwood acquisition and explained that Marriott had spent so much money on the acquisition that they did not have the money to invest in resources such as products to measure and assess IT security.[59] CW 1 recounted how frequently Marriott would need to pull resources from other teams to assist with IT security following the Starwood acquisition.

208. CW 1 said that Marriott made the decision to purchase "ridiculously expensive" hardware that CW 1 believed was unneeded. According to CW 1, this decision was made because Marriott was overwhelmed by the size of the Starwood IT Integration and unsure how to navigate it. CW 1 said that for Marriott, time was the enemy and that the initial integration of

[59] Notably, Marriott had to nearly double the Company's debt in order to be able to afford the more than $13 billion price tag for the Merger.

Starwood's IT systems into Marriott's was "painfully slow." CW 1 further explained that Starwood had "weird systems" and they knew that there were issues with them.

209. CW 1 added that he did not believe anyone at Marriott appreciated how long a proper integration would take, considering that Starwood had around 1,500 properties selected for the Integration worldwide. CW 1 went on to compare the Starwood Integration to Marriott's previous integration of a hotel chain in Canada's systems, with only 25 locations, that took 2 years to complete (the Delta acquisition and integration worth approximately $135 million). According to CW 1, only a few individual Starwood properties were completed by the time his tenure ended in March 2018. CW 1 also said that Marriott did not appreciate how long the integration would take and said the real timeline would be much longer than the 2 years it took to integrate Delta. CW 1 explained that he had previously been involved with the Delta and Gaylord mergers (an acquisition worth approximately $210 million) which involved significantly less properties and those were debacles on the IT Integration; "we needed NASA."

210. CW 1 said that Marriott was not eager to spend too much money facilitating the integration of the two companies, considering the price the Company paid for the acquisition. CW 1 said that Marriott's lack of spending and resources on IT security may be why the integration took so long, and why the Company did not pick up the Starwood breach sooner. CW 1 added that endpoint security is expensive.[60] And as explained in the PFI Report (*see* Section (VI)(G)), Starwood did not monitor endpoints for vulnerabilities.

211. According to CW 1, the threats caused by a new breed of bad actors, including state-sponsored hackers, has led endpoint security to being expensive. He continued that 99% of the IT decisions at Marriott came down to financial expense consideration. As a general

---

[60] Endpoint security is the practice of securing end-user devices, such as computers, from cyberattacks, with systems that detect, analyze, block, and contain attacks.

example to illustrate his point, CW 1 said that an IT security measure that costed $1 per computer to implement would be approved while that same measure would be denied if it costed $2 per computer. CW 1 also said that in every meeting he attended there was always discussion of figuring out how to get things done in IT without spending additional money.

212. CW 1 said that a lot of major IT purchasing decisions at Marriott were made higher up the chain of command and described senior management as "kind of stingy." CW 1 said that senior management would often reject proposals for IT spending outright, without entertaining the proposal. CW 1 also stated that Marriott wanted to do the Merger without spending the money necessary to do it right. He went on to say that adding to the expenditures, difficulty, and time consumption involved in the Marriott-Starwood IT merger was that Starwood has properties in every country, making such mergers "murky" when accounting for the policies and governance from country to country. CW 1 described the current challenges faced in IT security as "the Wild West," and said that it would be fair to say that Marriott "could have done more." CW 1 added that the threat capability generally has "gone way up" and that end-point detection is not as an effective method as it once was. He described the attitude towards IT security at Marriott as one in which the motivation for management to upgrade after a breach rather than proactive security measures.

213. CW 1 said that the entire IT organization was run by Defendant Hoffmeister throughout the Class Period. CW 1 said that Defendant Hoffmeister's reporting chain changed, that at one point it was Defendant Sorenson but that he may have reported to another executive, but that Defendant Hoffmeister sat on the sixth floor with Defendant Sorenson. CW 1 recalled attending many Town Hall meetings where Defendant Hoffmeister would say "I'm not an IT guy" and that he spent years in finance. CW 1 also said that the sentiment following the

acquisition at the Town Hall meetings was uncertainty and concern over the extent of work it would take to integrate such a large acquisition given their experiences with significantly smaller acquisitions.

214. CW 1 explained that Marriott traditionally performed two different audits of their IT systems annually, one focused on PCI compliance and the other focused on System Organizational Controls driven by SOX. But according to CW 1, in March 2016, he attended a presentation from PwC detailing the findings of a third unexpected audit that had been commissioned by the Board of Director's Audit Committee. CW 1 attended the presentation from PwC auditors, along with Kathy Memenza, the Former SVP of Information Protection and IT Security. CW 1 described PwC's March 2016 audit as an "elaborate process" to evaluate if Marriott's systems could be penetrated. As to the timing of the audit, CW 1 explained that, based on past practices, the audit would have been scheduled weeks or months earlier, in or around January or February 2016.

215. CW 1 explained that PwC auditors conducted a "penetration test" to see if they could get a "foothold" into Marriott's systems. CW 1 advised that the auditors used several different methods to penetrate Marriott's systems including through use of a "responder." CW 1 stated that a responder is an open source application that is used in penetration tests to intercept a user's credentials. He explained that a responder works by pretending to be a legitimate file server which then tricks legitimate systems into responding by sending user credentials to the responder.[61] CW 1 characterized this as a common method used to steal network credentials. He

[61] CW 1 clarified that by "credentials" he was referring to "hashed credentials." He explained, as an example, that with "hashed credentials" a saved password, as an example, is not stored in plain text, but rather random characters. CW 1 continued that a user, or hacker, however, can use those random characters that the password was stored as to access other data in the system, without having a plain text password.

went on to say that once PwC was able to steal user credentials, connect to the user's internal desktop, add their account to the system administrators group, they penetrated the system. CW 1 said that once PwC was able to get administrator's rights, it had unrestricted access to the entire system and—at one point—the auditor basically "owned the Company." CW 1 described PwC's presentation as "not a good meeting" and said that everyone was made aware of the findings from the third audit, including the Board, Defendant Sorensen and Defendant Hoffmeister. CW 1 stated that that there was definitely a formal written report that would have been generated following the audit and provided to Marriott's Audit Committee. CW 1 added that the Board, including Defendant Sorensen and Defendant Hoffmeister, also knew that Starwood's IT systems were even worse than Marriott's systems.

216. As to the unexpected cost increases related to the Merger, CW 6 reiterated that the IT merger process was a lot bigger and more expensive than what was originally anticipated. CW 6 said that it became apparent by the end of 2016 or early 2017 timeframe, and that is when management running the IT merger process were "starting to ask for more and more money." CW 6 noted that Marriott management's primary focus was getting the loyalty programs integrated in time for the closing of the Merger, which was completed on time, but that other "huge projects" were running late and had to "be done yesterday." CW 6 said that he knew about the increased costs because he was responsible for preparing the budgets for much of the work on Project Solar, which he presented to Mr. Rosa.

217. CW 6 said that Mr. Rosa had final approval over the budgets that CW 6 presented to him before Mr. Rosa and Defendant Hoffmeister presented the budget to Defendant Sorenson, who then presented the budget to the Board. CW 6 said he believed the Board was presented with budgets indicating the costs of the items and projects that Mr. Rosa retained from CW 6's

original budget request. CW 6 recalled that the 2017 supplemental budget he presented to Mr. Rosa included higher than expected cost requests, including for the data center build-up and an additional $10 million for a network upgrade. CW 6 recalled that Mr. Rosa and Mr. Guardino[62] did not approve all of the costs in that 2017 supplemental budget, and that Mr. Rosa and Defendant Hoffmeister presented what was left to Defendant Sorenson, who in turn presented it to the Board.

### 5. Marriott Was Put on Explicit Written Notice of Security Vulnerabilities in Starwood's Systems After It Commissioned Several Assessments of Starwood's Cybersecurity Risks

218. At several important points, Marriott was explicitly advised of serious cybersecurity risks posed by Starwood's systems. Yet, the evidence gathered to date shows Marriott took no meaningful action to correct these gaping problems.

219. As described in further detail below in Section (VI)(F)(2), a July 18, 2016, Marriott internal report titled "Marriott IT Infrastructure & Security Business Cases" detailed Marriott's internal cost summary for merging Starwood and Marriott's loyalty programs. That report also detailed several cybersecurity-related risks with Starwood's systems, including that Starwood: (1) did not have a SIEM process in place to identify, monitor, and analyze IT-security related events in real time for the guest reservation database; (2) did not monitor and report on the company's "state of security," nor did Starwood have any visibility into its out-of-date operating systems, including whether malware was running on those systems; and (3) that

[62] Lenny Guardino, according to information from a publicly available database, was employed at Marriott as a Global VP of Infrastructure Engineering & Operations from Aug 2016 to May 2018.

Starwood did not use tokenization or point-to-point encryption on its systems.[63] Consumer Complaint at ¶¶ 124-26.

220. After the Merger closed, Marriott commissioned PwC to conduct a "Starwood Cybersecurity Assessment." Consumer Complaint at ¶ 129. In January 2017, four months after the closing of the Merger, PwC informed Marriott of several critical vulnerabilities in Starwood's systems, including: (1) Starwood's lack of an "enterprise-wide security governing body directing strategic and tactical decisions based on business need"; (2) Starwood's lack of adequate network segmentation that could allow malicious actors to move from a single, initial point of entry to other data-storing systems; (3) Starwood's consistent non-compliance and deviations from baseline configuration standards that could allow malicious actors to compromise assets and maintain a foothold within the network, including that Starwood's brand standards did not mandate PCI compliance; and (4) that Starwood's cybersecurity practices had "not reached the maturity level expected from an organization that fits Starwood's risk profile." *Id.*; *see also* Financial Institution Complaint at ¶ 35.

221. Later in 2017, Marriott again commissioned PwC to provide an assessment of the Integration up to that point. Consumer Complaint at ¶ 131. PwC advised Marriott: (1) "that combined networks needed upgrades, including enhanced network segmentation, two-factor authentication, and vulnerability remediation"; and (2) "to develop an 'Enhanced Security Administrative environment for accounts the highest levels of privileges" to lock down and isolate privileged accounts to only authorized individuals.'" *Id.*

---

[63] *In re Marriott Int'l Inc. Customer Data Sec. Data Breach Litig.*, No. 19-md-2879, ECF Nos. 413, 537, & 595-2 (D. Md.) (Second Amended Consolidated Consumer Class Action Complaint) (cited as Consumer Complaint at ¶__).

222. In early 2018, Marriott commissioned Protiviti, a consulting firm, to "perform a penetration testing of select systems within the Starwood's systems holding payment card data." *Id.* at ¶ 132. Protiviti provided Marriott with a report detailing the results of that penetration testing. *Id.* at ¶ 132. ***During that penetration test, Protiviti found "19 critical or high priority vulnerabilities, 32 medium, and 28 low priority issues."*** *Id.* Protiviti "exploited certain 'jumpboxes' and bypassed multifactor authentication due to misconfigurations of devices intended to prevent access to the cardholder data environment." *Id.* ***The auditors "easily entered into the cardholder data environment and accessed the Starwood Database containing payment card and guest information." Id. Further, Protiviti "'was able to capture domain administrator credentials while connected to the general local-area network (LAN),'" and those credentials were "'taken offline and decrypted using available technology and software.'"*** Consumer Complaint at ¶ 132. ***As a result of obtaining the credentials, "'Protiviti was in complete control of the Starwood networks.'"*** *Id.* Protiviti then "accessed the card holder data environment where a database server with the database connection strings[64] were stored on the desktop," which allowed it to "open and access the database of credit card and customer information." *Id.*

223. As a result of the penetration test, Protiviti "advised Marriott and Starwood that there was improper segmentation on Starwood's internal network which allowed Protiviti to gain administrative access." *Id.* at ¶ 133. Further, Protiviti "identified several web applications with

[64] Applications use "connection strings" to identify which database to connect to, and to determine what driver or login to use to connect to the SQL server. "Connection strings" typically contain "everything that an attacker would need to break into a database." Denny Cherry, *Securing the Instance*, SCIENCEDIRECT.COM, https://www.sciencedirect.com/topics/computer-science/connection-string (last visited July 21, 2020).

issues related to input validations" which allowed it to access sensitive information from those web applications. *Id.*

224. Despite this explicit written notice of the severe deficiencies in Starwood's systems, however, Defendants still failed to take the necessary actions to secure the legacy Starwood guest reservation database and protect the sensitive customer data contained within.

### 6. Marriott Ignored Obvious Red Flags Alerting Them to Cybersecurity Risks and Data Breaches

225. In addition to having access to the obvious information provided by former employees in the course of their due diligence process, Defendants also disregarded numerous red flags that existed at the time of the Merger. These red flags should have put Marriott on heightened notice that the Company needed to exercise particular care in assessing Starwood's systems, and that if the Company discovered any kind of vulnerability, it needed to immediately remedy the vulnerability to protect its customers data.

#### a. Successful Cyberattacks of Starwood's Systems Put Defendants on Notice of Data Security Risks

226. Before the Data Breach, between 2015 and 2017, Starwood was affected by at least five different cybersecurity incidents of varying degrees of severity. Thus, at the time of the Merger and thereafter Defendants were on explicit notice that Starwood's IT systems suffered from serious data security problems. Yet, as noted above in Section (VI)(C)(4)(b), Defendants failed to act to secure Starwood's valuable data.

227. On November 20, 2015, ***just five days after Starwood signed the Agreement with Marriott,*** Starwood revealed that the POS systems at 54 of its hotels in North America had been infected by malware. The malware was active in Starwood's POS systems from November 2014 to October 2015. The malware enabled unauthorized parties to access the payment card data of some customers, including cardholder name, payment card number, security code, and expiration

date. In an article discussing this breach, *The Wall Street Journal* cited a "Marriott spokesman" who "said his company was aware of the Starwood security breach before it reached the agreement to acquire Starwood."[65] As a result of this RAM-scraper attack, discovered in late 2015, Starwood commissioned an investigation by a PFI investigator. Financial Institution Complaint at ¶ 60. That investigator determined that data breach "occurred because of violations of PCI DSS Requirements 1 and 8 (and additional requirements), both of which Starwood continued to violate after Marriott acquired it." *Id.*

228. On August 14, 2016, multiple news outlets reported a data breach that affected 20 hotels, some under the Starwood or Marriott brands, owned and operated by HEI Hotels & Resorts ("HEI"). The malware that infected HEI's system was active from March 1, 2015, to June 21, 2016. Reuters noted that of the 20 hotels affected by the payment card breach, 12 were Starwood hotels and six were Marriott hotels. The outside experts that HEI brought in to address the attack determined that hackers might have stolen customer names, account numbers, payment card expiration dates, and verification codes.

229. In a December 3, 2018, article titled *Revealed: Marriott's 500 Million Hack Came After a String of Security Breaches* written by Thomas Brewster for Forbes, Mr. Brewster gave several examples of security breaches at Starwood. In one example of a corruption of Starwood's system, cybersecurity researcher Alex Holden revealed to Forbes that six servers hosting various starwoodhotels.com domains were controlled by Russian botnets. Another example of a vulnerability in Starwood's IT systems is that Starwood's ServiceNow[66] cloud computing service was found to have easily guessable passwords. From the ServiceNow portal,

---

[65] Robin Sidel and Craig Karmin, *Starwood Reports Payment-Information Data Breach*, THE WALL STREET JOURNAL (Nov. 20, 2015).

[66] ServiceNow is a company that provides various IT services, including cloud computing, incident management, performance analytics, and change and release management.

an attacker was able to access a company's booking information, IT security controls, and financial records. The article also mentioned that going back to 2014, Starwood had a vulnerability on the company's website, which was infected with an SQL injection bug. That bug could have been exploited to gain access to Starwood's database. According to Forbes, vulnerabilities in Starwood's system were being advertised on the dark web at that time.

230. As a result of these incidents, Marriott was aware of the need to perform heightened diligence and thoroughly test Starwood's systems during the merger process and in operating the legacy Starwood guest reservation database after the Merger. Additionally, that these incidents occurred with relative frequency during the time around the Merger was a red flag for Marriott as to the need for heightened diligence and that vulnerabilities in Starwood's systems existed.

**b. Marriott Ignored Numerous High-Profile Data Breaches in the Hotel Industry**

231. Indeed, Marriott knew that it, Starwood, and other hotel chains were prime targets for hackers given the significant amount of sensitive customer data it collects, and that the hotel industry has for years suffered numerous cybersecurity incidents. In the years prior to the signing the Merger Agreement, Marriott was aware of numerous data breaches in the hotel industry and of other high-profile breaches that occurred after the Merger was announced.

232. On February 3, 2014, White Lodging Services Corporation ("White Lodging"), a franchise management company used by Marriott and Starwood, announced that the POS systems at 14 hotels, including seven Marriott locations, one Westin location, and one Sheraton location, were compromised. White Lodging's statement confirmed that the "unlawfully

accessed data may have included names printed on customers' credit or debit cards, credit or debit card numbers, the security code and card expiration dates."[67]

233. Following confirmation of that breach, Marriott also issued a statement stating that "one of its franchisees has experienced unusual fraud patterns in connection with its systems that process credit card transactions at a number of hotels across a range of brands, including some Marriott-branded hotels." The statement continued: "As this impacts customers of Marriott hotels we want to provide assurance that Marriott has a ***long-standing commitment to protect the privacy of the personal information that our guests entrust to us, and we will continue to monitor the situation closely***."[68]

234. The following year, sources in the banking industry began seeing a pattern of fraud on payment cards that were used at Marriott hotels. On April 8, 2015, White Lodging again confirmed that its POS systems at 10 hotels were breached, this time including seven Marriott locations and one Sheraton location. Marriott spokesperson Jeff Flaherty specifically commented on the White Lodging breach: "We recently were made aware of the possibility of unusual credit card transactions at a number of hotels operated by one of our franchise management companies. We understand the franchise company is looking into the matter. Because the suspected issue is related to systems that Marriott does not own or control, we do not have additional information to provide."[69]

---

[67] Nick Vivion, *White Lodging Releases More About Credit Card Data Breach, Including Affected Hotels*, PHOCUSWIRE.COM (Feb. 4, 2014), https://www.phocuswire.com/White-Lodging-releases-more-about-credit-card-data-breach-including-affected-hotels.

[68] *Hotel Franchise Firm White Lodging Investigates Breach*, KREBSONSECURITY.COM (Jan. 31, 2014), https://krebsonsecurity.com/2014/01/hotel-franchise-firm-white-lodging-investigates-breach/.

[69] *Banks: Card Thieves Hit White Lodging Again*, KREBSONSECURITY.COM (Feb. 3, 2015), https://krebsonsecurity.com/2015/02/banks-card-thieves-hit-white-lodging-again/#more-29697.

235. On March 4, 2015, approximately seven months before Marriott began its due diligence for the Merger, Mandarin Oriental Hotel Group ("Mandarin Hotels") announced a breach of its credit card systems in which the credit and debit card information of thousands of guests was stolen.

236. On November 24, 2015, just over a week after Marriott and Starwood signed the Merger Agreement and Marriott began its more involved due diligence, Hilton Worldwide Holdings Inc. ("Hilton Hotels") announced two breaches, one of which was very similar to the breach of the legacy Starwood guest reservation database, in that 360,000 customer records were aggregated for removal. Also in November 2015, Noble House Hotels and Resorts announced a breach affecting six of its properties over different periods of time from December 29, 2014 to August 11, 2015.

237. Less than a month later, on December 23, 2015, Hyatt Hotels Corp. ("Hyatt Hotels") announced that its customers were subject to a data breach through malware the company discovered on its payment processing systems at various properties, including front desks. One report published on December 24, 2015, by United Press International on the Hyatt Hotels breach noted that in 2015, across all industries, more than 178 million records had been affected by 766 data breaches.

238. In June 2016, Hard Rock Hotel & Casino Las Vegas announced that after receiving reports of fraudulent activity associated with payment cards used at its hotel, the resort conducted an investigation revealing that malware had been installed on its servers allowing unauthorized access to customers' names, credit card numbers, expiration dates, and verification numbers.

239. On July 8, 2016, Omni Hotels & Resorts ("Omni Hotels") announced that some of its POS systems had been infected by malware. Omni Hotels revealed that its customers' payment card information was exposed from December 23, 2015, through June 14, 2016. The company stated that more than 50,000 customers' names, card numbers, expiration dates, and CVV numbers across 49 properties were compromised by the breach. Omni Hotels offered its customers one year's worth of free identity theft protection and repair.

240. On August 26, 2016, Millennium Hotels & Resorts ("Millennium Hotels") announced that one of its third party service providers detected "malicious code in certain of its legacy [POS] systems," including those at 14 Millennium Hotels properties. Millennium Hotels revealed the breach affected its food and beverage POS systems. Though Millennium Hotels did not reveal its third party service provider, multiple news outlets reported that it was likely Oracle because Oracle had recently warned of "malicious code" in certain of its legacy systems.[70]

241. On September 5, 2016, the Hutton Hotel, in Nashville, TN, announced that its guest reservation system had been infected by malware that compromised customers' names, card numbers, expiration dates, and CVV numbers. The company revealed that the information of guests who placed or paid for a reservation with the Hutton Hotel from September 19, 2012, through April 16, 2015, was at risk. Additionally, the Hutton Hotel informed the public that its food and beverage POS systems may have been infected from September 19, 2012, to January 15, 2015, and from August 12, 2015, to June 10, 2016. The Hutton Hotel said it implemented enhanced security measures in response to the breach.

---

[70] Matthew J. Schwartz, *POS Malware Hits Two Hotel Chains*, BANKINFOSECURITY.COM (Aug. 26, 2016), https://www.bankinfosecurity.com/pos-malware-hits-two-hotel-chains-a-9364.

242. Also in September 2016, Kimpton Hotel & Restaurant Group LLC announced that customers' payment card information was compromised by malware installed on its servers at more than 60 of its hotels and restaurants during a six-month period.

243. On February 3, 2017, InterContinental Hotel Group ("IHG") announced that certain of its cash registers had been infected by malware designed to steal credit and debit card data from customers. While IHG initially informed the public that the breach only involved 12 of its properties, the company eventually revealed that the breach compromised customer data at more than 1,000 properties. The malware was able to siphon payment card data from the front desks at those properties from September 29, 2016, through December 29, 2016. IHG said it hired a computer forensics team to address the issue at the property level but did not announce any services for affected customers.[71]

244. On May 2, 2017, Sabre Hospitality Solutions ("Sabre") revealed in its Q1 2017 Form 10-Q that it was "investigating an incident of unauthorized access to payment information" in its reservations systems. On July 6, 2017, after warning the public of a potential breach in its SEC filing, rather than hiding it as Marriott did, the company began to reveal details about the breach. Sabre revealed that its reservation and booking systems had been infiltrated by an attacker that obtained credentials to gain unauthorized access to the reservation system. The company informed the public that both payment card information and customers' personal data were accessed by the attacker. One report on the Sabre breach noted that "the travel sector has had to deal with a steady rise in cyberattacks in recent years."[72]

---

[71] *Intercontinental Hotel Chain Breach Expands*, KREBSONSECURITY.COM (Apr. 18, 2017), https://krebsonsecurity.com/2017/04/intercontinental-hotel-chain-breach-expands/.

[72] Lee Matthews, *Travel Giant Sabre Confirms Its Reservation System Was Hacked*, FORBES (July 6, 2017), https://www.forbes.com/sites/leemathews/2017/07/06/travel-giant-sabre-confirms-its-reservation-system-was-hacked/#2d5c6bda4b20.

245. In July 2017, multiple hotel chains including Hard Rock Hotels & Casinos, Four Seasons Hotels and Resorts, Trump Hotels, Loews Hotels, Kimpton Hotels & Restaurants, RLH Corporation, and Club Quarter Hotels, among others, reported a data breach via a third-party reservations system provided by Sabre Hospitality Solutions. The breach permitted unauthorized access to customers' credit card information and certain reservation information between August 2016 and March 2017.

246. In October 2017, Hyatt announced that it discovered unauthorized access to payment card information at 41 of its properties worldwide. The company announced that its systems were compromised between March 18, 2017, and July 2, 2017. Hyatt revealed that the breach affected the front desk at 41 of its properties in 11 countries. The company informed the public that customers' names, card numbers, expiration dates, and CVV numbers were at risk but did not provide any details on any remediation measures.

247. On October 31, 2017, Hilton Hotels agreed to pay $700,000 to the state governments of New York and Vermont, and to bolster its data security practices for mishandling data breaches in 2014 and 2015, including failing to maintain reasonable data security and failing to notify victims of the data breach in a timely manner. The breaches, discovered in February and July 2015, respectively, exposed the credit card numbers of more than 360,000 guests.

248. In August 2018, it was announced that China-based Huazhu Hotels Group suffered a massive data breach where the personal information of hundreds of millions of hotel guests was exfiltrated and offered for sale on the dark web.

249. On November 1, 2018, Radisson Hotel Group ("Radisson Hotel") announced a breach of its rewards program database. The company revealed that customers' names,

addresses, email addresses, and in some cases, business contact information were all compromised as a result of the breach. Radisson Hotel said the breach affected approximately 10% of its rewards members. One report on the Radisson Hotel breach noted the "restaurant and hospitality sector continues to suffer a data-breach epidemic."[73]

250. Cybersecurity experts explained that hotels are frequent targets of data breaches "because they hold a lot of sensitive information, including credit card and passport details, but often don't have security standards as tough as those of more regulated industries, like banking."[74] In its recent Data Breach Investigations Report, Verizon noted that 15% of all data breaches occurring in 2017 involved the accommodation and food services industry and that it is "the hardest hit" industry for POS intrusions.[75] The report noted that there were 338 breaches in the accommodation industry in 2017 alone,[76] and as noted above, this included at major hotel brands including Hyatt, Radisson, Hard Rock, and Kimpton, among others.

**c. The Equifax Data Breach Was Another Red Flag for Defendants**

251. Furthermore, on September 7, 2017, during the Integration process, Equifax announced that the social security numbers, birth dates, addresses, and drivers' license numbers of over 140 million Americans had been stolen by attackers as a result of a data breach. Equifax was found to have a shocking number of deficiencies in its data security—which are strikingly similar to the deficiencies in Marriott's Starwood systems—including: (1) running obsolete or

---

[73] Esther Hertzfeld, *Radisson Loyalty Program Suffers Data Breach*, HOTELMANAGEMENT.NET (Nov. 6, 2016), https://www.hotelmanagement.net/tech/radisson-loyalty-program-suffers-data-breach.

[74] *Breach Puts Hotel Guests' Data at Risk*, ARKANSAS DEMOCRAT GAZETTE (Dec. 1, 2018), https://www.arkansasonline.com/news/2018/dec/01/breach-puts-hotel-guests-data-at-risk-2/.

[75] *2018 Data Breach Investigations Report*, ENTERPRISEVERIZON.COM, (11th ed.), at 5, 24, 25, 27, 28, https://enterprise.verizon.com/resources/reports/DBIR_2018_Report.pdf (last visited July 21, 2020).

[76] *Id.*

outdated software; (2) a failure to implement a process to ensure that software was updated and patched; (3) a failure to implement adequate encryption; (4) a failure to implement adequate authentication measures; (5) a failure to adequately monitor its system for breaches; and (6) a failure on the part of senior management to create the appropriate culture around data security. Similar to Starwood, Equifax was the subject of a number of prior breaches. The Equifax data breach was an incredibly public and well-known breach that made headlines across the world.

252. As a result of that breach, Equifax's CEO was called to testify before the Senate Permanent Subcomittee on Investigations along with Defendant Sorenson on March 7, 2019. In addition, that data breach subjected Equifax to numerous lawsuits and regulatory actions. For example, the District Court for the Northern District of Georgia recently approved a settlement of nearly $150 million in the securities suit, and a settlement of more than $380 million in the consumer suit related to the Equifax breach.[77] Additionally, the FTC recently announced that Equifax reached a settlement with the FTC, the Consumer Financial Protection Bureau, and 50 U.S. states and territories for violations related to that breach for at least $525 million and up to $700 million.

253. In addition to the data breaches affecting the hospitality industry and Equifax, Marriott was also aware of numerous well-publicized data breaches impacting other large companies. Indeed, the Merger Agreement was signed less than two years after Target reported a data breach affecting more than 40 million customers. Also in that time period, Yahoo announced the largest data breach in history to date. The day before the Merger was closed, Yahoo announced a breach of approximately 500 million records. Less than three months later,

[77] *In re Equifax Inc. Sec. Litig.*, No. 17-cv-3463 (N.D. Ga.) and *In re Equifax, Inc., Customer Data Sec. Data Breach Litig.*, No. 17-md-2800 (N.D. Ga.).

Yahoo corrected that number and informed the public the breach actually affected every single one of Yahoo's customer records, a total of approximately 3 billion.

254. Based on the factual record, Defendants therefore either discovered the obvious deficiencies with the Starwood system described above which exposed customer's sensitive data, or were severely reckless in not detecting these glaring and obvious deficiencies. Defendants are therefore liable for misleading the market as to the extent of the Company's due diligence, the positive progress of the Integration, and for continually assuring the market that its customers' data was secure, all while omitting material information related to the risks posed by Starwood's systems. Marriott is also liable for failing to safeguard this important customer data (while simultaneously touting the importance of safeguarding the data), and for omitting information to the market about the terrible and risky state of the assets it was purchasing for more than $13 billion.

## D. The Data Breach

### 1. Marriott's Discovery of the Data Breach and the Initial Revelation to the Public

255. On September 7, 2018, the IBM Guardium database alert tool discovered the Data Breach. Guardium triggered an alert that a user ran a query of how many entries were in a particular column of a table in the reservation system database. Accenture, Marriott's third party IT contractor tasked with running the legacy Starwood guest reservation database, alerted Marriott's IT department the following day. On September 10, 2018, Marriott brought in third party investigators, including CrowdStrike, to perform a review of their hacked systems.[78]

[78] Further details on the malware used in the attack and the more than four years that attackers had access to Starwood's systems are provided below in Section (VI)(G), detailing the findings of the PFI Report.

256. On September 12, 2018, "CrowdStrike deployed security monitoring tools designed to identify potentially malicious activity in real time to thousands of devices that were originally on the Starwood network." Consumer Complaint at 182. Those tools revealed that attackers "had installed webshells, VPN tools, and malware on Starwood's systems." *Id.* On September 17, 2018, the third party investigators identified a RAT. A RAT is a malware program that includes a back door that allows attackers to access, surveil, and even gain administrative control over a computer. On that day, Marriott's IT department notified Defendant Sorenson. On September 18, 2018, Defendant Sorenson notified Marriott's Board, including the Audit Committee Defendants, of the Data Breach, including the above information. Additionally, in early October 2018, the third party investigators found evidence of other malware in Starwood's database, including Mimikatz which searches a device's memory for usernames and passwords.

257. On October 29, 2018, still more than a month before informing the public, Marriott contacted the FBI to notify them of the tools used by the hackers, the timelines of the intrusion, and any forensic findings the Company or its third party investigators had made so far. In early November 2018, Marriott learned that the Data Breach stretched all the way back to at least July 2014. At that time, and still without informing the market of its findings, Marriott implemented "endpoint detection technology on devices across the Starwood network."

258. On November 6, 2018, Marriott filed its Q3 2018 Form 10-Q **without disclosing the fact that it had experienced a serious data breach on a critical customer-serving platform**. Defendant Sorenson and the Audit Committee Defendants had already been informed on September 18, 2018 that the legacy Starwood guest reservation database had been breached. Based on the evidence of the Data Breach and the known vulnerabilities, management knew that

its customers' sensitive personal data had been exposed to attackers. Marriott was silent in its Q3 2018 Form 10-Q as to the Data Breach, ***and continued to operate the hacked Starwood guest reservation database***, even going so far as to continue to encourage customers to book reservations with the corrupted reservation database.

259. On November 13, 2018, Marriott's investigators discovered evidence that two compressed encrypted files had been deleted from a device they were examining. On November 19, 2018, Marriott learned that those compressed and encrypted files contained personal information. On that day, Marriott finally began preparations to notify affected guests.

260. On November 25 and 26, 2018, Marriott discovered that in both 2015 and 2016, "the attacker had likely created a copy of two other tables, which the attacker later deleted." The file names of those tables corresponded to the files names of the two other tables that had been deleted, but Marriott could not recover those files and did not know if they had been taken.

261. On November 29, 2018, (83 days after the Data Breach was discovered) Marriott provided notice of the Data Breach to the four major payment card networks and their credit processing vendors, regulators in over 20 foreign countries and territories, state Attorneys General, the FTC, the SEC, and the three major credit reporting agencies. Marriott also provided an update to the FBI.

262. On November 30, 2018, nearly 3 months after discovering the Data Breach, Marriott made its first public revelations regarding the Data Breach.[79] Marriott informed the market that approximately 500 million guest records had been affected by the Data Breach and

[79] Notably, the average data breach lasts only 266 days before identification and containment but the data breach at Starwood and then Marriott went undetected for a total of nearly 1,500 days, including going undetected for 715 days and was not resolved for at least 733 days after Marriott took ownership and control of the legacy Starwood guest reservation database. *See* Rob Sobers, *Data Breach Response Times: Trends and Tips*, Varonis (Mar. 13, 2019).

that the Company had only just begun notifying guests that their personal information had been compromised. The attackers were able to steal names, mailing addresses, phone numbers, email addresses, passport numbers, Starwood Preferred Guest account information, date of birth, gender, arrival and departure information, reservation date, and communication preferences.

263. The market was shocked by the November 30, 2018, revelation and Marriott's share price was rocked by the news. In a Form 8-K filed before the market opened, Marriott revealed that there was unauthorized access to the legacy Starwood guest reservation database. The Company disclosed that the personal information of guests who made reservations at Starwood properties on or before September 10, 2018, had been exposed to attack. On this date, the Company's share price fell $6.81, or 5.5%, to close at $115.03 per share on extremely heavy volume.[80]

264. On November 30, 2018, Cowen released an analyst report discussing Marriott's revelation of the Data Breach. In that report, Cowen noted that the incident "***may hamper loyalty enrollment***." The report also noted that it had "cause[d] real brand damage" for Marriott.

265. On November 30, 2018, Taylor Telford and Craig Timberg published an article for the Washington Post on the Data Breach titled *Marriott discloses massive data breach affecting up to 500 million guests*. In that article, Mr. Telford and Mr. Timberg noted that the "breach of the reservation system for Marriott's Starwood subsidiaries was one of the largest in history . . . and was particularly troubling for the nature of the data that apparently was stolen." The article also quoted Edward Hasbrouck, a travel writer and consumer advocate, who said the Data Breach involved "extraordinarily intimate data" and that the "travel industry has been

---

[80] Marriott completed notification of all U.S.-based guests on December 11, 2018. However, at the time the Company announced the Data Breach, Marriott still was not able to determine whether the attackers had also stolen the encryption keys—and to this day, Marriott has still not released whether the attackers had also stolen the encryption keys.

grossly negligent compared to many industries when it comes to data privacy and security." Additionally, Paige Boshell, an attorney with Privacy Counsel LLC, noted that "there were significant opportunities for higher scrutiny." Mr. Telford and Mr. Timberg also highlighted Starwood's prior breaches.

266. On November 30, 2018, NBC News posted an article by Erik Oritz titled *Marriott says breach of Starwood guest database compromised info of up to 500 million* to its website. In that article, Mr. Ortiz quoted Jake Williams, the president and founder of cybersecurity firm Rendition Infosec, as saying the revelation was "very inarticulately worded" and that he was left "playing guesswork at what some of these statements mean."

267. Also on November 30, 2018, Krebs on Security ("Krebs") published an article titled *Marriott: Data on 500 Million Guests Stolen in 4-Year Data Breach*. In that article, Krebs described the incident as "a massive data breach exposing the personal and financial information on as many as a half billion customers who made reservations at [] Starwood['s] properties over the past four years." Krebs noted the potential for further revelations regarding the severity of the Data Breach and cited to the breach of IHG's payment systems in 2017. In the IHG breach, the company initially thought that the POS systems had been breached at the restaurants or bars of only 12 properties. Approximately three months later, however, IHG revealed the breach actually affected more than 1,000 properties, including the payments systems used at the front desks of some of the properties. Krebs also noted that Marriott's Data Breach was "just the latest in a long string of intrusions involving credit card data stolen from major hotel chains over the past four years."

268. On November 30, 2018, the New York Times published an article by Nicole Perlroth, Amie Tsang, and Adam Satariano titled *Marriott Hacking Exposes Data of Up to 500*

*Million Guests*. In that article, the reporters noted that Marriott "asked guests checking in for a treasure trove of personal information." The article also stated that the "intrusion was a reminder that after years of headline-grabbing attacks, the computer networks of big companies are still vulnerable." The reporters also noted that in recent years, according to cybersecurity experts, "the hospitality industry has become a rich target for nation-state hackers looking to track the travel movements and preferences of heads of states, diplomats, chief executives and other people of interest to espionage agencies." The article also quoted Jake Olcott, a VP at Bitsight, a computer ratings company, who said that finding out about a data breach after a merger closes is "everybody's worst-case scenario." Additionally, the article stated that "***[p]rivacy advocates said there was no excuse for a breach to go unnoticed for four years***." Gus Hosein, the executive director of Privacy International, said a company can claim to take security seriously, ***"but they don't if you can be hacked over a four-year period without noticing."***

269. Also on November 30, 2018, NPR posted an article, written by Avie Schneider, titled *Marriott Says Up To 500 Million Customers' Data Stolen In Data Breach* to its website. In that article, Schneider noted Marriott's share price fell 5.6% and that the "data breach is one of the largest in history" that included "sensitive data such as passport numbers, mailing addresses and credit card information." The article also quoted Ted Rossman, an analyst with CreditCards.com, who said the Data Breach is "one of the most significant data breaches in history given the size . . . and the sensitivity of the personal information that was stolen."

270. On November 30, 2018, the LA Times also posted an article, written by Sam Dean, titled *Marriott data breach exposes up to 500 million guests' personal information* to its website. In that article, Dean noted that as a result of the Data Breach "new laws in Europe could stick the global hotelier with hundreds of millions of dollars in fines." Dean stated that

"experts say too many companies continue to have a startlingly lax approach to data security." The article also noted that Marriott's share price fell 5.6%.

271. On November 30, 2018, Barclays issued a report regarding the potential implications of the data breach, which stated:

> Hotel data breaches are fairly common; however, this particular breach appears to be the largest yet. In recent years, Hyatt, InterContinental, HEI, Sabre and others have reported data breaches of various levels. In many cases, the breaches involved credit card and other data generated by credit card swipes or manual entry at the property level. In other cases, hackers targeted certain groups of hotels. The Starwood breach appears to be more significant than these prior incidents as it targeted customer data at the corporate level.

272. On December 4, 2018, Forbes posted an article, written by David Volodzko, titled *Marriott Data Breach Exposes Far More Than Just Data* to its website. The article noted that as a result of the Data Breach, Marriott's shares had fallen 5.6%. Additionally, Volodzko noted that Marriott's revelation ***"leaves the question of why [the Company] only now detected a problem that evidently began four years ago."*** The article quoted Andrei Barysevich, a researcher with Recorded Future, a threat intelligence company, who said that ***with all the resources Marriott has, "'they should have been able to isolate hackers back in 2015.'"*** Volodzko noted that "the whole problem began" when Marriott announced the Merger in November 2015 and that "***it's hard to believe Marriott couldn't see [the breach] coming***," particularly because "[h]otels are easy targets, constituting 92% of all [POS] intrusions in 2017." Volodzko noted that the prior breaches of Starwood's systems put Marriott on alert that the Company "was clearly taking on considerable risk by acquiring Starwood." Volodzko questioned whether Marriott was "unaware of this danger or was [the Company] using some version of the recall coordinator's formula, putting customers at risk because it assumed the cost of a breach would be less than the cost of better security?" Volodzko quoted John M. Simpson, a

project director for privacy and technology at Consumer Watchdog as stating "many companies opt for inadequate data security because it's cheaper than the consequences of a data breach." Volodzko also pointed out that the "ripple effect of a hotel breach goes well beyond customers" due to the interconnectedness of the business entities within a hotel.

273. On December 5, 2018, UBS released an analyst report discussing the Data Breach. In that analyst report, UBS listed a number of issues the Company would need to address as a result of the Data Breach, including legal costs, security costs, and potential settlement costs. UBS also noted other issues, such as the Data Breach taking management's attention away from regular operations, any potential impact on hotel owners, and the impact on enrollment in the Company's loyalty program.

274. On December 14, 2018, Bloomberg posted an article, written by Patrick Clark, titled *Marriott Data Breach Exposes Weakness in Cyber Defenses for Hotels* to its website. In that article, Clark stated that "[l]ong before Marriott International Inc. disclosed a massive security breach, the hotel industry had earned the dubious reputation as a hospitable place for hackers." In that article, John Burns, the president of Hospitality Technology Consulting, noted that the "longstanding tradition of an innkeeper," to allow customers to sleep safely and securely, has not always extended to the "digital environment."

275. In an article for TechCrunch published on January 4, 2019, Zack Whittaker noted that Marriott had allowed attackers to take "the sort of data that remains highly valuable for spy agencies that can use the information to track down where government officials, diplomats and adversaries have stayed – giving insight into what would normally be clandestine activities."

276. Notably, when Senator Elizabeth Warren initiated an investigation into Equifax for its data breach she produced a report of her findings (the "Warren Report") that criticized

Equifax for the same conduct that Marriott would later engage in—which is waiting to disclose the breach. After discovering the breach but before telling the public, Equifax held a conference in which it remained silent about the breach. The Warren Report noted that Equifax missed "key opportunities to inform investors of risks" while waiting 40 days to inform the public of suspicious activity in its network and failing to say anything at that conference. Here, Marriott waited more than 80 days from when the Data Breach was discovered and more than 70 days from when Defendant Sorenson and the Audit Committee Defendants were informed. The SEC also stated in an SEC Release that "an ongoing internal or external investigation – which often can be lengthy – would not on its own provide a basis for avoiding disclosures of a material cybersecurity incident."

### 2. Marriott's Response to the Data Breach

277. In response to the Data Breach, Defendant Sorenson said Marriott was finally shutting down Starwood's corrupted guest reservation database. On December 18, 2018, more than two years after closing the acquisition of Starwood, ***and 102 days after discovering the Data Breach***, Marriott finally stopped using the legacy Starwood guest reservation database for business operations.[81]

278. Additionally, Marriott began malware removal for the Starwood network, deploying EDR tools to approximately 70,000 devices, and eventually increased that number to 200,000. Defendant Sorenson claimed the EDR devices would "allow real-time discovery of suspicious behavior on both the Starwood and Marriott networks and have next-generation anti-virus features." Consistent with information provided by CW 1, Marriott was only willing to

[81] Further information on the remediation and containment actions undertaken by Marriott as a result of the Data Breach are provided in Section (VI)(G), detailing the findings of the PFI Report.

install these security measures after a breach rather than in response to the numerous red flags Marriott was aware of regarding Starwood's systems. Defendant Sorenson also touted Marriott's new-found commitment to "identity access management, which means a broader deployment of two-factor authentication across our systems, as well as network segmentation, which means isolating the most valuable data so that it becomes more difficult for attackers to access the systems and for malware to spread through the environment." Defendant Sorenson did not offer any explanation as to why Marriott had not undertaken any of these measures sooner.

279. As for the guests affected by the Data Breach, Marriott offered some limited security measures in an attempt to lessen the possibility that the sensitive customer data stolen in the Data Breach would be used. Marriott set up a website and dedicated call center to address customer concerns regarding the Data Breach. The Company offered one year of enrollment in WebWatcher.[82]

280. However, there were security issues with Marriott's remedial measures. For example, Marriott used email to notify guests, but the domain name the email was sent from was not Marriott's. Rather, the domain name, "email-marriott.com" is actually registered to a third party firm, CSC. The domain does not load, nor does it have an identifying HTTPS certificate.[83] The only way customers were able to verify the validity of the domain was a note lost in the other information on Marriott's notification site for the Data Breach. According to cybersecurity

[82] According to Marriott: "WebWatcher monitors internet sites where personal information is shared and generates an alert to the consumer if evidence of the consumer's personal information is found."

[83] HTTPS (Hyper Text Transfer Protocol Secure) appears in the URL when a website is secured by an SSL certificate. The details of the certificate, including the issuing authority and the corporate name of the website owner, can be viewed by clicking on the lock symbol on the browser bar.

experts, the domain was easily spoofable,[84] which put the victims of the Data Breach at even further risk. Jake Williams, founder of Rendition Infosec, actually registered the domain, "email-marriot.com," with Marriott misspelled, to prevent hackers from using it to try to take further advantage of Marriott's customers. Additionally, Nick Carr of the security firm FireEye registered "email-mariottt.com" for the same reason.

281. Ensuring reliable and unambiguous communication with customers is a fundamental safeguard for any company that relies on ecommerce. The fact that Marriott did not register obvious misspellings of their own domain name and did not have a breach response plan that included communicating with customers in a reliably secure manner indicates that, despite all the red flags and the discovery of an actual breach, Marriott did not have a cybersecurity professional, nor sufficient cybersecurity resources assigned to the systematic prevention of and response to a customer data breach.

**E. Post-Class Period**

282. Following the revelation of the Data Breach, Marriott continued to inform the market of the steps it was taking to make up for its lax data security. These remediation measures show the extent of the gap between Marriott's statements to the public regarding the operation and due diligence surrounding the legacy Starwood guest reservation database.

283. On December 5, 2018, Defendant Oberg admitted that due to the Data Breach, Marriott "had an ongoing data security program for a while." Additionally, Defendant Oberg stated that as a result of the Data Breach, the Company had to "step[] up" its investment in the security of the Company's data. Clearly, Marriott had not been doing enough to protect its customers' sensitive personal information, and the due diligence that should have identified the

[84] Domain spoofing, a common form of phishing, occurs when an attacker appears to use a company's domain to impersonate a company or one of its employees.

vulnerable systems was inadequate—despite Marriott's representations to the contrary throughout the Class Period. Defendant Oberg admitted that Marriott "had a plan" but "as a result of [the Data Breach], we're stepping it up even faster." Defendant Oberg also pointed out that "there's already been dramatic improvement of kind of ways that can quickly, quickly identify that somebody is trying to get into your system." However, Defendant Oberg failed to explain why Marriott failed to utilize any of these advancements in operating and monitoring Starwood's systems.

284. On January 4, 2019, Marriott issued a follow-up press release on the Data Breach. The Company announced that 383 million guest records were affected by the Data Breach. Of these 383 million guest records, 5.25 million unencrypted passport numbers were stolen, along with more than 20 million encrypted passport numbers. That number also included 8.6 million encrypted payment cards. The Company also revealed, for the first time, that some of the payment cards may have been unencrypted card numbers. As detailed below in Section (VI)(G), the PFI Report confirmed that more than 7,200 unencrypted payment card numbers were confirmed to have been taken in the Data Breach, and another 240,000 potentially taken.

285. On January 4, 2019, Cowen released an analyst report discussing Marriott's follow-up revelations regarding the Data Breach. In that report, Cowen noted that the Company was reporting the potential that unencrypted payment card numbers were involved for the first time. Additionally, an USA Today article dated January 4, 2019, by Nancy Trejos, acknowledged the announcement that unencrypted payment card numbers may have been involved. Most of the reaction, however, focused on the fact that more than 5 million unencrypted passport numbers were stolen.

286. On March 7, 2019 Defendant Sorenson and the CEO of Equifax, Mark Begor testified before the Senate Permanent Subcommittee on Investigations. Both Defendant Sorenson and Mr. Begor answered questions from Senators regarding the deficiencies in the two companies' data security. During that hearing, ***several Senators criticized Defendant Sorenson and Marriott for their deficient due diligence during the Merger*** and lax security procedures in operating the reservation database. Senator Tom Carper questioned Marriott's data retention policies and stated that he did not "know why [Marriott] would need to have maintained records of millions of guest passport numbers as appears to have occurred in this case." He said that the Data Breach "raises questions about the degree to which cybersecurity concerns do and should play a role in merger and acquisition decisions." He also noted that "Marriott acquired a company ***that it knew had serious cybersecurity challenges*** and had actually been attacked before" and that "[d]espite this, Marriott chose to initially leave Starwood's security system in place after acquiring the company." Senator Carper said the committee was interested in "learn[ing] more about the priority that Marriott executives chose to place on addressing security flaws at Starwood as it worked to integrate its systems into its own."

287. Further, Senator Rosen questioned Defendant Sorenson on Marriott's due diligence practices during the Merger, as well as the Company's data security practices during the Integration. Specifically, Senator Rosen asked "where was your responsibility in maintaining, and as you migrated, protecting that data?" In response, Defendant Sorenson noted that Marriott brought in external consultants to attempt to understand the risk related to Starwood's systems, but also stated: "we wish we had done even more."

288. In a Washington Post article titled *Senators slam Equifax, Marriott executives for massive data breaches* published on March 7, 2019, Tony Romm noted that "lawmakers []

faulted Marriott for moving too slowly" to phase out Starwood's systems. Specifically, Senator Rosen was "surprise[d] that Marriott had taken 'no method of auditing the data coming across' in the early days" of the Integration.

289. On March 7, 2019, David Shepardson published an article for Reuters discussing Defendant Sorenson's testimony in front of the Senate's Permanent Subcommittee on Investigations. Mr. Shepardson noted that Committee Chairman Portman commented on the POS breach that Starwood revealed just days after the Merger was announced. Further, the article noted that Senator Carper said that Marriott "acquired a company with 'serious cybersecurity challenges and had actually been attacked before' but chose to initially leave Starwood's security system in place after acquiring it."

290. On March 11, 2019, Kate O'Flaherty published an article for Forbes called *Marriott CEO Reveals New Details About Mega Data Breach*, in which she noted that ***Marriott took nearly three months to inform the public of the Data Breach.*** Additionally, Ms. O'Flaherty pointed out that Marriott "failed to protect valuable customer information" and that Marriott is "the subject of class action lawsuits that could cost it hugely."

291. On March 22, 2019, Patrick Nohe posted a blog for Hashed Out in which he noted that the identity of the attackers in the Data Breach could not make Marriott any less culpable for its failure to protect its customers' data. Mr. Nohe identified at least three issues with Marriott's conduct related to the Data Breach: (1) the Data Breach lasted for four years; (2) that Marriott failed to discover the Data Breach during its due diligence; and (3) that it waited months to disclose the Data Breach.

292. Approximately one year after Marriott's Senate testimony, on March 31, 2020, Marriott disclosed ***yet another breach of its systems*** exposing the sensitive personal information

of 5.2 million guests. The Company announced that the data exposed included: (1) contact details; (2) loyalty account information; (3) personal details such as gender and birth month and year; (4) linked partnerships and affiliations, such as airline rewards programs; and (5) preferences related to hotel stays, such as room and language preferences. Attackers were able to access this information using the login credentials of two employees at one of the Marriott's franchise properties. The Company stated the suspicious activity occurred from the middle of January 2020 through the end of February 2020.

### F. Litigation and Regulatory Action Against Marriott

293. The fallout from the second largest data breach in history has also included investigations from "certain committees of the U.S. Senate and House of Representatives" and "regulatory authorities in various other jurisdictions." Additionally, approximately 100 lawsuits have been filed against Marriott and Starwood from a variety of plaintiffs, including residents of all fifty states and foreign citizens in American and Canadian courts.

#### 1. The Multi-District Litigation in the District of Maryland

294. The lawsuits against Marriott in American courts have largely been consolidated into this multi-district litigation ("MDL"), which includes this lawsuit and: (1) claims on behalf of the citizens of Chicago affected by the Data Breach brought by the City of Chicago (the "Government Track"); (2) claims from financial institutions regarding their costs stemming from the Data Breach (the "Financial Institution Track"); (3) claims for violations of the data protection laws of all fifty states ("Consumer Track"); and (4) derivative claims brought on behalf of Marriott's shareholders and the Company itself (as a nominal defendant) (the "Derivative Track").[85] In addition to the Derivative Track in the MDL, a separate derivative

---

[85] The amended complaint for the Derivative Track is scheduled to be filed two weeks after this Complaint is filed. *See* ECF No. 559 (Court's Order approving the parties' proposed schedules).

action has been filed in Delaware Chancery Court (the "Delaware Action") after those shareholder plaintiffs made a successful § 220 books and records demand of Marriott.

295. After viewing the PFI Report[86] and other documents Marriott has produced in discovery, plaintiffs in each of the Government Track[87], the Financial Institution Track, and the Consumer Track made allegations in their amended complaints regarding Marriott's failure to perform adequate due diligence during the Merger and protect customer data. All three of those amended complaints have already survived the motion to dismiss, at least in part, and are all continuing with discovery.

### 2. The Court Has Already Determined That Marriott Made Material Omissions About Its Due Diligence and Data Security and Knew the Company's Due Diligence and Data Security Was Inadequate

296. This Court has already made several important rulings in parallel proceedings that apply to Lead Plaintiff's allegations here. Most importantly, the Court already held in a decision on the Defendants' motion to dismiss in the parallel Consumer Track, based on substantially the same facts, that plaintiffs met the heightened pleading requirements of Rule 9(b) with regard to: (1) **"their allegations of reliance on <u>material omissions</u> by Defendants"**; and (2) **their "extensive allegations that Marriott knew or should have known about its allegedly inadequate data security practices and the risk of a data breach."** Consumer MtD Opinion at 60-61, 64. The allegations referenced by Court in making this important determination, as pled in the consumer complaint, are re-alleged here:

---

[86] After a breach, payment card processors are required by the PCI to hire a Payment Card Industry Forensic Investigator ("PFI") to conduct a forensic examination. The company is required to submit a final PFI Report to the PCI.

[87] *Chicago v. Marriott Int'l, Inc.*, No. 19-cv-654, 19-md-2879 ECF Nos. 294, 296, 298, & 593-1 (D. Md.) (cited as Government Complaint at ¶__).

(a) As plaintiffs in the consumer track alleged in their complaint, "on November 16, 2015, Marriott International announced that it was purchasing Starwood for $13.6 billion, creating the world's largest hotel company." Consumer Complaint at ¶ 115.

(b) "After the transaction closed on September 23, 2016, Marriott stated in a press release that the new company 'offers the most comprehensive portfolio of brands including leading lifestyle brands, a significant global footprint, and leadership in the luxury and select-service tiers as well as the convention and resort segment. Beginning today, Marriott will match member status across Marriott Rewards – which includes The Ritz-Carlton Rewards – and Starwood Preferred Guest (SPG), enabling members to transfer points between the programs for travel and exclusive experiences when they link their accounts later today.'" *Id.* at ¶ 116 (quoting *Marriott International Completes Acquisition of Starwood Hotels & Resorts Worldwide, Creating World's Largest and Best Hotel Company*, MARRIOT.COM (Sept. 23, 2016), https://marriott.gcs-web.com/news-releases/news-release-details/marriott-international-completes-acquisition-starwood-hotels).

(c) "The press release further stated that Marriott 'will operate or franchise more than 5,700 properties and 1.1 million rooms, representing 30 leading brands from the moderate-tier to luxury in over 110 countries. With the completion of this acquisition, Marriott's distribution has more than doubled in Asia and the Middle East & Africa combined."' *Id.* at ¶ 117 (quoting *Marriott International Completes Acquisition of Starwood Hotels & Resorts Worldwide, Creating World's Largest and Best Hotel Company*, MARRIOT.COM (Sept. 23, 2016), https://marriott.gcs-web.com/news-releases/news-release-details/marriott-international-completes-acquisition-starwood-hotels).

(d) "According to Marriott CEO Arne Sorenson, Starwood's SPG Program was a 'central, strategic rationale for the transaction' because its members are deeply loyal, have generally higher incomes, and tend to spend many nights on the road." *Id.* at ¶ 118 (quoting S. Mayerowitz, *Marriott Buys Starwood, Becoming World's Largest Hotel Chain*, ASSOCIATED PRESS (Sept. 23, 2016)).

(e) "In any acquisition of this size, it is standard practice to perform cybersecurity due diligence, including researching undisclosed or unknown data breaches, as well as identifying information technology ("IT") security risks and shortfalls in operations and governance of the target company. A primary responsibility of Marriott (or any company conducting a merger and acquisition) is to perform a full and complete cyber-security assessment to understand the state of the target company's computer networks, systems, and its vulnerabilities." Consumer Complaint at ¶ 119.

(f) "During the year that elapsed between announcement and closing of the merger, Marriott and Starwood retained respective financial advisors and legal counsel to analyze business records and make a financial assessment of the merger and valuation of the stock for purposes of recommending the merger to stockholders. Marriott did not, however, retain a cybersecurity analyst to audit Starwood's information security risks and shortfalls, IT operations, technology and governance - even after Starwood disclosed a breach of its systems at [POS] more than 50 locations just four days after Marriott's announcement of the merger." *Id.* at ¶ 120.

(g) "This lack of cybersecurity due diligence violated 'Starwood's Secure Media Handling' policy, which states that as part of the merger and acquisition due diligence process, an evaluation must be performed to identify any existing information security issues that

might be inherited from the other company involved in the merger or acquisition and conduct a compliance review to compare the target organization's information security practices against Starwood's Global Information Security Policies, as well as other security requirements to identify potential risks. Neither Starwood nor Marriott performed due diligence into information security issues as mandated by internal policy." *Id.* at ¶ 121.

(h) "After the Data Breach, Jeff Flaherty, a senior director of global communications and public affairs at Marriott, stated that 'as part of the company's integration efforts, Marriott conducted an assessment of the legacy Starwood IT systems prior to and after the close of the transaction."' *Id.* at ¶ 122 (quoting *Starwood Data Breach: Lessons for the Hotel Industry*, HOTELNEWSNOW.COM (Apr. 9, 2019), http://www.hotelnewsnow.com/Articles/294646/Starwood-data-breach-Lessons-for-the-hotel-industry).

(i) But it was later disclosed that Marriott's "assessment" was simply a series of meetings with counterparts at Starwood IT before the closing in September 2016 – not an independent cybersecurity audit that any reasonable company would have undertaken. And, the focus of these efforts was forward-looking—*i.e.*, whether the combined Marriott/Starwood business would use Marriott's or Starwood's IT systems post-merger – not data security. Consumer Complaint at ¶ 123.

(j) "An internal report dated July 18, 2016 entitled 'Marriott IT infrastructure & Security Business Cases' detailed Marriott's internal cost summary of the infrastructure and security integration of the Marriott Loyalty Rewards and Starwood Preferred Guest databases through 2018.[] The report raised an alarm that the Starwood preferred guest database did not have a Security Incident & Event Management (SIEM) process in place to identify, monitor, and

analyze IT-security related events in real time: 'Starwood does not currently have a SIEM. The SIEM is the method by which an organization can leverage system and application logs to identify anomalies in the environment that could be indicators of compromise. Not having a SIEM would result in security events going undetected.' This is precisely what occurred." *Id.* at ¶ 124.

(k) "Marriott's July 18, 2016 report warned that Starwood did not monitor and report on the 'state of security' across the enterprise and has no visibility into out-of-date operating systems and/or suspicious or malicious software running on Starwood systems." *Id.* at ¶ 125.

(l) "The report further discussed Starwood's lack of tokenization and point-to-point encryption across its point-of-sale systems, [REDACTED].'" *Id.* at ¶ 126.[88]

(m) "Both before and after the acquisition, Marriott knew it and other hotel chains were prime targets for hackers given the significant amount of sensitive customer information it collects in the course of business. In fact, both Starwood and Marriott, among many other high-profile hotel chains, were targeted in other data breaches by hackers in the months and years before the Data Breach was discovered." *Id.* at ¶ 139.

(n) "Federal agencies have issued recommendations and guidelines to temper data breaches and the resulting harm to individuals and financial institutions. For example, the FTC has issued numerous guides for business highlighting the importance of reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making." *Id.* at ¶ 256 (citing FEDERAL TRADE COMMISSION, *Start With*

[88] Additionally: "The report recommended upgrading the security of Starwood's administrative account access including adopting token-based and two-step authentication. It acknowledged that Starwood did not currently have two-step authentication capability and that Starwood users were at increased risk of compromise without such controls in place." *Id.* at ¶ 127.

*Security* (June 2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf).

(o) "In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established guidelines for fundamental data security principles and practices for business. Among other things, the guidelines note businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach." Consumer Complaint at ¶ 257 (citing FEDERAL TRADE COMMISSION, *Protecting Personal Information: A Guide for Business* (Oct. 2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf).

(p) "Additionally, the FTC recommends that companies limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures." *Id.* at ¶ 258.

(q) "The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer information, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade

Commission Act, 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations." *Id.* at ¶ 259.

(r) "In this case, Marriott was fully aware of its obligation to use reasonable measures to protect the personal information of its customers, acknowledging as much in its own privacy policies. Marriott also knew it was a target for hackers. But despite understanding the consequences of inadequate data security, Marriott failed to comply with industry-standard data security requirements." *Id.* at ¶ 260.

297. Additionally, the Court held that the Section 5 of the FTC Act "is a statute that creates enforceable duties," and that duty "is ascertainable as it relates to data breach cases." Consumer MtD Opinion at 47. In discussing the duty imposed on Marriott by Section 5 of the FTC Act , the Court highlighted the Court of Appeals for the Third Circuit's decision in *FTC v. Wyndham* from 2015, and discussed in further detail below in Section (VI)(H)(3). *Id.* at 48. The Court noted that the Third Circuit found that "allegations regarding Wyndham's cybersecurity practices, including that it had an allegedly misleading privacy policy that overstated its cybersecurity, fell within the plain meaning of 'unfair' practices in the text of Section 5 of the FTC Act." *Id.* Further, the Court highlighted that the Third Circuit relied in part on the guidance from the FTC titled Protecting Personal Information: A Guide for Business, published in 2007. *Id.* That guide from the FTC "provided additional" notice to Wyndham regarding their data protection duties under Section 5 of the FTC Act. *Id.*

298. On December 13, 2019, the Court denied Defendants' motion to dismiss in the Government Track. ECF No. 517 (Court's Memorandum Opinion and Order on Defendants' Motion to Dismiss Chicago's First Amended Complaint) (hereinafter "Government MtD Order"). The amended complaint in the Government Track noted that the filing of that action

was prompted by a request from the Commissioner for the City of Chicago Department of Business Affairs and Consumer Protection, Rosa Escareno, after she completed her investigation into the Data Breach. Government Complaint at ¶ 10, n.7. As stated in the Government MtD Order: "Chicago alleges that Marriott's data security practices were unfair, deceptive, and unlawful" under a municipal ordinance, and Illinois state statutes. Government MtD Order at 5. In denying Defendants' motion to dismiss, the Court held that Chicago adequately pleaded an injury to the city's proprietary interests in the form of guests being less likely to stay at Marriott hotels in Chicago as a result of the Data Breach. *Id.* at 6-8.

299. On February 7, 2020, the Court denied Defendants' motion to dismiss, in part, in the Financial Institution Track. ECF No. 532 (Court's Memorandum Opinion and Order on Defendants' Motion to Dismiss Bank of Louisiana's First Amended Complaint) (hereinafter ("Financial Institution MtD Order"). Plaintiffs in the Financial Institution Track alleged that "Marriott chose not to address known and identified security vulnerabilities in Starwood's environment despite concerns from several data security assessors." Financial Institution Complaint at ¶ 12. Additionally, the Financial Institution Track plaintiffs noted that "[m]any of these security deficiencies were the same ones identified by previous security assessments of Starwood's systems and databases," and that "at least some of the PCI DSS violations both 'caused' and 'contributed' to the Data Breach." *Id.* at ¶ 18. Further, the Financial Institution Track's amended complaint, based on its review of the PFI Report, alleged that Marriott committed "numerous violations of the PCI DSS requirements." *Id.* at ¶ 59.

300. As noted below, while the MDL is pending, additional shareholders filed a derivative action in Delaware Chancery Court after receiving documents from Marriott pursuant to a § 220 books and records demand.

### 3. Evidence Produced to Plaintiffs in Parallel Derivative Litigation

301. Although discovery is stayed in this case under the PSLRA, documents produced by Marriott to plaintiffs in parallel litigation nevertheless support Lead Plaintiff's allegations here. Marriott's own documents—including board minutes— were produced to the plaintiffs in parallel derivative litigation under § 220 of the Delaware General Corporation Law and were incorporated into the plaintiffs' publicly-filed complaint in that case. This evidence shows that: (1) Defendants made false statements to the market; and (2) did so either knowingly or with severe recklessness. The specific supporting allegations and documents detailed in the derivative complaint filed in Delaware Chancery Court are summarized below:[89]

302. At a meeting of the Marriott Board on August 7, 2014, Defendant Sorenson and other board members discussed "some recent publicized [data breach] incidents," including the Target breach discussed in further detail below in Section (VI)(G)(8), and received a presentation titled "Security Overview" detailing recent cybersecurity incidents at other companies.[90] Nevertheless, Defendant Sorenson and the rest of the Board failed to retain the services of an outside analyst or consultant to audit any cybersecurity risks Starwood brought to the Merger.[91]

303. Only days after the Merger was announced, Starwood disclosed that the POS systems at some of its hotels in North America had been infected with RAM-scraper malware and that the software had been infected from November 2014 to October 2015. The malware allowed cybercriminals to access the payment card data of Starwood customers. Notwithstanding this significant development, Marriott's Board did not act. The Board did not

---

[89] Citations to "MAR-XXXXXX" refer to specific bates-numbered documents cited in the Chancery Court Complaint.

[90] Chancery Court Complaint at ¶ 96; MAR-000844; MAR-000847.

[91] Chancery Court Complaint at ¶¶ 106-108

order a more detailed and focused review of Starwood's IT operations, and merger negotiations continued without concern.[92]

304. While Defendant Sorenson and the rest of Marriott's Board, including the Audit Committee Defendants, failed to act to ascertain the depth of the cybersecurity issues publicly identified by Starwood, there is no question that Marriott's Board understood the threat facing Marriott stemming from Starwood's disclosed breach and Starwood's related cybersecurity deficiencies at the time it claimed to be conducting due diligence on Starwood.

305. At the Company's Board meeting on February 12, 2016, approximately seven months prior to the closing of the Merger, Defendant Oberg, the Company's CFO, gave a presentation on risks facing Marriott to the Board, which included Defendant Sorenson and the Audit Committee Defendants. Defendant Oberg's presentation ranked the top risks facing Marriott in 2016, and included a slide titled "Overall Company Risk Ranking," which ***showed that the Board itself ranked cybersecurity as the number one risk facing Marriott in 2016***. "Information Protection" also made the list of risks. Marriott's executive management team provided its own assessment, also listing cybersecurity high on its list of threats facing the Company. One slide presented to Defendant Sorenson and the rest of the Board, including the Audit Committee Defendants, summarized the Board and management's understanding of the Company's cybersecurity risk succinctly:

> The Board of Directors and Management both view this risk as having increased from 2015 to 2016. Cybersecurity is an enterprise-wide risk that continues to make headlines and present challenges for many large organizations due to the sophistication of cyber events and the related costs of establishing and continually evolving infrastructure to prevent and manage them. Large-scale cybersecurity breaches can quickly erode customer

[92] *Id.* at ¶ 99.

> confidence and result in significant brand damage. These concerns are evident in both groups ranking the risk in the Top 5 risks.[93]

306. At the same Board meeting, Defendant Sorenson was provided with the results of a survey of 270 of Marriott's top executives. One slide in that presentation showed that 59% of these executives considered cybersecurity as a "High/Substantial" risk. A second slide showed that 38% of the executives believed that Marriott's mitigation plans to address the cybersecurity risk should be "significantly enhanced" or "enhanced," and another 38% responded that "certain areas could be enhanced to more fully address the risk."[94]

307. While the Board and the Company's management acknowledged the threat of cybersecurity to the Company's future, minutes from various Board meetings held while Marriott was supposed to be conducting due diligence into Starwood's cybersecurity revealed not a single mention of Starwood's cybersecurity or data controls. Rather, these minutes indicate that Marriott's Board received information on the "related costs of establishing and continually evolving [cybersecurity] infrastructure to prevent and manage them" but not information regarding Starwood's existing controls and vital data.[95] It was not until after Merger actually closed that the Board was brought up to speed on Starwood's IT systems.

308. Marriott's Board recommended the Merger with Starwood in November 2015, and the Merger closed on September 23, 2016, notwithstanding the failures in the due diligence Marriott conducted of Starwood's cybersecurity systems, and failure to discover how vulnerable Starwood's systems, and specifically the guest reservation database, were.

309. Marriott's management made the decision to continue using Starwood's old reservations systems post-Merger, knowing that they had been breached at least once, recently,

---

[93] *Id.* at ¶ 100; MAR-000958

[94] Chancery Court Complaint at ¶ 101-102; MAR-000964, MAR-000966, MAR-000970.

[95] Chancery Court Complaint at ¶ 109.

and knowing that Starwood's cybersecurity efforts did not comply with industry standards or the applicable laws and regulations.[96] Minutes from a December 3, 2018, presentation by Marriott's management to the Board, show that Marriott made what management referred to as "security decisions" at the time of the Merger in deciding ***not*** to invest in Starwood's systems because they intended to operate the legacy Starwood guest reservation database for a short time. However, Marriott did not decommission the legacy Starwood guest reservation database until more than two years after the Merger closed and approximately three months after Marriott was first alerted to the Data Breach (*See* Section (VI)(G)).

310. The Board and its committees, including the Audit Committee,[97] met on February 8, 2017. Members of the Audit Committee were informed by its consultant, E&Y, that "[w]hile cybersecurity has historically been a topic of discussion in board rooms, the increase in the volume and severity of attacks, coupled with the increased scrutiny by regulators, has significantly elevated its importance."[98] It was the Audit Committee that was "now expected to have an understanding of the business implications of cyber risks" and that "cybersecurity has emerged to prominence as a massive risk area for the hospitality industry."[99] E&Y also informed the Audit Committee that they were expected to have an understanding of the appropriateness of the Company's cybersecurity risk disclosures required by the SEC.[100] Marriott's own internal audit department rated Marriott as "Needs Improvement" in cybersecurity. And Marriott's chief

---

[96] *Id.* at ¶ 117.

[97] In 2016, the members of Marriott's Board's Audit Committee were: (i) Mary K. Bush; (ii) Frederick A. Henderson, the Chair of the Audit Committee; (iii) Aylwin B. Lewis; (iv) George Munoz; and (v) Lawrence W. Kellner (who served on the committee until September 2016..

[98] Chancery Court Complaint at ¶ 67; MAR-001067.

[99] *Id.* at ¶¶ 118-119.

[100] *Id.*

audit executive ("CAE"),[101] Keri Day, stated that Marriott's "incident response plan is not up to date and does not include detailed playbooks/procedures for responding to highly probabl[e] incidents and protocols for invoking Marriott's broader Crisis Management Plan."[102]

311. Notwithstanding the directive from E&Y in 2017 that the Audit Committee, specifically, should be tasked with overseeing cybersecurity risk, Marriott did not move responsibility for cybersecurity risk oversight from the entire Board to the Audit Committee until January 2019.[103]

312. Defendant Sorenson and the rest of the Board, including the Audit Committee Defendants, were also reminded at the February 10, 2017, Board meeting that cybersecurity remained a top-level risk for the Company. According to Defendant Oberg's presentation, the Board ranked cybersecurity as the second biggest risk facing Marriott in 2017, and that the hospitality industry was "a target for cyber criminals," and "continuous efforts to identity and mitigate risks is required."[104]

313. The Board also received a presentation titled "Marriott Cybersecurity Report," which showed that 30 hospitality companies experienced data breaches in 2015, and another 21 did in 2016.[105] This presentation also included a slide that showed that, specifically, HEI, Mandarin, Hilton, and Starwood had all experienced breaches in the past three years.

---

[101] In a public company, the CAE is the head of Internal Audit and reports to both the CEO and directly to the Board, and is required to have an unfiltered line to the Audit Committee. The CAE is required to present an audit plan to the Board at least annually, and would likely do so on a quarterly basis.

[102] Chancery Court Complaint at ¶ 119.

[103] *Id.* at ¶ 120.

[104] *Id.* at ¶ 121; MAR-001324; MAR-001325; MAR-001341; MAR-001355.

[105] Chancery Court Complaint at ¶ 122; MAR- 001278; MAR-00279.

314. At the February 10, 2017, Board meeting, Defendant Sorenson and the Audit Committee Defendants, along with the rest of the Board, learned much more about the lack of cybersecurity controls involving Starwood's legacy databases, databases still in use after the merger. PwC was brought in to assess Starwood's systems, and created the "Starwood Security Program Assessment." After Defendant Hoffmeister presented PwC's "early observations" from this assessment, including [redacted], a presentation given to the Board explained that Starwood's "[b]rand standards did not mandate PCI compliance, tokenization, or point-to-point encryption."[106] Marriott's due diligence process should have uncovered Starwood's lack of PCI DSS compliance, as seeking to be compliant with relevant laws and regulations is a part of any standard due diligence process. PwC's assessment also reported that Starwood's "[d]ecentralized technology management model created a different risk profile than Marriott's centralized approach" which "[a]llowed for greater opportunity for deviation from the expected published standard, and led to an unusually high number of associates with elevated access to systems." Defendant Sorenson and the rest of the Board, including the Audit Committee Defendants, would have known all of this sooner had a proper due diligence investigation been conducted, and if the results had been reported to the Board, or the Board knew of and were severely reckless in disregarding these risks. Additionally, as Defendant Oberg noted, the Board recognized that cybersecurity was among the top risks facing Marriott. If Defendants did not know before the February 2017 Board meeting, they definitely knew afterwards that Starwood was not PCI DSS compliant. Notably, Marriott protected its client data using tokenization.[107]

---

[106] Chancery Court Complaint at ¶ 124. As detailed above in Section (VI)(G), Marriott's failure to correct Starwood's lack of PCI DSS compliance during the due diligence process was an egregious failure by Defendants.

[107] Chancery Court Complaint at ¶ 124; MAR-001249-51; MAR-001288.

315. PwC provided Marriott's Board, including Sorenson, with four "key recommendations" including: 1) Update Starwood brand standards to mandate PCI and set cybersecurity expectations; 2) Strengthen the security of systems that manage user accounts and passwords; 3) Tightly control user accounts that have elevated (administrator level) privileges to critical systems; and 4) Continue to analyze Starwood's technical environment to identify items exceeding Marriott's risk appetite.[108]

316. For a full year following the February 2017 Board meeting, based on the minutes produced pursuant to the § 220 demand, the Board did not reconsider or address the known, identified deficiencies associated with Starwood's databases, and customer reservations continued to be made using Starwood's antiquated, non-compliant guest reservation system. At the February 9, 2018, meeting of the Board, Defendant Sorenson and the Audit Committee Defendants, were informed that for the past year, Marriott had elected to simply "[i]mplement[] patching" to fix issues related to Starwood's unsafe databases, and that the transition and "[m]igration of Starwood systems to the Marriott established technology standards for PCs, Laptops and other end user devices" would not be completed until September, 2019, three years after the merger closed.[109] Defendant Sorenson and the other Board Members also heard from Defendant Oberg at this meeting, when she reminded them that "both management and the Board viewed … cybersecurity among the top risks facing the Company."[110]

317. The bad news kept coming. The Board, including Defendant Sorenson and the Audit Committee Defendants, was informed on August 9, 2018, that Marriott found "[m]alware on a legacy-Starwood server used by the Marriott Law Department" back in January 2018. At

[108] Chancery Court Complaint at ¶ 125; MAR-001289.
[109] Chancery Court Complaint at ¶ 127; MAR-001386.
[110] Chancery Court Complaint at ¶ 130.

the same meeting, Defendant Sorenson and the Audit Committee Defendants also learned about additional security events or incidents, including a malicious legacy Starwood domain registered in September 2017. Nonetheless, the Board did not change course.[111] Starwood's vulnerable guest reservation database remained in use, even after the Board acknowledged at the February 9, 2018, Board meeting that cybersecurity remained a "Top Five" risk facing the Company.[112] However, despite the acknowledgement of the risk cybersecurity posed, Marriott's mitigation efforts did not include any efforts to update the legacy Starwood systems.

318. In addition to the litigation detailed above, Marriott has also been the subject of regulatory proceedings from various state and federal agencies.

**4. Regulatory Proceedings**

319. As the Company has disclosed at the end of each quarter since revealing the Data Breach, and as of the end of Q4 2020, Marriott has spent approximately $114 million on remedial measures related to the Data Breach. Though most of those costs have been reimbursed by insurance thus far, Marriott has noted in its SEC filings that the Data Breach and similar incidents could make insurance unavailable.[113] Additionally, Marriott is being investigated by the Attorneys General of all fifty states and the District of Columbia, the FTC, and the SEC. Further, on July 9, 2019, the ICO announced its intention to fine Marriott more than $120 million for failure to comply with GDPR. The ICO's investigation ***"found that Marriott failed to undertake sufficient due diligence when it bought Starwood and should also have done more to secure its systems***." In the Company's response to the ICO's investigation into the Data Breach, Marriott claimed that it "had no reason to conclude that the [Merger] was likely to result

[111] *Id.* at ¶ 128; MAR-001783; MAR-001789.
[112] Chancery Court Complaint at ¶ 129.
[113] Notably, as discussed in further detail above in ¶ 292, Marriott disclosed yet another breach of its systems on March 31, 2020.

in a high risk" that data would be compromised, Consumer Complaint at ¶ 219, which could not have been further from the truth. Marriott also admitted that it did not conduct "any formal data protection impact assessment in relation to its acquisition of Starwood." *Id.* According to the ICO, a data protection impact assessment ("DPIA") is a process that helps companies identify and minimize the data protection risks related to a project. A company is required to conduct a DPIA when data processing is likely to result in a high risk to individuals. The ICO will consider comments from EU residents who were affected by the Data Breach, and Marriott before making a final ruling on the fine, currently scheduled for September 2020.[114]

### 5. Experts' Reaction to the Data Breach

320. Reactions to the Data Breach from cybersecurity experts reveal its severity and that experts were surprised that Marriott did not identify the data breach during its due diligence.

321. For example, Ollie Whitehouse, Global Chief Technology Officer at IT security company NCC Group, stated that

> ***Marriott Hotels should have identified this breach through their cyber due diligence of Starwood in 2016 when it acquired the company.*** As result of buying a breach they will face a number of challenges at a board level around the levels of governance and diligence within the business. Had it performed a detailed compromise assessment as part of its due diligence activity, the organization's board would have been informed of the breach and been able to make a decision based on risk or put other warranties in place.[115]

322. Joseph Carson, Chief Security Scientist at security company Thycotic, stated that: "What is shocking about this data breach is that the cybercriminals potentially got away with

---

[114] Separately, the ICO has opened two other investigations into Marriott; one for its online privacy policy, and one into how Marriott handles data subject access requests.

[115] Mirko Zorz, *Industry Reactions to the Enormous Marriott Data Breach*, HELPNETSECURITY.COM (Nov. 30, 2018), https://www.helpnetsecurity.com/2018/11/30/marriott-data-breach-reactions/.

both the encrypted data as well as the methods to decrypt the data which appears that Marriott have not practiced adequate cybersecurity protection for their customers[‘] personal and sensitive information.”[116]

323. Satya Gupta, Global Chief Technology Officer and Co-Founder of cybersecurity company Virsec, stated that: “What’s most disturbing about this attack is the enormous dwell time inside Starwood’s systems. The attackers apparently had unauthorized access since 2014—a massive window of opportunity to explore internal servers, escalate privileges, move laterally to other systems, and plot a careful exfiltration strategy before being discovered. All organizations should assume that the next threat is already inside their networks and won’t be caught by conventional perimeter security. We need much more careful scrutiny of what critical applications are actually doing to spot signs of internal corruption. We must reduce dwell time from years to seconds.”[117]

324. Tom van de Wiele, a security consultant at cybersecurity and privacy company FSecure, stated that: “The most disappointing part of this hack is the fact that the amount of data stolen is one of the bigger ones of the last few years and further made worse by the fact that the compromise had been going on for at least four years according to several online publications. This indicates that as far as security monitoring and being able to respond in a timely and adequate fashion, Marriott had severe challenges being able to live up to its mission statement of keeping customer data safe.”[118]

---

[116] *Id.*

[117] *Industry Leaders Reaction on Marriott Data Breach Exposing 500M Customers*, INFORMATIONSECURITYBUZZ.COM (Dec. 3, 2018), https://www.informationsecuritybuzz.com/expertcomments/marriott-data-breach/.

[118] Mirko Zorz, *Industry Reactions to the Enormous Marriott Data Breach*, *supra* n.43.

325. On March 7, 2019, the U.S. Senate Homeland Security and Governmental Affairs Permanent Subcommittee on Investigations held a hearing on "Examining Private Sector Data Breaches" during which Democratic Sen. Jacky Rosen (Nev.), who previously worked in IT, expressed surprise that Marriott had "no method of auditing the data coming across" following its acquisition of Starwood.

### G. The PFI Report Provides Conclusive Evidence That Marriott Misled the Market About Its Due Diligence and Security Risks Associated With Starwood's Systems[119]

#### 1. PCI DSS

326. As discussed above, Marriott is subject to the PCI DSS because it is a credit card processor. PCI DSS is an Information Security standard for organizations that handle branded credit cards from the major credit card companies. The standard was created to increase controls around cardholder data to reduce credit card fraud.

327. PCI DSS has been in force since 2004 and applies to all merchants who accept payment cards and any other organization in the card payment processing lifecycle. Since 2006, the requirements have been set by the PCI Security Standards Council (the "Council"),[120] which consists of American Express, Discover, JCB International, MasterCard and Visa Inc. Each company shares equally in governance and execution of the Council's work.

328. PCI DSS is a highly prescriptive standard that sets forth specific technical safeguards to protect the processing, storage, and transit of data. It specifies technology control

---

[119] The public version of the PFI Report has been attached hereto as Exhibit A. Lead Plaintiff has also attached as Exhibit B a legend explaining the various naming conventions utilized in the PFI Report. As detailed in Exhibit B, certain terms in the PFI Report have been replaced with generic identifiers, *i.e.*, naming conventions. Lead Plaintiff provides context when referring to the naming conventions in the Complaint.

[120] The Council was founded in 2006 by American Express, Discover, JCB International, MasterCard and Visa Inc. They share equally in governance and execution of the Council's work.

requirements, testing procedures, and explanatory guidance with which payment processors like Marriott must comply. PCI DSS specifically requires credit card merchants and processors to: (1) build and maintain a secure network; (2) protect cardholder data; (3) maintain a vulnerability management program; (4) implement strong access control measures; (5) regularly monitor and test networks; and (6) maintain an Information Security policy. These requirements are codified into 12 sections, each with between two and 10 subsections that enumerate multiple detailed technical controls.

329. To fully comply with PCI DSS, control activities must be implemented into a company's "business-as-usual" processes to allow the company to monitor the effectiveness of its security controls on a routine basis. The Payment Card Industry has listed several examples of best practices, including: (1) monitoring security controls, such as firewalls and intrusion detection systems, to ensure they are operating effectively; (2) ensuring that failures in security controls are detected and responded to in a timely manner; (3) reviewing changes to the CDE to determine the potential impact related to PCI DSS compliance; (4) conducting a formal review of the impact of organizational changes, such as an acquisition or merger, to PCI DSS compliance; (5) conducting periodic reviews of the entity's PCI DSS compliance, such as verifying that appropriate evidence like audit logs are being maintained; and (6) reviewing hardware and software at least annually to ensure that they meet security requirements.

### 2. Marriott Commissions a PFI Report

330. After a data breach occurs, the compromised company is required by PCI DDS Standards to hire a Payment Card Industry Forensic Investigator ("PFI"). The PFI conducts a

forensic investigation and writes a report detailing its investigation. If the investigation finds evidence of a breach, the report explains how the attack was carried out.[121]

331. Marriott therefore hired Verizon to conduct a forensic investigation into the Data Breach. In line with standard procedure in these cases, Verizon conducted an investigation and authored a report detailing its industry standard investigation and findings in the PFI Report. The PFI Report makes it clear that attackers had penetrated Starwood's CDE as early as July 28, 2014, and that, incredibly, Starwood's systems were compromised for a period of ***more than four years***, as the attack progressed ***before and after Marriott's acquisition of Starwood***. One glaring failure by Marriott noted in the PFI Report, and detailed further below, involved RAM-scraper malware, which is the same type of malware involved in the breach that Starwood revealed just days after the Merger announcement. Notably, the PFI Report stated that RAM-scraper malware was found at more than 50 Starwood locations after the closing of the Merger, and according to Starwood's prior disclosure, at least 13 of those locations were involved in Starwood's prior RAM-scraper breach. The RAM-scraper malware was merely one piece of evidence of Marriott's severe recklessness in Merger-related due diligence and operation of Starwood's systems.

332. The PFI Report describes the poor state of Starwood's systems at the time of the Merger announcement, the closing of the Merger, and throughout Marriott's operation of the legacy Starwood guest reservation database. Moreover, the PFI Report shows that, contrary to Defendants' statements throughout the Class Period regarding Marriott's due diligence, the Company failed to conduct meaningful due diligence on Starwood's compromised IT and data security systems, and/or failed to act on the findings of that due diligence by remediating the

---

[121] *See, e.g.*, *What to do if Compromised Document Revised*, USA.VISA.COM (Oct. 10, 2019) https://usa.visa.com/dam/VCOM/global/support-legal/documents/what-to-do-if.pdf.

risks identified during the due diligence process. Had they conducted proper due diligence, Marriott would have uncovered further evidence that Starwood's systems were extremely vulnerable, the customer data on these systems was at a high risk of being compromised, and in fact, Starwood systems were already seriously infected with viruses and malware at the time the Merger was being contemplated. As it pertains to PCI DSS compliance, the Audit Committee Defendants and Defendants Sorenson, Oberg, and Hoffmeister ***actually knew*** that Starwood was not compliant with PCI DSS requirements as of at least February 10, 2017, because they were notified of this at a board meeting on that date.

### 3. Threat Actor's Activity in Starwood's Systems

333. The PFI Report provides a play-by-play of the Data Breach. In broad terms, the Data Breach can be described as follows: an unknown threat actor(s) was able to remotely access a server within the Starwood CDE by exploiting known software vulnerabilities. The attacker then installed malware on that server and others which allowed the attacker to capture the username and passwords for certain user and administrator accounts within the Starwood CDE. The attacker then used the credentials from the user and administrator accounts to move through the Starwood CDE for the purposes of installing additional malware, and compiling sensitive personal information. The attacker then compiled, or staged, that sensitive information on another server. After staging that sensitive information gleaned from their access to the Starwood CDE, the attacker then transferred that data to a server with internet connectivity before sending that sensitive data to a computer outside the Starwood CDE.

### 4. Verizon's Conclusions and General Timeline of the Data Breach

334. Marriott engaged Verizon on December 5, 2018, and Verizon started its investigation on December 12, 2018. PFI Report at 11. The PFI Report was completed about five months later on May 6, 2019. *Id.* at 22.

335. As a part of its forensic investigation, Verizon performed analysis on 1,200 systems across 67 Starwood locations, and found conclusive evidence of the Data Breach. *Id.* at 16. The PFI Report shows that the Data Breach occurred because Starwood's system lacked sufficient data security. Specifically, Verizon identified four causes[122] of the Data Breach:

> (1) Starwood's system allowed for insecure remote access, meaning the network itself was not protected from simple attacks;
>
> (2) Starwood either lacked or had insufficient access/query and firewall logging, which meant there was insufficient, or a lack of, data for Starwood or Marriott to monitor;
>
> (3) Starwood lacked monitoring and logging of remote access, meaning that there was no one assigned to monitor who was accessing the systems; and
>
> (4) Starwood inadvertently stored payment account numbers on systems and in databases that were not designated for the storage of payment account numbers, which meant that Starwood was leaving sensitive data exposed for attackers to access.
>
> *See id.* at 17-19.

336. According to the PFI Report, the Data Breach began at least as far back as July 28, 2014, as there is evidence that a threat actor had access to Starwood's systems by installing malware on an external-facing webserver. *Id.* at 5. The pervasive installation and execution of malware progressed on Starwood's systems for over four years—from July 2014 through at least September 26, 2018, and perhaps beyond. *Id.* at 24.

337. Notably, Verizon was unable to determine the original path of intrusion that led to the Data Breach due to the fact that the first unauthorized activity that was observed by Verizon occurred more than four years prior to the reported discovery in September 2018, and due to

[122] In the context of the PFI Report, the causes of the Data Breach refer to the conditions that existed at the time of the attack that enabled to the intrusion itself, or contributed to the effects of the intrusion.

numerous changes in the CDE, suspicious or unauthorized activity is no longer available for review. *Id.* at 17. This evidence is part of the information Marriott would have been expected to review as a part of its due diligence related to the Merger.

338. According to the PFI Report, the "window of intrusion"—the time between the first confirmed date that an intruder entered the system until the date of containment—was open from July 28, 2014 through September 26, 2018. Similarly, the "window of vulnerability"—the timeframe in which a weakness in a system could be exploited by a threat—also opened on July 28, 2014 and, according to the PFI Report, remained open until December 21, 2018, a period of four years and nearly five months. *Id.* at 24. The "window of vulnerability" does not close until a weakness is properly remediated. The investigators in this case concluded that the "window of vulnerability" remained open for approximately three and a half months after the reported discovery of the Data Breach. Moreover, the PFI Report says only that this specific breach was remediated at the time of the Report's publication. Investigators noted that several appropriate management responses to prevent future breaches were still outstanding, such as the requirement to: (1) leverage EDR[123] and other security tools to perform searches for known indicators of compromise ("IOC")[124] (ongoing detection/protection); (2) implement additional enhanced monitoring for log sources being aggregated to a SIEM process;[125] (3) implement additional log sources being aggregated to the SIEM process; and (4) delete files containing PANs from inadvertent storage on various systems. PFI Report at 100. Further, investigators also included recommendations for Marriott management that would further reduce the risk of event

[123] Endpoint detection and response is a subset of endpoint security that uses continuous monitoring and collection of endpoint data to automatically respond to cybersecurity threats.

[124] An indicator of compromise, or IOC, is evidence of a cybersecurity breach left on a device.

[125] SIEM software collects and aggregates log data generated throughout the organization's technology infrastructure, then identifies and categorizes incidents and events, as well as analyzes them.

recurrence: (i) search the PCI environment for track data[126] and personal account numbers; (ii) restrict and monitor remote access; (iii) implement a binary whitelist;[127] and (iv) clear Pagefile upon Windows system shutdown.[128] PFI Report at 101-102.

339. Further, the PFI Report makes it clear that Starwood was unnecessarily storing large quantities of payment card information—in contradiction of the guidance on data security provided by the FTC, detailed above in Section (VI)(H)(3). The PFI Report also cited an ongoing containment action to delete files containing credit card data. *Id.* at 100. That the containment action was ongoing suggests an observation on the part of the investigators that, at the time the PFI Report was completed in March 2019, Starwood, and thus Marriott, still had unencrypted payment cards stored on it systems, and therefore needed to ***continue*** to delete files containing payment card data from inadvertent storage on Starwood's systems. This is evidence of insufficient system maintenance and an inattention to data protection on the part of Marriott. If Defendants had an adequate records management program, the Company would have been deleting expired payment card numbers.

---

[126] As noted below in ¶ 363, the attackers used RAM-scraper malware during the Data Breach which searches POS systems for what is known as track data. Track 1 and Track 2 card data refer to the data encoded in the magnetic strip or chip of a payment card that is used for authentication and/or authorization during payment transactions.

[127] Binary whitelisting is a security measure which restricts access to applications or services to only those users on the whitelist. For example, an application used for tracking a company's accounts payable transactions might only be accessible to users within the accounting department, or a particular host or server would only be able to run certain applications or processes. Ben Bernstein, *Whitelisting, blacklisting, and your security strategy: It's not either-or*, TECHBEACON.COM, https://techbeacon.com/security/whitelisting-blacklisting-your-security-strategy-its-not-either-or (last visited July 21, 2020).

[128] The Pagefile is a file Windows uses as virtual memory and/or extra RAM when existing RAM is insufficient to handle the applications and processes running on a system. Windows can be configured to clear that data each time the system is shut down, and doing so increases the system's security. *How to Clear Pagefile at Shutdown in Windows 10*, WINAERO.COM, https://winaero.com/blog/clear-pagefile-shutdown-windows-10/ (last visited July 21, 2020).

340. Specifically, the PFI Report noted that Starwood's "window of payment card data storage"—the timeframe for which account or payment card data was stored—reached all the way back to October 23, 2002, and lasted until December 21, 2018; a period of more than 16 years. *Id.* at 25. That Starwood had visible payment card data on its system dating all the way back to 2002 clearly indicated a systemic failure by the Company to delete payment card data it could no longer legally process, in violation of the FTC's guidance on data security.[129]

341. According to the PFI Report, a threat actor was able to leverage an external-facing webserver[130] to perform reconnaissance on Starwood's network and CDE to gain an understanding of Starwood's CDE, including enumerating users and network resources. PFI Report at 62-64. The threat actor then leveraged the information obtained during that reconnaissance to move laterally through Starwood's systems and install and/or execute various types and variants of malware on those systems. The malware that Verizon found on Marriott's system was extensive and included the following:

**Table 1**
**PFI Report Terms**

| Malware Type | Function |
|---|---|
| File Archiving Utility | Software programs that created file archives, which are single files that contain multiple files and/or folders. |
| Mimikatz[131] | A password stealing tool that collects and dumps passwords from memory. |
| Network Connectivity Tools | Tools that monitor machines and devices on a network. |
| Password Stealers | Malware that breaches networks and system security to obtain |

[129] Payment cards will typically only be valid for three to five years before expiring, which meant that even at the time of the closing of the Merger (14 years past the date of the earliest payment card on file) Starwood was storing a significant amount of payment card data it had no use for and that Marriott and Starwood should have deleted.

[130] An external-facing webserver is a server with internet connectivity and access to internal applications and/or database servers.

[131] As noted in the PFI Report and Defendant Sorenson's congressional testimony, Mimikatz was a direct cause of the Data Breach.

| Malware Type | Function |
|---|---|
| (including Mimikatz) | critical access credentials. |
| RAM-scraper malware | Malware that searches for specific strings of data that look like credit card numbers and saves it to a text file for exfiltration. |
| Remote Access Trojan ("RAT") | A Trojan is malware designed to damage, disrupt, steal, or in general inflict some other harmful action on data or a network. A RAT specifically can give an attacker full control over a computer via remote connection and is used to steal information and spy. |
| Reconnaissance Tools and Scripts | Tools used to gain information on a target's open ports, operating systems, and any services running on those ports. |
| Webshells | A script that can be uploaded to a web server to enable remote administration. It can be either internal to the network to spread malware, or Internet-facing to exfiltrate data. |

342. Investigators found a steady stream of such evidence of malware dating back to July 28, 2014. *See* PFI Report at Appendix B. The investigators found it primarily by scanning system storage devices for known malicious files, but also by looking for collaborating evidence in firewall logs, web server logs, transaction logs, anti-virus logs, database queries, security event logs, intrusion detection systems, and system login records. *Id.* at 31. Before September 7, 2018, numerous changes occurred in the Starwood CDE and some forensic artifacts are no longer available for analysis. Instead, the investigation mostly relied on traces of hacker activity left on the hard drives of the servers such as the installation, configuration, and execution of the malicious software listed above. *Id.*

343. Specifically, investigators noted that not all database access/query types of logs were routinely archived. Some were only stored on database servers themselves for a short indeterminable time, and routinely overwritten (*i.e.*, "rolled over"), some firewall logs were not centrally stored, and not all firewall events were logged. The situation encountered by investigators was that network connections made by malware observed within the Starwood CDE were not sufficiently logged and archived to support the goal of their investigation, *i.e.* to

identify the initial attack vector that led to Starwood's compromise. *Id.* at 31-32. But a lack of evidence as to the initial attack vector is not the same as a lack of malicious activity, which was identified throughout Starwood's systems. The investigators made it clear that the activity "expected" to be performed by the malware would likely have appeared in firewall logs, and would have been available for analysis had logs been archived. *Id.* at 32. Instead, there was no systematic monitoring of network connections. The investigators also observed that there was no monitoring at all of inbound connections via the remote access system used by administrators. *Id.*

344. Despite the warning signs during the Merger process and after the closing of the Merger, there was no management activity at Marriott that showed signs of preparedness to investigate hacking activities or any monitoring to detect such high risk and potentially damaging events. Investigators noted that remote access was "insecure" and allowed "administrative user groups" to access the Starwood CDE. *Id.* at 31. This means that there was not even systematic management ***control*** of access to the CDE. The failure to ***detect*** the misuse of such access pales in comparison to management's failure to protect the data. While the investigation was hampered by the lack of detection capability, it is the former observation on the lack of access control, or control over who could access the system, that is the most egregious demonstration of severe recklessness.

345. Investigators first found direct evidence of unauthorized database queries on August 22, 2018, *id.* at 61, though there may have been earlier unauthorized queries of which they are unaware due to lack of evidence.[132] That is, weeks before the breach was discovered,

---

[132] During its due diligence prior to the Merger, Marriott should have discovered the fact that all database queries were not being logged and started doing so, in accordance with PCI DSS

there was evidence in Marriott's logs that the threat actor leveraged the compromised systems and database accounts to perform unauthorized queries against the legacy Starwood guest reservation database. On September 7, 2018, the threat actor exported the main legacy Starwood guest reservation table and placed it into a password-protected .rar file archive.[133] *Id.* at 5. The next day, that file archive was transferred to two systems, one of which had internet connectivity. Shortly after the file archive was transferred to the system with internet connectivity, a file transfer tool was executed and a connection was made to an external IP address. *Id.* at 68. The PFI Report states that the observed activity and timeline indicates that the attacker likely stole the guest reservation database table through these actions. *Id.*

346. The PFI Report also noted that there were additional suspicious database queries within the guest reservation database observed as late as September 10, 2018. *Id.* at 61. Notably, Verizon found evidence of connections to malicious IP addresses both prior to, and beyond September 7, 2018. Although there were not sufficient logs to identify all connections to malicious IP addresses within the window of vulnerability, the connections to malicious IP addresses appeared in available logs on March 21, 2018, and in June 2018, and through September 19, 2018. *Id.* The PFI Report notes that Verizon expects that there were additional communications prior to March 2018 based on the fact that malware with the capability to make connections to the malicious IP addresses was installed and/or executed prior to March 2018. Additionally, Verizon identified evidence of RAM-scraper malware, the same type of malware that caused the breach Starwood revealed on November 20, 2015. This malicious activity,

---

standards, immediately after taking ownership and control over the legacy Starwood guest reservation database.

[133] To "export" a file is to extract a data set from its primary storage location, in this case, the export process also converted the reservation database table into a different format, one that allows more efficient data transport. A .rar archive is a data container that stores one or more compressed files.

continuing for a period of at least four years, could and should have been discovered and remedied through appropriate due diligence during the Merger. The nature of this intrusion is such that had Defendants performed an adequate review of Starwood's systems, and specifically the guest reservation database, they would have discovered the causes of the Data Breach and been in a position to remediate it.

347. As of September 10, 2018, the legacy Starwood guest reservation table contained more than 10 million encrypted payment card numbers.[134] PFI Report at 61. After the Data Breach was discovered, Starwood conducted a deduplication process to attempt to determine how many unique records were stolen, and identified more than 9 million unique payment card numbers in the legacy Starwood guest reservation table. *Id.* The stolen data that Verizon was concerned with was the customer's: (1) name; (2) address; (3) telephone number; (4) encrypted payment card number; and (5) payment card expiry date. *Id.* That data originated from internet customers, phone orders, and/or third party aggregators such as Expedia or Travelocity. *Id.* at 59. Notably, Verizon identified 7,243 potential unencrypted payment card numbers in other fields in two guest-reservation database tables that were exported and exfiltrated, and another 236,504 potential unencrypted payment card numbers inadvertently stored throughout 40 Starwood systems. *Id.* at 73. The fact that Starwood, and then Marriott, lost track of more than 240,000 payment card numbers represents a systemic failure on the part of Marriott to adequately protect its customers' sensitive personal data, and a general inattention to data protection.

[134] Those payment cards were encrypted using database encryption, which is a combination of a master encryption key and individual record encryption keys.

### 5. Malware Installation and Execution

348. The PFI Report identified the primary system used by the threat actor to move laterally through Starwood's environment as Computer 1[135], an Accolade web server. *Id.* at 63. The threat actor was subsequently able to access and install malware on other systems. *Id.* On July 28, 2014, two webshells, which can give a threat actor remote access to a company's systems, were created on Computer 1, which hosts the Sopheon Accolade application.[136] PFI Report at 63. The installation of these webshells gave the threat actor the ability to directly interact with Starwood's systems between July 29, 2014, and October 17, 2014. On August 12, 2014, an additional webshell was created on Computer 1, which gave the threat actor the ability to directly interact with the system between August 13, 2014, and November 26, 2014. On October 14, 2014, a RAT was created on Computer 1. *Id.* This RAT gave the threat actor command-and-control functionality, which would allow the threat actor to: (1) establish network connection; (2) perform file management; and (3) utilize remote command capabilities. *Id.*

349. Between October 15, 2014, more than a year before the Merger Announcement, and August 8, 2018, nearly two years after the close of the Merger, additional malware was installed and executed on Computer 1 including a RAT, a webshell, and a rootkit. *Id.* Further,

[135] As noted above in Footnote 119, attached hereto as Exhibit B is a legend explaining the naming conventions utilized throughout the PFI Report. The various computers that were infected are identified in the PFI Report as Computer 1, Computer 2, Computer 3, and so on. These are computers located at Starwood hotels or at various administrative locations, like Starwood headquarters. 1,360 different Computers were found to have malware present. As noted in Exhibit B, the PFI Report also contains other naming conventions, for example malware or files are identified as Malware 1, Malware 2, Malware 3, and so on, and Starwood user accounts utilized by the attacker during the Data Breach are identified as System Account 1, System Account 2, System Account 3, and so on, among others.

[136] The Accolade application "enables companies to make better decisions about which product ideas to invest in, align resources with those opportunities, accelerate time to market, and increase your innovation and new product development success rate." *Accolade – Enterprise Innovation Performance*, SOPHEON.COM, https://www.sopheon.com/wp-content/uploads/Accolade-Brochure-Online-Version.pdf (last visited July 21, 2020).

on September 3, 2015, Malware 12, a RAT, was installed on Computer 1, which possessed the ability to perform keystroke logging of user account activity from September 4, 2015, through September 13, 2018, throughout Marriott's Merger due diligence and for just under two years after the close of the Merger. *Id.* at 63-64. Verizon was able to determine that during that period, the keystroke logging capability captured activity from 24 administrator and user accounts, including two compromised user accounts that were being leveraged by the threat actor to collect, store, and steal information. *See* PFI Report at 63-67. The attacker was able to utilize that keystroke logging capability to obtain password data for those user accounts and move throughout Starwood's systems. Additionally, forensic analysis of keystroke logging of the compromised accounts showed unauthorized activity between July 19, 2018, and September 10, 2018. This unauthorized activity included: (1) network reconnaissance activity; (2) user reconnaissance activity; (3) remote program execution; and (4) field and folder access, management, and/or manipulation.

350. Verizon also identified evidence that the threat actor was performing searches for and accessing files within the CDE environment that contained the words "user," "password," or "script" in the filename. *Id.* at 64. The threat actor was also able to access the database connection history logs, which may have given them the additional connection details and information necessary to access the guest reservation database. *Id.* While Computer 1 was identified by Verizon as the primary system used by the threat actor to move throughout the rest of the system, the threat actor also used additional systems to access the guest reservation database.

351. According to the PFI Report, the primary system being leveraged by the threat actor for accessing the guest reservation database was Computer 4, a jump-box.[137] On September 3, 2018, a RAT was created on Computer 4. *Id.* at 69. Additionally, Verizon identified system artifacts related to a database dumping tool, and the evidence also indicated that the tool was used to export the GUEST_MASTER_PROFILE and PP_MASTER database tables. *Id.* The GUEST_MASTER_PROFILE database table included guest information such as name, address, phone number, encrypted payment card number, and the payment card expiration date. *Id.* at 59. The PP_MASTER database table stores information regarding password encryption values and information. *Id.* at 67.

**6. Suspicious Queries**

352. Marriott disclosed that the first alert for potentially suspicious activity related to the Data Breach was generated by the IBM Guardium tool[138] on September 7, 2018, and picked up by Accenture[139] the following day, as detailed above in Section (VI)(D). As also discussed above, Accenture then alerted Marriott to the Data Breach the next day. The Guardium alert indicated that a database administrator account was performing unusual queries against the GUEST_MASTER_PROFILE database table, which contained sensitive personal information, including names, addresses, and payment cards, and that traffic originated from a jump-box. PFI Report at 61.

---

[137] A jump-box is a secure computer that all administrators first log into before launching administrative tasks or to connect to other servers or untrusted environments. Roger Grimes, *'Jump boxes' and SAWs improve security, if you set them up right*, CSOONLINE.COM (July 26, 2017), https://www.csoonline.com/article/2612700/security-jump-boxes-improve-security-if-you-set-them-up-right.html.

[138] As noted above, the IBM Guardium tool provides for automated monitoring of unusual activity around sensitive data, and provides real-time alerts.

[139] Accenture provides Marriott with data security services, including monitoring the legacy Starwood guest reservation database.

353. However, Verizon subsequently discovered that unauthorized queries against Starwood's GUEST_MASTER_PROFILE database table began at least as early as August 22, 2018.[140] On that date, the threat actor made four queries against the legacy Starwood guest reservation database table, and leveraged at least four different database administrator accounts in making queries until September 10, 2018. *Id.* On August 27, 2018, the threat actor made another three unauthorized queries. *Id.* at 50.

354. On September 7, 2018, the date the IBM Guardium tool first triggered an alert, Verizon identified eight suspicious queries by the threat actor. On September 10, 2018, ***two days after Accenture was initially alerted to suspicious activity***, Verizon identified an additional 12 unauthorized queries from the threat actor, and three suspicious activities using database functions designed to decrypt and archive encrypted payment card values from the database. *Id.* at 50-51. The unauthorized queries against the legacy Starwood guest reservation database included several variations of data requests, including: (1) database user details; (2) environmental variables; (3) database arguments;[141] (4) record counts and details; and (5) other database objects. *Id.* at 62.

**7. Other Affected Servers**

355. In addition to the hosts described in more detail herein, the threat actor was able to utilize jump-boxes to spread malware to at least five other hosts on Starwood's systems. The spread of the malware across different hosts is summarized in Table 2 below:

---

[140] Notably, as confirmed by a cybersecurity expert, the IBM Guardium database tool with recommended settings would have triggered an alert for the unauthorized access on August 22, 2018. That Marriott did not receive an alert until the suspicious queries on September 7, 2018, suggests that Defendants reconfigured the IBM Guardium database tool to not trigger alerts in response to unauthorized access to the Starwood CDE.

[141] A database argument is a named set of values used by one or more database programs.

**Table 2**
**Other Affected Servers**[142]

| Server | Malware |
|---|---|
| Computer 131 | • activity associated with reconnaissance script [sql].bat<br>• contained several lines of code designed to: (i) obtain SQL username and password hash information; (ii) obtain a list of running processes; (iii) modify a registry key; and (iv) test internet connectivity |
| Computer 7 | • on or around 1/8/2015 RAT present |
| Computer 3 | • on 10/16/2014 threat actor created and executed various malicious files, one of which was password stealer Mimikatz<br>• on 10/17/2014 RAT created; made external connections to known malicious IP address associated with RAT |
| Computer 8 | • on or around 1/8/2015 RAT present |
| Computer 202 | • activity associated with reconnaissance script [sql].bat<br>• contained several lines of code designed to: (i) obtain SQL username and password hash information; (ii) obtain a list of running processes; (iii) modify a registry key; and (iv) test internet connectivity |

356. The threat actor then utilized additional hosts to stage and exfiltrate the sensitive guest information they had amassed. PFI Report at 68-69.

**a. Staging & Exfiltration of Database Tables**

357. As noted above, after utilizing Computers 1, 3, 4, 7, 8, 131, and 202 as detailed above, to amass the sensitive personal data of more than 380 million guests, the threat actor then transferred that personal data to another computer before exfiltrating the data.

358. One of the systems leveraged by the threat actor for the staging of the guest reservation tables was Computer 10. *Id.* at 64. Verizon recovered evidence of deleted file archives on Computer 10 that contained guest reservation database table exports. *Id.* On or around September 8, 2018, a file archiving utility was created on Computer 10, and divided into 21 subparts, which contained a file named GUEST_MASTER_PROFILE.dmp. *Id.* at 64-65.

[142] PFI Report at 68-69.

Additionally, on September 10, 2018, another deleted archive file, File 4, on Computer 10 was created, which likely contained an export of the PP_MASTER database table, which stores information regarding password encryption values and information. *Id.* at 65-66. Further, Computer 10 contained two other deleted archive files named RESERVATION_ROOM_SHARER.dmp and CONSUMPTION_ROOM_TYPE.dmp, both of which were timestamped April 2015. *Id.* at 66. Verizon determined these archive files were exports, or conversions, of guest reservation database tables into files that the attacker could exfiltrate. *Id.*

359. Computer 5 was the system that Verizon identified as being leveraged by the threat actor for staging and potential exfiltration of the guest reservation database tables. *Id.* Verizon recovered evidence of deleted file archives from Computer 5 that contained guest reservation database table exports, which matched the contents of the archive files from Computer 10. Verizon indicated the archive files were likely sent from Computer 10 to Computer 5 because Computer 5 possessed internet connectivity, which the threat actor tested on September 8, 2018. *Id.* Also, on September 8, 2018, two copies of a file transfer tool were created on Computer 5 and subsequently executed multiple times by the compromised Starwood user account System Account 6. *Id.* at 67. When Verizon cross-checked the tool against firewall logs, it showed a connection to a known malicious IP address. Verizon was not able to determine the specific activity, but the timing indicated that the tool was likely used to steal file archives containing guest reservation database tables from the Starwood environment. *Id.*

360. Verizon also found evidence of a deleted filed archive, File 26, which was determined to be an export of the guest reservation database table and was timestamped September 10, 2018. *Id.* Also, on September 10, 2018, three days after the initial Guardium

alert, a file transfer tool was executed on Computer 5 by the compromised user account System Account 5. Correlation against firewall logs showed a connection to a known malicious IP address, and though the specific activity could not be determined, the timing indicated that the tool was likely used by the threat actor to steal files from the Starwood CDE. *Id.*

### 8. RAM-Scraper Malware in the Starwood CDE

361. On November 20, 2015, just five days after Starwood signed the Merger Agreement with Marriott, Starwood revealed that the POS systems at 54 of its hotels in North America had been infected by RAM-scraper malware. According to Starwood's disclosure, this malware was first active in Starwood's POS systems from November 2014 to October 2015, and enabled unauthorized parties to access its customers' credit card information, including cardholders' names, payment card numbers, security codes, and expiration dates.

362. In Starwood's press release announcing this breach, Starwood assured the public that the "affected hotels have taken steps to secure customer payment card information and the malware no longer presents a threat to customers using payment cards at Starwood hotels." Starwood's President of the Americas Sergio Rivera even stated that Starwood "want[ed] to assure [its] customers that [the company had] implemented additional security measures to help prevent this type of crime from reoccurring." As stated by Rivera, the RAM-scraper malware breach was supposedly contained by Starwood prior to the Merger Announcement in November of 2015. Marriott also issued a statement indicating the Company was aware of the RAM-scraper malware breach of Starwood's systems.

363. Thus, Marriott knew that Starwood's systems had been infected with RAM-scraper malware. Then, as detailed in the PFI Report and discussed in further detail below, in November 2016 (just two months after the close of the Merger), Starwood's systems, now owned by Marriott as of the Merger closing in September 2016, were found by Verizon to have ***again***

been infected with RAM-scraper malware.[143] Thus, Defendants were, at least, severely reckless in not protecting the Company's systems against attacks involving RAM-scraper malware.

364. Yet, during its forensic investigation following the Data Breach, Verizon found RAM-scraper malware on 480 systems spread out across 58 Starwood locations. *Id.* at 69. The affected locations included corporate, data centers, customer contact centers, and hotel property locations. *Id.* According to the PFI Report, eight of those systems were related to payment card processing functions. *Id.* at 71. Evidence of the RAM-scraper malware was found to be in the Starwood CDE and executed between November 2016—just two months after the closing of the Merger—and January 2017. *Id.* at 69. Notably, 13 of the 54 locations affected by the POS breach were again infected by RAM-scraper malware, only this time directly under Marriott's watch, even though Defendants knew that those very locations had been compromised by the same type of malware just a year before. The RAM-scraper malware was designed to capture payment card information, including payment account numbers, and Track 1 and/or Track 2 card data from the systems' memory.[144] *Id.* at 70.

365. As noted above, Verizon found that evidence of RAM-scraper malware existed on Starwood's systems dating back to November 21, 2016, just two months after the closing of the Merger. Verizon also found evidence of additional installation and execution of RAM-scraper malware between December 31, 2016, and January 10, 2017. *Id.* at 69. Further, between January 9, 2017, and October 19, 2018, "additional evidence of persistent malware execution

---

[143] That RAM-scraper malware was discovered within the Starwood CDE so soon after the Starwood breach announced in November 2015 suggests that Starwood never actually removed the RAM-scraper malware from its systems prior to the Merger.

[144] Track 1 and Track 2 card data refer to the data encoded in the magnetic strip or chip of a payment card that is used for authentication and/or authorization during payment transactions. *Payment Card Industry (PCI) Data Security Standard Glossary, Abbreviations and Acronyms*, PCISECURITYSTANDARDS.ORG, https://www.pcisecuritystandards.org/pci_security/glossary#T (last visited July 21, 2020).

was observed" on Computer 195. *Id.* This malware execution was the result of a malicious service that launched RAM-scraper malware when Computer 195 started. *Id.* The malicious service on Computer 195 was finally terminated by Marriott on October 19, 2018, more than five weeks after the initial IBM Guardium database alert that eventually triggered Marriott's discovery of the Data Breach. *Id.* at 69-70.

366. Notably, after Target was breached (announced in January 2014), it was revealed that it cost Target a mere $1.6 million to install a malware detection system that "worked as designed and issued multiple alerts" prior to the breach, which Target ignored. As detailed above in Section (VI)(F)(3), Marriott's Board, including Defendant Sorenson and the Audit Committee Defendants, attended a presentation that discussed the Target breach, and the cost of Target's malware detection system is public knowledge. Had Marriott installed a similar detection system, and a corresponding monitoring and incident response capability, something Target lacked for which it was widely criticized, Defendants would have discovered at least one aspect of the Data Breach within two months of closing, instead of two years and more than two months later.

**9. PCI DSS Violations**

367. Marriott and Starwood are subject to PCI DSS. The PFI Report specifically highlights how Marriott and Starwood violated several requirements that led to the Data Breach. In the PCI DSS Summary in the PFI Report, Verizon answered the question: "***Did the entity utilize any advanced payment technology at the time of the compromise – e.g. end-to-end encryption or tokenization?" by checking a box marked simply "No."*** PFI Report at 104-05. By not utilizing a security method such as end-to-end encryption or tokenization, Starwood, and thus Marriott, were in violation of PCI DSS requirement 3.4, the violation of which is detailed in the table below. *Id.* at 106-107.

368. The PFI Report identified four separate PCI DSS requirements that Starwood, and thus Marriott, violated: (1) restrict traffic from untrusted networks and hosts; (2) render cardholder data unreadable anywhere it is stored; (3) secure administrative and remote access with multi-factor authentication; and (4) implement automated audit trails for actions taken by users with root or administrative privileges. Below, Table 3 identifies the PCI DSS violations as detailed in the PFI Report. *See* PFI Report at 105-10.

**Table 3**
**PCI DSS Violations**

| PCI DSS Requirements | | Violations by Marriott |
|---|---|---|
| 1.2 | Requires firewall and router configurations to restrict all traffic from untrusted networks and hosts. | • Non-PCI related system were allowed to directly communicate with PCI-related systems<br>• Systems within CDE or PCI scope able to make inbound and outbound connections to malicious IP addresses |
| 3.4 | Requires cardholder data to be rendered unreadable anywhere it was stored. | • The storage of potential unencrypted and clear-text payment card numbers identified within databases and in-scope systems |
| 8.3 | Requires entities to secure all individual non-console administrative access and all remote access to the CDE using multi-factor authentication. | • Certain administrator user groups were excluded from requiring multi-factor authentication |
| 10.2 | Entities must implement automated audit trails for tracking individual user access to cardholder data and all actions taken by any individual with root or administrative privileges | • Not all database access/query types were being sent to the centralized SIEM<br>• Not all firewall events were being archived for a minimum of twelve months<br>• Logging associated with remote access to systems and/or applications within the CDE was not configured |

369. As a result of these PCI DSS violations, the threat actor was able to directly communicate with PCI-related systems and gain access to Starwood's CDE via only single-factor authentication. *Id.* at 108. Further, after gaining access to those systems, the threat actor was able to access unencrypted, or clear-text, payment card numbers. *Id.* at 107. Additionally,

logging of remote access to systems and/or applications within the Starwood CDE was ***not even configured***. *Id.* at 108-09. The fact that the logging of remote access was not configured meant that Marriott lacked the ability to review ***any*** logs related to remote access to the Starwood CDE. This represented a huge red flag in that it left Marriott without the ability to determine if there had been any suspicious remote access to the Starwood CDE, both during the Company's due diligence, and later during Marriott's operation of the legacy Starwood guest reservation database. Without these logs, Marriott could not seriously attest to having performed sufficient due diligence because Defendants had no data upon which to base such an attestation.

370. The fact that there are only four PCI DSS violations identified in the PFI report does not mean that Starwood was compliant with all other PCI DSS requirements. Verizon noted that the most recent PCI DSS assessment prior to their investigation was in May 2017, 8 months after the close of the Merger. PFI Report at 104-105. The PFI Report makes a clear distinction between assessing a requirement, and simply testing some sub-requirements of the requirement and finding no issues. As stated above, the goal of Verizon's investigation was to identify the initial attack vector that led to the Data Breach. PCI DSS has 12 requirements, each with between 3 and 11 sub-requirements, and none of those 12 PCI DSS requirements were fully assessed in the course of Verizon's investigation. Investigations such as this are not to be confused with audit or assessment services, and a more robust investigation could (and most likely would) lead to the finding of even more PCI violations. As confirmed by Lead Plaintiff's cybersecurity expert, based on the PFI Report and publicly available information, Marriott was in violation of more than just the four requirements identified by Verizon in the PFI Report.

### 10. Causes of Data Breach Identified in the PFI Report

371. As per the PCI DSS standards for conducting a forensic investigation, Verizon aligned its findings regarding the PCI DSS violations with the Attack Vectors detailed in

Appendix D of the PFI Report, and discussed those violations as "causes" of the Data Breach. Verizon was unable to determine the original path of intrusion that led to the Data Breach because the first observed unauthorized activity was more than four years prior to the initial discovery of unauthorized activity. During that time, Starwood made numerous changes to the CDE and some forensic artifacts were no longer available for analysis, or were never available to begin with. PFI Report at 31. However, Verizon identified four causes of the Data Breach: (1) the system allowed for insecure remote access; (2) a lack of or insufficient logging of firewall activity; (3) a lack of monitoring and logging of remote access activity; and (4) inadvertent storage of payment account numbers and payment card track data. *Id.* at 31-32.

372. First, regarding insecure remote access, certain administrator user groups were excluded from the requirement to use multi-factor authentication to access the CDE. As a result, a threat actor was able to access systems and databases within the CDE leveraging jump-boxes where multi-factor authentication was not required for all user accounts. *Id.* at 31.

373. Second, regarding a lack of or insufficient logging, Verizon found that Starwood failed to aggregate all database access and query logs to a centralized SIEM. Those database access and query logs that were not sent to a centralized SIEM were only stored on database servers for a short, and indeterminable, amount of time, and then eventually overwritten. Additionally, Verizon found that Starwood failed to aggregate all firewall activity to a centralized SIEM, and as a result some firewall events were not saved for a minimum of 12 months, in violation of PCI DSS as detailed above. In the absence of adequate logging of firewall activity, Marriott was unable to review those logs for suspicious activity. Verizon also found that expected firewall events associated with network connections made by malware observed within the environment were not sufficiently logged or archived. *Id.* at 32.

374. Third, regarding monitoring and logging of remote activity, as noted above the logging associated with remote access to Starwood's CDE was not even configured. *Id.*

375. Fourth, Verizon found that the Data Breach was caused in part by Starwood's inadvertent storage of potential payment account numbers present on other systems and in databases that were not designated for the storage of payment account numbers. *Id.*

376. As a result of the Data Breach, Marriott was forced to implement substantial corrective measures, including substantial infrastructure changes.

### 11. Timing of Response to Data Breach and Remediation Efforts

377. In response to the Data Breach, Marriott needed to undertake significant containment measures and infrastructure changes. Marriott's containment actions began on September 8, 2018, its infrastructure changes began on September 10, 2018, and both were still ongoing at least as of the time the PFI Report was completed in May 2019. Those containment actions are detailed in full below in Table 4, and included adding prevention and protection rules to the EDR tools, disabling known compromised database accounts, updating firewall rules, blocking rather than just monitoring suspicious database activity, and decommissioning the entire Starwood CDE. *See* PFI Report at 98-99.

**Table 4**
**Marriott's Containment Actions & Infrastructure Changes**

| Date | Containment Actions (*Infrastructure Changes*) |
|---|---|
| 9/8/2018 to 11/19/2018 | • Password resets on all accounts that accessed [redacted] environment within specified timeframe<br>• Disabled known compromised database accounts<br>• Disabled known compromised system/network accounts |
| 9/9/2018 to 12/15/2018 | • Leveraged threat intelligence and Darknet research in an attempt to identify additional potential IOCs related to the event |
| 9/10/2018 | • *Implemented blocks for sources and program execution on in-scope database servers* |

| Date | Containment Actions (*Infrastructure Changes*) |
|---|---|
| 9/10/2018 to 10/24/2018 | • *Performed validation of database monitoring and alerts, made adjustments to database alerts, and moved from MONITOR only to BLOCK for suspicious activities* |
| 9/11/2018 to 1/1/2019 | • *Deployed EDR tool to Marriott and Starwood environment* |
| 9/11/218 through 11/16/2018 | • *Added prevention and protection rules associated with known IOCs to EDR*<br>• *Leveraged EDR for additional prevention/detection signatures – tuned to maximum protection/detection settings*<br>• Leveraged EDR to remove known malicious files from impacted systems |
| 9/11/2018 to ongoing | • *Leveraged EDR and other security tools to perform searches for known IOCs* |
| 9/14/2018 | • *Replaced encryption keys for all of the CDE records in the in-scope database* |
| 9/14/2018 to 10/24/2018 | • *Increased retention periods and logging type for database monitoring logs* |
| 9/16/2018 to 11/22/2018 | • *Submitted malware samples to anti-virus vendors, received updated detection signatures, and deployed signatures to environment*<br>• *Implemented enhanced detection rules in anti-virus solutions for detection of known malicious domains* |
| 9/18/2018 to 9/26/2018 | • *Implemented block for DNS firewall known for malicious IP addresses*<br>• *Implemented firewall rule blocks for known malicious IP addresses* |
| 9/20/2018 to 9/30/2018 | • *Implemented policies to enforce multi-factor authentication access to the CDE environment* |
| 10/9/2018 | • Performed external scanning for known IOCs<br>• Performed external vulnerability scans of CDE environment in the in-scope database |
| 11/26/2018 to ongoing | • *Implemented enhanced monitoring for log sources being aggregated to SIEM*<br>• *Implemented additional log sources being aggregated to SIEM* |
| 12/1/2018 to 1/12/2019 | • *Quarantined and/or decommissioned known compromised systems*<br>• *Rebuilt systems for known compromised systems* |
| 12/21/2018 | • *Performed system reconfiguration to modify network connectivity settings* |

| Date | Containment Actions (*Infrastructure Changes*) |
|---|---|
| 1/11/2019 | • *Decommissioned entire Starwood CDE environment* |
| 1/12/2019 | • *Created new user accounts for employees whose accounts were disabled* |

378. In addition to the containment actions and infrastructure changes that had already been completed or were ongoing, the PFI Report identified four additional planned containment actions that Marriott's wholly-owned subsidiary Starwood failed to complete by the time the PFI Report was finished. The PFI Report indicated that Starwood planned to: (1) leverage EDR and other security tools for ongoing detection and protection; (2) implement additional monitoring for log sources being aggregated to SIEM; (3) implement additional log sources being aggregated to SIEM; and (4) delete files containing PANs from inadvertent storage on various systems. PFI Report at 100.

379. Further, the PFI Report contained four recommendations for Starwood, two of which Verizon recommended "as a matter of due diligence." PFI Report at 101-02. First, Verizon recommended that Starwood search the PCI environment for track data and PANs "for evidence of inadvertent storage as a matter of due diligence." *Id.* at 101. Second, Verizon recommended that Starwood should restrict remote access activity, and adjust logging configurations to ensure that remote access to resources is logged and monitored. *Id.* Verizon also noted that: "As a general rule, remote access applications and protocols are classified as high-risk as they can be used to allow an intruder unauthorized access to information within the environment." *Id.* Third, Verizon recommended that Starwood implement a binary whitelist, which would allow Starwood to ensure that only trusted software can exist within the POS environment and prevent any unauthorized code from being executed. *Id.* Fourth, Verizon

recommended that Starwood, "as a matter of due diligence," clear Pagefile upon Windows system shutdown. *Id.* at 102.

380. As discussed further below in Section (VIII)(B), the details on the Data Breach in the PFI Report provide ample evidence of Defendants' knowledge and/or severe recklessness in making statements related to Marriott's due diligence in advance of the merger. There were multiple variants of malware present throughout Starwood's systems during the Merger announcement, the Merger Closing, and past the initial alert of the IBM Guardium database alert system. However, despite all of this, Defendants made multiple false and misleading statements and omissions to the market throughout the Class Period.

### H. In Addition to the PCI Violations Detailed Above, Marriott Violated Various IT and Security Standards During Its Due Diligence of Starwood's IT Systems, During the Integration Process, and During the Operation of the Starwood Database[145]

381. According to an expert in cybersecurity, IT compliance, and IT due diligence, with whom Lead Plaintiff consulted in this litigation, Marriott was required to comply with applicable cybersecurity industry standards before and throughout the Class Period—but failed to do so. Cybersecurity industry standards follow a security paradigm that originated before the days of computers. First, **<u>protect</u>**. If you cannot protect, then **<u>detect</u>** compromises. If you cannot protect—and detection fails—then once the attack is discovered, **<u>respond</u>**. Companies must then use the lessons learned in responding to attacks to **improve protection capability**. This simple process flow is depicted in Figure 1. It has worked for police and fire departments, and beginning in the 1980s, for computer security specialists. Cybersecurity specialists have

[145] This section was prepared with assistance from an expert in IT cyber security and compliance who has expertise in the requirements for IT due diligence.

refined this cycle over the years to include more detailed steps, as depicted in Figures 2[146] and 3.[147]

**Figure 1**




**Figure 2**




**Figure 3**




382. As discussed in further detail above in Section (VI)(G), the evidence of the Data Breach identified in the PCI Forensic Investigation that Marriott was required to conduct after the Data Breach firmly established that:

> (1) systems allowed insecure remote access and therefore Marriott **failed to protect** assets;
>
> (2) logging of firewall activity was lacking or insufficient and therefore Marriott **failed to detect** the Data Breach;
>
> (3) monitoring and logging of remote access activity was lacking and therefore Marriott **failed to respond** to the Data Breach; and
>
> (4) payment account numbers and payment card track data was stored on servers in clear text and this **failure to protect**, in combination with the three control weaknesses above, led to **asset compromise**.

383. All Information Security industry and regulatory standards contain some version of this process flow. Nevertheless, the findings from the PFI that Marriott was required to hire after the Data Breach show that Marriott failed to establish a protect, detect, and respond process.

---

[146] *See* Jennifer Bayuk, *Stepping Through the InfoSec Program*, an Information Systems Audit and Control Association (ISACA) publication, 2007, pp.64-66.

[147] National Institute of Standards and Technology Cybersecurity Framework (“NIST-CSF”), version 1.1, 2018.

Specifically, Marriott was obligated to comply with COSO, PCI DSS, and FTC standards for asset protection. The prevent, detect, respond process cycle elements in some of these standards are depicted in Figures 4-6,[148] and described in more detail below.

**Figure 4**




**Figure 5**




**Figure 6**




384. Despite telling the market that they used "reasonable" efforts to protect customer data, Marriott failed to implement this basic practice, and thereby failed to comply with these legal and regulatory standards and corresponding reasonably accepted Information Security practices. Marriott's failure to adhere to these standards and reasonable practices rendered their Class Period statements about the effectiveness of their due diligence process, and the success of the Integration false and misleading when made. Marriott's failure to adhere to these industry standards and reasonable security practices also rendered their risk warnings about the Integration and cyber security false and misleading, because they failed to disclose the facts about their non-compliance to the market.

385. Marriott's failure to comply with industry and regulatory standards also shows that Defendants acted with severely recklessness, at a minimum, when they touted the

[148] The FTC cycle in Figure 6 is extracted from a longer 10-step version recommended in 2015. In 2016, the FTC specifically endorsed the National Institution of Standards and Technology Cybersecurity Framework, the cycle that appears in Figure 3. *See* Andrea Arias, *The NIST Cybersecurity Framework and the FTC*, FTC.GOV (Aug. 31, 2016), https://www.ftc.gov/news-events/blogs/business-blog/2016/08/nist-cybersecurity-framework-ftc.

Company's due diligence activities related to the Starwood acquisition, and success of the post-Merger Integration—when in fact Marriott was obviously violating known requirements and guidelines governing data security and due diligence.

**1. Due Diligence and Integration Standards**

386. Due diligence for Mergers and Acquisition ("M&A") is almost always driven by decisions made by executive managers such as a Company's CEO and CFO—two of the Defendants in this case. Moreover, technology and cybersecurity must be critical focal points of the due diligence process, particularly where, as here, customer data is a primary driver of an acquisition. For an effective due diligence process, management must clearly lay out the objectives for the merger, identify the assets of the acquisition target that are expected to be preserved and utilized post-acquisition, and form multiple teams of trusted evaluators organized by asset type.

387. According to Lead Plaintiff's cybersecurity expert, it has been recognized for decades by both legal and technology members of M&A teams that IT due diligence should include data privacy and Information Security reviews. Moreover, in any merger the acquiring company is expected to focus on the aspects of the deal that are most important to the transaction, or that pose the most significant risk. In this case, the customer data and the guest reservation system were focal points of the Merger, and were of critical importance to both Marriott and the market.

388. They also posed the most significant risk because Starwood's IT systems were known to be particularly susceptible to attack—as discussed at length above—and therefore should have been a subject of intense focus. There is no evidence that Marriott's due diligence team was constrained in its testing for vulnerabilities at Starwood during its due diligence review. But even if it was, Marriott had ample opportunity to repeat the review in the form of a

professionally conducted audit of the legacy Starwood guest reservation database in the intervening two years after the closing of the Merger and before the discovery of the Data Breach.

### 2. COSO Framework

389. As a publicly traded company, Marriott had an obligation to maintain safe and secure internal systems so that its sensitive financial and customer data was protected, and so that investors have accurate information regarding the Company. For this reason, Marriott claimed in its Form 10-Ks prior to and throughout the Class Period that it used the COSO Framework to evaluate the effectiveness of the Company's internal controls. Marriott's most egregious violation of the standards laid out in the COSO Framework is that Marriott failed to identify and assess changes that could significantly impact the Company's systems, and was, at least, severely reckless in selecting and developing deficient control activities over technology to achieve the Company's business objectives.

390. The COSO Framework provides rigorous internal control standards for cybersecurity and other operational risks. In 2013, the COSO Framework was updated, and changes in organizational reliance on technology were a major driver for that update. In the Risk Assessment part of its cycle, Marriott was bound by the COSO Framework to evaluate how the acquisition of Starwood changed the Company's cybersecurity risk, and address this area of high risk by implementing appropriate control activities. Among other requirements underlying the general overview in Figure H(2)(a), the COSO Framework dictates that management: (1) assess risk; (2) create an information and communication system; (3) monitor internal controls; and (4) establish internal controls to ensure the company achieves its objectives.

391. First, Marriott was required to **assess risks** in a manner that focuses on standard operations, reporting and compliance objectives, and establishes control activities to ensure that

risks are mitigated and objectives are achieved. This requirement specifically places focus on establishing security management **control activities** to restrict technology access rights to authorized use commensurate with job responsibilities, and to protect assets from external threats. The first operations objective in the COSO Framework is to **safeguard assets**. That Marriott violated this requirement is evident from the observation in the PFI Report that *insecure remote access* led to compromise of *payment account numbers and payment card track data stored in clear text* (a **failure to protect**).

392. Second, Marriott was required to create an **information and communication** system that would enable the organization to obtain, generate, use, and communicate information to maintain and measure performance or progress toward achieving objectives. That Marriott violated this requirement to collect and communicate information to measure controls intended to safeguard assets is evident from the observations in the PFI Report of insufficient logging of firewall activity and remote access (a **failure to detect**).

393. Third, Marriott was required to **monitor** via ongoing and/or separate evaluations to ascertain whether the components of internal control, such as safeguarding assets, are present and functioning. Ongoing monitoring is defined, routine, and performed on a real-time basis. Separate evaluations are conducted periodically by personnel independent of management. That Marriott violated this requirement is evident from the PFI observation that monitoring and logging of remote access activity was lacking (a **failure to respond**).

394. Finally, Marriott was required to establish an effective system of **internal controls** to provide reasonable assurance regarding achievement of objectives. The preceding three observations are the most obvious violations of the COSO Framework because they are thoroughly documented in the PFI Report. However, Marriott also violated the COSO

Framework's more prescriptive governance requirements. The COSO Framework acknowledges that controls embedded in Risk Assessment may affect other internal control components, such as Control Activities and Monitoring, at the divisional, organizational unit, or functional levels, and vice versa. Accordingly, the COSO Framework contains a graphic to communicate that it is not possible for components such as Risk Assessment to be managed in a vacuum, only holistically. Figure 7, the COSO Cube, illustrates the interconnectivity of a company's internal control environment. In Marriott's case, it was not just a few isolated technology issues, but ***multiple control failures in multiple dimensions*** (leading to Marriott's **data assets** being compromised).

**Figure 7**
**The COSO Cube**




395. Because the operations category of objectives in the COSO Framework includes the requirement to safeguard assets, *i.e.*, to protect and preserve the company's assets, if Marriott complied with the COSO Framework, risk assessment and subsequent mitigation of control failures with respect to processing Starwood's vast repository of sensitive personal information should have occurred in conjunction with the close of the deal. Marriott was required to protect

the data it purchased from Starwood beginning ***immediately*** upon the close of the Merger. The COSO Framework states that such business objectives should be articulated using attributes that are specific, measurable or observable, attainable, relevant, and time-bound, and the due diligence process required by the SEC prior to a decision to merge includes immediate planning for control over all acquired operations on day 1 of the lifecycle of the merged entity. Marriott's two-year plan for integrating the systems did nothing to absolve Marriott of liability for the Data Breach in the guest reservation database. As noted above, and detailed in the PFI Report, Marriott's most egregious violation of the COSO Framework is that Marriott failed to identify and assess changes that could significantly impact the Company's systems, and were severely reckless in failing to select and develop control activities over technology to achieve the Company's business objectives.

396. The COSO Framework requirements are both process and governance oriented, rather than a prescription for exactly which controls need to be implemented. However, COSO has issued supplemental guidance specific to technology controls. The guidance advises that risk evaluation is aided by comparison of enterprise control activities to technology standards and frameworks that are aligned with the management of cyber risks. The recommended standards for comparison are detailed in Table 5 below.

**Table 5**
**COSO Compliant Technology Standards**

| Standard | Publisher | Scope |
| --- | --- | --- |
| ISACA COBIT[149] | The Information Systems Audit and Control Association ("ISACA") | Originally Control Objectives for Information Technology, now a set of processes that bridge the gap between |

[149] ISACA (2012). COBIT5, A Business Framework for the Governance and Management of Enterprise IT. Rolling Meadows, IL, Information Systems Audit and Control Association, IT Governance Institute.

| Standard | Publisher | Scope |
|---|---|---|
| | | technical control issues and business risks |
| ISO 27000 Series[150] | The International Organization for Standardization (ISO) | A progressively more detailed set of documents that set standards for Information Security governance process and control implementation. |
| NIST-CSF[151] | NIST | A Framework for Improving Critical Infrastructure Cybersecurity that reduces cybersecurity to five critical functions and maps multiple existing standards, guidelines, and practices to those functions. |

397. All of these technology standards are widely used by large global corporations like Marriott. Considered from the perspective of industry standards, COBIT is the least prescriptive of the three recommended in the COSO Framework. Like the COSO Framework, COBIT is principle-based, and relies on management to use sound judgment to evaluate and address risk. Yet even by the COBIT standard, Marriott failed to adequately assess the effectiveness of its internal controls in operating the reservation system and database for two years while it contained a breach and left critical information vulnerable. Among other activities, the COBIT standard requires management to, among other things, ensure that remote access services are active only when required. That Marriott violated this requirement is evident from the observation in the PFI Report of *insecure remote access* (a **failure to protect**). Additionally, COBIT requires management to produce event logs and retain them for an appropriate period to assist in future investigations. That Marriott violated this requirement is evident from the observation in the PFI Report of, for example, insufficient logging of firewall

[150] International Organization for Standardization (ISO) and International Electrotechnical Commission (IEC), ISO/IEC 27000 family - Information security management systems.
[151] NIST, Framework for Improving Critical Infrastructure Cybersecurity, Version 1.1. Department of Commerce, 2018.

activity (a **failure to detect**). Further, COBIT requires management to monitor the infrastructure for security-related events. That Marriott violated this requirement is evident from the observation in the PFI Report that monitoring and logging of remote access activity was lacking (a **failure to respond**). Finally, COBIT requires management to assign access privileges to sensitive documents and output devices based on the least-privilege principle.[152] That Marriott violated this requirement this is evident from the PFI observation that payment account numbers and payment card track data was stored in clear text (a **failure to protect**).[153]

398. The preceding four observations are the most glaring COBIT violations because they are supported by the evidence thoroughly documented in the PFI Report. However, both COBIT and PCI DSS include a specific requirement for management to "[p]rotect against malware," and "[p]rotect all systems against malware and regularly update anti-virus software or programs," respectively.[154] The PFI Report also include evidence that this requirement was violated (a **failure to protect resulting in asset compromise**).

### 3. The FTC ACT and NIST-CSF

399. Marriott was also required to comply with the FTC Act.[155] Section 5 of the FTC Act requires all corporations to refrain from unfair or deceptive acts or practices in or affecting commerce. When companies tell consumers they will safeguard their personal information, the

---

[152] The Principle of Least Privilege states that a user should be granted the minimum access to information needed to perform job responsibilities.

[153] These Manage Security Key Activities in Delivery, Service and Support (DSS05.04, DSS05.02, SS05.06, DSS05.07) are taken from COBIT 5, the version of COBIT that was in place at the time and they have not changed with the most recent update COBIT 19, see www.isaca.org

[154] *See* PCI DSS Principle 5 and COBIT DSS05.01

[155] Importantly, as detailed above in Section (VI)(F)(2), this Court already held in its motion to dismiss Order in the Consumer Track that Section 5 of the FTC Act imposed an affirmative, enforceable duty on Marriott regarding protecting customers' sensitive personal information. Consumer MtD Opinion at 47.

FTC can and does take enforcement action to make sure that companies live up to these promises. To provide guidance for companies regarding data security, in 2015 the FTC published a guide for businesses titled *Start with Security*.[156] Among other activities, the FTC guide instructed management to secure remote access to its network. That Marriott violated this requirement is evident from the observation in PFI Report of *insecure remote access* (a **failure to protect**). Additionally, the FTC instructed companies to segment their networks and monitor who was trying to get in and out. That Marriott violated this requirement is evident from the observations in the PFI Report of insufficient logging of firewall activity (a **failure to detect**). The FTC also instructed companies to put procedures in place to keep security current, and address vulnerabilities that may arise. That Marriott violated this requirement is evident from the observation in the PFI Report that the monitoring and logging of remote access activity was lacking (a **failure to respond**). Finally, the FTC instructed companies to store sensitive personal information securely and protect it during transmission. That Marriott violated this requirement is evident from the PFI observation that payment account numbers and payment card track data was stored in clear text (a **failure to protect resulting in asset compromise**)).

400. In its settlement with Wyndham Hotels, the FTC laid out a roadmap for compliance with the FTC Act as it relates to data security.[157] In that case, the FTC made clear that lack of security in a hotel company that purports to have "reasonable security" constitutes deceptive and fraudulent practices. The FTC brought charges against Wyndham Hotels for three separate data breaches that allowed attackers to steal the payment card information of more than 500,000 customers. The attacks were spread out over a two-year period and Wyndham Hotels'

---

[156] *See* FEDERAL TRADE COMMISSION, *Start With Security* (June 2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf.

[157] *FTC v. Wyndham Worldwide Corp.*, No. 13-cv-1887, ECF No. 283 (D. N.J. Dec. 11, 2015).

customer data was accessed by hackers via a local network at a hotel and also using an administrative account in the Wyndham data center. As a result of that settlement, the FTC required Wyndham Hotels to create a comprehensive Information Security program, and have it audited annually by a qualified, objective third party. That program was required to include:

- a designated employee or employees to coordinate and be held responsible for the program;
- a risk assessment including consideration of (1) employee training and management; (2) information systems, including storage and transmission; (3) company-specific risks; and (4) "prevention, detection, and response to attacks, intrusions, or other systems failure" (**protect, detect, respond**);
- the design and implementation of safeguards to control the risks identified through that assessment (**protect**);
- regular monitoring and testing of the effectiveness of the key controls, systems, and procedures of the safeguards (**detect**);
- identifying and retaining capable third parties to safeguard payment card information and including contractually required safeguards in agreements with those third parties; and
- evaluating and adjusting the company's Information Security program in light of the above-mentioned assessments (**respond**).

401. In 2016, the FTC issued a memo endorsing the NIST-CSF as a good source of fundamental security practices because this cybersecurity industry standard aligns with FTC objectives.[158] The FTC has publicly stated that NIST-CSF guidance is aligned with its own standards for enforcing compliance with the FTC Act, and as such the NIST-CSF can be used as a proxy for an actual FTC publication on the topic. The FTC memo on NIST-CSF states:

> The types of things the Framework calls for organizations to evaluate are the types of things the FTC has been evaluating for years in its Section 5 enforcement to determine whether a

[158] NIST operates under the supervision of the Department of Commerce. On its website, NIST says it "strives to be a leader in best privacy practices and privacy policy."

> company's data security and its processes are reasonable. By identifying different risk management practices and defining different levels of implementation, the NIST Framework takes a similar approach to the FTC's long-standing Section 5 enforcement.

402. Although NIST-CSF is not an implementation checklist, it nevertheless lists five basic cybersecurity functions expected to be in place at organizations at various levels of cybersecurity program sophistication (as depicted above in Figure 3), and suggests that businesses rate their cybersecurity risk management capability using four "tiers": (1) Partial; (2) Risk Informed; (3) Repeatable; and (4) Adaptive. A detailed explanation of these four tiers is attached hereto as Exhibit C.

403. NIST-CSF encourages organizations to manage cybersecurity risk at Tier 2 ("Risk Informed") or greater, depending on their own risk profile. In consultation with a cybersecurity expert and after reviewing publicly available information, Lead Plaintiff has determined that the risk management capability within Marriott's cybersecurity program would be classified in the "Partial" tier, and would therefore be insufficient. This is because "Risk Informed"—the next tier up—implies that prioritization and management of **protect, detect, and respond** activities is based on the outcome of formal risk assessment informed by threat intelligence and situational awareness, and the PFI Report shows that Marriott did not exhibit such awareness.

404. The NIST-CSF describes a closed-loop cybersecurity risk management system in which the output of risk management activities is continuously informing five basic functions: (1) **Identify**; (2) **Protect**; (3) **Detect**; (4) **Respond**; and (5) **Recover** (see Figure 3). The five functions are then divided into categories of cybersecurity outcomes that generally correspond to aspects of enterprise cybersecurity programs. These categories are further divided into specific measurable outcomes of technical and/or management activities. These subcategories provide an exemplar set of results that help shape enterprise efforts to produce the outcomes. Table 6 below

details NIST-CSF subcategories that Marriott failed to achieve. Note that this list is based on the solid evidence listed in the PFI Report. It would likely be expanded if more investigations or audits of Marriott's security program were made available to Lead Plaitniff for review.

**Table 6**
**NIST-CSF Guidance Violations**

| # | Function/ Category | Subcategory | Violations |
|---|---|---|---|
| 1 | **Identify** Governance | ID.GV-3: Legal and regulatory requirements regarding cybersecurity, including privacy and civil liberties obligations, are understood and managed | The PFI Report Appendix A includes evidence that that the contractual requirements Marriott had with respect to PCI were not met. In addition, the Information Commissioner's Office made a determination that Marriott failed to perform adequate due diligence during the Merger and thereby did not comply with GDPR. In the context of this governance outcome, it is concluded that legal and regulatory requirements with respect to personally identifiable information were either not understood or not managed. |
| 2 | **Protect** Identity Management, Authentication and Access Control | PR.AC-1: Identities and credentials are issued, managed, verified, revoked, and audited for authorized devices, users and processes | The PFI Report Section 5.4 enumerates general findings that include evidence that Domain User Accounts and Database Administrator accounts were leveraged by an unknown threat actor throughout the course of the attack without detection. This indicates systemic inadequate control and auditing for these identities and credentials. |
| 3 | | PR.AC-3: Remote access is managed | Investigator's Findings with respect to PCIS Requirement 6 (*see* PFI Report, Appendix A). Certain administrator groups were excluded from multifactor authentication requirements, allowing access to the CDE. |

| # | Function/ Category | Subcategory | Violations |
|---|---|---|---|
| 4 | | PR.AC-4: Access permissions and authorizations are managed, incorporating the principles of least privilege and separation of duties | Investigator's Findings with respect to PCIS Requirement 3 (*see* PFI Report, Appendix A). Storage of potential unencrypted and clear-text payment card numbers were identified within databases and in folders/directories, in archive logs, database exports, etc. This allows users who have not been granted access to CDE systems access to cardholder data. Investigator's Findings with respect to PCIS Requirement 6 (*see* PFI Report, Appendix A). Certain administrator groups were excluded from multifactor authentication requirements, allowing access to the CDE. |
| 5 | | PR.AC-5: Network integrity is protected (*e.g.*, network segregation, network segmentation) | Investigator's Findings with respect to PCIS Requirement 1 (*see* PFI Report, Appendix A). A non-PCI related system was allowed to directly communicate with PCI related systems. Additionally, systems within the Cardholder Data Environment and/or within PCI scope, were able to make inbound and outbound connections to malicious IP addresses. |
| 6 | | PR.AC-7: Users, devices, and other assets are authenticated (*e.g.*, single-factor, multi-factor) commensurate with the risk of the transaction (e.g., individuals' security and privacy risks and other organizational risks) | Investigator's Findings with respect to PCIS Requirement 6 (*see* PFI Report, Appendix A). Certain administrator groups were excluded from multifactor authentication requirements, allowing access to the CDE. |
| 7 | **Protect** Data Security | PR.DS-1: Data-at-rest is protected | Investigator's Findings with respect to PCIS Requirement 3 (*see* PFI Report, Appendix A). Storage of potential unencrypted and clear-text payment card numbers were identified within databases and in folders/directories, in archive logs, |

| # | Function/ Category | Subcategory | Violations |
|---|---|---|---|
| | | | database exports, etc. |
| 8 | | PR.DS-5: Protections against data leaks are implemented | Investigator's Findings with respect to PCIS Requirement 1 (*see* PFI Report, Appendix A). A non-PCI related system was allowed to directly communicate with PCI related systems. Additionally, systems within the Cardholder Data Environment and/or within PCI scope, were able to make inbound and outbound connections to malicious IP addresses. |
| 9 | **Protect** Maintenance | PR.MA-2: Remote maintenance of organizational assets is approved, logged, and performed in a manner that prevents unauthorized access | The PFI Report Section 5.3 contains an attack timeline of events that includes dates and activities relevant to the Breach. It begins on July 28, 2014 and ends on 10/19/2018. The continuation of observable malicious activity throughout a time wherein management is aware of data breaches indicates a lack of improvement in protection processes. |
| 10 | **Protect** Protective Technology | PR.PT-4: Communications and control networks are protected | Investigator's Findings with respect to PCIS Requirement 1 (*see* PFI Report, Appendix A). A non-PCI related server (Internet-facing web server) was allowed to directly communicate with PCI-related systems used for administrative access. Some of these were jump boxes, so called because they allow administrators to jump from one machine to another. These administrative servers were able to make direct inbound and outbound connections to malicious Internet sites. |
| 11 | **Detect** Anomalies and Events | DE.AE-1: A baseline of network operations and expected data flows for users and systems is established and managed | Investigator's Findings with respect to PCIS Requirement 6 and PCIS Requirement 10 (*see* PFI Report, Appendix A). Certain administrator groups were excluded from |

| # | Function/ Category | Subcategory | Violations |
|---|---|---|---|
| | | | multifactor authentication requirements, allowing access to the Cardholder Data Environment. Expected firewall events associated with network connections made by malware observed within the environment and connections made by malware were not sufficiently logged/archived. |
| 12 | **Detect** Security Continuous Monitoring | DE.CM-1: The network is monitored to detect potential cybersecurity events | Investigator's Findings with respect to PCIS Requirement 10 (*see* PFI Report, Appendix A). Expected firewall events associated with network connections made by malware observed within the environment and connections made by malware were not sufficiently logged/archived. |
| 13 | | DE.CM-4: Malicious code is detected | Malicious code is detected Violation: The PFI Report Section 5.3 contains an attack timeline of events that includes dates and activities relevant to the Breach. It begins on July 29, 2014 and ends on 10/10/2018. The continuation of observable malicious activity throughout a time wherein management is aware of data breaches indicates a lack of improvement in protection processes. |
| 14 | | DE.CM-6: External service provider activity is monitored to detect potential cybersecurity events | Section 5.2 of the report indicates that application development, database management, system management, and operations were managed by Accenture, an external service provider whose malware control activity was not monitored in a manner by which Marriott detected this attack. Also listed is a managed security services provider, Symantec, who provided log harvesting and monitoring, which |

| # | Function/ Category | Subcategory | Violations |
|---|---|---|---|
| | | | was inadequate as per PFI Report Appendix A, Requirement 10, and this inadequacy was not detected by Marriott. |
| 15 | | DE.CM-7: Monitoring for unauthorized personnel, connections, devices, and software is performed | Investigator's Findings with respect to PCIS Requirement 6 and PCIS Requirement 10 (*see* PFI Report, Appendix A). Certain administrator groups were excluded from multifactor authentication requirements, allowing access to the Cardholder Data Environment. Expected firewall events associated with network connections made by malware observed within the environment and connections made by malware were not sufficiently logged/archived. |
| 16 | **Detect** Detection Processes | DE.DP-2: Detection activities comply with all applicable requirements | Investigator's Findings with respect to PCIS Requirement 6 and PCIS Requirement 10 (*see* PFI Report, Appendix A). Certain administrator groups were excluded from multifactor authentication requirements, allowing access to the Cardholder Data Environment. Expected firewall events associated with network connections made by malware observed within the environment and connections made by malware were not sufficiently logged/archived. |
| 17 | | DE.DP-5: Detection processes are continuously improved | The PFI Report Section 5.3 contains an attack timeline of events that includes dates and activities relevant to the Breach. It includes over a dozen "unauthorized database query" events that began on 8/22/2018 but were not escalated to alert status until an event type of "access to sensitive data objects" appeared on 9/7/2018. This alert was not |

| # | Function/ Category | Subcategory | Violations |
|---|---|---|---|
| | | | communicated by Accenture to Marriott until 9/8/2018. |
| 18 | **Respond** Mitigation | RS.RP-1: Response plan is executed during or after an incident | Although a response was performed in this case, as per the PFI Report, Appendix A, this requirement was not fully assessed and there is no evidence that a response plan existed or that the response was executed according to a plan. |
| 19 | **Respond** Mitigation | RS.MI-1: Incidents are contained | Although the PFI Report, Section 6, describes containment actions completed. It also lists containment actions that have not yet been completed. Section 7 provides recommendations for enhanced detection and protection mechanisms that are not included in the list of planned containment actions. |

**4. GDPR**

405. Marriott also breached numerous requirements of the EU's GDPR in connection with its handling of the sensitive personal information on Starwood's systems. Notably, Marriott's failure to follow GDPR's requirements resulted in the ICO[159] issuing a notice of its intention to fine Marriott more than $120 million, ***and a determination that Marriott failed to perform adequate due diligence during the Merger.*** In levying that fine, the Information Commissioner for the ICO stated:

> The GDPR makes it clear that organisations must be accountable for the personal data they hold. This can include carrying out proper due diligence when making a corporate acquisition, and putting in place proper accountability measures to assess not only what personal data has been acquired, but also how it is protected.

[159] The ICO is an independent authority in the United Kingdom ("UK") that is tasked with taking the lead on enforcing GDPR on behalf of the EU. Additionally, the ICO cooperates with international data protection authorities, including the European Commission.

406. GDPR became effective in May 2018 and regulates the storage, transmission and processing of personal data belonging to people who reside in the EU. GDPR applies regardless of where a business is incorporated or operates.

407. GDPR fines can reach a maximum of 4% of a company's annual global revenue. Given Marriott's global operations, billions of dollars in annual revenues, and European clientele, the Company therefore should have been keenly focused on complying with GDPR.

408. For the purposes of GDPR compliance, Marriott is considered both a "data processor," and a "data controller."[160] A data controller is defined as "the party that, alone or jointly with others, determines the purposes and means of the processing of personal data." A data processor is the party that actually processes that personal data for itself and/or others, such as the hotels managed by Marriott. GDPR Section 4 Articles 24 through 39 define the obligations of data controllers and processors, which dictate that management:

> (1) Implement data protection by design and by default, that is technical and organizational measures to ensure that by default personal data are not made accessible without the individual's intervention to an indefinite number of natural persons, (25-1,25-2). That Marriott violated this requirement is evident from the observation in PFI Report of *insecure remote access* (a **failure to protect**);
>
> (2) The controller and the processor shall implement appropriate technical and organizational measures to ensure a level of security appropriate to the risk, including the ability to ensure the ongoing confidentiality of processing systems and services.[161] That Marriott violated this requirement is evident from the observation in the PFI Report that *payment account numbers and payment card track data stored in clear text were compromised* (a **failure to protect**);

---

[160] *See* GDPR Section 4; ICO Guidance at: *Controllers and processors*, ICO.ORG.UK, https://ico.org.uk/for-organisations/guide-to-data-protection/guide-to-the-general-data-protection-regulation-gdpr/key-definitions/controllers-and-processors/ (last visited July 21, 2020).

[161] GDPR Section 32-1.

> (3) The controller and the processor shall implement appropriate technical and organizational measures to ensure a level of security appropriate to the risk, including a process for regularly testing, assessing and evaluating the effectiveness of technical and organizational measures for ensuring the security of the processing.[162] That Marriott violated this requirement is evident from the PFI observation in the PFI Report of insufficient logging of firewall activity and that that monitoring and logging of remote access activity was lacking (a **failure to detect and respond**); and
>
> (4) Where a type of processing using new technologies, and taking into account the nature, scope, context and purposes of the processing, is likely to result in a high risk to the rights and freedoms of natural persons, the controller shall, prior to the processing, carry out an assessment of the impact of the envisaged processing operations on the protection of personal data.[163] That Marriott violated this requirement is evident from the observations in the PFI Report that *payment account numbers and payment card track data stored in clear text were compromised*, and that there was *no risk assessment and remediation process as part of due diligence in Marriott's decision to operated legacy Starwood systems*, which were new to Marriott at the time. An assessment such as that described in GDPR would have uncovered Marriott's failures to **protect, detect**, and **respond**.

### 5. Privacy Shield and Safe Harbor Principles

409. Marriott informed the public that the Company voluntarily complied with additional standards governing the security of customer data in the EU. Specifically, Marriott informed the public through its website starwoodhotels.com that the Company's data security practices were in compliance with the U.S.-EU Safe Harbor Framework ("Safe Harbor Framework"). Additionally, Marriott informed the public through its website Marriott.com that the Company certified to following the data security requirement laid out in the EU-U.S. Privacy Framework and the Swiss-U.S. Privacy Shield Framework (collectively the "Privacy Shield Frameworks"). These standards have been superseded by GDPR, but are nevertheless important

---

[162] GDPR Section 32-1.

[163] GDPR Section 35-11.

because Marriott claimed compliance within the timeframe that the PFI Report refers to as the "window of intrusion"—the time between the first confirmed date that an intruder entered the system until the date of containment, that is July 28, 2014, through September 26, 2018. Similarly, the PFI Report labeled the timeframe in which system weaknesses could be exploited by a threat as the "window of vulnerability," that is July 28, 2014, through December 21, 2018. In 2015, Marriott's website privacy statement read:

> We treat the personal information you provide to us as confidential and take reasonable steps, including standard industry safeguards to protect your personal information from accidental deletion or loss and unauthorized access, disclosure or modification. When you submit personal information to us via our Websites, it is transferred over a Secured Sockets Layer (SSL) connection, provided you are using a SSL enabled browser or device.[164]

By May of 2018, this had changed to claim compliance with the EU-U.S. and Swiss-U.S. Privacy Shield frameworks.

410. The Safe Harbor Framework was in effect until 2015 and was designed to assist U.S. companies that process personal data collected in the EU in complying with European privacy regulations. The Safe Harbor Framework has seven requirements companies must adhere to in order to attest compliance. First, companies must provide individuals with details on the collection of their data, what it will be used for, and how to get in touch with the company regarding the data. Second, companies must provide individuals with the opportunity to choose how the company uses the individual's data. Third, parties are only able to transfer data to third parties if they've complied with the first two requirements of the Safe Harbor Framework.

[164] Marriott's websites at the time were not continuously publicly archived throughout the timeframe, but these excerpts were captured in by webarchive.org, *See Global Privacy Statement – United States and Canada*, MARRIOTT.COM, https://web.archive.org/web/20151118063903/http://www.marriott.com/about/privacy.mi (last visited July 21, 2020).

Fourth, companies "creating, maintaining, using or disseminating personal information must take reasonable measures to assure its reliability for its intended use and reasonable precautions to protect it from loss, misuse and unauthorized access, disclosure, alteration and destruction." Fifth, companies can only use personal data for the purpose for which it was collected. Sixth, companies must provide individuals with access to the personal data they have collected on the individual. Seventh, companies must have mechanisms in place to enforce the preceding requirements, and remedy problems that arise in the context of adhering to the Safe Harbor Framework.

411. The EU-U.S. Privacy Shield Framework became effective in 2016, and the Swiss-U.S. Privacy Shield Framework became effective 2017. The Privacy Shield Frameworks were designed to provide American and European countries with a mechanism to comply with European data privacy requirements when transmitting customer data from Europe to the U.S. The Privacy Shield Frameworks have similar requirements to the Safe Harbor Framework: (1) notice; (2) choice; (3) accountability for onward transfer; (4) security; (5) data integrity and purpose limitation; (6) access; and (7) recourse enforcement, and liability.

412. Among the specific requirements set by these standards, they dictate that management must:

> (1) take reasonable and appropriate measures to protect personal data from loss, misuse and unauthorized access, disclosure, alteration and destruction, taking into due account the risks involved in the processing and the nature of the personal data. That Marriott violated this requirement is evident from the observation in the PFI Report of *insecure remote access* (a **failure to protect**);
>
> (2) have mechanisms in place to enforce the data protection and requirements, and remedy problems that arise in the context of adhering to the Safe Harbor Framework. That Marriott violated this requirement is evident from the observation in the PFI Report

> that *payment account numbers and payment card track data stored in clear text were compromised* (a **failure to protect**);
>
> (3) have mechanisms in place to enforce the data protection and requirements, and remedy problems that arise in the context of adhering to the Safe Harbor Framework. That Marriott violated this requirement is evident from the observation in the PFI Report of *insufficient logging of firewall activity*, and that *monitoring and logging of remote access activity was lacking* (a **failure to detect and respond**);
>
> (4) retain information in a form identifying or making identifiable the individual only for as long as it serves a purpose of processing. That Marriott violated this requirement is evident from the observation in the PFI Report that *the "window of payment card storage," that is, the timeframe for which account or payment card data was stored, started on October 23, 2002, and lasted until December 21, 2018, a period of more than 16 years* (a **failure to protect, detect, and respond**).

### 6. ISACA Publication on Technology Due Diligence and Risk

413. Due diligence is a generic term that refers to thorough investigation and/or research prior to investment to confirm all assumptions that may materially influence the advisability of the investment decision. As early as 2005, Information Security professionals were actively engaged in due diligence reviews related to merger agreements.[165] Where technology is a major asset in the acquisition target, security reviews are required to ensure that the technology underlying an acquisition target's business processes will indeed perform as expected, that the merged entity does have expected information asset protection, and/or that regulatory requirements for Information Security are met. An example method of performing such due diligence was published in 2014 by the ISACA Journal. Due to ISACA's well-known international peer review process, the article may be considered an exemplar of security professionals' practice at the time of its publication in 2014. The article frames management's

---

[165] Jennifer Bayuk, *Security Review Alternatives*, BAYUK.COM, https://bayuk.com/publications/SecurityReviewAlternatives.pdf (last visited July 21, 2020).

responsibility for Information Systems due diligence in the form of a *Responsible, Accountable, Consulted and Informed* (“RACI”) matrix.[166] A RACI matrix lists activities performed in a process as rows and the organizational participants as columns. The letters in the intersection of a row and a column indicate that the organizational participant in the column heading has an obligation to participate in the activities labeled in the row. The letters, RACI, indicate the role of the individual in the column with respect to the activity in the row. The roles indicated by the letters in the column are:

- “R” - Responsible: the individual performs the activity
- “A” - Accountable: the individual is the authority and decision-maker responsible for the quality of the task performance, the individual is expected to provide oversight and endorse the outcome of the process, or
- “C” - Consulted: the individual contributes knowledge and participates in two-way communication with those responsible and accountable as the activity is planned and executed
- “I” - Informed: the individual receives one-way communication on the details of the activity, typically from those responsible

414. Figure 8 is the exemplar due diligence process RACI matrix. It shows that the CEO is the individual in the organization who is accountable for the Information Security due diligence process and is accountable for presenting it to the board. It also shows that the CIO is responsible for conducting the due diligence and is expected to consult the entire executive management team in the process.

---

[166] Bostjan Delak & Marko Bajec, *Conducting IS Due Diligence in a Structured Model Within a Short Period of Time*, ISACA J. Volume 4 (2014).

**Figure 8**
**Exemplar Due Diligence RACI Matrix**

| Activity | | Chief Executive Officer | Chief Financial Officer | Chief Operations Officer | Business Process Owners | Project Management Office | Privacy Officer | Compliance | Human Resources Manager | Audit Manager | Chief Information Security Officer | Chief Information Officer | Head Architect | Head of Development | Head of IT Operations | Database Administrator | LAN/WAN Administrator | Developer | System Administrator | Help Desk Team | Other IT Personnel | IS Due Diligence Team Leader/Manager | IS Due Diligence Team |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Make decision for activating IS due diligence. | | A | I | R | | | | C | I | C | | R | | | | | | | | | | C | |
| Prepare for IS due diligence. | | | | | | | C | I | | C | C | R | R | R | R | R | C | C | C | C | C | A | R |
| Conduct due diligence. | Interviews with IT | | | | | | | | | | | R | C | C | C | C | C | C | C | C | C | A | R |
| | Interviews with end user | C | C | R | C | C | C | C | C | C | C | | | | | | | | | | | A | R |
| | Visiting IT premises | | | | | | I | | | C | C | I | | I | R | | I | I | I | I | I | A | R |
| Analyze gathered data. | | I | | I | | | | | | | | I | | | | | | | | | | A | R |
| Prepare the report. | | I | | I | | | | | | | | I | | | | | | | | | | A | R |
| Present the report to the board. | | A | R | C | I | I | C | I | C | C | C | R | C | C | C | I | I | | I | | | R | I |

415. ISACA published another article related to merger due diligence in 2016.[167] In that guidance, the author noted that IT capabilities "are considered a key strategic asset for contemporary firms." Additionally, the "[i]ntegration of IT systems and IT management processes is one of the major challenges in the M&A process," and is "crucial to the overall success" of that process.

416. The 2016 article identified three broad categories of risks related to the integration of IT systems: (1) technical-level risk; (2) application user-level risk; and (3) business-level risk.[168] As relevant here, issues related to assessing technical-level risk include "[e]nsuring that business transaction processes work," and "[i]mplementing appropriate systems, policies and processes to engender confidentiality, integrity and availability of data, technology and systems."

---

[167] Vipin Arora, Deepak Khazanchi, *Evaluating IT Integration Risk Prior to Mergers & Acquisitions*, ISACA J. Volume 2 (2016).

[168] ISACA notes that these categories align with those laid out in NIST's Special Publication 800-39, *Managing Information Security Risk*, discussed in further detail above in Section (VI)(H)(3). Additionally, ISACA endorses the COBIT Framework for "managing postmerger integration and associated risk assessment," which is discussed in further detail above in Section (VI)(H)(2).

The issues related to application user-level risk, as relevant here, include "[i]ntentionally planning for integration after M&A," assessing the organization's readiness for the integration, and "[a]ssessing coordination and control procedures for maintaining reliability of transaction processes."

417. The category of risk most relevant to the Merger is business-level risk, which includes issues related to the "appropriateness of extant systems and technologies for an organization's culture and structure." As detailed above in Section (VI)(F)(3), Marriott's Board, including Defendant Sorenson, knew that unlike Marriott, Starwood did not utilize point-to-point encryption or tokenization for its guest reservation database, making it an inappropriate fit for Marriott's "culture and structure." While Marriott did make the decision not to integrate the legacy Starwood guest reservation database into its own systems, Defendants failed to properly assess and mitigate the risk to Marriott in operating the legacy Starwood guest reservation system and database post-Merger.

418. Additionally, business-level risk includes issues related to "[a]dherence to legal requirements," such as "information privacy laws." Marriott failed to properly address this risk, as evidenced by the more than $100 million fine levied by the ICO because Defendants violated their duties under GDPR. Further, as this Court held in the Consumer MtD Opinion, Defendants violated the duties related to data security imposed by Section 5 of the FTC Act for failing to adequately protect customers' personal data, as discussed earlier in this section.

419. Business-level risk also includes issues regarding adequate planning and systems to monitor the secure transmission of data, and the auditability of that security. Notably, the 2016 ISACA Journal article pointed out that even if the two merging firms are individually complaint with relevant regulations and data security practices, which Starwood was not, "the

combined postmerger entity may not be compliant," as was the case with Marriott post-Merger having failed to address the known deficiencies in Starwood's systems. As detailed in the PFI Report, and laid out in Section (VI)(G), Defendants violated numerous PCI DSS requirements related to data security. For example, as noted in the PFI Report and discussed above, Starwood failed to keep adequate logs and documentation of firewall activity and remote access to Starwood's systems which severely hampered the PFI investigators and so would also have hampered Defendants' ability to conduct adequate audits of Starwood's systems. In acknowledgement that such situations may be encountered during M&A activities, the author stated that CEOs and CFOs should develop a keen awareness of the challenges and importance of IT integration issues in M&A, and include Internal Audit, CIOs and/or a technology unit in M&A planning activities.

420. In another exemplar article published by the ISACA Journal in 2015, the authors noted that, "reports of information security breaches and unauthorized actions on organizations' IT infrastructure had increased because information had become the new natural resource of the 21st century."[169] As noted above in Section (VI)(C)(6)(b), this was particularly true in the hospitality industry.

421. Defendants were repeatedly informed of heightened cybersecurity risks faced by Marriott during numerous board meetings. ISACA has stated that boards "must include cyber risk considerations in their review of the strategic risk." As also noted above in Section (VI)(F)(3), Marriott's Board, which included Defendant Sorenson and the Audit Committee Defendants, was repeatedly presented with information regarding Marriott's prioritization of risks related to cybersecurity.

---

[169] Jeimy J. Cano, *Cyberinsurance—The Challenge of Transferring Failure in a Digital, Globalized World*, ISACA J. Volume 5 (2015).

**7. Standards for Risk Assessment**

422. In this section, Lead Plaintiff describes what actions Defendants should have taken if they were complying with their legal and regulatory requirements for data protection. Since 1985, NIST has been publishing consensus-built guidance on best practices regarding computer security. In the 1990s the publications expanded to Information Security, and in the 2010s expanded to cybersecurity.[170] Marriott's IT executives and employees were no doubt familiar with NIST standards, as were their information systems internal and external auditors, vendors, and third party service providers. The standards for risk assessment described here are based on guidance regarding cybersecurity risk in special publications released by NIST, which are different from the NIST-CSF described above in that NIST-CSF goes beyond guidance and provides companies with a framework for structuring their IT processes.

423. In March 2011, NIST released Special Publication 800-39, titled *Managing Information Security Risk: Organization, Mission, and Information System View* ("NIST-SP 800-39") that addresses "the management of information security-related risk derived from or associated with the operation and use of information systems or the environment in which those systems operate." According to NIST-SP 800-39, IT "is widely recognized as the engine that drives the U.S. economy," and provides companies with a competitive advantage. Further, NIST notes that to carry out business functions, companies rely on information systems, which include workstations and personal computers, as well as specialized systems. NIST also defines information systems as "a discrete set of information resources organized for the collection,

[170] The NIST special publications detailed below provide general guidance on how entities should manage technology and cybersecurity risk, and is the type of guidance that professional auditors would follow in conducting cybersecurity audits.

processing, maintenance, use, sharing, dissemination or disposition of information," which includes the legacy Starwood guest reservation system and database.

424. NIST-SP 800-39 highlights the role of a company's leaders and management in addressing risk related to information systems. In order to protect information and information systems from attacks, "it is imperative that leaders and managers at all levels understand their responsibilities and are held accountable for managing information security risk." Further, "leaders must recognize that explicit, well-informed risk-based decisions are necessary in order to balance" the risks and benefits associated with a given information system. NIST-SP 800-39 also notes that an organization's culture "informs, and perhaps even to a large degree, defines" an organization's risk management strategy, and also impacts the degree of risk an organization is willing to incur. NIST-SP 800-39 defines organizational culture as "the values, beliefs, and norms that influence the behaviors and actions of the senior leaders/executives and individual members of organizations."

425. In addition to a commitment from top-level executives, NIST-SP 800-39 identifies four key elements of managing Information Security risk organization-wide: (1) the assignment of risk management to senior leaders and executives; (2) an ongoing recognition and understanding by senior leaders and management of the relevant Information Security risks; (3) establishing the organization's tolerance for risk and communicating that throughout the organization; and (4) accountability for senior leaders and management "for the implementation of effective, organization-wide risk management programs."

426. NIST-SP 800-39 lays out the process for risk management in four categories: (1) framing risk; (2) assessing risk; (3) responding to identified risks; and (4) monitoring risk on an ongoing basis. The purpose of the first component, framing risk, is to produce a risk

management strategy that addresses how organizations intend to address the other three components. The purpose of the second component, assessing risk, is to identify threats to the organization, internal and external vulnerabilities, the potential harm that could result from those vulnerabilities, and the likelihood that harm will occur. The purpose of the third component, responding to identified risks, is to provide a consistent, organization-wide, response to risk by developing and implementing appropriate risk responses as a part of an organizational framework. The purpose of the fourth component is threefold: (i) to verify that planned risk response measures are implemented and that Information Security requirements derived from "federal legislation, directives, regulations, policies, standards, and guidelines are satisfied"; (ii) to determine the ongoing effectiveness of risk response measures; and (iii) identify changes that impact organizational information systems and the related environments.

427. On the topic of risk response measures itself, the most authoritative publicly available cybersecurity control assessment guidance is NIST Special Publication 800-53A ("NIST-SP 800-53A").[171] NIST-SP 800-53A contains dozens of Information Security control assessment steps that may be expected to be performed by independent technology auditors during technology assessments and audits such as IS Due Diligence reviews. In consultation with a cybersecurity expert, Lead Plaintiff has determined that Marriott failed to take a number of those steps and laid out below are several of the most relevant failures by Marriott in its due diligence during the Merger.

428. For example, had Marriott engaged professional IT auditors as a part of M&A due diligence, the auditors would have performed technology due diligence following guidance such

[171] National Institute of Standards and Technology (NIST) Special Publication 800-53A, *Assessing Security and Privacy Controls in Federal Information Systems and Organizations: Building Effective Assessment Plans*, Dec. 2014.

as that as laid out by NIST-SP 800-53A. They would have obtained documentation of or themselves documented the flow of customer data within Starwood's systems, including the reservation system. They would have verified that a list of allowed information flows both existed, and that they were authorized by management. Under Marriott's supervision, the auditors also would have examined policies, procedures, and configuration settings for all of the technology devices that were traversed by that data flow. The auditors would also have performed tests to ensure that only data flows on the allowed devices were operating, and that there were audit trails of all actual data flows. These tests would allow them to evaluate whether Starwood management enforced approved authorizations for controlling the flow of customer information within its systems and between interconnected systems based on information flow control policies.

429. The auditors would have used the results from the evaluation to: (i) identify the method by which audit records of actual information flows were recorded and preserved, and (ii) compare the list of authorized information flows to the audit records to make sure there were no exceptions. They would also have attempted to execute an unauthorized data flow and observed whether or not it resulted in an alert that was investigated using a standard cybersecurity operations procedure.

430. Also in consultation with a data security expert, Lead Plaintiff has determined that at the due diligence stage, and continuing periodically thereafter, Marriott should have conducted vulnerability scans at the network level, the operating system level, and at the code level for all the software they were purchasing. These measures are taken not just for security, but are a part of compliance and contractual duties, such as with PCI DSS, as well. In particular, the reservation database should have been given special attention given that it had highly sensitive

information and an externally facing interface with third party communication (like Expedia or TripAdvisor to make reservations).

431. Further, according to Lead Plaintiff's data security expert, during and subsequent to the due diligence process, Marriott should have also prepared and adhered to a schedule to make sure to scan all internet facing applications at a periodic intervals corresponding to changes to the system or its environment (in this case, change occurred at least annually). Additionally, Defendants should have examined the actual software and operating systems of the machines and systems they were purchasing in order to make sure there was no unauthorized or unlicensed software, especially no Trojan Horses, malware, or back door access. Moreover, as part of the due diligence review, Marriott should have tested the security of the access control features of the business applications running on the systems. In addition to the focus on critical applications such as the reservations database, a key aspect of any technology due diligence process is the need to make an inventory of the systems, applications, and software. Marriott should have completed that inventory, and after completing the system inventory, Marriott should have examined the security of item in its technology inventory as described above as part of the due diligence process (and thereafter).

432. Further, Marriott needed to perform due diligence on their ability to monitor their newly acquired Starwood environment with complete activity logs, including firewall connection logs, remote access logs, file transfer logs and database access logs. Importantly, the PFI Report noted that these logs were incomplete. As a part of operating with adequate IT security, Starwood should have been monitoring access to its systems and correlating each login to an authorized user, including logging all administrative access and remote access activity to a centralized SIEM. While Marriott would not have been expected to manually review these logs

and check each login, they should at a minimum have verified that Starwood had a method to correlate each administrative login to an authorized user performing a necessary task, and an automated procedure to detect anomalous access among non-administrative staff, third parties, and customers. Post-acquisition, Marriott should have repeated these access control monitoring procedures to ensure they worked adequately and that log anomalies were investigated. ***Given that the Data Breach began at least as far back as July 2014, either Marriott knew that Starwood did not have adequate access log correlation procedures or Marriott did not review them and was severely reckless in assuring the market the Company had performed extensive due diligence and maintained adequate data security***.

433. Through its due diligence during the Merger and its operation of the legacy Starwood guest reservation database, Marriott violated industry standards, the COSO Framework, PCI DSS, the FTC Act, GDPR, the Safe Harbor Framework, and the Privacy Shield Frameworks. Even a cursory review of the legacy Starwood guest reservation database would have revealed the lack of a **protect, detect**, and **respond** cycle adequate to comply with regulatory and industry standards. Defendants knew of these violations and repeatedly, and misleadingly, touted Marriott's due diligence and data security standards, or Defendants were severely reckless in making statements to the market regarding Marriott's due diligence and security standards without a reasonable basis for doing so. Additionally, these standards require the company to give notice to consumers, which Marriott delayed, as well as U.S. states, federal entities, and European government agencies.

### 8. SEC Guidance Regarding Cybersecurity Risks and Incidents

434. On June 10, 2014, then-SEC Commissioner Luis A. Aguilar gave a speech titled *Board of Directors, Corporate Governance and Cyber-Risks: Sharpening the Focus*, at the Cyber Risks and the Boardroom Conference hosted by the NYSE. Commissioner Aguilar noted

that both law enforcement and financial regulators had stated publicly that cyberattacks were becoming more frequent and more sophisticated, and ultimately costing companies more money. Companies subject to cyberattacks allow damage not only to their customers, but also risk reputational harm that could "significantly affect[] a company's bottom line." Commissioner Aguilar also noted that the threat of cyberattacks was not a new concept for public companies, as the SEC first released guidance to public companies regarding disclosure obligations related to cybersecurity risks and related incidents in 2011. Further, Commissioner Aguilar stated: "Effective board oversight of management's efforts to address these issues is critical to preventing and effectively responding to successful cyber-attacks and, ultimately, to protecting companies and their consumers, as well as protecting investors and the integrity of the capital markets." He also noted that it is incumbent on the board to "ensure that management has implemented effective risk management protocols," including cyber-risk.

435. Commissioner Aguilar also highlighted the fact that "significant" cyberattacks were "occurring with disturbing frequency," and that as a result, "ensuring the adequacy of a company's cybersecurity measures needs to be a critical part of a board of director's risk oversight responsibilities." Commissioner Aguilar also highlighted the potential detrimental effects of a cyberattack, including significant business disruptions, substantial response costs, negative publicity, and liability in litigation. Given such potential effects, "one would expect that corporate boards and senior management universally would be proactively taking steps to confront these cyber-risks."

436. In addressing cybersecurity-related risks, Commissioner Aguilar encouraged public companies to consider the NIST-CSF. While adoption of the NIST-CSF was, and remains, voluntary, Commissioner Aguilar predicted that it would "likely become a baseline for

best practices by companies, including in assessing legal or regulatory exposure to these issues." In addition to participation from the board, Commissioner Aguilar also stressed that a company must have "the appropriate personnel to carry out effective cyber-risk management and to provide regular reports to the board."

437. On February 21, 2018, the SEC released guidance for public companies on how to appropriately inform the market about cybersecurity risks (the "SEC Release").[172] The SEC Release explained that guidance on this issue was important because "[c]ybersecurity risks pose grave threats to investors, our capital markets, and our country" which is why the SEC "believes that it is critical that public companies take all required actions to inform investors about material cybersecurity risks and incidents in a timely fashion." The SEC Release explained further:

> Crucial to a public company's ability to make any required disclosure of cybersecurity risks and incidents in the appropriate timeframe are disclosure controls and procedures that provide an appropriate method of discerning the impact that such matters may have on the company and its business, financial condition, and results of operations, as well as a protocol to determine the potential materiality of such risks and incidents. In addition, ***the Commission believes that the development of effective disclosure controls and procedures is best achieved when a company's directors, officers, and other persons responsible for developing and overseeing such controls and procedures are informed about the cybersecurity risks and incidents that the company has faced or is likely to face***.

438. More specifically, the SEC Release provides guidance to public companies on how to properly inform the market of cybersecurity risks. With respect to a public company's existing disclosure obligations, the SEC explained: "We remind companies that they may have a duty to correct prior disclosure that the company determines was untrue (or omitted a material fact necessary to make the disclosure not misleading) at the time it was made (for example, if the

---

[172] SEC Release Nos. 33-10459; 34-82746, "Statement and Guidance on Public Company Cybersecurity Disclosures."

company subsequently discovers contradictory information that existed at the time of the initial disclosure), or a duty to update disclosure that becomes materially inaccurate after it is made (for example, when the original statement is still being relied on by reasonable investors). ***Companies should consider whether they need to revisit or refresh previous disclosure, including during the process of investigating a cybersecurity incident***."

439. With respect to a public company's risk disclosures, the SEC explained the following issues, among others, should be considered when a company makes a risk factor disclosure:

> (a) the occurrence of prior cybersecurity incidents, including their severity and frequency;
>
> (b) the probability of the occurrence and potential magnitude of cybersecurity incidents;
>
> (c) the adequacy of preventative actions taken to reduce cybersecurity risks and the associated costs, including, if appropriate, discussing the limits of the company's ability to prevent or mitigate certain cybersecurity risks;
>
> (d) the aspects of the company's business and operations that give rise to material cybersecurity risks and the potential costs and consequences of such risks, including industry-specific risks and third party supplier and service provider risks; and
>
> (e) the costs associated with maintaining cybersecurity protections, including, if applicable, insurance coverage relating to cybersecurity incidents or payments to service providers.

440. Moreover, when making those risk disclosures, the SEC explained: "***[C]ompanies may need to disclose previous or ongoing cybersecurity incidents or other past events in order to place discussions of these risks in the appropriate context***. For example, if a company previously experienced a material cybersecurity incident involving denial-of-service, it likely would not be sufficient for the company to disclose that there is a risk that a denial-of-service

incident may occur. Instead, ***the company may need to discuss the occurrence of that cybersecurity incident and its consequences as part of a broader discussion of the types of potential cybersecurity incidents that pose particular risks to the company's business and operations***. Past incidents involving suppliers, customers, competitors, and others may be relevant when crafting risk factor disclosure. In certain circumstances, this type of contextual disclosure may be necessary to effectively communicate cybersecurity risks to investors."

441. As detailed more thoroughly below, Marriott's risk disclosures failed to inform investors of the actual cybersecurity risks the Company faced, in accordance with the SEC's guidance. For example, although the SEC Release specifically discusses the importance of including language in risk disclosures about "the occurrence of prior cybersecurity incidents" and their "consequences as part of a broader discussion of the types of potential cybersecurity incidents," none of Marriott's risk disclosures (including those that post-date the SEC Release) discussed anything about Starwood's prior data breaches or their impact on Marriott's then-current cybersecurity risks. Instead, Marriott only vaguely warned of general cybersecurity risks, which failed to provide contextual disclosures that were necessary to effectively communicate the Company's cybersecurity risks to investors. Additionally, Defendants continually assured the market they had conducted adequate due diligence and took sufficient measures to protect customer data.

## VII. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD[173]

### A. November 16, 2015 – Prospectus Containing a Letter to Marriott Associates Regarding the Merger

442. The Class Period begins on November 16, 2015, the day the Merger was announced. On November 16, 2015, after the market closed, Marriott filed a prospectus pursuant to SEC Rule 425 containing a letter from Defendant Sorenson to Marriott associates discussing the Merger and what Marriott's associates should expect. In that letter, Defendant Sorenson stated:

> This union will also generate tremendous growth: growing value for shareholders, growing choices and benefits for consumers, growing economic advantages for our owners and franchisees, and growing opportunities for associates.
>
> ***This integration will require a significant amount of work, but while the scale is much larger, we have successfully completed integrations before. We have always emerged stronger, and better positioned, to compete in a rapidly changing marketplace.***

443. Also in that letter to Marriott associates, Defendant Sorenson stated: "***The team will guide the Starwood integration and ensure that it succeeds with minimal disruption to our business.***"

444. The Prospectus also contained a letter from Defendant Sorenson to Starwood associates. In that letter, Defendant Sorenson stated:

> Delighting our guests is the priority, ***and we don't anticipate the integration having an impact at the hotel level worldwide.*** There will be some support areas where we overlap and we'll address those in time as we look to more efficiently run our combined organization.

[173] The statements that are ***bolded and italicized*** in this section are statements alleged to be false or misleading.

445. These statements and omissions concerning the state of the Integration and Marriott's prior integration experience were false and misleading when made because at the time Defendants made these statements, Starwood's IT systems were severely vulnerable. Specifically, among other issues: (1) the systems were using an outdated Oracle application portal that could not be updated or patched; (2) the legacy Starwood system allowed for insecure remote access; (3) only a fraction of Starwood's firewall activity was being logged, so nobody could adequately monitor for attacks; (4) the legacy Starwood system lacked monitoring and logging of remote access, meaning that there was no record of who was remotely accessing the systems; (5) not all database queries were being logged, so nobody could see if a hacker was accessing Starwood's valuable data without permission; and (6) payment account numbers were being stored without encryption, so sensitive data was easily accessible to attackers. An adequate merger due diligence process would have easily revealed these glaring deficiencies, yet Marriott knowingly, or with severe recklessness, failed to share this important information with the market. In addition, throughout the Class Period, the legacy Starwood guest reservation database was already compromised by the Data Breach.

446. Further, the statements and omissions: (1) gave investors a false impression that Marriott had made adequate preparations and dedicated adequate resources to cybersecurity when, in fact, Marriott failed to secure Starwood's systems, despite knowledge of cybersecurity risks; and (2) gave investors the false sense that Marriott's prior acquisition experience was relevant to the Merger due diligence and Integration processes, and was in fact guiding those processes. Additionally, as detailed above in the Board minutes pleaded in Section (VI)(F)(3), the Board was well aware of the risk that cybersecurity posed to the Company, however, Marriott ignored multiple red flags that should have caused Defendants to discover the Data

Breach (or at least safeguard Starwood's vulnerable client data) including, but not limited to: (1) Starwood's known cybersecurity issues, as detailed above in Sections (VI)(C)(3)-(5); (2) significant (and public) intrusions into the systems and databases of Marriott's competitors in the hospitality industry, as detailed above in Section (VI)(C)(6)(b); and (3) other significant data breaches in other industries, as detailed above in Section (VI)(C)(6)(c). Notably, as detailed above in Section (VI)(F)(2), this Court has already held that plaintiffs in parallel litigation adequately pleaded under FRCP 9(b) "that Marriott knew or should have known about its allegedly inadequate data security practices and the risk of a data breach." *See also* Section (VIII) (Additional Allegations Supporting Scienter).

### B. December 22, 2015 – Registration Statement; January 27, 2016 – First Amendment to the Registration Statement; February 16, 2016 – Second Amendment to the Registration Statement; and February 17, 2016 – Prospectus

447. On December 22, 2015, before the market opened, Marriott filed the Company's Form S-4 Registration Statement (the "Registration Statement") related to the Merger. The Registration Statement was signed by Defendants Sorenson and Bauduin, and the Audit Committee Defendants. On January 27, 2016, Marriot filed the First Amendment to the Registration Statement (the "First Amended Registration Statement"), which was signed by Defendants Sorenson and Oberg. On February 16, 2016, Marriot filed the Second Amendment to the Registration Statement (the "Second Amended Registration Statement"), which was signed by Defendant Sorenson. On February 17, 2016, after the market closed, Marriott filed a prospectus pursuant to SEC Rule 424(b)(3) related to the Merger (the "First Prospectus"). The First Prospectus was signed by Defendant Sorenson.

448. The Registration Statement, First Amended Registration Statement, Second Amended Registration Statement, and the First Prospectus stated that Marriott's Board, in

arriving at its decision to recommend the Merger, "***consulted with Marriott's senior management, legal advisors, financial advisors, and other advisors," and later stated that the Board "reviewed a significant amount of information***." Additionally, those documents informed the market that "***both Marriott's and Starwood's strong track records in merger integration***" supported voting in favor of the Merger.

449. Also in the Registration Statement, First Amended Registration Statement, Second Amended Registration Statement, and First Prospectus, when listing the strategic and financial benefits of the Merger, Marriott stated:

> All 11 of Marriott's current directors will continue to serve on Marriott's Board with the expected addition of three members of Starwood's current board, ensuring continuity of Marriott's Board and the addition of directors with a deep knowledge of Starwood, enhancing the Marriott Board's understanding of the integration process.
>
> * * *
>
> ***Given Marriott's Board's knowledge of Marriott's business, operations, financial condition, earnings and prospects and Marriott's Board's knowledge of Starwood's business, operations, financial condition, earnings and prospects, taking into account Starwood's publicly filed information and the results of Marriott's due diligence review of Starwood, the prospects for the combined company are favorable.***

450. These statements and omissions concerning Marriott's preparedness, and the state of the Integration up to that point were false and misleading when made because at the time Defendants made these statements, Starwood's IT systems were severely vulnerable. Specifically, among other issues: (1) the systems were using an outdated Oracle application portal that could not be updated or patched; (2) the legacy Starwood system allowed for insecure remote access; (3) only a fraction of Starwood's firewall activity was being logged, so nobody could adequately monitor for attacks; (4) the legacy Starwood system lacked monitoring and

logging of remote access, meaning that there was no record of who was remotely accessing the systems; (5) not all database queries were being logged, so nobody could see if a hacker was accessing Starwood's valuable data without permission; and (6) payment account numbers were being stored without encryption, so sensitive data was easily accessible to attackers. An adequate merger due diligence process would have easily revealed these glaring deficiencies, yet Marriott knowingly, or with severe recklessness, failed to share this important information with the market. In addition, throughout the Class Period, the legacy Starwood guest reservation database was already compromised by the Data Breach.

451. Further, the statements and omissions: (1) gave investors a false impression that Marriott had undertaken sufficient due diligence in accordance with relevant requirements, standards, and best practices detailed above; (2) gave investors a false impression that Marriott had made adequate preparations and dedicated adequate resources to cybersecurity when, in fact, Marriott failed to secure Starwood's systems, despite knowledge of cybersecurity risks; and (3) gave investors the false sense that Marriott's prior acquisition experience was relevant to the Merger due diligence and Integration processes, and was in fact guiding those processes. Additionally, as detailed above in the Board minutes pleaded in Section (VI)(F)(3), the Board was well aware of the risk that cybersecurity posed to the Company, including ranking cybersecurity as a top risk facing the Company, however, Marriott ignored multiple red flags that should have caused Defendants to discover the Data Breach (or at least safeguard Starwood's vulnerable client data) including, but not limited to: (1) Starwood's known cybersecurity issues, now including the RAM-scraper breach announced on November 20, 2015, and as detailed above in Section (VI)(C)(3)-(5); (2) significant (and public) intrusions into the systems and databases of Marriott's competitors in the hospitality industry, now including the FTC's

settlement with Wyndham hotels announced on December 9, 2015, and as detailed above in Section (VI)(C)(6)(b); and (3) other significant data breaches in other industries, as detailed above in Section (VI)(C))(6)(c). Notably, as detailed above in Section (VI)(F)(2), this Court has already held that plaintiffs in parallel litigation adequately pleaded under FRCP 9(b) "that Marriott knew or should have known about its allegedly inadequate data security practices and the risk of a data breach." *See also* Section (VIII) (Additional Allegations Supporting Scienter).

**C. February 18, 2016 – Q4 2015 Earnings Call**

452. On February 18, 2016, at 10:00 am EST, Marriott held a conference call to discuss Q4 2015 earnings, the Merger, and other topics. On that call, an analyst asked Defendant Sorenson about avoiding pitfalls in an acquisition and Defendant Sorenson stated:

> <u>Analyst</u>
>
> So, if you guys could talk about the challenges that you face integrating the two companies and their systems. We are getting several questions about, going back to the Ryman acquisition, how -- I guess the question really is, what are you doing to be as thorough as you can so that you avoid some of the pitfalls?
>
> <u>Defendant Sorenson</u>
>
> Yes, it is a good question. I think we are hopefully learning from the experiences we have had in the past few years. You can, to some extent, look at the Gaylord acquisition and the Protea and Delta acquisitions as warm-up acts for this, I suppose, and hopefully we're getting better at it.
>
> Now at the same time, obviously, Starwood is a much bigger deal than any of those were, which presents some positive differences and then some greater challenges. I think on the positive side Starwood is hopefully less distracted by the process of the sale of the company, and you have got a big, talented group of folks over there running 350,000 rooms or so. But I know the Starwood team, with our encouragement, is very much focused on continuing to drive sales and to drive the development engine, and we have taken steps to try and put our arms around those teams of folks so that they are as little distracted by this as possible.

> I think some of the other deals we did early, it was that sales engine which looked like it got distracted during a sales process and to some extent between the negotiator -- the signing of a deal and the closing of a deal.
>
> ***And we are doing everything we can to plan for integration of systems and integration of business units between now and when we close so that we can implement those as quickly as possible. And we're optimistic at this point that this will go well.***

453. These statements and omissions regarding the Integration planning up to that point were false and misleading when made because at the time Defendants made these statements, Starwood's IT systems were severely vulnerable. Specifically, among other issues: (1) the systems were using an outdated Oracle application portal that could not be updated or patched; (2) the legacy Starwood system allowed for insecure remote access; (3) only a fraction of Starwood's firewall activity was being logged, so nobody could adequately monitor for attacks; (4) the legacy Starwood system lacked monitoring and logging of remote access, meaning that there was no record of who was remotely accessing the systems; (5) not all database queries were being logged, so nobody could see if a hacker was accessing Starwood's valuable data without permission; and (6) payment account numbers were being stored without encryption, so sensitive data was easily accessible to attackers. An adequate merger due diligence process would have easily revealed these glaring deficiencies, yet Marriott knowingly, or with severe recklessness, failed to share this important information with the market. In addition, throughout the Class Period, the legacy Starwood guest reservation database was already compromised by the Data Breach.

454. Further, the statements and omissions gave investors a false impression that Marriott had made adequate preparations and dedicated adequate resources to cybersecurity when, in fact, Marriott failed to secure Starwood's systems, despite knowledge of cybersecurity risks. Additionally, as detailed above in the Board minutes pleaded in Section (VI)(F)(3), the

Board was well aware of the risk that cybersecurity posed to the Company, however, Marriott ignored multiple red flags that should have caused Defendants to discover the Data Breach (or at least safeguard Starwood's vulnerable client data) including, but not limited to: (1) Starwood's known cybersecurity issues, as detailed above in Section (VI)(C)(3)-(5); (2) significant (and public) intrusions into the systems and databases of Marriott's competitors in the hospitality industry, as detailed above in Section (VI)(C)(6)(b); and (3) other significant data breaches in other industries, as detailed above in Section (VI)(C)(6)(c). Notably, as detailed above in Section (VI)(F)(2), this Court has already held that plaintiffs in parallel litigation adequately pleaded under FRCP 9(b) "that Marriott knew or should have known about its allegedly inadequate data security practices and the risk of a data breach." *See also* Section (VIII) (Additional Allegations Supporting Scienter).

### D. February 18, 2016 – 2015 Form 10-K

455. On February 18, 2016, at around noon, Marriott filed the Company's Form 10-K for year ending 2015 ("2015 Form 10-K"). The 2015 Form 10-K was signed by Defendants Sorenson, Oberg, and Bauduin, and the Audit Committee Defendants, and made representations regarding the security of customer data, the Company's operations, and the Merger.

456. In the 2015 Form 10-K, in regard to the security of customer data, Marriott stated:

> Keeping pace with developments in technology is important for our operations and our competitive position. Furthermore, ***the integrity and protection of customer, employee, and company data is critical to us*** as we use such data for business decisions and to maintain operational efficiency.

457. These statements and omissions concerning the "***integrity and protection***" of data being "***critical***" to Marriott were false and misleading when made for the reasons detailed in ¶¶ 453-54.

458. Also in the 2015 Form 10-K, when describing **potential** risks the Company **might** face as a result of the Merger, Marriott stated:

> The combined company may not be able to integrate successfully and many of the anticipated benefits of combining Starwood and Marriott may not be realized. ***We entered into the Merger Agreement with the expectation that the Starwood Combination will result in various benefits, including, among other things, operating efficiencies. Achieving those anticipated benefits is subject to a number of uncertainties, including whether we can integrate the business of Starwood in an efficient and effective manner.***
>
> ***The integration process could also take longer than we anticipate and could result in*** the loss of valuable employees, ***the disruption of each company's ongoing businesses, processes and systems or inconsistencies in standards, controls, procedures, practices, policies*** and compensation arrangements, ***any of which could adversely affect the combined company's ability to achieve the benefits we anticipate***. The combined company's resulting portfolio of approximately 30 brands could be challenging for us to maintain and grow, and ***the harmonization of our different reservations and other systems and business practices could be more difficult, disruptive, and time consuming than we anticipate. The combined company's results of operations could also be adversely affected by any issues attributable to either company's operations that arise or are based on events or actions that occur before the Starwood Combination closes. The combined company may also have difficulty addressing possible differences in corporate cultures and management philosophies. The integration process is subject to a number of uncertainties, and we cannot assure you that the benefits we anticipate will be realized at all or as quickly as we expect. If we don't achieve those benefits, our costs could increase, our expected net income could decrease, and the combined company's future business, financial condition, operating results and prospects could suffer.***

459. These statements and omissions were false and misleading when made because while warning of potential risks related to integrating the business, Defendants failed to disclose critical facts relevant to these risks that existed at the time, including the vulnerability of the customer data and that the Data Breach was currently ongoing. Additionally, these statements and omissions were false and misleading when made for the reasons detailed in ¶¶ 453-54.

460. Also in the 2015 Form 10-K, when describing **potential** risks the Company **might** face as a result of its technology and information protection operations, Marriott stated:

> ***A failure to keep pace with developments in technology could impair our operations or competitive position. The lodging industry continues to demand the use of sophisticated technology and systems, including those used for our reservation, revenue management, and property management systems, our Marriott Rewards and The Ritz-Carlton Rewards programs, and technologies we make available to our guests. These technologies and systems must be refined, updated, and/or replaced with more advanced systems on a regular basis, and if we cannot do so as quickly as our competitors or within budgeted costs and time frames, our business could suffer. We also may not achieve the benefits that we anticipate from any new technology or system, and a failure to do so could result in higher than anticipated costs or could impair our operating results.***

*   *   *

> ***We are exposed to risks and costs associated with protecting the integrity and security of internal and customer data. Our businesses process, use, and transmit large volumes of internal employee and customer data, including credit card numbers and other personal information in various information systems that we maintain*** and in those maintained by third parties, including our owners, franchisees and licensees, as well as our service providers, in areas such as human resources outsourcing, website hosting, and various forms of electronic communications. ***The integrity and protection of that customer, employee, and company data is critical to our business. If that data is inaccurate or incomplete, we could make faulty decisions.***
>
> ***Our customers and employees also have a high expectation that we, as well as our owners, franchisees, licensees, and service providers, will adequately protect their personal information. The information, security, and privacy requirements imposed by governmental regulation and the requirements of the payment card industry are also increasingly demanding, in both the United States and other jurisdictions where we operate. Our systems and the systems maintained or used by our owners, franchisees, licensees, and service providers may not be able to satisfy these changing requirements and employee and customer expectations, or may require significant additional investments or time in order to do so.***

* * *

***Cyber-attacks could have a disruptive effect on our business. Efforts to hack or breach security measures, failures of systems or software to operate as designed or intended, viruses, operator error, or inadvertent releases of data may materially impact our, including our owners', franchisees', licensees', or service providers', information systems and records.*** Our reliance on computer, Internet-based and mobile systems and communications and the frequency and sophistication of efforts by hackers to gain unauthorized access to such systems have increased significantly in recent years. ***A significant theft, loss, or fraudulent use of customer, employee, or company data could adversely impact our reputation and could result in remedial and other expenses, fines, or litigation. Breaches in the security of our information systems or those of our owners, franchisees, licensees, or service providers or other disruptions in data services could lead to an interruption in the operation of our systems, resulting in operational inefficiencies and a loss of profits.*** In addition, although we carry cyber/privacy liability insurance that is designed to protect us against certain losses related to cyber risks, such insurance coverage may be insufficient to cover all losses or all types of claims that may arise in connection with cyber-attacks, security breaches, and other related breaches.

* * *

***Any disruption in the functioning of our reservation system, such as in connection with the Starwood Combination, could adversely affect our performance and results. We manage a global reservation system that communicates reservations to our branded hotels that individuals make directly with us online, through our mobile app, or through our telephone call centers, or through intermediaries like travel agents, Internet travel web sites and other distribution channels. The cost, speed, accuracy and efficiency of our reservation system are critical aspects of our business and are important considerations for hotel owners when choosing our brands. Our business may suffer if we fail to maintain, upgrade, or prevent disruption to our reservation system. In addition, the risk of disruption in the functioning of our global reservation system could increase in connection with the system integration that we anticipate undertaking following consummation of the Starwood Combination. Disruptions in or changes to our reservation system could result in a disruption to our business and the loss of important data.***

461. These statements and omissions were false and misleading when made because while warning of potential cybersecurity-related risks to the business, Defendants failed to disclose critical facts relevant to these risks that existed at the time, including the vulnerability of the customer data and that the Data Breach was currently ongoing. Additionally, these statements and omissions were false and misleading when made for the reasons detailed in ¶¶ 453-54.

462. Attached to Marriott's 2015 Form 10-K were certifications[174] signed by Defendants Sorenson and Oberg that stated:

> ***I have reviewed this annual report on Form 10-K of Marriott International, Inc.;***
>
> ***Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report. . . .***

463. These statements and omissions were false and misleading when made because either Defendants Sorenson and Oberg reviewed the 2015 Form 10-K, and knew they could not reasonably certify that the risk language was not false and misleading, or they were at least severely reckless in certifying that it was not false and misleading given the information available to them at the time concerning the risks that existed to the customer data. Additionally, these statements and omissions were false and misleading when made for the reasons detailed in ¶¶ 453-54.

[174] Under the Sarbanes-Oxley Act of 2002 ("SOX"), the CEO and CFO of publicly traded companies are required to sign certifications attesting to the fact that they have reviewed the company's quarterly SEC filings for false statements, and that they have reviewed the company's internal controls and processes to ensure the accuracy of the company's financial statements (the "SOX Certifications").

**E. March 21, 2016 – Conference Call to Discuss Amended Merger Agreement; and Defendant Sorenson's LinkedIn Post**

464. On March 21, 2016, at noon EST, Marriott held a conference call to discuss the Amended Merger Agreement. On that call, Defendant Oberg stated:

> ***After we've had extensive due diligence and spending a lot of time with the Starwood team and joint integration planning,*** we increased our targeted annual G&A cost synergies to $250 million, up from $200 million. And excluding any benefit from even more incremental cost savings beyond the $250 million and additional revenue synergies which we're confident we will provide, we expect adjusted EPS to be roughly neutral in 2017 and 2018.

465. Later on in that conference call, in discussing Marriott's due diligence, Defendant Sorenson stated:

> ***In the further diligence we have completed in last five months, we have become even more convinced of the tremendous opportunity presented by this merger. That confidence is reflected in our higher offer. We now believe there are more cost synergies than we estimated in November.***

466. Later on in that conference call, Defendant Sorenson stated:

> We've talk a little bit about cost synergies. This is now on page 10 for those of you who are following along. ***We have been working intensely since we announced this deal in November to prepare for integration and of course, to understand each other's organizations and structures and start to think about how to meld those into one organization.***

467. On March 21, 2016, Defendant Sorenson also posted a statement to LinkedIn:

> Since we announced the merger in November 2015, our integration teams have met on average multiple times a week across disciplines. ***As a result of our extensive due diligence and joint integration planning, we are now even more confident in the potential of cost savings of this transaction***.

468. These statements and omissions concerning Marriott's due diligence, including "***extensive due diligence and joint integration planning***," and Integration planning up to that point were false and misleading when made because at the time Defendants made these

statements, Starwood's IT systems were severely vulnerable. Specifically, among other issues: (1) the systems were using an outdated Oracle application portal that could not be updated or patched; (2) the legacy Starwood system allowed for insecure remote access; (3) only a fraction of Starwood's firewall activity was being logged, so nobody could adequately monitor for attacks; (4) the legacy Starwood system lacked monitoring and logging of remote access, meaning that there was no record of who was remotely accessing the systems; (5) not all database queries were being logged, so nobody could see if a hacker was accessing Starwood's valuable data without permission; and (6) payment account numbers were being stored without encryption, so sensitive data was easily accessible to attackers. An adequate merger due diligence process would have easily revealed these glaring deficiencies, yet Marriott knowingly, or with severe recklessness, failed to share this important information with the market. In addition, throughout the Class Period, the legacy Starwood guest reservation database was already compromised by the Data Breach.

469. Further, the statements and omissions: (1) gave investors a false impression that Marriott had undertaken sufficient due diligence in accordance with relevant requirements, standards, and best practices detailed above; and (2) gave investors a false impression that Marriott had made adequate preparations and dedicated adequate resources to cybersecurity when, in fact, Marriott failed to secure Starwood's systems, despite knowledge of cybersecurity risks. Additionally, as detailed above in the Board minutes pleaded in Section (VI)(F)(3), the Board was well aware of the risk that cybersecurity posed to the Company, however, Marriott ignored multiple red flags that should have caused Defendants to discover the Data Breach (or at least safeguard Starwood's vulnerable client data) including, but not limited to: (1) Starwood's known cybersecurity issues, as detailed above in Section (VI)(C)(3)-(5); (2) Marriott's

cybersecurity vulnerabilities separate from Starwood's systems, including those evidenced by the penetration test conducted by PwC, as detailed above in Section (VI)(C)(4); (3) significant (and public) intrusions into the systems and databases of Marriott's competitors in the hospitality industry, as detailed above in Section (VI)(C)(6)(b); and (4) other significant data breaches in other industries, as detailed above in Section (VI)(C)(6)(c). Notably, as detailed above in Section (VI)(F)(2), this Court has already held that plaintiffs in parallel litigation adequately pleaded under FRCP 9(b) "that Marriott knew or should have known about its allegedly inadequate data security practices and the risk of a data breach." *See also* Section (VIII) (Additional Allegations Supporting Scienter).

### F. March 21, 2016 – Prospectus Containing an Updated Letter to Marriott Associates

470. On March 21, 2016, at approximately 1:30 pm EST, Marriott filed a Prospectus pursuant to SEC Rule 425 containing an updated letter to Marriott associates explaining Marriott's strategy regarding the Merger. In that letter, Defendant Sorenson stated:

> Beyond the math, the strategic story hasn't changed. The simple fact remains that the combination of Marriott and Starwood will create a premier lodging company that will offer broader choice for guests, greater benefits for owners and franchisees, more opportunities for associates and increased value for shareholders of both companies. ***Over the course of the last few months we've had an opportunity to learn even more about Starwood through our integration process and we believe that the benefits of combining both companies are even more compelling than our original expectations.***

471. These statements and omissions regarding the progress of the Integration up to that point, was false and misleading when made because at the time Defendants made these statements, Starwood's IT systems were severely vulnerable. Specifically, among other issues: (1) the systems were using an outdated Oracle application portal that could not be updated or patched; (2) the legacy Starwood system allowed for insecure remote access; (3) only a fraction

of Starwood's firewall activity was being logged, so nobody could adequately monitor for attacks; (4) the legacy Starwood system lacked monitoring and logging of remote access, meaning that there was no record of who was remotely accessing the systems; (5) not all database queries were being logged, so nobody could see if a hacker was accessing Starwood's valuable data without permission; and (6) payment account numbers were being stored without encryption, so sensitive data was easily accessible to attackers. An adequate merger due diligence process would have easily revealed these glaring deficiencies, yet Marriott knowingly, or with severe recklessness, failed to share this important information with the market. In addition, throughout the Class Period, the legacy Starwood guest reservation database was already compromised by the Data Breach.

472. Further, the statements and omissions gave investors a false impression that Marriott had made adequate preparations and dedicated adequate resources to cybersecurity when, in fact, Marriott failed to secure Starwood's systems, despite knowledge of cybersecurity risks. Additionally, as detailed above in the Board minutes pleaded in Section (VI)(F)(3), the Board was well aware of the risk that cybersecurity posed to the Company, however, Marriott ignored multiple red flags that should have caused Defendants to discover the Data Breach (or at least safeguard Starwood's vulnerable client data) including, but not limited to: (1) Starwood's known cybersecurity issues, as detailed above in Section (VI)(C)(3)-(5); (2) Marriott's cybersecurity vulnerabilities separate from Starwood's systems, including those evidenced by the penetration test conducted by PwC, as detailed above in Section (V)(C)(4); (3) significant (and public) intrusions into the systems and databases of Marriott's competitors in the hospitality industry, as detailed above in Section (VI)(C)(6)(b); and (4) other significant data breaches in other industries, as detailed above in Section (VI)(C)(6)(c). Notably, as detailed above in

Section (VI)(F)(2), this Court has already held that plaintiffs in parallel litigation adequately pleaded under FRCP 9(b) "that Marriott knew or should have known about its allegedly inadequate data security practices and the risk of a data breach." *See also* Section (VIII) (Additional Allegations Supporting Scienter).

**G. March 21, 2016 – Form 8-K**

473. On March 21, 2016, after the market closed, Marriott filed an 8-K, signed by Executive VP and General Counsel Edward A. Ryan, which included an amendment to the Merger Agreement and a press release with statements from Defendant Sorenson.

474. In that press release, Defendant Sorenson stated:

> ***After five months of extensive due diligence and joint integration planning with Starwood, including a careful analysis of the brand architecture and future development prospects, we are even more excited about the power of the combined companies and the upside growth opportunities.***

475. This statement and/or omission regarding Marriott's "***extensive due diligence and joint integration planning***" up to that point was false and misleading when made for the reasons detailed in ¶¶ 468-69.

**H. March 31, 2016 – Press Release from Marriott in Support of the Merger**

476. On March 31, 2016, just after the market opened at 9:31 am EST, Marriott issued a press release regarding the upcoming Starwood shareholder vote. In that press release, Defendant Sorenson stated:

> We are focused on maximizing shareholder value and from the beginning of this process we have been steadfast in our belief that a combination with Starwood will offer the highest value to all shareholders. Together, we can provide opportunities for significant equity upside and great long-term value driven by a larger global footprint, wider choice of brands for consumers, substantial synergies, and improved economics to owners and franchisees leading to accelerated global growth and continued strong returns. ***Our integration teams have been diligent in their***

> ***work over the last few weeks and are more committed than ever to a timely and smooth transition.***

477. These statements and omissions regarding Marriott's "***diligent***" Integration work up to that point were false and misleading when made for the reasons detailed in ¶¶ 471-72.

### I. April 1, 2016 – Marriott and Starwood M&A Conference Call

478. On April 1, 2016, at 9:00 am EST, Marriott held a conference call to discuss the Merger. On that call, Defendant Sorenson discussed the Integration. In response to a question about the integration, Defendant Sorenson touted the extent of the diligence performed:

> Analyst
>
> Good morning, everyone. A quick question on cost synergies. Just wondering if you can provide a little more elaboration on -- the previous estimate was $200 million, it went to $250 million, that is. What was included in the incremental $50 million, and is there any reason to believe that with more information there could be more to come on that front?
>
> Defendant Sorenson
>
> So Tom thought we could do $250 million from the moment we announced a deal. And he knows the cost structure at Starwood, obviously dramatically better than we do. And I guess in a way we just were acknowledging that he was right. For us, we want to take it a step at a time and we hadn't, when we announced the deal, really done any organizational diligence, if you will. ***We've done financial diligence and tried to understand the assets and the balance sheet and those sorts of things.***
>
> ***But in the four months we've had following, we've had -- I think one of our team, the Starwood integration [lead] counted 150-ish meetings between Marriott and Starwood people in various disciplines or various regions around the world, where they are getting to know each other, where they are getting to know the organizations, where they are starting to think about what the combined organization looks like from a staffing level going forward.*** And all of that has given us greater confidence that the $250 million number is achievable. We don't have another number to hang out for you as further upside from that.

479. These statements and omissions regarding the progress of Marriott's due diligence and Integration planning up to that point were false and misleading when made for the reasons detailed in ¶¶ 468-69.

**J. April 27, 2016 – Form 8-K**

480. On April 27, 2016, after the market closed, Marriott filed a Form 8-K signed by Defendant Bauduin that included a press release discussing the Company's earnings and the Integration efforts and statements from Defendant Sorenson. In that press release, Defendant Sorenson stated:

> ***Our planned acquisition of Starwood Hotels & Resorts is on track.*** Shareholders of both companies overwhelmingly approved proposals relating to the merger and we continue to look forward to a mid-2016 closing. ***Toward that end, integration teams from both companies have been working over the last several months to ensure a smooth transition.*** We look forward to creating the largest lodging company in the world.

481. These statements and omissions concerning the state of the Integration, including that it was currently "***on track***," up to that point were false and misleading when made because at the time Defendants made these statements, Starwood's IT systems were severely vulnerable. Specifically, among other issues: (1) the systems were using an outdated Oracle application portal that could not be updated or patched; (2) the legacy Starwood system allowed for insecure remote access; (3) only a fraction of Starwood's firewall activity was being logged, so nobody could adequately monitor for attacks; (4) the legacy Starwood system lacked monitoring and logging of remote access, meaning that there was no record of who was remotely accessing the systems; (5) not all database queries were being logged, so nobody could see if a hacker was accessing Starwood's valuable data without permission; and (6) payment account numbers were being stored without encryption, so sensitive data was easily accessible to attackers. An adequate merger due diligence process would have easily revealed these glaring deficiencies, yet

Marriott knowingly, or with severe recklessness, failed to share this important information with the market. In addition, throughout the Class Period, the legacy Starwood guest reservation database was already compromised by the Data Breach.

482. Further, the statements and omissions gave investors a false impression that Marriott had made adequate preparations and dedicated adequate resources to cybersecurity when, in fact, Marriott failed to secure Starwood's systems, despite knowledge of cybersecurity risks. Additionally, as detailed above in the Board minutes pleaded in Section (VI)(F)(3), the Board was well aware of the risk that cybersecurity posed to the Company, however, Marriott ignored multiple red flags that should have caused Defendants to discover the Data Breach (or at least safeguard Starwood's vulnerable client data) including, but not limited to: (1) Starwood's known cybersecurity issues, as detailed above in Section (VI)(C)(3)-(5); (2) Marriott's cybersecurity vulnerabilities separate from Starwood's systems, including those evidenced by the penetration test conducted by PwC, as detailed above in Section (VI)(C)(4); (3) significant (and public) intrusions into the systems and databases of Marriott's competitors in the hospitality industry, as detailed above in Section (VI)(C)(6)(b); (4) other significant data breaches in other industries, as detailed above in Section (VI)(C)(6)(c); and (5) the passage and imminent enforcement of GDPR. Notably, as detailed above in Section (VI)(F)(2), this Court has already held that plaintiffs in parallel litigation adequately pleaded under FRCP 9(b) "that Marriott knew or should have known about its allegedly inadequate data security practices and the risk of a data breach." *See also* Section (VIII) (Additional Allegations Supporting Scienter).

**K. April 28, 2016 – Q1 2016 Form 10-Q**

483. On April 28, 2016, at approximately 1:00 pm EST, Marriott filed the Company's Q1 2016 Form 10-Q, which was signed by Defendant Bauduin. In the Q1 2016 Form 10-Q,

when describing **potential** risks the Company **might** face as a result of the Merger, Marriott stated:

> The combined company may not be able to integrate successfully and many of the anticipated benefits of combining Starwood and Marriott may not be realized. ***We entered into the Merger Agreement with the expectation that the Starwood Combination will result in various benefits, including, among other things, operating efficiencies. Achieving those anticipated benefits is subject to a number of uncertainties, including whether we can integrate the business of Starwood in an efficient and effective manner.***
>
> ***The integration process could also take longer than we anticipate and could result in*** the loss of valuable employees, ***the disruption of each company's ongoing businesses, processes and systems or inconsistencies in standards, controls, procedures, practices, policies*** and compensation arrangements, ***any of which could adversely affect the combined company's ability to achieve the benefits we anticipate.*** The combined company's resulting portfolio of approximately 30 brands could be challenging for us to maintain and grow, and ***the harmonization of our different reservations and other systems and business practices could be more difficult, disruptive, and time consuming than we anticipate. The combined company's results of operations could also be adversely affected by any issues attributable to either company's operations that arise or are based on events or actions that occur before the Starwood Combination closes. The combined company may also have difficulty addressing possible differences in corporate cultures and management philosophies. The integration process is subject to a number of uncertainties, and we cannot assure you that the benefits we anticipate will be realized at all or as quickly as we expect. If we don't achieve those benefits, our costs could increase, our expected net income could decrease, and the combined company's future business, financial condition, operating results and prospects could suffer.***

484. These statements and omissions were false and misleading when made because while warning of potential risks related to integrating the business, Defendants failed to disclose critical facts relevant to these risks that existed at the time, including the vulnerability of the customer data and that the Data Breach was currently ongoing. Additionally, these statements and omissions were false and misleading when made for the reasons detailed in ¶¶ 481-82.

485. Also in the Q1 2016 Form 10-Q, when describing **potential** risks the Company **might** face as a result of its technology and information protection operations, Marriott stated:

> ***A failure to keep pace with developments in technology could impair our operations or competitive position. The lodging industry continues to demand the use of sophisticated technology and systems, including those used for our reservation, revenue management, and property management systems, our Marriott Rewards and The Ritz-Carlton Rewards programs, and technologies we make available to our guests. These technologies and systems must be refined, updated, and/or replaced with more advanced systems on a regular basis, and if we cannot do so as quickly as our competitors or within budgeted costs and time frames, our business could suffer. We also may not achieve the benefits that we anticipate from any new technology or system, and a failure to do so could result in higher than anticipated costs or could impair our operating results.***
>
> * * *
>
> ***We are exposed to risks and costs associated with protecting the integrity and security of internal and customer data. Our businesses process, use, and transmit large volumes of internal employee and customer data, including credit card numbers and other personal information in various information systems that we maintain*** and in those maintained by third parties, including our owners, franchisees and licensees, as well as our service providers, in areas such as human resources outsourcing, website hosting, and various forms of electronic communications. ***The integrity and protection of that customer, employee, and company data is critical to our business. If that data is inaccurate or incomplete, we could make faulty decisions.***
>
> ***Our customers and employees also have a high expectation that we, as well as our owners, franchisees, licensees, and service providers, will adequately protect their personal information. The information, security, and privacy requirements imposed by governmental regulation and the requirements of the payment card industry are also increasingly demanding, in both the United States and other jurisdictions where we operate. Our systems and the systems maintained or used by our owners, franchisees, licensees, and service providers may not be able to satisfy these changing requirements and employee and customer expectations, or may require significant additional investments or time in order to do so.***

> ***Cyber-attacks could have a disruptive effect on our business. Efforts to hack or breach security measures, failures of systems or software to operate as designed or intended, viruses, operator error, or inadvertent releases of data may materially impact our, including our owners', franchisees', licensees', or service providers', information systems and records.*** Our reliance on computer, Internet-based and mobile systems and communications and the frequency and sophistication of efforts by hackers to gain unauthorized access to such systems have increased significantly in recent years. ***A significant theft, loss, or fraudulent use of customer, employee, or company data could adversely impact our reputation and could result in remedial and other expenses, fines, or litigation. Breaches in the security of our information systems or those of our owners, franchisees, licensees, or service providers or other disruptions in data services could lead to an interruption in the operation of our systems, resulting in operational inefficiencies and a loss of profits.*** In addition, although we carry cyber/privacy liability insurance that is designed to protect us against certain losses related to cyber risks, such insurance coverage may be insufficient to cover all losses or all types of claims that may arise in connection with cyber-attacks, security breaches, and other related breaches.
>
> * * *
>
> ***Any disruption in the functioning of our reservation system, such as in connection with the Starwood Combination, could adversely affect our performance and results. We manage a global reservation system that communicates reservations to our branded hotels that individuals make directly with us online, through our mobile app, or through our telephone call centers, or through intermediaries like travel agents, Internet travel web sites and other distribution channels. The cost, speed, accuracy and efficiency of our reservation system are critical aspects of our business and are important considerations for hotel owners when choosing our brands. Our business may suffer if we fail to maintain, upgrade, or prevent disruption to our reservation system. In addition, the risk of disruption in the functioning of our global reservation system could increase in connection with the system integration that we anticipate undertaking following consummation of the Starwood Combination. Disruptions in or changes to our reservation system could result in a disruption to our business and the loss of important data.***

486. These statements and omissions were false and misleading when made because while warning of potential cybersecurity-related risks to the business, Defendants failed to

disclose critical facts relevant to these risks that existed at the time, including the vulnerability of the customer data and that the Data Breach was currently ongoing. Additionally, these statements and omissions were false and misleading when made for the reasons detailed in ¶¶ 481-82.

487. Attached to Marriott's Q1 2016 Form 10-Q were identical SOX Certifications signed by Defendants Sorenson and Oberg that stated:

> ***I have reviewed this quarterly report on Form 10-Q of Marriott International, Inc.;***
>
> ***Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report. . . .***

488. These statements were false and misleading when made because either Defendants Sorenson and Oberg reviewed the Q1 2016 Form 10-Q, and knew they could not reasonably certify that the risk language was not false and misleading, or they were at least severely reckless in certifying that it was not false and misleading given the information available to them at the time concerning the risks that existed to the customer data. Additionally, these statements were false and misleading when made for the reasons detailed in ¶¶ 481-82.

### L. July 28, 2016 – Q2 2016 Earnings Call

489. On July 28, 2016, at 10:00 am EST, Marriott held a conference call to discuss the Q2 2016 earnings, the Merger and Integration, and other topics. In his opening remarks, Defendant Sorenson stated:

> I would also like to say that I have never been more proud of Marriott associates. This team has done a lot of transactions over the last five years from the spinoff of Marriott Vacations Worldwide in 2011 to the more recent acquisitions of AC Hotels, Gaylord, Protea and Delta. With each of these transactions, Marriott associates worked hard to first execute the transaction and

> then capture the strategic value of the deal all while growing and managing our existing business.
>
> The Starwood transaction should be completed in the coming weeks bringing these terrific teams together. ***Both the Marriott and Starwood teams have done exhaustive planning to get ready*** and we are excited by our prospects. While we will see a lot of progress in the near-term, we expect that full integration will be a two-year project.

490. These statements and omissions concerning the state of Marriott's "***exhaustive***" Integration planning up to that point were false and misleading when made because at the time Defendants made these statements, Starwood's IT systems were severely vulnerable. Specifically, among other issues: (1) the systems were using an outdated Oracle application portal that could not be updated or patched; (2) the legacy Starwood system allowed for insecure remote access; (3) only a fraction of Starwood's firewall activity was being logged, so nobody could adequately monitor for attacks; (4) the legacy Starwood system lacked monitoring and logging of remote access, meaning that there was no record of who was remotely accessing the systems; (5) not all database queries were being logged, so nobody could see if a hacker was accessing Starwood's valuable data without permission; and (6) payment account numbers were being stored without encryption, so sensitive data was easily accessible to attackers. An adequate merger due diligence process would have easily revealed these glaring deficiencies, yet Marriott knowingly, or with severe recklessness, failed to share this important information with the market. In addition, throughout the Class Period, the legacy Starwood guest reservation database was already compromised by the Data Breach.

491. Further, the statements and omissions gave investors a false impression that Marriott had made adequate preparations and dedicated adequate resources to cybersecurity when, in fact, Marriott failed to secure Starwood's systems, despite knowledge of cybersecurity risks, which Marriott now knew included the fact that Starwood did not have visibility into its

own out-of-date operating systems and/or malware on Starwood's systems, and that Starwood did not use point-to-point encryption or tokenization. Additionally, as detailed above in the Board minutes pleaded in Section (VI)(F)(3), the Board was well aware of the risk that cybersecurity posed to the Company, however, Marriott ignored multiple red flags that should have caused Defendants to discover the Data Breach (or at least safeguard Starwood's vulnerable client data) including, but not limited to: (1) Starwood's known cybersecurity issues, as detailed above in Section (VI)(C)(3)-(5); (2) Marriott's cybersecurity vulnerabilities separate from Starwood's systems, including those evidenced by the penetration test conducted by PwC, as detailed above in Section (VI)(C)(4); (3) significant (and public) intrusions into the systems and databases of Marriott's competitors in the hospitality industry, as detailed above in Section (VI)(C)(6)(b); (4) other significant data breaches in other industries, as detailed above in Section (VI)(C)(6)(c); and (5) the passage and imminent enforcement of GDPR. Notably, as detailed above in Section (VI)(F)(2), this Court has already held that plaintiffs in parallel litigation adequately pleaded under FRCP 9(b) "that Marriott knew or should have known about its allegedly inadequate data security practices and the risk of a data breach." *See also* Section (VIII) (Additional Allegations Supporting Scienter).

**M. July 28, 2016 – Q2 2016 Form 10-Q**

492. On July 28, 2016, shortly after noon, Marriott filed the Company's Q2 2016 Form 10-Q, which was signed by Defendant Bauduin. In the Q2 2016 Form 10-Q, when describing **potential** risks the Company **might** face as a result of the Merger, Marriott stated:

> The combined company may not be able to integrate successfully and many of the anticipated benefits of combining Starwood and Marriott may not be realized. ***We entered into the Merger Agreement with the expectation that the Starwood Combination will result in various benefits, including, among other things, operating efficiencies. Achieving those anticipated benefits is subject to a number of uncertainties, including whether we can***

> ***integrate the business of Starwood in an efficient and effective manner.***
>
> ***The integration process could also take longer than we anticipate and could result in*** the loss of valuable employees, ***the disruption of each company's ongoing businesses, processes and systems or inconsistencies in standards, controls, procedures, practices, policies*** and compensation arrangements, ***any of which could adversely affect the combined company's ability to achieve the benefits we anticipate.*** The combined company's resulting portfolio of approximately 30 brands could be challenging for us to maintain and grow, ***and the harmonization of our different reservations and other systems and business practices could be more difficult, disruptive, and time consuming than we anticipate***. ***The combined company's results of operations could also be adversely affected by any issues attributable to either company's operations that arise or are based on events or actions that occur before the Starwood Combination closes. The combined company may also have difficulty addressing possible differences in corporate cultures and management philosophies. The integration process is subject to a number of uncertainties, and we cannot assure you that the benefits we anticipate will be realized at all or as quickly as we expect. If we do not achieve those benefits, our costs could increase, our expected net income could decrease, and the combined company's future business, financial condition, operating results and prospects could suffer.***

493. These statements and omissions were false and misleading when made because while warning of potential risks related to integrating the business, Defendants failed to disclose critical facts relevant to these risks that existed at the time, including the vulnerability of the customer data and that the Data Breach was currently ongoing. Additionally, these statements and omissions were false and misleading when made for the reasons detailed in ¶¶ 490-91.

494. Also in the Q2 2016 Form 10-Q, when describing **potential** risks the Company **might** face as a result of its technology and information protection operations, Marriott stated:

> ***A failure to keep pace with developments in technology could impair our operations or competitive position. The lodging industry continues to demand the use of sophisticated technology and systems, including those used for our reservation, revenue management, and property management systems, our Marriott Rewards and The Ritz-Carlton Rewards programs, and***

***technologies we make available to our guests. These technologies and systems must be refined, updated, and/or replaced with more advanced systems on a regular basis, and if we cannot do so as quickly as our competitors or within budgeted costs and time frames, our business could suffer. We also may not achieve the benefits that we anticipate from any new technology or system, and a failure to do so could result in higher than anticipated costs or could impair our operating results.***

* * *

***We are exposed to risks and costs associated with protecting the integrity and security of internal and customer data. Our businesses process, use, and transmit large volumes of internal employee and customer data, including credit card numbers and other personal information in various information systems that we maintain*** and in those maintained by third parties, including our owners, franchisees and licensees, as well as our service providers, in areas such as human resources outsourcing, website hosting, and various forms of electronic communications. ***The integrity and protection of that customer, employee, and company data is critical to our business. If that data is inaccurate or incomplete, we could make faulty decisions.***

***Our customers and employees also have a high expectation that we, as well as our owners, franchisees, licensees, and service providers, will adequately protect their personal information. The information, security, and privacy requirements imposed by governmental regulation and the requirements of the payment card industry are also increasingly demanding, in both the United States and other jurisdictions where we operate. Our systems and the systems maintained or used by our owners, franchisees, licensees, and service providers may not be able to satisfy these changing requirements and employee and customer expectations, or may require significant additional investments or time in order to do so.***

***Cyber-attacks could have a disruptive effect on our business. Efforts to hack or breach security measures, failures of systems or software to operate as designed or intended, viruses, operator error, or inadvertent releases of data may materially impact our, including our owners', franchisees', licensees', or service providers', information systems and records.*** Our reliance on computer, Internet-based and mobile systems and communications and the frequency and sophistication of efforts by hackers to gain unauthorized access to such systems have increased significantly in

> recent years. ***A significant theft, loss, or fraudulent use of customer, employee, or company data could adversely impact our reputation and could result in remedial and other expenses, fines, or litigation. Breaches in the security of our information systems or those of our owners, franchisees, licensees, or service providers or other disruptions in data services could lead to an interruption in the operation of our systems, resulting in operational inefficiencies and a loss of profits.*** In addition, although we carry cyber/privacy liability insurance that is designed to protect us against certain losses related to cyber risks, such insurance coverage may be insufficient to cover all losses or all types of claims that may arise in connection with cyber-attacks, security breaches, and other related breaches.
>
> * * *
>
> ***Any disruption in the functioning of our reservation system, such as in connection with the Starwood Combination, could adversely affect our performance and results. We manage a global reservation system that communicates reservations to our branded hotels that individuals make directly with us online, through our mobile app, or through our telephone call centers, or through intermediaries like travel agents, Internet travel web sites and other distribution channels. The cost, speed, accuracy and efficiency of our reservation system are critical aspects of our business and are important considerations for hotel owners when choosing our brands. Our business may suffer if we fail to maintain, upgrade, or prevent disruption to our reservation system. In addition, the risk of disruption in the functioning of our global reservation system could increase in connection with the system integration that we anticipate undertaking following consummation of the Starwood Combination. Disruptions in or changes to our reservation system could result in a disruption to our business and the loss of important data.***

495. These statements and omissions were false and misleading when made because while warning of potential cybersecurity-related risks to the business, Defendants failed to disclose critical facts relevant to these risks that existed at the time, including the vulnerability of the customer data and that the Data Breach was currently ongoing. Additionally, these statements and omissions were false and misleading when made for the reasons detailed in ¶¶ 490-91.

496. Attached to Marriott's Q2 2016 Form 10-Q were SOX Certifications signed by Defendants Sorenson and Oberg with statements identical to those detailed in ¶ 487.

497. These statements and omissions were false and misleading when made because either Defendants Sorenson and Oberg reviewed the Q2 2016 Form 10-Q, and knew they could not reasonably certify that the risk language was not false and misleading, or they were at least severely reckless in certifying that it was not false and misleading given the information available to them at the time concerning the risks that existed to the customer data. Additionally, these statements and omissions were false and misleading when made for the reasons detailed in ¶¶ 490-91.

**N. September 23, 2016 – Marriott's Privacy Statement**

498. On September 23, 2016, and for each day following throughout the Class Period, Marriott provided the public with a Global Privacy Statement through the Company's website, marriott.com. Marriott's Global Privacy Statement was last updated on July 1, 2016, and applied to Marriott, its wholly-owned subsidiary Starwood, and Marriott's affiliates. In the Global Privacy Statement, Marriott provided the public with its policies and procedures for using, collecting, and storing the data the Company collects from its customers.

> <u>Security</u>
>
> ***We seek to use reasonable organizational, technical and administrative measures to protect Personal Information within our organization.*** Unfortunately, no data transmission or storage system can be guaranteed to be 100% secure. If you have reason to believe that your interaction with us is no longer secure (for example, if you feel that the security of your account has been compromised), please immediately notify us in accordance with the "Contacting Us" section below.

499. These statements and omissions concerning Marriott's data protection measures were false and misleading when made because at the time Defendants made these statements,

Starwood's IT systems, now owned by Marriott, were severely vulnerable. Specifically, among other issues: (1) the systems were using an outdated Oracle application portal that could not be updated or patched; (2) the legacy Starwood system allowed for insecure remote access; (3) only a fraction of Starwood's firewall activity was being logged, so nobody could adequately monitor for attacks; (4) the legacy Starwood system lacked monitoring and logging of remote access, meaning that there was no record of who was remotely accessing the systems; (5) not all database queries were being logged, so nobody could see if a hacker was accessing Starwood's valuable data without permission; and (6) payment account numbers were being stored without encryption, so sensitive data was easily accessible to attackers. An adequate merger due diligence process would have easily revealed these glaring deficiencies, yet Marriott knowingly, or with severe recklessness, failed to share this important information with the market. In addition, throughout the Class Period, the legacy Starwood guest reservation database was already compromised by the Data Breach.

500. Further, the statements and omissions: (1) gave investors a false impression that Marriott was operating the newly-acquired Starwood systems in accordance with relevant requirements, standards, and best practices detailed above; and (2) gave investors a false impression that Marriott had made adequate preparations and dedicated adequate resources to cybersecurity when, in fact, Marriott failed to secure Starwood's systems, despite knowledge of cybersecurity risks. Additionally, as detailed above in the Board minutes pleaded in Section (VI)(F)(3), the Board was well aware of the risk that cybersecurity posed to the Company, however, Marriott ignored multiple red flags that should have caused Defendants to discover the Data Breach (or at least safeguard Starwood's vulnerable client data) including, but not limited to: (1) Starwood's known cybersecurity issues, as detailed above in Section (VI)(C)(3)-(5); (2)

Marriott's cybersecurity vulnerabilities separate from Starwood's systems, including those evidenced by the penetration test conducted by PwC, as detailed above in Section (VI)(C)(4); (3) significant (and public) intrusions into the systems and databases of Marriott's competitors in the hospitality industry, as detailed above in Section (VI)(C)(6)(b); (4) other significant data breaches in other industries, as detailed above in Section (VI)(C)(6)(c); and (5) the passage and imminent enforcement of GDPR. Notably, as detailed above in Section (VI)(F)(2), this Court has already held that plaintiffs in parallel litigation adequately pleaded under FRCP 9(b) "that Marriott knew or should have known about its allegedly inadequate data security practices and the risk of a data breach." *See also* Section (VIII) (Additional Allegations Supporting Scienter).

**O. November 7, 2016 – Form 8-K**

501. On November 7, 2016, after the market closed, Marriott filed an 8-K signed by Defendant Bauduin containing a press release discussing the Company's operations and the Integration with statements from Defendant Sorenson. As to the integration, Defendant Sorenson stated:

> We were thrilled to close the acquisition of Starwood in late September. We are enthusiastically engaged in welcoming Starwood's associates around the world into the Marriott family and ***are working diligently on integrating the companies*** and realizing revenue and cost synergies as quickly as possible.

502. These statements and omissions that Marriott was, at that point, "***working diligently***" on the Integration were false and misleading when made for the reasons detailed in ¶¶ 499-500.

**P. November 9, 2016 – Q3 2016 Form 10-Q**

503. On November 9, 2016, at approximately 12:45 pm EST, Marriott filed the Company's Q3 2016 Form 10-Q, which was signed by Defendant Bauduin. In the Q3 2016

Form 10-Q, when describing **potential** risks the Company **might** face as a result of the Merger, Marriott stated:

> We may not be able to integrate Starwood successfully and many of the anticipated benefits of combining Starwood and Marriott may not be realized. ***We entered into the Merger Agreement with the expectation that the Starwood Combination will result in various benefits, including, among other things, operating efficiencies. Achieving those anticipated benefits is subject to a number of uncertainties, including whether we can integrate the business of Starwood in an efficient and effective manner.***
>
> ***The integration process could also take longer than we anticipate and could result in*** the loss of valuable employees, ***the disruption of each company's ongoing businesses, processes and systems or inconsistencies in standards, controls, procedures, practices, policies*** and compensation arrangements, ***any of which could adversely affect the combined company's ability to achieve the benefits we anticipate. Our resulting portfolio of approximately 30 brands may be challenging for us to maintain and grow, and the harmonization of our different reservations and other systems and business practices could be more difficult, disruptive, and time consuming than we anticipate. We may also have difficulty addressing possible differences in corporate cultures and management philosophies.*** We may incur unanticipated costs in the integration of the businesses of Starwood. Although we expect that the elimination of certain duplicative costs, as well as the realization of other efficiencies related to the integration of the two businesses, will over time offset the substantial incremental transaction and merger-related costs and charges we incurred in connection with the Starwood Combination, we may not achieve this net benefit in the near term, or at all.
>
> ***The integration process is subject to a number of uncertainties, and we cannot assure you that the benefits we anticipate will be realized at all or as quickly as we expect. If we don't achieve those benefits, our costs could increase, our expected net income could decrease, and the combined company's future business, financial condition, operating results, and prospects could suffer.***
>
> Our future results will suffer if we do not effectively manage our expanded operations. ***With completion of the Starwood Combination, the size of our business has increased significantly. Our future success depends, in part, upon our ability to manage this expanded business, which poses substantial challenges for management, including challenges related to the management***

> ***and monitoring of new operations and associated increased costs and complexity.*** We cannot assure you that we will be successful or that we will realize the expected operating efficiencies, cost savings, and other benefits from the combination that we currently anticipate.

504. These statements and omissions were false and misleading when made because while warning of potential risks related to integrating the business, Defendants failed to disclose critical facts relevant to these risks that existed at the time, including the vulnerability of the customer data and that the Data Breach was currently ongoing. Additionally, these statements and omissions were false and misleading when made for the reasons detailed in ¶¶ 499-500.

505. Also in the Q3 2016 Form 10-Q, when describing **potential** risks the Company **might** face as a result of its technology and information protection operations, Marriott stated:

> ***A failure to keep pace with developments in technology could impair our operations or competitive position. The lodging industry continues to demand the use of sophisticated technology and systems, including those used for our reservation, revenue management, and property management systems, our Marriott Rewards and The Ritz-Carlton Rewards programs, and technologies we make available to our guests. These technologies and systems must be refined, updated, and/or replaced with more advanced systems on a regular basis, and if we cannot do so as quickly as our competitors or within budgeted costs and time frames, our business could suffer. We also may not achieve the benefits that we anticipate from any new technology or system, and a failure to do so could result in higher than anticipated costs or could impair our operating results.***
>
> * * *
>
> ***We are exposed to risks and costs associated with protecting the integrity and security of internal and customer data. Our businesses process, use, and transmit large volumes of internal employee and customer data, including credit card numbers and other personal information in various information systems that we maintain*** and in those maintained by third parties, including our owners, franchisees and licensees, as well as our service providers, in areas such as human resources outsourcing, website hosting, and various forms of electronic communications. ***The***

***integrity and protection of that customer, employee, and company data is critical to our business. If that data is inaccurate or incomplete, we could make faulty decisions.***

***Our customers and employees also have a high expectation that we, as well as our owners, franchisees, licensees, and service providers, will adequately protect their personal information. The information, security, and privacy requirements imposed by governmental regulation and the requirements of the payment card industry are also increasingly demanding, in both the United States and other jurisdictions where we operate. Our systems and the systems maintained or used by our owners, franchisees, licensees, and service providers may not be able to satisfy these changing requirements and employee and customer expectations, or may require significant additional investments or time in order to do so.***

***Cyber-attacks could have a disruptive effect on our business. Efforts to hack or breach security measures, failures of systems or software to operate as designed or intended, viruses, operator error, or inadvertent releases of data may materially impact our, including our owners', franchisees', licensees', or service providers', information systems and records.*** Our reliance on computer, Internet-based and mobile systems and communications and the frequency and sophistication of efforts by hackers to gain unauthorized access to such systems have increased significantly in recent years. ***A significant theft, loss, or fraudulent use of customer, employee, or company data could adversely impact our reputation and could result in remedial and other expenses, fines, or litigation. Breaches in the security of our information systems or those of our owners, franchisees, licensees, or service providers or other disruptions in data services could lead to an interruption in the operation of our systems, resulting in operational inefficiencies and a loss of profits.*** In addition, although we carry cyber/privacy liability insurance that is designed to protect us against certain losses related to cyber risks, such insurance coverage may be insufficient to cover all losses or all types of claims that may arise in connection with cyber-attacks, security breaches, and other related breaches. Furthermore, in the future such insurance may not be available to us on commercially reasonable terms.

* * *

***Any disruption in the functioning of our reservation system, such as in connection with our integration of Starwood, could adversely affect our performance and results. We manage a***

> ***global reservation system that communicates reservations to our branded hotels that individuals make directly with us online, through our mobile app, or through our telephone call centers, or through intermediaries like travel agents, Internet travel websites and other distribution channels. The cost, speed, accuracy and efficiency of our reservation system are critical aspects of our business and are important considerations for hotel owners when choosing our brands. Our business may suffer if we fail to maintain, upgrade, or prevent disruption to our reservation system. In addition, the risk of disruption in the functioning of our global reservation system could increase in connection with the system integration that we anticipate undertaking as part of our integration of Starwood. Disruptions in or changes to our reservation system could result in a disruption to our business and the loss of important data.***

506. These statements and omissions were false and misleading when made because while warning of potential cybersecurity-related risks to the business, Defendants failed to disclose critical facts relevant to these risks that existed at the time, including the vulnerability of the customer data and that the Data Breach was currently ongoing. Additionally, these statements and omissions were false and misleading when made for the reasons detailed in ¶¶ 499-500.

507. Attached to Marriott's Q3 2016 Form 10-Q were SOX Certifications signed by Defendants Sorenson and Oberg with statements identical to those detailed in ¶ 487.

508. These statements and omissions were false and misleading when made because either Defendants Sorenson and Oberg reviewed the Q3 2016 Form 10-Q, and knew they could not reasonably certify that the risk language was not false and misleading, or they were at least severely reckless in certifying that it was not false and misleading given the information available to them at the time concerning the risks that existed to the customer data. Additionally, these statements and omissions were false and misleading when made for the reasons detailed in ¶¶ 499-500.

**Q. February 21, 2017 – 2016 Form 10-K**

509. On February 21, 2017, just before the market closed, Marriott filed the Company's Form 10-K for year ending 2016 ("2016 Form 10-K"). The 2016 Form 10-K was signed by Defendants Sorenson, Oberg, Bauduin, and the Audit Committee Defendants, and made representations regarding the security of customer data, the Company's operations, the Merger, and other topics.

510. In the 2016 Form 10-K, Marriott repeated its statement from the 2015 Form 10-K that:

> Keeping pace with developments in technology is important for our operations and our competitive position. Furthermore, ***the integrity and protection of customer, employee, and company data is critical to us*** as we use such data for business decisions and to maintain operational efficiency.

511. These statements and omissions concerning the "***integrity and protection***" of data being "***critical***" to Marriott were false and misleading when made because at the time Defendants made these statements, Starwood's IT systems were severely vulnerable. Specifically, among other issues: (1) the systems were using an outdated Oracle application portal that could not be updated or patched; (2) the legacy Starwood system allowed for insecure remote access; (3) only a fraction of Starwood's firewall activity was being logged, so nobody could adequately monitor for attacks; (4) the legacy Starwood system lacked monitoring and logging of remote access, meaning that there was no record of who was remotely accessing the systems; (5) not all database queries were being logged, so nobody could see if a hacker was accessing Starwood's valuable data without permission; (6) payment account numbers were being stored without encryption, so sensitive data was easily accessible to attackers; and (7) that Starwood did not mandate PCI compliance, tokenization, or point-to-point encryption. An adequate merger due diligence process would have easily revealed these glaring deficiencies, yet

Marriott knowingly, or with severe recklessness, failed to share this important information with the market. In addition, throughout the Class Period, the legacy Starwood guest reservation database was already compromised by the Data Breach.

512. Further, the statements and omissions: (1) gave investors a false impression that Marriott was operating the newly-acquired Starwood systems in accordance with relevant requirements, standards, and best practices detailed above; (2) gave investors a false impression that Marriott had made adequate preparations and dedicated adequate resources to cybersecurity when, in fact, Marriott failed to secure Starwood's systems, despite knowledge of cybersecurity risks. Additionally, as detailed above in the Board minutes pleaded in Section (VI)(F)(3), the Board was well aware of the risk that cybersecurity posed to the Company, which now included the fact that Marriott's Audit Department rated the Company as Needs Improvement for cybersecurity and an increase in the volume and severity of cyberattacks in the hospitality industry, however, Marriott ignored multiple red flags that should have caused Defendants to discover the Data Breach (or at least safeguard Starwood's vulnerable client data) including, but not limited to: (1) Starwood's known cybersecurity issues, which the Board now knew included the fact that Starwood did not mandate PCI compliance, nor did Starwood use tokenization or point-to-point encryption, and that Starwood's systems posed a higher risk to the Company than Marriott's, as detailed above in Section (VI)(C)(3)-(5); (2) Marriott's cybersecurity vulnerabilities separate from Starwood's systems, including those evidenced by the penetration test conducted by PwC, as detailed above in Section (VI)(C)(4); (3) significant (and public) intrusions into the systems and databases of Marriott's competitors in the hospitality industry, as detailed above in Section (VI)(C)(6)(b); (4) other significant data breaches in other industries, as detailed above in Section (VI)(C)(6)(c); and (5) the passage and imminent enforcement of

GDPR. Notably, as detailed above in Section (VI)(F)(2), this Court has already held that plaintiffs in parallel litigation adequately pleaded under FRCP 9(b) "that Marriott knew or should have known about its allegedly inadequate data security practices and the risk of a data breach." *See also* Section (VIII) (Additional Allegations Supporting Scienter).

513. Also in the 2016 Form 10-K, when describing **potential** risks the Company **might** face as a result of the Merger, Marriott stated:

> We may not be able to integrate Starwood successfully and many of the anticipated benefits of combining Starwood and Marriott may not be realized. ***We decided to acquire Starwood with the expectation that the Starwood Combination will result in various benefits, including, among other things, operating efficiencies. Achieving those anticipated benefits is subject to a number of uncertainties, including whether we can integrate the business of Starwood in an efficient and effective manner, and we cannot assure you that those benefits will be realized at all or as quickly as we expect.*** If we do not achieve those benefits, our costs could increase, our expected net income could decrease, and our future business, financial condition, operating results, and prospects could suffer.
>
> ***The integration process could take longer than we anticipate and involve unanticipated costs. Disruptions of each company's ongoing businesses, processes, and systems or inconsistencies in standards, controls, procedures, practices, policies, and compensation arrangements could adversely affect the combined company. We may also have difficulty addressing differences in corporate cultures and management philosophies, and in harmonizing our different reservations and other systems and business practices. Although we expect that the elimination of certain duplicative costs, as well as the realization of other efficiencies related to the integration of the two businesses, will over time offset the substantial incremental transaction and merger-related costs and charges we incurred in connection with the Starwood Combination, we may not achieve this net benefit in the near term, or at all.***
>
> *Our future results will suffer if we do not effectively manage our expanded operations.* ***With completion of the Starwood Combination, the size of our business has increased significantly. Our continued success depends, in part, upon our ability to manage this expanded business, which poses substantial***

> ***challenges for management, including challenges related to the management and monitoring of new operations and associated increased costs and complexity.*** We cannot assure you that we will be successful or that we will realize the expected operating efficiencies, cost savings, and other benefits from the combination that we currently anticipate.

514. These statements and omissions were false and misleading when made because while warning of potential risks related to integrating the business, Defendants failed to disclose critical facts relevant to these risks that existed at the time, including the vulnerability of the customer data and that the Data Breach was currently ongoing, despite the fact that the Audit Committee was specifically advised regarding the SEC's risk disclosure requirements. Additionally, these statements and omissions were false and misleading when made for the reasons detailed in ¶¶ 511-12.

515. Also in the 2016 Form 10-K, when describing **potential** risks the Company **might** face as a result of its technology and information protection operations, Marriott stated:

> ***A failure to keep pace with developments in technology could impair our operations or competitive position. The lodging industry continues to demand the use of sophisticated technology and systems, including those used for our reservation, revenue management, and property management systems, our Loyalty Programs, and technologies we make available to our guests. These technologies and systems must be refined, updated, and/or replaced with more advanced systems on a regular basis, and if we cannot do so as quickly as our competitors or within budgeted costs and time frames, our business could suffer. We also may not achieve the benefits that we anticipate from any new technology or system, and a failure to do so could result in higher than anticipated costs or could impair our operating results.***
>
> * * *
>
> ***We are exposed to risks and costs associated with protecting the integrity and security of internal and customer data. Our businesses process, use, and transmit large volumes of internal employee and customer data, including credit card numbers and other personal information in various information systems that***

***we maintain*** and in those maintained by third parties, including our owners, franchisees and licensees, as well as our service providers, in areas such as human resources outsourcing, website hosting, and various forms of electronic communications. ***The integrity and protection of that customer, employee, and company data is critical to our business. If that data is inaccurate or incomplete, we could make faulty decisions.***

***Our customers and employees also have a high expectation that we, as well as our owners, franchisees, licensees, and service providers, will adequately protect their personal information. The information, security, and privacy requirements imposed by governmental regulation and the requirements of the payment card industry are also increasingly demanding, in both the United States and other jurisdictions where we operate. Our systems and the systems maintained or used by our owners, franchisees, licensees, and service providers may not be able to satisfy these changing requirements and employee and customer expectations, or may require significant additional investments or time in order to do so.***

***Cyber-attacks could have a disruptive effect on our business. Efforts to hack or breach security measures, failures of systems or software to operate as designed or intended, viruses, operator error, or inadvertent releases of data may materially impact our, including our owners', franchisees', licensees', or service providers', information systems and records.*** Our reliance on computer, Internet-based and mobile systems and communications and the frequency and sophistication of efforts by hackers to gain unauthorized access to such systems have increased significantly in recent years. ***A significant theft, loss, or fraudulent use of customer, employee, or company data could adversely impact our reputation and could result in remedial and other expenses, fines, or litigation. Breaches in the security of our information systems or those of our owners, franchisees, licensees, or service providers or other disruptions in data services could lead to an interruption in the operation of our systems, resulting in operational inefficiencies and a loss of profits.*** In addition, although we carry cyber/privacy liability insurance that is designed to protect us against certain losses related to cyber risks, such insurance coverage may be insufficient to cover all losses or all types of claims that may arise in connection with cyber-attacks, security breaches, and other related breaches. Furthermore, in the future such insurance may not be available to us on commercially reasonable terms, or at all.

* * *

> ***Any disruption in the functioning of our reservation system, such as in connection with our integration of Starwood, could adversely affect our performance and results. We manage a global reservation system that communicates reservations to our branded hotels that individuals make directly with us online, through our mobile app, or through our telephone call centers, or through intermediaries like travel agents, Internet travel websites and other distribution channels. The cost, speed, accuracy and efficiency of our reservation system are critical aspects of our business and are important considerations for hotel owners when choosing our brands. Our business may suffer if we fail to maintain, upgrade, or prevent disruption to our reservation system. In addition, the risk of disruption in the functioning of our global reservation system could increase in connection with the system integration that we anticipate undertaking as part of our integration of Starwood. Disruptions in or changes to our reservation system could result in a disruption to our business and the loss of important data.***

516. These statements and omissions were false and misleading when made because while warning of potential cybersecurity-related risks to the business, Defendants failed to disclose critical facts relevant to these risks that existed at the time, including the vulnerability of the customer data and that the Data Breach was currently ongoing, despite the fact that the Audit Committee was specifically advised regarding the SEC's risk disclosure requirements. Additionally, these statements and omissions were false and misleading when made for the reasons detailed in ¶¶ 511-12.

517. Attached to Marriott's 2016 Form 10-K were SOX Certifications signed by Defendants Sorenson and Oberg with statements identical to those detailed in ¶ 462.

518. These statements and omissions were false and misleading when made because either Defendants Sorenson and Oberg reviewed the 2016 Form 10-K, and knew they could not reasonably certify that the risk language was not false and misleading, or they were at least severely reckless in certifying that it was not false and misleading given the information available to them at the time concerning the risks that existed to the customer data. Additionally,

these statements and omissions were false and misleading when made for the reasons detailed in ¶¶ 511-12.

### R. May 9, 2017 – Q1 2017 Form 10-Q

519. On May 9, 2017, just after noon EST, Marriott filed the Company's Q1 2017 Form 10-Q, which was signed by Defendant Bauduin. In the Q1 2017 Form 10-Q, when describing **<u>potential</u>** risks the Company **<u>might</u>** face as a result of the Merger, Marriott stated:

> We may not be able to integrate Starwood successfully and many of the anticipated benefits of combining Starwood and Marriott may not be realized. ***We decided to acquire Starwood with the expectation that the Starwood Combination will result in various benefits, including, among other things, operating efficiencies. Achieving those anticipated benefits is subject to a number of uncertainties, including whether we can integrate the business of Starwood in an efficient and effective manner, and we cannot assure you that those benefits will be realized at all or as quickly as we expect.*** If we do not achieve those benefits, our costs could increase, our expected net income could decrease, and our future business, financial condition, operating results, and prospects could suffer.
>
> ***The integration process could take longer than we anticipate and involve unanticipated costs. Disruptions of each company's ongoing businesses, processes, and systems or inconsistencies in standards, controls, procedures, practices, policies, and compensation arrangements could adversely affect the combined company. We may also have difficulty addressing differences in corporate cultures and management philosophies, and in harmonizing our different reservations and other systems and business practices.*** Although we expect that the elimination of certain duplicative costs, as well as the realization of other efficiencies related to the integration of the two businesses, will over time offset the substantial incremental transaction and merger-related costs and charges we incurred in connection with the Starwood Combination, we may not achieve this net benefit in the near term, or at all.
>
> *Our future results will suffer if we do not effectively manage our expanded operations.* ***With completion of the Starwood Combination, the size of our business has increased significantly. Our future success depends, in part, upon our ability to manage this expanded business, which poses substantial challenges for***

> ***management, including challenges related to the management and monitoring of new operations and associated increased costs and complexity.*** We cannot assure you that we will be successful or that we will realize the expected operating efficiencies, cost savings, and other benefits from the combination that we currently anticipate.

520. These statements and omissions were false and misleading when made because while warning of potential risks related to integrating the business, Defendants failed to disclose critical facts relevant to these risks that existed at the time, including the vulnerability of the customer data and that the Data Breach was currently ongoing, despite the fact that the Audit Committee was specifically advised regarding the SEC's risk disclosure requirements. Additionally, these statements and omissions were false and misleading when made because at the time Defendants made these statements, Starwood's IT systems were severely vulnerable. Specifically, among other issues: (1) the systems were using an outdated Oracle application portal that could not be updated or patched; (2) the legacy Starwood system allowed for insecure remote access; (3) only a fraction of Starwood's firewall activity was being logged, so nobody could adequately monitor for attacks; (4) the legacy Starwood system lacked monitoring and logging of remote access, meaning that there was no record of who was remotely accessing the systems; (5) not all database queries were being logged, so nobody could see if a hacker was accessing Starwood's valuable data without permission; (6) payment account numbers were being stored without encryption, so sensitive data was easily accessible to attackers; and (7) that Starwood did not mandate PCI compliance, tokenization, or point-to-point encryption. An adequate merger due diligence process would have easily revealed these glaring deficiencies, yet Marriott knowingly, or with severe recklessness, failed to share this important information with the market. In addition, throughout the Class Period, the legacy Starwood guest reservation database was already compromised by the Data Breach.

521. Further, the statements and omissions: (1) gave investors a false impression that Marriott was operating the newly-acquired Starwood systems in accordance with relevant requirements, standards, and best practices detailed above; (2) gave investors a false impression that Marriott had made adequate preparations and dedicated adequate resources to cybersecurity when, in fact, Marriott failed to secure Starwood's systems, despite knowledge of cybersecurity risks. Additionally, as detailed above in the Board minutes pleaded in Section (VI)(F)(3), the Board was well aware of the risk that cybersecurity posed to the Company, which now included the fact that Marriott's Audit Department rated the Company as Needs Improvement for cybersecurity and an increase in the volume and severity of cyberattacks in the hospitality industry, however, Marriott ignored multiple red flags that should have caused Defendants to discover the Data Breach (or at least safeguard Starwood's vulnerable client data) including, but not limited to: (1) Starwood's known cybersecurity issues, which the Board now knew included the fact that Starwood did not mandate PCI compliance, nor did Starwood use tokenization or point-to-point encryption, and that Starwood's systems posed a higher risk to the Company than Marriott's, and that PwC recommended enhanced network segmentation, two-factor authentication, and vulnerability remediation for Starwood's systems, as detailed above in Section (VI)(C)(3)-(5); (2) Marriott's cybersecurity vulnerabilities separate from Starwood's systems, including those evidenced by the penetration test conducted by PwC, as detailed above in Section (VI)(C)(4); (3) significant (and public) intrusions into the systems and databases of Marriott's competitors in the hospitality industry, as detailed above in Section (VI)(C)(6)(b); (4) other significant data breaches in other industries, as detailed above in Section (VI)(C)(6)(c); and (5) the passage and imminent enforcement of GDPR . Notably, as detailed above in Section (VI)(F)(2), this Court has already held that plaintiffs in parallel litigation adequately pleaded

under FRCP 9(b) "that Marriott knew or should have known about its allegedly inadequate data security practices and the risk of a data breach." *See also* Section (VIII) (Additional Allegations Supporting Scienter).

522. Also in the Q1 2017 Form 10-Q, when describing **potential** risks the Company **might** face as a result of its technology and information protection operations, Marriott stated:

> ***A failure to keep pace with developments in technology could impair our operations or competitive position. The lodging industry continues to demand the use of sophisticated technology and systems, including those used for our reservation, revenue management, and property management systems, our Loyalty programs, and technologies we make available to our guests. These technologies and systems must be refined, updated, and/or replaced with more advanced systems on a regular basis, and if we cannot do so as quickly as our competitors or within budgeted costs and time frames, our business could suffer. We also may not achieve the benefits that we anticipate from any new technology or system, and a failure to do so could result in higher than anticipated costs or could impair our operating results.***
>
> * * *
>
> ***We are exposed to risks and costs associated with protecting the integrity and security of internal and customer data. Our businesses process, use, and transmit large volumes of internal employee and customer data, including credit card numbers and other personal information in various information systems that we maintain*** and in those maintained by third parties, including our owners, franchisees and licensees, as well as our service providers, in areas such as human resources outsourcing, website hosting, and various forms of electronic communications. ***The integrity and protection of that customer, employee, and company data is critical to our business. If that data is inaccurate or incomplete, we could make faulty decisions.***
>
> ***Our customers and employees also have a high expectation that we, as well as our owners, franchisees, licensees, and service providers, will adequately protect their personal information. The information, security, and privacy requirements imposed by governmental regulation and the requirements of the payment card industry are also increasingly demanding, in both the United States and other jurisdictions where we operate. Our***

***systems and the systems maintained or used by our owners, franchisees, licensees, and service providers may not be able to satisfy these changing requirements and employee and customer expectations, or may require significant additional investments or time in order to do so.***

***Cyber-attacks could have a disruptive effect on our business. Efforts to hack or breach security measures, failures of systems or software to operate as designed or intended, viruses, operator error, or inadvertent releases of data may materially impact our, including our owners', franchisees', licensees', or service providers', information systems and records.*** Our reliance on computer, Internet-based and mobile systems and communications and the frequency and sophistication of efforts by hackers to gain unauthorized access to such systems have increased significantly in recent years. ***A significant theft, loss, or fraudulent use of customer, employee, or company data could adversely impact our reputation and could result in remedial and other expenses, fines, or litigation. Breaches in the security of our information systems or those of our owners, franchisees, licensees, or service providers or other disruptions in data services could lead to an interruption in the operation of our systems, resulting in operational inefficiencies and a loss of profits.*** In addition, although we carry cyber/privacy liability insurance that is designed to protect us against certain losses related to cyber risks, such insurance coverage may be insufficient to cover all losses or all types of claims that may arise in connection with cyber-attacks, security breaches, and other related breaches. Furthermore, in the future such insurance may not be available to us on commercially reasonable terms, or at all.

* * *

***Any disruption in the functioning of our reservation systems, such as in connection with our integration of Starwood, could adversely affect our performance and results. We manage global reservation systems that communicate reservations to our branded hotels that individuals make directly with us online, through our mobile apps, or through our telephone call centers, or through intermediaries like travel agents, Internet travel websites and other distribution channels. The cost, speed, accuracy and efficiency of our reservation systems are critical aspects of our business and are important considerations for hotel owners when choosing our brands. Our business may suffer if we fail to maintain, upgrade, or prevent disruption to our reservation systems. In addition, the risk of disruption in the functioning of our global reservation systems could increase in***

> ***connection with the systems integration that we anticipate undertaking as part of our integration of Starwood. Disruptions in or changes to our reservation systems could result in a disruption to our business and the loss of important data.***

523. These statements and omissions were false and misleading when made because while warning of potential cybersecurity-related risks to the business, Defendants failed to disclose critical facts relevant to these risks that existed at the time, including the vulnerability of the customer data and that the Data Breach was currently ongoing, despite the fact that the Audit Committee was specifically advised regarding the SEC's risk disclosure requirements. Additionally, these statements and omissions were false and misleading when made for the reasons detailed in ¶¶ 520-21.

524. Attached to Marriott's Q1 2017 Form 10-Q were SOX Certifications signed by Defendants Sorenson and Oberg with statements identical to those detailed in ¶ 487.

525. These statements and omissions were false and misleading when made because either Defendants Sorenson and Oberg reviewed the Q1 2017 Form 10-Q, and knew they could not reasonably certify that the risk language was not false and misleading, or they were at least severely reckless in certifying that it was not false and misleading given the information available to them at the time concerning the risks that existed to the customer data. Additionally, these statements and omissions were false and misleading when made for the reasons detailed in ¶¶ 520-21.

**S. August 7, 2017 – Form 8-K**

526. On August 7, 2017, after the market closed, Marriott filed a Form 8-K signed by Defendant Bauduin and attached a press release discussing the Company's operations, the Integration, and other topics. In that press release, in discussing the Integration, Defendant Sorenson stated: "***Integration of the Starwood transaction is on track.***"

527. This statement and/or omission that the Integration was currently "***on track***" at that point was false and misleading when made for the reasons detailed in ¶¶ 520-21.

**T. August 8, 2017 – Q2 2017 Form 10-Q**

528. On August 8, 2017, at approximately 2:25 pm EST, Marriott filed the Company's Q2 2017 Form 10-Q, which was signed by Defendant Bauduin. In the Q2 2017 Form 10-Q, when describing **potential** risks the Company **might** face as a result of the Merger, Marriott stated:

> We may not be able to integrate Starwood successfully and many of the anticipated benefits of combining Starwood and Marriott may not be realized. ***We decided to acquire Starwood with the expectation that the Starwood Combination will result in various benefits, including, among other things, operating efficiencies. Achieving those anticipated benefits is subject to a number of uncertainties, including whether we can integrate the business of Starwood in an efficient and effective manner, and we cannot assure you that those benefits will be realized as fully or as quickly as we expect.*** If we do not achieve those benefits, our costs could increase, our expected net income could decrease, and our future business, financial condition, operating results, and prospects could suffer.
>
> ***The integration process could take longer than we anticipate and involve unanticipated costs. Disruptions of each company's ongoing businesses, processes, and systems or inconsistencies in standards, controls, procedures, practices, policies, and compensation arrangements could adversely affect the combined company. We may also have difficulty addressing differences in corporate cultures and management philosophies, and in harmonizing our different reservations and other systems and business practices.*** Although we expect that the elimination of certain duplicative costs, as well as the realization of other efficiencies related to the integration of the two businesses, will over time offset the substantial incremental transaction and merger-related costs and charges we incurred in connection with the Starwood Combination, we may not achieve this net benefit in the near term, or at all.
>
> *Our future results will suffer if we do not effectively manage our expanded operations.* ***With completion of the Starwood Combination, the size of our business increased significantly.***

> ***Our future success depends, in part, upon our ability to manage this expanded business, which poses substantial challenges for management, including challenges related to the management and monitoring of new operations and associated increased costs and complexity.*** We cannot assure you that we will be successful or that we will realize the expected operating efficiencies, cost savings, and other benefits from the combination that we currently anticipate.

529. These statements and omissions were false and misleading when made because while warning of potential risks related to integrating the business, Defendants failed to disclose critical facts relevant to these risks that existed at the time, including the vulnerability of the customer data and that the Data Breach was currently ongoing, despite the fact that the Audit Committee was specifically advised regarding the SEC's risk disclosure requirements. Additionally, these statements and omissions were false and misleading when made for the reasons detailed in ¶¶ 520-21.

530. Also in the Q2 2017 Form 10-Q, when describing **potential** risks the Company **might** face as a result of its technology and information protection operations, Marriott stated:

> ***A failure to keep pace with developments in technology could impair our operations or competitive position. The lodging industry continues to demand the use of sophisticated technology and systems, including those used for our reservation, revenue management, and property management systems, our Loyalty Programs, and technologies we make available to our guests. These technologies and systems must be refined, updated, and/or replaced with more advanced systems on a regular basis, and if we cannot do so as quickly as our competitors or within budgeted costs and time frames, our business could suffer. We also may not achieve the benefits that we anticipate from any new technology or system, and a failure to do so could result in higher than anticipated costs or could impair our operating results.***
>
> * * *
>
> ***We are exposed to risks and costs associated with protecting the integrity and security of internal and customer data. Our businesses process, use, and transmit large volumes of internal***

***employee and customer data, including credit card numbers and other personal information in various information systems that we maintain*** and in those maintained by third parties, including our owners, franchisees and licensees, as well as our service providers, in areas such as human resources outsourcing, website hosting, and various forms of electronic communications. ***The integrity and protection of that customer, employee, and company data is critical to our business. If that data is inaccurate or incomplete, we could make faulty decisions.***

***Our customers and employees also have a high expectation that we, as well as our owners, franchisees, licensees, and service providers, will adequately protect their personal information. The information, security, and privacy requirements imposed by governmental regulation and the requirements of the payment card industry are also increasingly demanding, in both the United States and other jurisdictions where we operate. Our systems and the systems maintained or used by our owners, franchisees, licensees, and service providers may not be able to satisfy these changing requirements and employee and customer expectations, or may require significant additional investments or time in order to do so.***

***Cyber-attacks could have a disruptive effect on our business. Efforts to hack or breach security measures, failures of systems or software to operate as designed or intended, viruses, "ransomware" or other malware, operator error, or inadvertent releases of data may materially impact our, including our owners', franchisees', licensees', or service providers', information systems and records.*** Our reliance on computer, Internet-based and mobile systems and communications and the frequency and sophistication of efforts by hackers to gain unauthorized access or prevent authorized access to such systems have increased significantly in recent years. ***A significant theft, loss, loss of access to, or fraudulent use of customer, employee, or company data could adversely impact our reputation and could result in remedial and other expenses, fines, or litigation. Breaches in the security of our information systems or those of our owners, franchisees, licensees, or service providers or other disruptions in data services could lead to an interruption in the operation of our systems, resulting in operational inefficiencies and a loss of profits.*** In addition, although we carry cyber/privacy liability insurance that is designed to protect us against certain losses related to cyber risks, such insurance coverage may be insufficient to cover all losses or all types of claims that may arise in connection with cyber-attacks, security breaches, and other

related breaches. Furthermore, in the future such insurance may not be available to us on commercially reasonable terms, or at all.

* * *

***Any disruption in the functioning of our reservation systems, such as in connection with our integration of Starwood, could adversely affect our performance and results. We manage global reservation systems that communicate reservations to our branded hotels that individuals make directly with us online, through our mobile apps, or through our telephone call centers, or through intermediaries like travel agents, Internet travel websites and other distribution channels. The cost, speed, accuracy and efficiency of our reservation systems are critical aspects of our business and are important considerations for hotel owners when choosing our brands. Our business may suffer if we fail to maintain, upgrade, or prevent disruption to our reservation systems. In addition, the risk of disruption in the functioning of our global reservation systems could increase in connection with the systems integration that we anticipate undertaking as part of our integration of Starwood. Disruptions in or changes to our reservation systems could result in a disruption to our business and the loss of important data.***

531. These statements and omissions were false and misleading when made because while warning of potential cybersecurity-related risks to the business, Defendants failed to disclose critical facts relevant to these risks that existed at the time, including the vulnerability of the customer data and that the Data Breach was currently ongoing, despite the fact that the Audit Committee was specifically advised regarding the SEC's risk disclosure requirements. Additionally, these statements and omissions were false and misleading when made for the reasons detailed in ¶¶ 520-21.

532. Attached to Marriott's Q2 2017 Form 10-Q were SOX Certifications signed by Defendants Sorenson and Oberg with statements identical to those detailed in ¶ 487.

533. These statements and omissions were false and misleading when made because either Defendants Sorenson and Oberg reviewed the Q2 2017 Form 10-Q, and knew they could not reasonably certify that the risk language was not false and misleading, or they were at least

severely reckless in certifying that it was not false and misleading given the information available to them at the time concerning the risks that existed to the customer data. Additionally, these statements and omissions were false and misleading when made for the reasons detailed in ¶¶ 520-21.

**U. October 5, 2017 – Privacy Statement**

534. On September 23, 2016, Marriott completed the acquisition of Starwood. On October 5, 2017, Marriott updated the Online Privacy Statement it presented to the public.[175] In that statement, Marriott informed the public of its policy for transferring, storing, and securing the customer data the Company collected through starwoodhotels.com:

> SAFE HARBOR
>
> In addition, Starwood is certified under the Safe Harbor privacy framework as set forth by the U.S. Department of Commerce, European Commission and Switzerland regarding the collection, storage, use, transfer and other processing of PII transferred from the European Economic Area or Switzerland to the U.S. Please note that since October 6, 2015, the European Union no longer recognizes Safe Harbor. ***Nonetheless, Starwood upholds to comply with the Safe Harbor Privacy Principles.***
>
> DELETION AND RETENTION OF YOUR PERSONAL DATA
>
> ***Your personal data will be kept in a form which enables to identify you for no longer than it is necessary for the purposes for which we collected and use your data.*** Your personal data may be retained in certain files for a period of time as required by applicable law and following Starwood's data retention policies in order to comply with such financial or legal requirements, to properly resolve disputes or to troubleshoot problems. In addition, some types of information may be stored indefinitely due to technical constraints, and will be blocked from further processing for purposes which are not mandatory by law.

---

[175] Lead Plaintiff's investigation has uncovered that Marriott's privacy statement was updated no later than October 5, 2017, however, it may have been updated earlier. The same privacy statement was present on Marriott's website from at least October 5, 2017, and likely earlier, until around February 2018 on starwoodhotels.com.

* * *

> <u>SECURITY SAFEGUARDS</u>
>
> ***Starwood recognizes the importance of information security, and is constantly reviewing and enhancing our technical, physical, and logical security rules and procedures. All Starwood owned web sites and servers have security measures in place to help protect your personal data against accidental, loss, misuse, unlawful or unauthorized access, disclosure, or alteration while under our control. Although "guaranteed security" does not exist either on or off the Internet, we safeguard your information using appropriate administrative, procedural and technical safeguards, including password controls, "firewalls" and the use of up to 256-bit encryption based on a Class 3 Digital Certificate issued by VeriSign, Inc. This allows for the use of Secure Sockets Layer (SSL), an encryption method used to help protect your data from interception and hacking while in transit.***

535. These statements and omissions concerning Starwood's, and thus Marriott's, information and data security were false and misleading when made because at this time, Marriott was in violation of the Safe Harbor Principles that Defendants stated the Company adhered to. Additionally, these statements and omissions were false and misleading when made for the reasons detailed in ¶¶ 520-21.

## V. November 8, 2017 – Q3 2017 Form 10-Q

536. On November 8, 2017, at just after 1:30 pm EST, Marriott filed the Company's Q3 2017 Form 10-Q, which was signed by Defendant Bauduin. At the time of the filing of the Q3 2017 Form 10-Q, the Merger had already closed and Marriott owned the legacy Starwood guest reservation database.

537. In the Q3 2017 Form 10-Q, when describing <u>**potential**</u> risks the Company <u>**might**</u> face as a result of the Merger, Marriott stated:

> Some of the anticipated benefits of combining Starwood and Marriott may still not be realized. ***We decided to acquire Starwood with the expectation that the Starwood Combination will result in various benefits, including, among other things,***

> ***operating efficiencies. Although we have already achieved some of those anticipated benefits, others remain subject to a number of uncertainties, including whether we can continue to integrate the business of Starwood in an efficient and effective manner and whether, and on what terms, we can reach agreement with the companies that issue our branded credit cards and the timeshare companies with whom we do business to allow us to move to a single unified reservation system and loyalty platform.***
>
> ***The integration process could take longer than we anticipate and involve unanticipated costs. Disruptions of each legacy company's ongoing businesses, processes, and systems could adversely affect the combined company. We also may still encounter difficulties harmonizing our different reservations and other systems and business practices as the integration process continues.*** As a result of these or other factors, we cannot assure you when or that we will be able to fully realize additional benefits from the Starwood Combination in the form of eliminating duplicative costs, or achieving other operating efficiencies, cost savings, or benefits.

538. These statements and omissions were false and misleading when made because while warning of potential risks related to integrating the business, Defendants failed to disclose critical facts relevant to these risks that existed at the time, including the vulnerability of the customer data and that the Data Breach was currently ongoing, despite the fact that the Audit Committee was specifically advised regarding the SEC's risk disclosure requirements. Additionally, these statements and omissions were false and misleading when made for the reasons detailed in ¶¶ 520-21.

539. Also in the Q3 2017 Form 10-Q, when describing **potential** risks the Company **might** face as a result of its technology and information protection operations, Marriott stated:

> ***A failure to keep pace with developments in technology could impair our operations or competitive position. The lodging industry continues to demand the use of sophisticated technology and systems, including those used for our reservation, revenue management, and property management systems, our Loyalty Programs, and technologies we make available to our guests. These technologies and systems must be refined, updated, and/or***

***replaced with more advanced systems on a regular basis, and if we cannot do so as quickly as our competitors or within budgeted costs and time frames, our business could suffer. We also may not achieve the benefits that we anticipate from any new technology or system, and a failure to do so could result in higher than anticipated costs or could impair our operating results.***

* * *

***We are exposed to risks and costs associated with protecting the integrity and security of internal and customer data. Our businesses process, use, and transmit large volumes of internal employee and customer data, including credit card numbers and other personal information in various information systems that we maintain*** and in those maintained by third parties, including our owners, franchisees and licensees, as well as our service providers, in areas such as human resources outsourcing, website hosting, and various forms of electronic communications. ***The integrity and protection of that customer, employee, and company data is critical to our business. If that data is inaccurate or incomplete, we could make faulty decisions.***

***Our customers and employees also have a high expectation that we, as well as our owners, franchisees, licensees, and service providers, will adequately protect their personal information. The information, security, and privacy requirements imposed by governmental regulation and the requirements of the payment card industry are also increasingly demanding, in both the United States and other jurisdictions where we operate. Our systems and the systems maintained or used by our owners, franchisees, licensees, and service providers may not be able to satisfy these changing requirements and employee and customer expectations, or may require significant additional investments or time in order to do so.***

***Cyber-attacks could have a disruptive effect on our business. Efforts to hack or breach security measures, failures of systems or software to operate as designed or intended, viruses, "ransomware" or other malware, operator error, or inadvertent releases of data may materially impact our, including our owners', franchisees', licensees', or service providers', information systems and records.*** Our reliance on computer, Internet-based and mobile systems and communications and the frequency and sophistication of efforts by hackers to gain unauthorized access or prevent authorized access to such systems have increased significantly in recent years. ***A significant theft,***

> ***loss, loss of access to, or fraudulent use of customer, employee, or company data could adversely impact our reputation and could result in remedial and other expenses, fines, or litigation. Breaches in the security of our information systems or those of our owners, franchisees, licensees, or service providers or other disruptions in data services could lead to an interruption in the operation of our systems, resulting in operational inefficiencies and a loss of profits.*** In addition, although we carry cyber/privacy liability insurance that is designed to protect us against certain losses related to cyber risks, such insurance coverage may be insufficient to cover all losses or all types of claims that may arise in connection with cyber-attacks, security breaches, and other related breaches. Furthermore, in the future such insurance may not be available to us on commercially reasonable terms, or at all.

* * *

> ***Any disruption in the functioning of our reservation systems, such as in connection with our integration of Starwood, could adversely affect our performance and results. We manage global reservation systems that communicate reservations to our branded hotels that individuals make directly with us online, through our mobile apps, or through our telephone call centers, or through intermediaries like travel agents, Internet travel websites and other distribution channels. The cost, speed, accuracy and efficiency of our reservation systems are critical aspects of our business and are important considerations for hotel owners when choosing our brands. Our business may suffer if we fail to maintain, upgrade, or prevent disruption to our reservation systems. In addition, the risk of disruption in the functioning of our global reservation systems could increase in connection with the systems integration that we anticipate undertaking as part of our integration of Starwood. Disruptions in or changes to our reservation systems could result in a disruption to our business and the loss of important data.***

540. These statements were false and misleading when made because while warning of potential cybersecurity-related risks to the business, Defendants failed to disclose critical facts relevant to these risks that existed at the time, including the vulnerability of the customer data and that the Data Breach was currently ongoing, despite the fact that the Audit Committee was specifically advised regarding the SEC's risk disclosure requirements. Additionally, these

statements and omissions were false and misleading when made for the reasons detailed in ¶¶ 520-21.

541. Attached to Marriott's Q3 2017 Form 10-Q were SOX Certifications signed by Defendants Sorenson and Oberg with statements identical to those detailed in ¶ 487.

542. These statements and omissions were false and misleading when made because either Defendants Sorenson and Oberg reviewed the Q3 2017 Form 10-Q, and knew they could not reasonably certify that the risk language was not false and misleading, or they were at least severely reckless in certifying that it was not false and misleading given the information available to them at the time concerning the risks that existed to the customer data. Additionally, these statements and omissions were false and misleading when made for the reasons detailed in ¶¶ 520-21.

**W. November 8, 2017 – Q3 2017 Earnings Call**

543. On November 8, 2017, at 3:00 pm EST, Marriott held a conference call to discuss the Company's operations, the Integration, and other topics. In his opening remarks, Defendant Sorenson stated:

> We've never been more optimistic about our business, our underlying competitive strengths and our long-term growth potential. ***The Starwood integration is on track.*** We have identified more synergies and more business opportunities than we anticipated. We continue to believe we will achieve $250 million of G&A savings and expect to do that in 2018. And we continue to improve our products, services and systems to enhance the value of every room night.

544. These statements and omissions that the Integration was currently "***on track***" at that point were false and misleading when made for the reasons detailed in ¶¶ 520-21.

**X. January 12, 2018 – Defendant Hoffmeister Interview**

545. On January 12, 2018, Defendant Hoffmeister conducted an interview with Rich Siegel to discuss the Merger, and other topics. In that interview, Defendant Hoffmeister was asked about the Integration process, and in response misleadingly stated that Marriott was utilizing the "***best***" of Starwood's systems and that Marriott had conducted a "thorough analysis" of Starwood's systems:

> Siegel
>
> It's been more than a year since Marriott International merged with Starwood. From your perspective, how's the integration process going?
>
> Defendant Hoffmeister
>
> Whenever two large companies come together, you have to determine what processes, systems and tools to use. ***We're going through the process of bringing our systems together to get the best of both worlds wherever possible.*** It's very exciting. We have a lot going on, and a lot of work ahead still, but it's a very exciting time.
>
> * * *
>
> Siegel
>
> At the Download conference, you mentioned that when you learned of the Starwood merger, as CIO you looked for advice from other CIOs. Can you elaborate on that?
>
> Defendant Hoffmeister
>
> * * *
>
> Two themes emerged. The first was quite simply to "just adopt and go." Choose your systems and just go with them; you're not going to please everyone. ***We did a thorough analysis of the systems before we made our decision***, but we didn't dwell on it, we just made a decision.

546. These statements and omissions concerning Marriott getting "***the best of both worlds***" through the Merger, and the Company's purported "***thorough analysis***" of Starwood's

systems were false and misleading when made because at the time Defendants made these statements, Starwood's IT systems were severely vulnerable. Specifically, among other issues: (1) the systems were using an outdated Oracle application portal that could not be updated or patched; (2) the legacy Starwood system allowed for insecure remote access; (3) only a fraction of Starwood's firewall activity was being logged, so nobody could adequately monitor for attacks; (4) the legacy Starwood system lacked monitoring and logging of remote access, meaning that there was no record of who was remotely accessing the systems; (5) not all database queries were being logged, so nobody could see if a hacker was accessing Starwood's valuable data without permission; (6) payment account numbers were being stored without encryption, so sensitive data was easily accessible to attackers; and (7) that Starwood did not mandate PCI compliance, tokenization, or point-to-point encryption. An adequate merger due diligence process would have easily revealed these glaring deficiencies, yet Marriott knowingly, or with severe recklessness, failed to share this important information with the market. In addition, throughout the Class Period, the legacy Starwood guest reservation database was already compromised by the Data Breach.

547. Further, the statements and omissions: (1) gave investors a false impression that Marriott had undertaken sufficient due diligence, and was operating the newly-acquired Starwood systems in accordance with relevant requirements, standards, and best practices detailed above; (2) gave investors a false impression that Marriott had made adequate preparations and dedicated adequate resources to cybersecurity when, in fact, Marriott failed to secure Starwood's systems, despite knowledge of cybersecurity risks. Additionally, as detailed above in the Board minutes pleaded in Section (VI)(F)(3), the Board was well aware of the risk that cybersecurity posed to the Company, which now included the fact that Marriott's Audit

Department rated the Company as Needs Improvement for cybersecurity and an increase in the volume and severity of cyberattacks in the hospitality industry, however, Marriott ignored multiple red flags that should have caused Defendants to discover the Data Breach (or at least safeguard Starwood's vulnerable client data) including, but not limited to: (1) Starwood's known cybersecurity issues, as detailed above in Section (VI)(C)(3)-(5); (2) Marriott's cybersecurity vulnerabilities separate from Starwood's systems, including those evidenced by the penetration test conducted by PwC, as detailed above in Section (VI)(C)(4); (3) significant (and public) intrusions into the systems and databases of Marriott's competitors in the hospitality industry, as detailed above in Section (VI)(C)(6)(b); (4) other significant data breaches in other industries, as detailed above in Section (VI)(C)(6)(c); and (5) the passage and imminent enforcement of GDPR . Notably, as detailed above in Section (VI)(F)(2), this Court has already held that plaintiffs in parallel litigation adequately pleaded under FRCP 9(b) "that Marriott knew or should have known about its allegedly inadequate data security practices and the risk of a data breach." *See also* Section (VIII) (Additional Allegations Supporting Scienter).

**Y. February 14, 2018 – 2017 Form 10-K**

548. Marriott filed its Form 10-K for year ending 2017 ("2017 Form 10-K") just before the market closed on February 15, 2018. The 2017 Form 10-K was signed by Defendants Sorenson, Oberg, and Bauduin, and the Audit Committee Defendants, and made representations regarding the security of customer data, the Company's operations, the Integration, and other topics.

549. In the 2017 Form 10-K, Marriott stated:

> Keeping pace with developments in technology is important for our operations and our competitive position. Furthermore, ***the integrity and protection of customer, employee, and company data is critical to us*** as we use such data for business decisions and to maintain operational efficiency.

550. These statements and omissions concerning the "***integrity***" and "***protection***" of data being "***critical***" to Marriott were false and misleading when made for the reasons stated in ¶¶ 520-21.

551. Also in the 2017 Form 10-K, when describing **potential** risks the Company **might** face as a result of the Merger, Marriott stated:

> Some of the anticipated benefits of combining Starwood and Marriott may still not be realized. ***We decided to acquire Starwood with the expectation that the Starwood Combination will result in various benefits, including, among other things, operating efficiencies. Although we have already achieved some of those anticipated benefits, others remain subject to several uncertainties, including whether we can continue to effectively and efficiently integrate the Starwood business and whether, and on what terms, we can reach agreement with the timeshare companies with whom we do business to allow us to move to a single unified reservation system and loyalty platform.***
>
> ***Integration could also take longer than we anticipate and involve unexpected costs. Disruptions of each legacy company's ongoing businesses, processes, and systems could adversely affect the combined company. We also may still encounter difficulties harmonizing our different reservations and other systems and business practices as the integration process continues.*** Because of these or other factors, we cannot assure you when or that we will be able to fully realize additional benefits from the Starwood Combination in the form of eliminating duplicative costs, or achieving other operating efficiencies, cost savings, or benefits.

552. These statements and omissions were false and misleading when made because while warning of potential risks related to integrating the business, Defendants failed to disclose critical facts relevant to these risks that existed at the time, including the vulnerability of the customer data and that the Data Breach was currently ongoing, despite the fact that the Audit Committee was specifically advised regarding the SEC's risk disclosure requirements. Additionally, these statements and omissions were false and misleading when made for the reasons detailed in ¶¶ 520-21.

553. Also in the 2017 Form 10-K, when describing **potential** risks the Company **might** face as a result of its technology and information protection operations, Marriott stated:

> ***A failure to keep pace with developments in technology could impair our operations or competitive position. The lodging industry continues to demand the use of sophisticated technology and systems, including those used for our reservation, revenue management, property management, human resources and payroll systems, our Loyalty Programs, and technologies we make available to our guests and for our associates. These technologies and systems must be refined, updated, and/or replaced with more advanced systems on a regular basis, and our business could suffer if we cannot do that as quickly or effectively as our competitors or within budgeted costs and time frames. We also may not achieve the benefits that we anticipate from any new technology or system, and a failure to do so could result in higher than anticipated costs or could impair our operating results.***
>
> * * *
>
> ***We are exposed to risks and costs associated with protecting the integrity and security of company associate and guest data. Our businesses process, use, and transmit large volumes of associate and guest data, including credit card numbers and other personal information in various information systems that we maintain*** and in systems maintained by third parties, including our owners, franchisees and licensees, as well as our service providers, in areas such as human resources outsourcing, website hosting, and various forms of electronic communications. ***The integrity and protection of that guest, associate, and company data is critical to our business. If that data is inaccurate or incomplete, we could make faulty decisions.***
>
> ***Our guests and associates also have a high expectation that we, as well as our owners, franchisees, licensees, and service providers, will adequately protect their personal information. The information, security, and privacy requirements imposed by laws and governmental regulation and the requirements of the payment card industry are also increasingly demanding, in the U.S., the European Union, Asia, and other jurisdictions where we operate. Our systems and the systems maintained or used by our owners, franchisees, licensees, and service providers may not be able to satisfy these changing legal and regulatory requirements and employee and guest expectations, or may require significant additional investments or time to do so.***

***Cyber-attacks could have a disruptive effect on our business. Efforts to hack or breach security measures, failures of systems or software to operate as designed or intended, viruses, "ransomware" or other malware, operator error, or inadvertent releases of data may materially impact our information systems and records and those of our owners, franchisees, licensees, or service providers.*** Our reliance on computer, Internet-based and mobile systems and communications and the frequency and sophistication of efforts by hackers to gain unauthorized access or prevent authorized access to such systems have greatly increased in recent years. ***A significant theft, loss, loss of access to, or fraudulent use of guest, employee, or company data could adversely impact our reputation and could result in remedial and other expenses, fines, or litigation. Breaches in the security of our information systems or those of our owners, franchisees, licensees, or service providers or other disruptions in data services could lead to an interruption in the operation of our systems, resulting in operational inefficiencies and a loss of profits.*** In addition, although we carry cyber/privacy liability insurance that is designed to protect us against certain losses related to cyber risks, that insurance coverage may not be sufficient to cover all losses or all types of claims that may arise in connection with cyber-attacks, security breaches, and other related breaches. Furthermore, in the future such insurance may not be available to us on commercially reasonable terms, or at all.

* * *

***Any disruption in the functioning of our reservation systems, as part of our integration of Starwood or otherwise, could adversely affect our performance and results. We manage global reservation systems that communicate reservations to our branded hotels that individuals make directly with us online, through our mobile apps, through our telephone call centers, or through intermediaries like travel agents, Internet travel websites, and other distribution channels. The cost, speed, accuracy and efficiency of our reservation systems are critical aspects of our business and are important considerations for hotel owners when choosing our brands. Our business may suffer if we fail to maintain, upgrade, or prevent disruption to our reservation systems. In addition, the risk of disruption in the functioning of our global reservation systems could increase with the anticipated systems integration that is part of our integration of Starwood. Disruptions in or changes to our reservation systems could result in a disruption to our business and the loss of important data.***

554. These statements and omissions were false and misleading when made because while warning of potential cybersecurity-related risks to the business, Defendants failed to disclose critical facts relevant to these risks that existed at the time, including the vulnerability of the customer data and that the Data Breach was currently ongoing, despite the fact that the Audit Committee was specifically advised regarding the SEC's risk disclosure requirements. Additionally, these statements were false and misleading when made for the reasons detailed in ¶¶ 520-21.

555. Attached to Marriott's 2017 Form 10-K were SOX Certifications signed by Defendants Sorenson and Oberg with statements identical to those detailed in ¶ 462.

556. These statements and omissions were false and misleading when made because either Defendants Sorenson and Oberg reviewed the 2017 Form 10-K, and knew they could not reasonably certify that the risk language was not false and misleading, or they were at least severely reckless in certifying that it was not false and misleading given the information available to them at the time concerning the risks that existed to the customer data. Additionally, these statements and omissions were false and misleading when made for the reasons detailed in ¶¶ 520-21.

### Z. May 10, 2018 – Q1 2018 Form 10-Q

557. On May 10, 2018, shortly after the market opened, Marriott filed the Company's Q1 2018 Form 10-Q, which was signed by Defendant Bauduin. In the Q1 2018 Form 10-Q, when describing **<u>potential</u>** risks the Company **<u>might</u>** face as a result of the Merger, Marriott stated:

> Some of the anticipated benefits of combining Starwood and Marriott may still not be realized. ***We decided to acquire Starwood with the expectation that the Starwood Combination will result in various benefits, including, among other things, operating efficiencies. Although we have already achieved***

> ***some of those anticipated benefits, others remain subject to several uncertainties, including whether we can continue to effectively and efficiently integrate the Starwood business.***
>
> ***Integration could also take longer than we anticipate and involve unexpected costs. Disruptions of each legacy company's ongoing businesses, processes, and systems could adversely affect the combined company. We also may still encounter difficulties harmonizing our different reservations and other systems, Loyalty Programs and other business practices as the integration process continues.*** Because of these or other factors, we cannot assure you when or that we will be able to fully realize additional benefits from the Starwood Combination in the form of eliminating duplicative costs, or achieving other operating efficiencies, cost savings, or benefits, or that difficulties encountered with our harmonization efforts will not have adverse effects on our business or reputation.

558. These statements and omissions were false and misleading when made because while warning of potential risks related to integrating the business, Defendants failed to disclose critical facts relevant to these risks that existed at the time, including the vulnerability of the customer data and that the Data Breach was currently ongoing, despite the fact that the Audit Committee was specifically advised regarding the SEC's risk disclosure requirements. Additionally, these statements were false and misleading when made because at the time Defendants made these statements, Starwood's IT systems were severely vulnerable. Specifically, among other issues: (1) the systems were using an outdated Oracle application portal that could not be updated or patched; (2) the legacy Starwood system allowed for insecure remote access; (3) only a fraction of Starwood's firewall activity was being logged, so nobody could adequately monitor for attacks; (4) the legacy Starwood system lacked monitoring and logging of remote access, meaning that there was no record of who was remotely accessing the systems; (5) not all database queries were being logged, so nobody could see if a hacker was accessing Starwood's valuable data without permission; (6) payment account numbers were being stored without encryption, so sensitive data was easily accessible to attackers; and (7) that

Starwood did not mandate PCI compliance, tokenization, or point-to-point encryption. An adequate merger due diligence process would have easily revealed these glaring deficiencies, yet Marriott knowingly, or with severe recklessness, failed to share this important information with the market. In addition, throughout the Class Period, the legacy Starwood guest reservation database was already compromised by the Data Breach.

559. Further, the statements and omissions: (1) gave investors a false impression that Marriott was operating the newly-acquired Starwood systems in accordance with relevant requirements, standards, and best practices detailed above; and (2) gave investors a false impression that Marriott had made adequate preparations and dedicated adequate resources to cybersecurity when, in fact, Marriott failed to secure Starwood's systems, despite knowledge of cybersecurity risks. Additionally, as detailed above in the Board minutes pleaded in Section (VI)(F)(3), the Board was well aware of the risk that cybersecurity posed to the Company, however, Marriott ignored multiple red flags that should have caused Defendants to discover the Data Breach (or at least safeguard Starwood's vulnerable client data) including, but not limited to: (1) Starwood's known cybersecurity issues, which now included the fact that Protiviti was able to penetrate and access the Starwood CDE, as detailed above in Section (VI)(C)(3)-(5); (2) Marriott's cybersecurity vulnerabilities separate from Starwood's systems, including those evidenced by the penetration test conducted by PwC, as detailed above in Section (VI)(C)(4); (3) significant (and public) intrusions into the systems and databases of Marriott's competitors in the hospitality industry, as detailed above in Section (VI)(C)(6)(b); (4) other significant data breaches in other industries, as detailed above in Section (VI)(C)(6)(c); and (5) the passage and imminent enforcement of GDPR. Notably, as detailed above in Section (VI)(F)(2), this Court has already held that plaintiffs in parallel litigation adequately pleaded under FRCP 9(b) "that

Marriott knew or should have known about its allegedly inadequate data security practices and the risk of a data breach." *See also* Section (VIII) (Additional Allegations Supporting Scienter). Additionally, on February 21, 2018, the SEC released guidance for companies specifically on disclosing cybersecurity risk.

560. Also in the Q1 2018 Form 10-Q, when describing **potential** risks the Company **might** face as a result of its technology and information protection operations, Marriott stated:

> ***A failure to keep pace with developments in technology could impair our operations or competitive position. The lodging industry continues to demand the use of sophisticated technology and systems, including those used for our reservation, revenue management, property management, human resources and payroll systems, our Loyalty Programs, and technologies we make available to our guests and for our associates. These technologies and systems must be refined, updated, and/or replaced with more advanced systems on a regular basis, and our business could suffer if we cannot do that as quickly or effectively as our competitors or within budgeted costs and time frames. We also may not achieve the benefits that we anticipate from any new technology or system, and a failure to do so could result in higher than anticipated costs or could impair our operating results.***
>
> * * *
>
> ***We are exposed to risks and costs associated with protecting the integrity and security of company, employee, and guest data. Our businesses process, use, and transmit large volumes of employee and guest data, including credit card numbers and other personal information in various information systems that we maintain*** and in systems maintained by third parties, including our owners, franchisees and licensees, as well as our service providers, in areas such as human resources outsourcing, website hosting, and various forms of electronic communications. ***The integrity and protection of that guest, employee, and company data is critical to our business. If that data is inaccurate or incomplete, we could make faulty decisions.***
>
> ***Our guests and employees also have a high expectation that we, as well as our owners, franchisees, licensees, and service providers, will adequately protect their personal information. The information, security, and privacy requirements imposed by***

***laws and governmental regulation and the requirements of the payment card industry are also increasingly demanding, in the U.S., the European Union, Asia, and other jurisdictions where we operate. Our systems and the systems maintained or used by our owners, franchisees, licensees, and service providers may not be able to satisfy these changing legal and regulatory requirements and employee and guest expectations, or may require significant additional investments or time to do so.***

***Cyber-attacks could have a disruptive effect on our business. Efforts to hack or breach security measures, failures of systems or software to operate as designed or intended, viruses, "ransomware" or other malware, operator error, or inadvertent releases of data may materially impact our information systems and records and those of our owners, franchisees, licensees, or service providers.*** Our reliance on computer, Internet-based and mobile systems and communications and the frequency and sophistication of efforts by hackers to gain unauthorized access or prevent authorized access to such systems have greatly increased in recent years. ***A significant theft, loss, loss of access to, or fraudulent use of guest, employee, or company data could adversely impact our reputation and could result in remedial and other expenses, fines, or litigation. Breaches in the security of our information systems or those of our owners, franchisees, licensees, or service providers or other disruptions in data services could lead to an interruption in the operation of our systems, resulting in operational inefficiencies and a loss of profits, and negative publicity, resulting in tangible adverse effects on our business, including consumer boycotts, lost sales, litigation, loss of development opportunities, or associate retention and recruiting difficulties, all of which could affect our market share, reputation, business, financial condition, or results of operations. The techniques used to obtain unauthorized access, disable or degrade service, or sabotage information systems change frequently, can be difficult to detect for long periods of time, and can be difficult to assess ore remediate even once detected, which could magnify the severity of these adverse effects.*** In addition, although we carry cyber/privacy liability insurance that is designed to protect us against certain losses related to cyber risks, that insurance coverage may not be sufficient to cover all losses or all types of claims that may arise in connection with cyber-attacks, security breaches, and other related breaches. Furthermore, in the future such insurance may not be available to us on commercially reasonable terms, or at all.

* * *

> ***Any disruption in the functioning of our reservation systems, as part of our integration of Starwood or otherwise, could adversely affect our performance and results. We manage global reservation systems that communicate reservations to our branded hotels that individuals make directly with us online, through our mobile apps, through our telephone call centers, or through intermediaries like travel agents, Internet travel websites, and other distribution channels. The cost, speed, accuracy and efficiency of our reservation systems are critical aspects of our business and are important considerations for hotel owners when choosing our brands. Our business may suffer if we fail to maintain, upgrade, or prevent disruption to our reservation systems. In addition, the risk of disruption in the functioning of our global reservation systems could increase with the anticipated systems integration that is part of our integration of Starwood. Disruptions in or changes to our reservation systems could result in a disruption to our business and the loss of important data.***

561. These statements and omissions were false and misleading when made because while warning of potential cybersecurity-related risks to the business, Defendants failed to disclose critical facts relevant to these risks that existed at the time, including the vulnerability of the customer data and that the Data Breach was currently ongoing, despite the fact that the Audit Committee was specifically advised regarding the SEC's risk disclosure requirements. Additionally, these statements and omissions were false and misleading when made for the reasons detailed in ¶¶ 558-59.

562. Attached to Marriott's Q1 2018 Form 10-Q were SOX Certifications signed by Defendants Sorenson and Oberg with statements identical to those detailed in ¶ 487.

563. These statements and omissions were false and misleading when made because either Defendants Sorenson and Oberg reviewed the Q1 2018 Form 10-Q, and knew they could not reasonably certify that the risk language was not false and misleading, or they were at least severely reckless in certifying that it was not false and misleading given the information available to them at the time concerning the risks that existed to the customer data. Additionally,

these statements and omissions were false and misleading when made for the reasons detailed in ¶¶ 558-59.

**AA. August 7, 2018 – Q2 2018 Form 10-Q**

564. On August 7, 2018, shortly before noon EST, Marriott filed the Company's Q2 2018 Form 10-Q, which was signed by Defendant Bauduin. In the Q2 2018 Form 10-Q, when describing **potential** risks the Company **might** face as a result of the Merger, Marriott stated:

> Some of the anticipated benefits of combining Starwood and Marriott may still not be realized. ***We decided to acquire Starwood with the expectation that the Starwood Combination would result in various benefits, including, among other things, operating efficiencies. Although we have already achieved some of those anticipated benefits, others remain subject to several uncertainties, including whether we can continue to effectively and efficiently integrate the Starwood business.***
>
> ***Integration could also take longer than we anticipate and involve unexpected costs. Disruptions of each legacy company's ongoing businesses, processes, and systems could adversely affect the combined company. We also may still encounter difficulties harmonizing our different reservations and other systems, Loyalty Programs and other business practices as the integration process continues.*** Because of these or other factors, we cannot assure you when or that we will be able to fully realize additional benefits from the Starwood Combination in the form of eliminating duplicative costs, or achieving other operating efficiencies, cost savings, or benefits, or that difficulties encountered with our harmonization efforts will not have adverse effects on our business or reputation.

565. These statements and omissions were false and misleading when made because while warning of potential risks related to integrating the business, Defendants failed to disclose critical facts relevant to these risks that existed at the time, including the vulnerability of the customer data and that the Data Breach was currently ongoing, despite the fact that the Audit Committee was specifically advised regarding the SEC's risk disclosure requirements. Additionally, these statements and omissions were false and misleading when made because

while warning of potential risks related to integrating the business, Defendants failed to disclose critical facts relevant to these risks that existed at the time, including the vulnerability of the customer data and that the Data Breach was currently ongoing. Additionally, these statements were false and misleading when made because at the time Defendants made these statements, Starwood's IT systems were severely vulnerable. Specifically, among other issues: (1) the systems were using an outdated Oracle application portal that could not be updated or patched; (2) the legacy Starwood system allowed for insecure remote access; (3) only a fraction of Starwood's firewall activity was being logged, so nobody could adequately monitor for attacks; (4) the legacy Starwood system lacked monitoring and logging of remote access, meaning that there was no record of who was remotely accessing the systems; (5) not all database queries were being logged, so nobody could see if a hacker was accessing Starwood's valuable data without permission; (6) payment account numbers were being stored without encryption, so sensitive data was easily accessible to attackers; and (7) that Starwood did not mandate PCI compliance, tokenization, or point-to-point encryption. An adequate merger due diligence process would have easily revealed these glaring deficiencies, yet Marriott knowingly, or with severe recklessness, failed to share this important information with the market. In addition, throughout the Class Period, the legacy Starwood guest reservation database was already compromised by the Data Breach.

566. Further, the statements and omissions: (1) gave investors a false impression that Marriott was operating the newly-acquired Starwood systems in accordance with relevant requirements, standards, and best practices detailed above, which now included the enforcement of GDPR; and (2) gave investors a false impression that Marriott had made adequate preparations and dedicated adequate resources to cybersecurity when, in fact, Marriott failed to

secure Starwood's systems, despite knowledge of cybersecurity risks. Additionally, as detailed above in the Board minutes pleaded in Section (VI)(F)(3), the Board was well aware of the risk that cybersecurity posed to the Company, however, Marriott ignored multiple red flags that should have caused Defendants to discover the Data Breach (or at least safeguard Starwood's vulnerable client data) including, but not limited to: (1) Starwood's known cybersecurity issues, as detailed above in Section (VI)(C)(3)-(5); (2) Marriott's cybersecurity vulnerabilities separate from Starwood's systems, including those evidenced by the penetration test conducted by PwC, as detailed above in Section (VI)(C)(4); (3) significant (and public) intrusions into the systems and databases of Marriott's competitors in the hospitality industry, as detailed above in Section (VI)(C)(6)(b); and (4) other significant data breaches in other industries, as detailed above in Section (VI)(C)(6)(c). Notably, as detailed above in Section (VI)(F)(2), this Court has already held that plaintiffs in parallel litigation adequately pleaded under FRCP 9(b) "that Marriott knew or should have known about its allegedly inadequate data security practices and the risk of a data breach." *See also* Section (VIII) (Additional Allegations Supporting Scienter). Additionally, on February 21, 2018, the SEC released guidance for companies specifically on disclosing cybersecurity risk.

567. Also in the Q2 2018 10-Q, when describing **potential** risks the Company **might** face as a result of its technology and information protection operations, Marriott stated:

> ***A failure to keep pace with developments in technology could impair our operations or competitive position. The lodging industry continues to demand the use of sophisticated technology and systems, including those used for our reservation, revenue management, property management, human resources and payroll systems, our Loyalty Programs, and technologies we make available to our guests and for our associates. These technologies and systems must be refined, updated, and/or replaced with more advanced systems on a regular basis, and our business could suffer if we cannot do that as quickly or***

***effectively as our competitors or within budgeted costs and time frames. We also may not achieve the benefits that we anticipate from any new technology or system, and a failure to do so could result in higher than anticipated costs or could impair our operating results.***

* * *

***We are exposed to risks and costs associated with protecting the integrity and security of company, employee, and guest data. Our businesses process, use, and transmit large volumes of employee and guest data, including credit card numbers and other personal information in various information systems that we maintain*** and in systems maintained by third parties, including our owners, franchisees and licensees, as well as our service providers, in areas such as human resources outsourcing, website hosting, and various forms of electronic communications. ***The integrity and protection of that guest, employee, and company data is critical to our business. If that data is inaccurate or incomplete, we could make faulty decisions.***

***Our guests and employees also have a high expectation that we, as well as our owners, franchisees, licensees, and service providers, will adequately protect their personal information. The information, security, and privacy requirements imposed by laws and governmental regulation and the requirements of the payment card industry are also increasingly demanding, in the U.S., the European Union, Asia, and other jurisdictions where we operate. Our systems and the systems maintained or used by our owners, franchisees, licensees, and service providers may not be able to satisfy these changing legal and regulatory requirements and associate and guest expectations, or may require significant additional investments or time to do so.***

***Cyber-attacks could have a disruptive effect on our business. Efforts to hack or breach security measures, failures of systems or software to operate as designed or intended, viruses, "ransomware" or other malware, operator error, or inadvertent releases of data may materially impact our information systems and records and those of our owners, franchisees, licensees, or service providers.*** Our reliance on computer, Internet-based and mobile systems and communications and the frequency and sophistication of efforts by hackers to gain unauthorized access or prevent authorized access to such systems have greatly increased in recent years. ***A significant theft, loss, loss of access to, or fraudulent use of guest, associate, or company data could adversely impact our reputation and could result in remedial and***

> ***other expenses, fines, or litigation. Breaches in the security of our information systems or those of our owners, franchisees, licensees, or service providers or other disruptions in data services could lead to an interruption in the operation of our systems, resulting in operational inefficiencies and a loss of profits, and negative publicity, resulting in tangible adverse effects on our business, including consumer boycotts, lost sales, litigation, loss of development opportunities, or associate retention and recruiting difficulties, all of which could affect our market share, reputation, business, financial condition, or results of operations. The techniques used to obtain unauthorized access, disable or degrade service, or sabotage information systems change frequently, can be difficult to detect for long periods of time, and can be difficult to assess ore remediate even once detected, which could magnify the severity of these adverse effects.*** In addition, although we carry cyber/privacy liability insurance that is designed to protect us against certain losses related to cyber risks, that insurance coverage may not be sufficient to cover all losses or all types of claims that may arise in connection with cyber-attacks, security breaches, and other related breaches. Furthermore, in the future such insurance may not be available to us on commercially reasonable terms, or at all.
>
> * * *
>
> ***Any disruption in the functioning of our reservation systems, as part of our integration of Starwood or otherwise, could adversely affect our performance and results. We manage global reservation systems that communicate reservations to our branded hotels that individuals make directly with us online, through our mobile apps, through our telephone call centers, or through intermediaries like travel agents, Internet travel websites, and other distribution channels. The cost, speed, accuracy and efficiency of our reservation systems are critical aspects of our business and are important considerations for hotel owners when choosing our brands. Our business may suffer if we fail to maintain, upgrade, or prevent disruption to our reservation systems. In addition, the risk of disruption in the functioning of our global reservation systems could increase with the anticipated systems integration that is part of our integration of Starwood. Disruptions in or changes to our reservation systems could result in a disruption to our business and the loss of important data.***

568. These statements and omissions were false and misleading when made because while warning of potential cybersecurity-related risks to the business, Defendants failed to

disclose critical facts relevant to these risks that existed at the time, including the vulnerability of the customer data and that the Data Breach was currently ongoing, despite the fact that the Audit Committee was specifically advised regarding the SEC's risk disclosure requirements. Additionally, these statements and omissions were false and misleading when made for the reasons detailed in ¶¶ 565-66.

569. Attached to Marriott's Q2 2018 Form 10-Q were SOX Certifications signed by Defendants Sorenson and Oberg with statements identical to those detailed in ¶ 487.

570. These statements and omissions were false and misleading when made because either Defendants Sorenson and Oberg reviewed the Q1 2018 Form 10-Q, and knew they could not reasonably certify that the risk language was not false and misleading, or they were at least severely reckless in certifying that it was not false and misleading given the information available to them at the time concerning the risks that existed to the customer data. Additionally, these statements and omissions were false and misleading when made for the reasons detailed in ¶¶ 565-66.

**BB. September 19, 2018 – Marriott's Global Privacy Statement**

571. On September 19, 2018, and continuing through the end of the Class Period, Marriott continued to provide the public with a Global Privacy Statement on Marriott's website, marriott.com. Notably, despite Defendants having actual knowledge of the Data Breach on September 18, 2018, Defendants continued to provide a version of the Global Privacy Statement that was last updated on May 18, 2018. The Global Privacy Statement applied to Marriott, its wholly-owned subsidiary Starwood, and Marriott's affiliates. In the Global Privacy Statement, Marriott provided the public with its policies and procedures for using, collecting, and storing the data the Company collects from its customers.

> Security
>
> ***We seek to use reasonable organizational, technical and administrative measures to protect Personal Data.*** Unfortunately, no data transmission or storage system can be guaranteed to be 100% secure. If you have reason to believe that your interaction with us is no longer secure (for example, if you feel that the security of your account has been compromised), please immediately notify us in accordance with the *"Contacting Us"* section, below.
>
> Privacy Shield Certified
>
> ***Marriott International, Inc. and certain of its U.S. affiliates have certified to the EU-U.S. and Swiss-U.S. Privacy Shield frameworks.*** Our certifications can be found at: www.privacyshield.gov/list. For more information about the Privacy Shield principles, please visit: www.privacyshield.gov. Our Privacy Shield Guest Privacy Policy can be found here.

572. These statements and omissions were false and misleading when made because Marriott was in violation of the Privacy Shield Frameworks, which the Company stated it complied with, and despite Marriott having **actual knowledge of the Data Breach**, including the findings of the CrowdStrike investigation detailed above in ¶¶ 255-56. Defendants failed to make any change to the Global Privacy Statement as a result. Additionally, these statements and omissions were false and misleading when because while warning of potential risks related to integrating the business, Defendants failed to disclose critical facts relevant to these risks that existed at the time, including the vulnerability of the customer data and that the Data Breach was currently ongoing. Additionally, these statements were false and misleading when made because at the time Defendants made these statements, Starwood's IT systems were severely vulnerable. Specifically, among other issues: (1) the systems were using an outdated Oracle application portal that could not be updated or patched; (2) the legacy Starwood system allowed for insecure remote access; (3) only a fraction of Starwood's firewall activity was being logged, so nobody could adequately monitor for attacks; (4) the legacy Starwood system lacked monitoring and

logging of remote access, meaning that there was no record of who was remotely accessing the systems; (5) not all database queries were being logged, so nobody could see if a hacker was accessing Starwood's valuable data without permission; (6) payment account numbers were being stored without encryption, so sensitive data was easily accessible to attackers; and (7) that Starwood did not mandate PCI compliance, tokenization, or point-to-point encryption. An adequate merger due diligence process would have easily revealed these glaring deficiencies, yet Marriott knowingly, or with severe recklessness, failed to share this important information with the market. In addition, throughout the Class Period, the legacy Starwood guest reservation database was already compromised by the Data Breach.

573. Further, the statements and omissions: (1) gave investors a false impression that Marriott was operating the newly-acquired Starwood systems in accordance with relevant requirements, standards, and best practices detailed above; and (2) gave investors a false impression that Marriott had made adequate preparations and dedicated adequate resources to cybersecurity when, in fact, Marriott failed to secure Starwood's systems, despite knowledge of cybersecurity risks. Additionally, as detailed above in the Board minutes pleaded in Section (VI)(F)(3), the Board was well aware of the risk that cybersecurity posed to the Company, however, Marriott ignored multiple red flags that should have caused Defendants to discover the Data Breach (or at least safeguard Starwood's vulnerable client data) including, but not limited to: (1) Starwood's known cybersecurity issues, as detailed above in Section (VI)(C)(3)-(5); (2) Marriott's cybersecurity vulnerabilities separate from Starwood's systems, including those evidenced by the penetration test conducted by PwC, as detailed above in Section (VI)(C)(4); (3) significant (and public) intrusions into the systems and databases of Marriott's competitors in the hospitality industry, as detailed above in Section (VI)(C)(6)(b); and (4) other significant data

breaches in other industries, as detailed above in Section (VI)(C)(6)(c). Notably, as detailed above in Section (VI)(F)(2), this Court has already held that plaintiffs in parallel litigation adequately pleaded under FRCP 9(b) "that Marriott knew or should have known about its allegedly inadequate data security practices and the risk of a data breach." *See also* Section (VIII) (Additional Allegations Supporting Scienter). Additionally, on February 21, 2016, the SEC released guidance for companies specifically on disclosing cybersecurity risk.

**CC. September 25, 2018 – Salesforce's The Future of Travel & Hospitality**

574. On September 25, 2018, Salesforce hosted an event titled The Future of Travel & Hospitality, during which Defendant Sorenson was interviewed and stated as follows:

> [Interviewer]: So what would you say has been your biggest bet when it comes to technology?
>
> Defendant Sorenson: Well, um, that's a good question. I think the, uh, we spend a lot of money on technology. We're spending hundreds of millions of dollars a year. ***Uh, it is mostly about investing in the loyalty and reservations platform. Uh, they're big bets but they are not risky bets . . . .***
>
> ***I think the, uh, biggest bet that sort of has some risk in it . . . was our acquisition of Starwood a couple of years ago. . . $13 billion dollars, biggest deal by a lot that Marriott has ever done. We were a $20 billion company when we bought them so, you know, it's risking a fair amount of the Company***. And while it isn't at its core maybe a technology bet, it was a bet on the loyalty program. We said if we can bring these two companies together and have a bigger ecosystem for our customers, and they are really our customers, then we can say to them, "why would you stay anywhere else?" that would be a good thing.
>
> [Interviewer]: You mentioned risk, what would be some of the riskier elements of technology? . . . .
>
> Defendant Sorenson: . . . . You've got two examples that I'd use today. ***One is the regulatory one. So we are increasingly living in a world in which data will be required to be maintained in the country of residence of your customer. GDPR in Europe is probably the most profound, China heading the same way, California of course passed a law last year. All of this is going to***

> ***have some impact on where we can keep the information we have about you.*** And to some extent how we mine it. Can we mine it through pure anonymous tools . . . ***so that's an area of risks***.

575. These statements and omissions concerning the Merger, legacy Starwood guest reservation database, and regulatory compliance, made **after** Defendant Sorenson and the Audit Committee Defendants admittedly had **actual knowledge of the Data Breach**, including the findings of the CrowdStrike investigation detailed above in ¶¶ 255-56, were false and misleading when made because at the time Defendants made these statements, Starwood's IT systems were severely vulnerable. Specifically, among other issues: (1) the systems were using an outdated Oracle application portal that could not be updated or patched; (2) the legacy Starwood system allowed for insecure remote access; (3) only a fraction of Starwood's firewall activity was being logged, so nobody could adequately monitor for attacks; (4) the legacy Starwood system lacked monitoring and logging of remote access, meaning that there was no record of who was remotely accessing the systems; (5) not all database queries were being logged, so nobody could see if a hacker was accessing Starwood's valuable data without permission; (6) payment account numbers were being stored without encryption, so sensitive data was easily accessible to attackers; and (7) that Starwood did not mandate PCI compliance, tokenization, or point-to-point encryption. An adequate merger due diligence process would have easily revealed these glaring deficiencies, yet Marriott knowingly, or with severe recklessness, failed to share this important information with the market. In addition, throughout the Class Period, the legacy Starwood guest reservation database was already compromised by the Data Breach, a fact which Defendants now had actual knowledge of.

576. Further, the statements and omissions: (1) gave investors a false impression that Marriott was operating the newly-acquired Starwood systems in accordance with relevant requirements, standards, and best practices detailed above; and (2) gave investors a false

impression that Marriott had made adequate preparations and dedicated adequate resources to cybersecurity when, in fact, Marriott failed to secure Starwood's systems, despite knowledge of cybersecurity risks. Additionally, as detailed above in the Board minutes pleaded in Section (VI)(F)(3), the Board was well aware of the risk that cybersecurity posed to the Company, however, Marriott ignored multiple red flags that should have caused Defendants to discover the Data Breach (or at least safeguard Starwood's vulnerable client data) including, but not limited to: (1) Starwood's known cybersecurity issues, as detailed above in Section (VI)(C)(3)-(5); (2) Marriott's cybersecurity vulnerabilities separate from Starwood's systems, including those evidenced by the penetration test conducted by PwC, as detailed above in Section (VI)(C)(4); (3) significant (and public) intrusions into the systems and databases of Marriott's competitors in the hospitality industry, as detailed above in Section (VI)(C)(6)(b); and (4) other significant data breaches in other industries, as detailed above in Section (VI)(C)(6)(c). Notably, as detailed above in Section (VI)(F)(2), this Court has already held that plaintiffs in parallel litigation adequately pleaded under FRCP 9(b) "that Marriott knew or should have known about its allegedly inadequate data security practices and the risk of a data breach." *See also* Section (VIII) (Additional Allegations Supporting Scienter). Additionally, on February 21, 2016, the SEC released guidance for companies specifically on disclosing cybersecurity risk.

**DD. October 10, 2018 – Skift Global Forum 2018**

577. On October 10, 2018, Defendant Sorenson was interviewed at the Skift Global Forum 2018 by Skift's Senior Hospitality Editor, Deanna Ting. During the interview, Ms. Ting asked Defendant Sorenson whether there have been "any disappointments along the way" in connection with the Merger. In response, Defendant Sorenson stated:

> ***There has never been a moment of regret. . . . Have there been disappointments? Of course, but there have also been positive***

> ***surprises. And I think on balance there have been more positive surprises than negative ones.***

578. Defendant Sorenson was also asked specifically about Marriott's reservation system:

> Ms. Ting: Speaking of software, reservations systems, I sort of feel like your reservations platform, is overdue for an overhaul. How are you planning to update it or have you already updated it?
>
> Defendant Sorenson: ***Well we are, uh, again, this is a little bit in the context of the merger of Starwood and Marriott, uh right now in waves, we are putting all of the Starwood hotels on the Marriott system. Uh, that will be done at the end of the year, uh then stabilized. We do have a new res platform that's rolling out this year . . . .***

579. These statements and omissions concerning the Merger and the legacy Starwood guest reservation database, made **after** Defendant Sorenson and the Audit Committee Defendants admittedly had **actual knowledge of the Data Breach**, including the findings of the CrowdStrike investigation detailed above in ¶¶ 255-56, were false and misleading when made for the reasons detailed in ¶¶ 575-76.

### EE. October 20, 2018 – Interview with Richmond Times Dispatch

580. In an article in the New York Times titled *Marriott's Merger of Hotel Rewards Programs Tests Members' Loyalty*, Marriott's Senior VP of Global Loyalty David Flueck gave an interview to the Richmond Times Dispatch. In that article, Mr. Flueck "***described the merger as 99.9 percent successful***, though he acknowledged that it still left millions of customer records in limbo, some for weeks before they were resolved."

581. This statement and/or omission concerning the success of the Merger, made **after** Defendant Sorenson and the Audit Committee Defendants admittedly had **actual knowledge of the Data Breach**, including the findings of the CrowdStrike investigation detailed above in ¶¶ 255-56, was false and misleading for the reasons detailed in ¶¶ 575-76.

**FF. November 5, 2018 – Form 8-K**

582. On November 5, 2018, after the market closed, Marriott filed a Form 8-K signed by Defendant Bauduin and attached a press release with statements from Defendant Sorenson regarding the Company's operations, the Integration, and other topics. In regard to the Integration, Defendant Sorenson stated:

> It's been just over two years since the completion of the Starwood acquisition. ***We are in the home stretch on integrating the companies and are pleased with the results.***

583. These statements and omissions concerning the progress and success of the Integration up to that point, made **after** Defendant Sorenson and the Audit Committee Defendants admittedly had **actual knowledge of the Data Breach**, including the findings of the CrowdStrike investigation detailed above in ¶¶ 255-56, were false and misleading when made for the reasons detailed in ¶¶ 575-76.

**GG. November 6, 2018 – Q3 2018 Form 10-Q**

584. On November 6, 2018, shortly before noon, Marriott filed the Company's Q3 2018 Form 10-Q, which was signed by Defendant Bauduin.

585. Also in the Q3 2018 Form 10-Q, when describing **potential** risks the Company **might** face as a result of the Merger, Marriott stated:

> Some of the anticipated benefits of combining Starwood and Marriott may still not be realized. ***We decided to acquire Starwood with the expectation that the Starwood Combination would result in various benefits, including, among other things, operating efficiencies. Although we have already achieved some of those anticipated benefits, others remain subject to several uncertainties, including whether we can continue to effectively and efficiently integrate the Starwood business.***
>
> ***Integration could also take longer than we anticipate and involve unexpected costs. Disruptions of each legacy company's ongoing businesses, processes, and systems could adversely affect the combined company. We have encountered challenges in***

> ***harmonizing our different reservations and other systems, Loyalty Program, and other business practices, and may encounter additional or increased challenges as the integration process continues.*** Because of these or other factors, we cannot assure you when or that we will be able to fully realize additional benefits from the Starwood Combination in the form of eliminating duplicative costs, or achieving other operating efficiencies, cost savings, or benefits, or that challenges encountered with our harmonization efforts will not have adverse effects on our business or reputation.

586. These statements and omissions, made **after** Defendant Sorenson and the Audit Committee Defendants admittedly had **actual knowledge of the Data Breach**, including the findings of the CrowdStrike investigation detailed above in ¶¶ 255-56, were false and misleading when made because while warning of potential risks related to integrating the business, Defendants failed to disclose critical facts relevant to these risks that existed at the time, including the vulnerability of the customer data and that the Data Breach was currently ongoing, despite the fact that the Audit Committee was specifically advised regarding the SEC's risk disclosure requirements. Additionally, these statements and omissions were false and misleading when made for the reasons detailed in ¶¶ 575-76.

587. Also in the Q3 2018 Form 10-Q, when describing **potential** risks the Company **might** face in its technology and information protection operations, Marriott stated:

> ***A failure to keep pace with developments in technology could impair our operations or competitive position. The lodging industry continues to demand the use of sophisticated technology and systems, including those used for our reservation, revenue management, property management, human resources and payroll systems, our Loyalty Program, and technologies we make available to our guests and for our associates. These technologies and systems must be refined, updated, and/or replaced with more advanced systems on a regular basis, and our business could suffer if we cannot do that as quickly or effectively as our competitors or within budgeted costs and time frames. We also may not achieve the benefits that we anticipate from any new technology or system, and a failure to do so could***

***result in higher than anticipated costs or could impair our operating results.***

* * *

***We are exposed to risks and costs associated with protecting the integrity and security of company, associate, and guest data. In the operation of our business, we collect, store, use, and transmit large volumes of data regarding associates, guests, customers, owners, licensees, franchisees, and our own business operations, including credit card numbers, reservation and loyalty data, and other personal information, in various information systems that we maintain*** and in systems maintained by third parties, including our owners, franchisees, licensees, and service providers. ***The integrity and protection of this data is critical to our business. If this data is inaccurate or incomplete, we could make faulty decisions.***

***Our guests and associates also have a high expectation that we, as well as our owners, franchisees, licensees, and service providers, will adequately protect and appropriately use their personal information. The information, security, and privacy requirements imposed by laws and governmental regulation, our contractual obligations, and the requirements of the payment card industry are also increasingly demanding in the U.S., the European Union, Asia, and other jurisdictions where we operate. Our systems and the systems maintained or used by our owners, franchisees, licensees, and service providers may not be able to satisfy these changing legal and regulatory requirements and associate and guest expectations, or may require significant additional investments or time to do so. We may incur significant additional costs to meet these requirements, obligations, and expectations, and in the event of alleged or actual noncompliance we may experience increased operating costs, increased exposure to fines and litigation, and increased risk of damage to our reputation and brand.***

* * *

***Cyber security incidents could have a disruptive effect on our business. We have implemented security measures to safeguard our systems and data, and we may implement additional measures in the future, but our measures or the measures of our service providers or our owners, franchisees, licensees, and their service providers may not be sufficient to maintain the confidentiality, security, or availability of the data we collect, store, and use to operate our business. Efforts to hack or***

***circumvent security measures, efforts to gain unauthorized access to data, failures of systems or software to operate as designed or intended, viruses, "ransomware" or other malware, "phishing" or other types of business email compromises, operator error, or inadvertent releases of data may materially impact our information systems and records and those of our owners, franchisees, licensees, or service providers. Our reliance on computer, Internet-based, and mobile systems and communications and the frequency and sophistication of efforts by third parties to gain unauthorized access or prevent authorized access to such systems have greatly increased in recent years. Like most large multinational corporations, we have experienced cyber-attacks, attempts to disrupt access to our systems and data, and attempts to affect the integrity of our data, and the frequency and sophistication of such efforts could continue to increase. Although some of these efforts may not be successful or impactful, a significant theft, loss, loss of access to, or fraudulent use of guest, associate, owner, franchisee, licensee, or company data could adversely impact our reputation and could result in remedial and other expenses, fines, or litigation. Depending on the nature and scope of the event, compromises in the security of our information systems or those of our owners, franchisees, licensees, or service providers or other disruptions in data services could lead to an interruption in the operation of our systems, resulting in operational inefficiencies and a loss of profits, and negative publicity, resulting in tangible adverse effects on our business, including consumer boycotts, lost sales, litigation, loss of development opportunities, or associate retention and recruiting difficulties, all of which could affect our market share, reputation, business, financial condition, or results of operations. The techniques used to obtain unauthorized access, disable or degrade service, or sabotage information systems change frequently, can be difficult to detect for long periods of time, and can involve difficult or prolonged assessment or remediation periods even once detected, which could magnify the severity of these adverse effects.*** In addition, although we carry cyber/privacy liability insurance that is designed to protect us against certain losses related to cyber risks, that insurance coverage may not be sufficient to cover all losses or all types of claims that may arise in connection with cyber-attacks, security compromises, and other related incidents. Furthermore, in the future such insurance may not be available to us on commercially reasonable terms, or at all.

***Any disruption in the functioning of our reservation systems, as part of our integration of Starwood or otherwise, could adversely affect our performance and results. We manage global***

> ***reservation systems that communicate reservations to our branded hotels that individuals make directly with us online, through our mobile apps, through our telephone call centers, or through intermediaries like travel agents, Internet travel websites, and other distribution channels. The cost, speed, accuracy and efficiency of our reservation systems are critical aspects of our business and are important considerations for hotel owners when choosing our brands. Our business may suffer if we fail to maintain, upgrade, or prevent disruption to our reservation systems. In addition, the risk of disruption in the functioning of our global reservation systems could increase with the ongoing systems integration that is part of our integration of Starwood. Disruptions in or changes to our reservation systems could result in a disruption to our business and the loss of important data.***

588. These statements and omissions, made **after** Defendant Sorenson and the Audit Committee Defendants had **actual knowledge of the Data Breach**, including the findings of the CrowdStrike investigation detailed above in ¶¶ 255-56, were false and misleading when made because while warning of potential risks related to integrating the business, Defendants failed to disclose critical facts relevant to these risks that existed at the time, including the vulnerability of the customer data and that the Data Breach was currently ongoing, despite the fact that the Audit Committee was specifically advised regarding the SEC's risk disclosure requirements. Additionally, these statements and omissions were false and misleading when made for the reasons detailed in ¶¶ 575-76.

589. Attached to Marriott's Q3 2018 Form 10-Q were SOX Certifications signed by Defendants Sorenson and Oberg with statements identical to those detailed in ¶ 487.

590. These statements and omissions, made **after** Defendant Sorenson and the Audit Committee Defendants had **actual knowledge of the Data Breach**, including the findings of the CrowdStrike investigation detailed above in ¶¶ 255-56, were false and misleading when made because either Defendants Sorenson and Oberg reviewed the Q3 2018 Form 10-Q, and knew they could not reasonably certify that the risk language was not false and misleading, or they

were at least severely reckless in certifying that it was not false and misleading given the information available to them at the time concerning the risks that existed to the customer data. Additionally, these statements and omissions were false and misleading when made for the reasons detailed in ¶¶ 575-76.

## VIII. ADDITIONAL ALLEGATIONS SUPPORTING SCIENTER

591. Numerous independent pieces of evidence support the inference that Defendants either knew they were making false statements and omissions to the market throughout the Class Period, or else were severely reckless in disregarding the risk that they were misrepresenting the security vulnerabilities that existed within Starwood's systems to the market, and the risk that Starwood's systems had been breached. These facts each support a strong inference of scienter, both independently and holistically. Notably, as detailed above in Section (VI)(F)(2), this Court has held that plaintiffs in parallel litigation adequately pleaded under FRCP 9(b) "that Marriott knew or should have known about its allegedly inadequate data security practices and the risk of a data breach." Consumer MtD Opinion at 60-61, 64.

### A. CW Allegations Regarding Starwood and Marriott's IT Systems Support a Strong Inference of Scienter

592. Information provided by CWs, detailed above in Sections (VI)(C)(3)-(5), supports the strong inference that Defendants knew, or were at least severely reckless in not knowing about: (1) the glaring deficiencies in Starwood's IT systems and the associated risks during the Class Period; (2) Marriott's failure to address the security vulnerabilities during the Merger due diligence process; and (3) Marriott's failure take any action to remediate the serious security risks posed by Starwood's systems during Integration and operation of the legacy Starwood IT systems.

593. Witness allegations detail how Starwood's IT systems were in complete shambles, and that the deficiencies were both known internally at Marriott, and obvious to anyone responsible for knowing about their state. Among other issues, Starwood was using an Oracle portal that was seven years past the end of its life and could not be updated or patched. ¶ 154. Notably, CWs said that the primary reason Starwood sought to be acquired was because its Oracle portal could not be patched or expanded. ¶¶ 153-54. Additionally, CWs confirmed that Starwood was not even monitoring its security or privilege access logs. ¶¶ 161, 68. Further, CWs recounted how Starwood was storing both its employee and customer username names and passwords in a readily viewable fashion, among other security concerns. ¶ 159.

594. In addition, CWs discussed how Marriott was aware of a high "likelihood of a threat" related to Starwood's IT systems before, during, and after the Merger. ¶ 179. And they recounted how there were various discussions at Marriott about the weaknesses in Starwood's systems, and meetings regarding the Starwood due diligence. *See, e.g.*, ¶¶ 156, 66-67, 75. Further, Marriott made the decision to compartmentalize the legacy Starwood guest reservation database, thus recognizing the need to keep the compromised Starwood system separate from Marriott's legacy system, ¶ 178, but still failed to adequately protect that data.

595. Further, there is evidence that Defendants would have known how vulnerable Starwood's systems were because Marriott's own systems (which were known to be superior to Starwood's) were demonstrably penetrable in March 2016. Early in 2016, the Board's Audit Committee authorized a penetration test, and the Board, including the Audit Committee, and Defendants Sorenson and Hoffmeister were informed that PwC was able to steal credentials and gain complete control of Marriott's systems. ¶¶ 214-15. According to CW 1, the Audit Committee definitely would have received a formal report on the results of the penetration test.

Additionally, Defendant Sorenson and the Audit Committee Defendants knew that Marriott's systems had been breached before in other cybersecurity incidents, but no preventative measures were taken. ¶ 317.

596. Witness allegations also highlight how Marriott was not willing to dedicate sufficient resources to integrating its $13 billion acquisition. *See, e.g.*, ¶¶ 207-12. The Integration proved to be more than Marriott could handle and cost more than anticipated. ¶¶ 216-17. During the Integration, Defendant Hoffmeister even admitted internally that Marriott lacked a strategy to complete the Integration by the end of 2018. ¶ 205. Moreover, CWs addressed how, during its due diligence, Marriott made a conscious decision to avoid digging too deeply into Starwood's IT systems, despite encountering numerous red flags. *See, e.g.*, ¶¶ 176-85. This decision was made despite PCI compliance purportedly being the driving force behind Marriott's data security policies and procedures. ¶ 190. Further, Starwood and Marriott lost a lot of institutional knowledge at the time of the Merger when many of Starwood's IT employees left, which hindered the Integration. *See, e.g.*, ¶¶ 181, 92, 97.

597. Thus, evidence provided by confidential witnesses shows Defendants were at least severely reckless when they made affirmative statements and omissions regarding Marriott's due diligence, data security practices, and Marriott's cybersecurity risk.

### B. Defendants' Violations of Data Security Standards Including Those Detailed in the PFI Report Support a Strong Inference of Scienter

598. Marriott's flagrant violation of governing cybersecurity standards supports a strong inference of scienter. Marriott was subject to clear data security standards that required it to keep the customer data it collected secure. *See* Section (VI)(H). Moreover, as a part of the Company's due diligence process, Defendants were required to ensure Starwood and its systems were in compliance with these laws, standards, and regulations. Marriott was also required to

maintain compliance with these standards when operating the legacy Starwood guest reservation database. Additionally, multiple agencies and organizations have published guidance and best practices related to data security and cybersecurity risk, and disclosing those risks to the public. Marriott's failure to adhere to these standards and best practices represented an extreme departure from the standard of ordinary care.

599. As detailed in the PFI Report, which commissioned after the Data Breach, Marriott violated multiple PCI DSS requirements that the Company was contractually obligated to comply with. Egregiously, Marriott: (1) failed to configure its remote access to restrict administrator access from unknown users; (2) failed to render all credit card data unreadable on legacy Starwood systems; (3) failed to require multifactor authentication for all user accounts; and (4) failed to log and monitor all database queries, firewall activity, and remote access. *See* Section (VI)(G).[176]

600. Marriott also violated numerous GDPR requirements, which prompted a finding from the ICO that Marriott ***"failed to undertake sufficient due diligence when it bought Starwood and should have done more to secure its systems."*** ¶ 319.

601. Further, Marriott is subject to Section 5 of the FTC Act, which imposes an affirmative duty on companies to protect customer data. *See* Section (VI)(H)(3). Notably, as detailed above in Section (VI)(F)(2), this Court has already held that the complaint in the Consumer Track satisfied the Rule 9(b) pleading standard because it "contains extensive allegations that Marriott knew or should have known about its allegedly inadequate data security practices and the risk of a data breach and its alleged failures and omissions were material and relied upon by consumers."

---

[176] The information in the PFI Report and publicly available information shows that Marriott violated various other PCI DSS requirements.

602. Marriott also affirmatively stated that it complied with the principles laid out in the COSO Framework (*see* Section (VI)(H)(2)), and the EU-US Privacy Shield Principles (*see* Section (VI)(H)(5)), but the evidence in the PFI Report shows that is not true. Similarly, Marriott failed to adhere to the principles laid out in the NIST-CSF, which the FTC recommended for companies in the hospitality industry, (*see* Section (VI)(H)(3)),[177] ISACA released guidance related to due diligence, (*see* Section (VI)(H)(6)), and SEC guidance related to cybersecurity risk. The fact that Marriott blatantly violated all of these cybersecurity standards and practices, and ignored cybersecurity guidance in connection with its acquisition and maintenance of Starwood's legacy systems evidences Defendants' knowing, or at least severely reckless, disregard for the true state of Starwood's systems when making statements and omitting material information to the market.

**C. Defendants' Knowledge or Reckless Disregard of Cybersecurity Risks, Including Those Specific to Starwood, Support a Strong Inference of Scienter**

603. As detailed in Section (VI)(F)(3), internal documents and Board minutes from parallel litigation show that the Board, which included Defendant Sorenson and the Audit Committee Defendants, was repeatedly made aware throughout the Class Period of the cybersecurity risks Marriott faced, and the risks related to Starwood's systems in particular. Similarly, Defendant Oberg gave presentations on cybersecurity during at least three Board meetings during the Class Period, and Defendant Hoffmeister gave a presentation on the deficiencies in Starwood's systems during at least one Board meeting during the Class Period.

[177] The FTC also provided additional guidance for protecting personal information in October 2016. In addition to the NIST-CSF, NIST has also released special publications prior to and during the Class Period that provide cybersecurity-related guidance for companies. *See* Section (VI)(H)(3).

Additionally, Defendants had access to several reports and assessments detailing cybersecurity issues and risks related to the Merger.

604. On February 12, 2016, for example, the Board (which included Defendant Sorenson and the Audit Committee Defendants) was presented with materials showing the Board ranked cybersecurity as the ***number one risk*** facing Marriott in 2016, and was again reminded of that fact in December 2016. On top of that, in March 2016, the Board and Defendant Hoffmeister were presented with a report showing that PwC was able to gain complete control of Marriott's systems through a penetration test. Similarly, in February 2017, the Board was presented with the PwC's "Starwood Security Program Assessment" which showed that Starwood's decentralized technology management model created an elevated level of risk, including allowing an unusually high number of employees with high-level access to systems, and that ***"[b]rand standards did not mandate PCI compliance, tokenization, or point-to-point encryption."*** Also in February 2017, E&Y informed the Board, including Defendant Sorenson and the Audit Committee Defendants that: (1) it was expected to understand cybersecurity risk; (2) Marriott received a "Needs Improvement" regarding cybersecurity risk; and (3) there had been an increase in the volume and severity of cyberattacks in the accommodations industry. Additionally, the Board was informed that malware was found on Starwood's servers, and that a malicious domain associated with Starwood had been discovered. *See* Section (VI)(F)(3).

605. Finally, the Board, including Defendant Sorenson and the Audit Committee Defendants, had actual knowledge of the Data Breach more than ten weeks before Marriott informed the public, actual knowledge that included the tools used by the attackers and the specific types of malware that were installed. ¶ 256. Despite the fact that Defendant Sorenson and the Audit Committee had actual knowledge that the legacy Starwood guest reservation

database had been breached, Defendants not only failed to inform the public of that fact, but continued to take reservations and add the sensitive personal information of additional guests to that database, and made numerous statements to the market regarding the Merger.[178]

606. Thus, the Board minutes, presentations, and other documents that Defendants reviewed support a strong inference of scienter.

### D. Defendants Had Access to Reports and Assessments Detailing Deficiencies in Starwood's and Marriott's Systems throughout the Class Period

607. In addition to the information detailed above that was presented to, and by, Defendants Sorenson, Oberg, and Hoffmeister, and the Audit Committee Defendants, throughout the Class Period Defendants had access, at least, to various reports and assessments detailing deficiencies and cybersecurity risks in the legacy Starwood systems. Given their roles as top executives at Marriott and direct involvement with the Merger, the Individual Defendants would have had easy access to the reports and assessments detailed below in this Section. Similarly, given their role on the Board's Audit Committee and their responsibilities related to cybersecurity risk detailed above, the Audit Committee Defendants also would have had easy access to these reports and assessments. *See* Section (VI)(C)(5).

608. A Marriott internal report, the "Marriott IT Infrastructure and Security Business Cases" report, dated July 18, 2016, detailed several specific deficiencies in Starwood's systems, including: (1) that the legacy Starwood guest reservation database lacked a SIEM process; (2) that Starwood did not monitor and report on the state of the company's security, and that Starwood had no visibility into its out-of-date systems or the presence of malware; and (3) that Starwood did not utilize tokenization or point-to-point encryption. In January 2017, PwC

[178] Notably, the Warren Report pointed out that Equifax "missed several key opportunities" to inform investors of that breach while waiting only forty days, less than half what it took Defendants to disclose the Data Breach.

informed Marriott of the results of PwC's "Starwood Cybersecurity Assessment," which detailed several critical vulnerabilities in Starwood's systems, including that Starwood: (1) lacked an enterprise-wide security governing body; (2) lacked adequate network segmentation; (3) consistently failed to comply with baseline configuration standards, leaving the systems vulnerable; and (4) did not mandate PCI DSS compliance.

609. An assessment performed by PwC in mid-2017 on the state of the Integration up to that point indicated that the combined network required enhanced network segmentation, two-factor authentication, and other vulnerability remediation activities. Additionally, Marriott commissioned Protiviti to conduct a penetration test of Starwood's systems, and a May 1, 2018, report indicated that Protiviti was able to capture domain administrator credentials and used those credentials to access the Starwood CDE.

610. That the Individual Defendants and the Audit Committee Defendants had, at least, easy access to reports and assessments detailing the deficiencies and cybersecurity risks in the legacy Starwood systems support a strong inference of scienter.

### E. Numerous Data Security and Cybersecurity Red Flags Throughout the Class Period Support Scienter

611. Throughout the Class Period, Defendants either knew, or were severely reckless in not knowing about numerous data security and cybersecurity-related red flags that should have put them on notice of the importance of securing Starwood's systems. For example, Starwood announced a breach involving RAM-scraper malware on its POS systems on November 20, 2015, just 5 days after the Merger Announcement. Additionally, Starwood was affected by four other cybersecurity incidents. *See* Section (VI)(C)(6)(a). Notably, RAM-scraper malware was employed in the Data Breach, and the PFI report found this malware littered throughout Starwood's systems.

612. Additionally, there were at least twelve breaches of companies in the hospitality industry involving payment card data and/or personal information, which should have put Defendants on notice of the heightened risk of a potential data breach. *See* Section (VI)(C)(6)(b). As detailed above in Section (VI)(F)(3), at the February 10, 2017 Board meeting Defendant Sorenson and the Audit Committee were presented with information on more than 50 breaches in the hospitality industry in 2015 and 2016 alone. Furthermore, in September 2017, the Equifax data breach was announced, followed by the Warren Report in February 2018, detailing many of Equifax's failures during that breach (which mirror many of the same failures by Marriott). *See* Section (VI)(C)(6)(c). In April 2018, Verizon released its 2018 Data Breach Investigative Report which detailed 338 incidents in the accommodations industry in 2017. *See* Section (VI)(C)(6)(b).

613. The fact that Defendants were put on notice of the importance of securing Starwood's systems by past data breaches is also independently supported by Board minutes. On August 7, 2014, for example, the Board discussed recently publicized data security incidents and received a presentation titled "Security Overview" which detailed breaches at other companies, including the Target breach, and were reminded repeatedly throughout the Class Period. *See* Section (VI)(F)(3).

614. Thus, the existence of these past cybersecurity incidents, including past breaches of Starwood's systems in particular, necessarily put Defendants on notice of the heightened risk of a data breach at Starwood. This evidence independently supports a strong inference of scienter.

### F. Defendants' Public Statements Regarding the Merger Support a Strong Inference of Scienter

615. Defendants made several admissions throughout the Class Period that also support a strong inference of knowledge or severe recklessness. For example, Defendant Sorenson publicly acknowledged that a driving purpose of the Merger was the acquisition of Starwood's data, when he admitted that the Merger, while not "at its core a technology bet, [ ] was a bet on the loyalty program." ¶ 574. Defendant Sorenson publicly acknowledged that Marriott was paying $13 billion primarily to access Starwood's customers and their data. Thus, Defendants needed to perform adequate due diligence to adequately secure their investment. Not doing so was severely reckless under the circumstances.

616. Similarly, Defendant Hoffmeister claimed that Marriott did "a thorough analysis of the systems before we made our decision." ¶ 545. And Marriott's Senior Director of Global Communications and Public Affairs Jeff Flaherty, confirmed that Marriott conducted an assessment of Starwood's technology systems prior to and after the close of the Merger. ¶ 139. Thus, Defendants' public statements themselves are evidence of knowledge, or at least severe recklessness, with respect to the cybersecurity risks Marriott faced as a result of the Merger.

### G. The Magnitude of the Breach Supports a Strong Inference of Scienter

617. The size, scope, and duration of the Data Breach support a strong inference of scienter. As detailed in the PFI Report, the Data Breach lasted at least four years, and potentially longer as there was limited evidence available for Verizon to review in the aftermath of the Data Breach. As noted above, the average data breach lasts only 266 days before identification and containment. However, the Data Breach went undetected for more than 1,500 days from evidence of the first intrusion, including more than 700 days while under Marriott's ownership and control. As a part of this more than four-year intrusion, the attackers utilized 1,360 different

computers and machines in Starwood's IT systems. The attacker was able to obtain the usernames and passwords for 17 different Starwood system accounts to infect those computers with 120 variants of 15 types of malware. Additionally, the attacker was able to conduct several unauthorized database queries in the two weeks prior to triggering the IBM Guardium alert because Marriott failed to configure that tool to properly detect suspicious activity. *See* Section (VI)(G).

618. Further, Defendants were responsible for allowing, and failing to timely disclose, the second largest data breach in history. The sensitive personal information of more than 380 million people was stolen in the Data Breach, personal information including name, payment card data, passport information, traveling companions, and home address. Data from more than 9 million payment cards was stolen, including more than 7,200 potential unencrypted payment card numbers. Further, Verizon discovered that another more than 240,000 potential unencrypted payment cards were stored on Starwood's systems and could have been taken in the Data Breach. *See* Sections (VI)(D) & (G).

619. As a result of the Data Breach, Marriott had to undertake a litany of corrective and containment measures, including various infrastructure changes. These required measures were so extensive that some were still ongoing when Verizon completed the PFI Report—six months after the Data Breach was announced. *See* Section (VI)(G).

620. For more than 700 days Defendants allowed an attacker to utilize 17 different accounts to steal the personal information of more than 380 million people. Thus, the magnitude and duration of the Data Breach contributes to a strong inference of scienter.

### H. Defendant Sorenson, as CEO and a Board Member, Acted With Scienter

621. In addition to the allegations detailed above in this section, Defendant Sorenson was also personally involved with Marriott's acquisition of Starwood. He was Marriott's point

person during Marriott's initial interest in Starwood, Marriott's decision to reengage with the acquisition process, and Marriott's ultimate decision to acquire Starwood. As detailed in prospectuses filed related to the Merger, Defendant Sorenson held numerous individual meetings with Starwood executives during the acquisition process. Additionally, Defendant Sorenson was a member of the Board and met repeatedly with the Company's Board to keep them informed of the Merger process. The Prospectus also states that the Board, of which Defendant Sorenson was a member, gained an enhanced "understanding of the integration process" with the addition of the former Starwood board members. The Prospectus also stated that the Board's review of the due diligence process gave it a "favorable" outlook for the Merger. Indeed, the Prospectus highlighted the Board's (*i.e.*, Defendant Sorenson's and the Audit Committee Defendants') "knowledge" about, among other things, "the results of Marriott's due diligence review." Finally, based on the due diligence standards in the RACI matrix, at least Defendants Sorenson and Hoffmeister would have been intimately involved in the due diligence process and should have discovered the glaring issues with Starwood's protection of customer data, and as noted below Defendant Oberg would have been informed regarding the Merger process and reported to the Board.

622. Further, Defendant Sorenson knew, or was at least severely reckless in not knowing, of the data security and cybersecurity risks, and red flags detailed above. *See* Sections (VI)(C)(3)-(6). Despite knowledge of these risks and red flags, throughout the Class Period, Defendant Sorenson signed SOX Certifications indicating that he had reviewed each of the Form 10-Ks and Form 10-Qs Marriott filed throughout the Class Period, and that those filings did not contain any material false and misleading statements. Thus, Defendant Sorenson knowingly, or with severe recklessness, failed to disclose material information that made Defendants'

statements to the market regarding Marriott's due diligence and data security practices, and Marriott's cybersecurity risk detailed above false and misleading when made.

623. It cannot be disputed that Defendant Sorenson had actual knowledge of the Data Breach, including the tools and malware used by the attackers, for at least ten weeks before Defendants informed the public, and while Marriott continued to make statements to the market regarding the Merger and Marriott's data security and cybersecurity. ¶ 256. Additionally, Defendant Sorenson was known to be a "hands on" manager when it came to Marriott's M&A activity. Prior to joining Marriott, Defendant Sorenson was an M&A partner with Latham & Watkins. His relationship with Marriott began more than 25 years ago when he represented the Company in various acquisitions. Defendant Sorenson joined Marriott as the head of the Company's M&A activity in 1996 and promptly undertook his first acquisition, acquiring Renaissance Hotels. Thus, Defendant Sorenson, more than anyone, should have known of the basic steps that would have been necessary to ensure Starwood's customer data—the driving force behind the merger—was secure.

**I. Defendant Oberg, as CFO and Presenter to the Board, Acted With Scienter**

624. As noted above, Defendant Oberg presented to the Board, which included Defendant Sorenson and the Audit Committee Defendants, on cybersecurity risk no fewer than three times throughout the Class Period. Defendant Oberg routinely reminded the Board that cybersecurity was a priority for Marriott, and that Marriott needed to mitigate that risk, including that "continuous efforts to identify and mitigate risks [are] required." *See* Section (VI)(F)(3). That Defendant Oberg routinely presented at, and attended Board meetings supports a strong inference of scienter.

625. In addition to signing the Company's SEC filings, Defendant Oberg was named Manager of Starwood upon the closing of the Merger. As Manager of the newly acquired entity,

Defendant Oberg would have been intricately involved in the Integration process. Additionally, according to the RACI matrix detailed above in Section (VI)(H)(6), as CFO Defendant Oberg would be informed regarding the decision to perform information security due diligence as well as responsible for reporting the result to the Board. Given her involvement in both the Merger and Integration process, Defendant Oberg knew or was severely reckless in not knowing that Defendants omitted material information throughout the Class Period which would have made their statements regarding Marriott's due diligence, data security and cybersecurity policies and practices, and cybersecurity risks false and misleading when made. Defendant Oberg was at least severely reckless in failing to disclose this information.

626. Additionally, as a member of Marriott's senior management, and a regular presenter on cybersecurity risk at Marriott's Board meetings throughout the Class Period, Defendant Oberg was aware of the cybersecurity and data security risks and red flags Marriott faced. Despite knowledge of these risks and red flags, throughout the Class Period, Defendant Oberg signed SOX Certifications indicating that she had reviewed each of the Form 10-Ks and Form 10-Qs Marriott filed throughout the Class Period, and that those filings did not contain any material false and misleading statements.

**J. The Audit Committee Defendants Acted With Scienter**

627. In addition to the allegations detailed above in this section, the Audit Committee Defendants were tasked with having an understanding of cybersecurity-related risks. The Audit Committee was required to oversee the Company's internal control environment, compliance with legal and regulatory requirements, and internal audit function. The Audit Committee Defendants were also required to periodically review Marriott's risk assessment policies and procedures, and meet with the CAE. Additionally, the Audit Committee Defendants signed the Registration Statement and Form 10-Ks throughout the Class Period. *See* Section (III)(B)(2).

Further, throughout the Class Period, the Audit Committee Defendants were provided with reports, presentations, and information related to the deficiencies in Starwood's systems, including the March 2016 results of PwC's penetration test, and in February 2017 when the Audit Committee was informed that Starwood was not PCI DSS compliant. Also in February 2017, the Audit Committee was advised as to their responsibilities regarding disclosing risks related to cybersecurity in accordance with SEC regulations. *See* Section (VI)(F)(3).

628. Like Defendant Sorenson, the Audit Committee Defendants had actual knowledge of the Data Breach, including the tools and malware used by the attackers, more than ten weeks before it was disclosed to the public. ¶ 256. Further, the Audit Committee Defendants knew, or were at least severely reckless in not knowing, of the data security and cybersecurity risks, and red flags detailed above. However, the Audit Committee Defendants knowingly, or with severe recklessness, failed to disclose material information to the market that made Defendants' statements regarding Marriott's due diligence and data security practices, and Marriott's cybersecurity risk detailed above false and misleading when made.

**K. Defendant Hoffmeister Was Responsible for Marriott's IT Function**

629. In addition to the allegations related to Defendant Hoffmeister detailed above in this subsection, including that Defendant Hoffmeister presented to the Board on Starwood's cybersecurity issues in February 2017, as Marriott's CIO, Defendant Hoffmeister was deeply involved in the Merger. According to CW 1, Defendant Hoffmeister ran the entire IT organization throughout the process. Additionally, CW 6 said that Defendant Hoffmeister was involved in presenting the IT budget to Defendant Sorenson. Given his involvement in the Merger and Integration process, Defendant Hoffmeister knew (or was at least severely reckless in not knowing) that Marriott had not performed adequate diligence, nor performed adequate security during the Integration, and made false and misleading statements to the contrary.

630. Moreover, Defendant Hoffmeister—as CIO—was responsible for overseeing the people, processes, and technologies within Marriott's IT organization to ensure it delivered outcomes that supported the goals of the business. It is well established in the business community that a CIO is "responsible for managing an organization's IT staff, as well as its IT-related assets like software and hardware, and for strategic planning as it relates to computer systems and the organization's network."[179]

631. Indeed, the U.S. Department of Commerce, National Institute of Standards and Technology describes the job responsibilities of the CIO as follows:

> Agency official responsible for: (i) Providing advice and other assistance to the head of the executive agency and other senior management personnel of the agency to ensure that information technology is acquired and **information resources are managed in a manner that is consistent with laws, Executive Orders, directives, policies, regulations**, and priorities established by the head of the agency; (ii) **Developing, maintaining, and facilitating the implementation of a sound and integrated information technology architecture** for the agency; and (iii) Promoting the **effective** and efficient **design and operation** of all major information resources management **processes** for the agency, including improvements to work processes of the agency.[180]

632. Defendant Hoffmeister was therefore responsible for protecting and preserving Marriott's digital assets throughout every aspect of a systems development and operations lifecycle. Thus, Defendant Hoffmeister knowingly, or with severe recklessness, failed to disclose material information that made Defendants' statements to the market regarding Marriott's due diligence and data security practices, and Marriott's cybersecurity risk detailed above false and misleading when made.

---

[179] Sean Riley, *What is a CIO?* BUSINESSNEWSDAILY.COM (Dec. 29, 2019). https://www.businessnewsdaily.com/11146-what-is-a-cio.html.

[180] U.S. DEP'T OF COMMERCE, NAT'L INST. OF STANDARDS AND TECH., COMPUT. SEC. RES. CTR., *Glossary, Chief Information Officer (CIO)*, https://csrc.nist.gov/glossary/term/CIO (last visited July 21, 2020).

### L. Defendant Bauduin Acted With Scienter

633. In addition to his role as CAO, Defendant Bauduin was Marriott's lone signatory for the Company's Form 10-Qs, and signed each of Marriott's Form 10-Ks and Form 8-Ks during the Class Period. As such, Defendant Bauduin was not only responsible for reviewing the statements in those filings, but also would have been involved in the process of preparing those filings. In order to carry out those responsibilities, Defendant Bauduin would have to be involved in, or at the very least kept informed of, the due diligence and Integration process related to Starwood. Further, Defendant Bauduin was named a Manager of Starwood at the close of the Merger.

### M. Defendant Marriott Acted With Scienter Through Its Agents

634. As a corporation, scienter can be imputed to Defendant Marriott through any of its agents and as detailed above, each of the Individual Defendants and the Audit Committee Defendants acted with scienter. Additionally, Ms. Linnartz, Marriott's Global Chief Commercial Officer during the Class Period, made several statements on the importance of customer data to Marriott's business, and to the Merger. ¶ 88. Additionally, a Senior Vice President with Marriott, David Flueck, described customer data as a "tremendous asset" for Marriott. ¶ 89. These statements further reinforce that Defendant Marriott was aware of the importance of data security, and as alleged herein, failed to disclose known risks related to the Merger while making false and misleading statements. Therefore, Defendant Marriott acted with scienter.

## IX. LOSS CAUSATION

635. During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Marriott's securities and operated as a fraud or deceit on Class Period purchasers of Marriott's securities by failing to disclose and misrepresenting the adverse facts and risks detailed herein. Later, when

Defendants' prior misrepresentations and fraudulent course of conduct, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed to the market, the price of Marriott's securities declined significantly as the prior artificial inflation was released from the Company's share price. Specifically, Defendants' materially false and misleading statements, half-truths, and omissions misrepresented, *inter alia*, the extent of Marriott's due diligence when it acquired Starwood, the extreme vulnerability of Starwood's systems, the state of Starwood and Marriott's IT security during the Integration, and Marriott's data security and cybersecurity practices.

636. As a result of their purchases of Marriott's securities during the Class Period, Lead Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws. Defendants' false and misleading statements, half-truths, and omissions had the intended effect and caused Marriott's securities to trade at artificially inflated levels throughout the Class Period, closing as high as $147.99 on January 29, 2018.

637. By concealing from investors the adverse facts and risks related to the Merger, Integration, and cybersecurity detailed herein, Defendants presented a misleading picture of Marriott's business and prospects. When the information and/or underlying conditions, and/or effects thereof were revealed to the market through Defendants' corrective disclosure and/or a materialization of the concealed risk, the price of Marriott's securities fell dramatically. This decline removed the artificial inflation from the price of Marriott's securities, causing economic loss to investors who had purchased Marriott's securities during the Class Period.

638. The decline in the price of Marriott's securities following the corrective disclosure and/or materialization of the concealed risk on November 30, 2018, was a direct result of the nature and extent of Defendants' fraudulent misrepresentations, half-truths, and omissions

being revealed to investors and the market. The timing and magnitude of the price declines in Marriott's securities, Defendants' post-Class Period revelations, and analyst reactions to the news, individually and collectively, negate any inference that the loss suffered by Lead Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

639. The economic loss, *i.e.*, damages, suffered by Lead Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme and course of conduct to artificially inflate the price of Marriott's securities and the subsequent material decline in the value of Marriott's securities when Defendants' prior misrepresentations, misleading omissions and half-truths, and other fraudulent conduct were revealed.

640. Specifically, on November 30, 2018, Defendants revealed that the legacy Starwood guest reservation database that Marriott owned and operated had been compromised by a breach since at least two years before Marriott acquired it. On November 30, 2018, the Company revealed that the sensitive, personal information of approximately 500 million guests had been stolen from Marriott's customers through the Data Breach in the legacy Starwood guest reservation database. The Company revealed that attackers had stolen: (1) names; (2) passport numbers; (3) dates of birth; (4) credit card information; (5) home addresses; and (6) other valuable, sensitive personal information.

641. As a result of this corrective disclosure and/or revelation of a previously concealed, materialized risk, Marriott's share price dropped by $6.81 from a close of $121.84 per share on November 29, 2018 to $115.03 per share on November 30, 2018, a decline of 5.59%.

642. Several news outlets issued reports discussing the announcement of the Data Breach and resulting share price decline. MarketWatch also reported that Marriott's share price

dropped "5.6% in premarket trade Friday, after the hotel operator disclosed a 'data security incident' of its Starwood guest reservation database that contains information on up to 500 million guests." Additionally, Bloomberg reported that Marriott's share price "tumble[d]" on the revelation of the Data Breach, and Nasdaq.com reported that Marriott's share price "was falling hard" on news of the Data Breach.

643. This share price reaction was the direct result of the market learning facts that Defendants had concealed throughout the Class Period, including that throughout the Integration, the legacy Starwood guest reservation system and database had been compromised by the Data Breach and that Starwood's IT systems were severely vulnerable and susceptible to hacking—facts that an adequate due diligence process would have easily revealed. Indeed, this corrective disclosure and/or materialization of a concealed risk revealed to the market that the Company had made false and misleading statements, half-truths, and omissions throughout the Class Period, as detailed in Section (VII).

## X. APPLICATION OF PRESUMPTION OF RELIANCE

644. Lead Plaintiff is entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market theory:

(a) Marriott's securities were actively traded on the NASDAQ and Chicago Stock Exchange, informationally efficient markets, throughout the Class Period;

(b) Marriott's securities traded at high weekly volumes during the Class Period;

(c) as a regulated issuer, Marriott filed periodic public reports with the SEC;

(d) Marriott regularly communicated with public investors by means of established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public

disclosures, such as communications with the financial press, securities analysts and other similar reporting services;

(e) the market reacted promptly to public information disseminated by Marriott;

(f) Marriott's securities were covered by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective firms. Each of these reports was publicly available and entered the public marketplace. The firms who wrote analyst reports on Marriott during the Class Period include, but are not limited to, the following: Barclays, Deutsche Bank, JP Morgan, Jefferies, SunTrust Robinson Humphrey, Wells Fargo, and others;

(g) the material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Marriott's securities; and

(h) without knowledge of the misrepresented or omitted material facts alleged herein, Lead Plaintiff and other members of the Class purchased shares of Marriott's securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were revealed.

645. In the alternative, Lead Plaintiff is entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah* v. *United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are primarily predicated upon omissions of material facts which there was a duty to disclose.

## XI. NO SAFE HARBOR

646. The statutory safe harbor provided by the PSLRA for forward-looking statements under certain circumstances does not apply to any of the materially false and misleading statements and omissions alleged herein.

647. ***First***, Defendants' statements and omissions alleged to be false and misleading relate to historical facts or existing conditions, and omissions are not protected by the statutory safe harbor. Defendants' false and misleading statements and omissions alleged herein are not forward-looking because such statements: (1) relate to historical or current fact; (2) implicate existing conditions; and (3) do not contain projections of future performance or future objective. To the extent that any of the alleged false and misleading statements and omissions might be construed to touch on future intent, they are mixed statements of present facts and future intent and are not entitled to safe harbor protection with respect to the part of the statement that refers to the present.

648. ***Second***, any purported forward-looking statements were not accompanied by meaningful cautionary language because any risks that Defendants warned of had already come to pass, and any cautionary language did not mention important factors of similar significance to those actually realized. Additionally, to the extent Defendants included any cautionary language, such language was not meaningful because any potential risks identified by Defendants had already manifested. To the extent Defendants included any cautionary language, it was not precise, not meaningful, and did not relate directly to any forward-looking statements at issue. Defendants' cautionary language was boilerplate and did not meaningfully change during the Class Period, despite the fact that conditions had materially changed.

649. ***Third***, to the extent that there were any forward-looking statements that were identified as such, Defendants are liable because, at the time each of those forward-looking statements were made, the speaker knew the statement was false when made.

## XII. CLASS ACTION ALLEGATIONS

650. Lead Plaintiff brings this federal securities class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of itself and all persons and entities that, during the

proposed Class Period of November 16, 2015 through November 29, 2018, inclusive, purchased or otherwise acquired the publicly traded securities of Marriott, and were damaged thereby, except as excluded by definition. Excluded from the Class are: (1) Defendants; (2) members of the immediate family of each of the Individual Defendants; (3) any subsidiary or affiliate of Marriott, including its employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); (4) the directors and officers of Marriott during the Class Period, as well as the members of their immediate families; and (5) the legal representatives, heirs, successors, and assigns of any such excluded party.

651. The members of the Class are so numerous that joinder of all members is impracticable. According to Marriott's 2018 Annual Report, there were just under 340 million shares of Marriott's securities outstanding as of February 20, 2019 and over 36,400 registered holders of such securities, with a significant number of shares held by banks, brokers and/or nominees for the accounts of their customers. While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that the proposed Class numbers in the thousands and is geographically widely dispersed. Record owners and other members of the Class may be identified from records maintained by Marriott or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

652. Lead Plaintiff's claims are typical of the claims of the members of the Class. All members of the Class were similarly affected by Defendants' allegedly wrongful conduct in violation of the Exchange Act as complained of herein.

653. Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

654. There is a well-defined community of interest in the questions of law and fact involved in this case. Common questions of law and fact exist as to all members of the Class, and predominate over any questions solely affecting individual members of the Class. The questions of law and fact common to the Class include:

(a) whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

(b) whether the statements made to the investing public during the Class Period contained material misrepresentations;

(c) whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d) whether Defendants knew or were severely reckless in disregarding that their statements were false and misleading;

(e) whether and to what extent the market price of Marriott's securities was artificially inflated during the Class Period because of the material misstatements alleged herein;

(f) whether the Individual Defendants were controlling persons of Marriott;

(g) whether reliance may be presumed pursuant to the fraud-on-the-market doctrine and/or the presumption of reliance afforded by *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972); and

(h) whether the members of the Class have sustained damages as a result of the conduct complained of herein and, if so, the proper measure of damages.

655. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because, among other things, joinder of all members of the Class is impracticable. Furthermore, because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### Violation of §10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

656. Lead Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

657. This Count is asserted pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC against all Defendants.

658. As alleged herein, throughout the Class Period, Defendants, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails, and/or the facilities of national securities exchanges, made untrue statements of material fact and/or omitted to state material facts necessary to make their statements not misleading and carried out a plan, scheme and course of conduct, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. Defendants intended to and did, as alleged herein: (i) deceive the investing public, including Lead Plaintiff and members of the Class; (ii) artificially inflate and maintain the prices of Marriott's securities;

and (iii) cause Lead Plaintiff and members of the Class to purchase Marriott's securities at artificially inflated prices.

659. The Individual Defendants and the Audit Committee Defendants (and Marriott, through their actions) were individually and collectively responsible for making the false and misleading statements and omissions alleged herein and having engaged in a plan, scheme and course of conduct designed to deceive Lead Plaintiff and members of the Class, by virtue of having made public statements and prepared, approved, signed and/or disseminated documents that contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading.

660. As set forth above, Defendants made their false and misleading statements and omissions and engaged in the fraudulent activity described herein knowingly and intentionally, or in such a severely reckless manner as to constitute willful deceit and fraud upon Lead Plaintiff and the other members of the Class who purchased Marriott's securities during the Class Period.

661. In ignorance of the false and misleading nature of Defendants' statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market price for Marriott's securities, Lead Plaintiff and other members of the Class purchased Marriott's securities at artificially inflated prices during the Class Period. But for the fraud, Lead Plaintiff and members of the Class would not have purchased Marriott's securities at such artificially inflated prices.

662. As set forth herein, when Defendants began to reveal adverse, previously undisclosed facts concerning the Company, the price of Marriott's securities declined precipitously and Lead Plaintiff and members of the Class were harmed and damaged as a direct and proximate result of their purchases of shares of Marriott's securities at artificially inflated

prices and the subsequent decline in the price of shares of those securities when Defendants began to reveal such facts.

663. By virtue of the foregoing, Defendants are liable to Lead Plaintiff and members of the Class for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

### Violation of §20(a) of the Exchange Act
### Against the Individual Defendants and the Audit Committee Defendants

664. Lead Plaintiff repeats, incorporates, and realleges each of the allegations set forth above as if fully set forth herein.

665. This Count is asserted pursuant to Section 20(a) of the Exchange Act against the Individual Defendants and the Audit Committee Defendants.

666. As alleged above, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by making false and misleading statements in connection with the purchase and sale of Marriott's securities and by participating in a fraudulent scheme and course of business or conduct throughout the Class Period. This fraudulent conduct was undertaken with scienter and the Company is charged with the knowledge and scienter of each of the Individual Defendants and the Audit Committee Defendants who knew of or acted with severely reckless disregard for the falsity of their statements and the fraudulent nature of this scheme during the Class Period. Thus, Marriott is primarily liable under Section 10(b) of the Exchange Act.

667. As set forth above, the Individual Defendants and the Audit Committee Defendants were controlling persons of Marriott during the Class Period, due to their senior executive and director positions with the Company and their direct involvement in the

Company's day-to-day operations, as well as their ability to exercise and/or actual exercise of influence and control over the Company's dissemination of information.

668. By virtue of the foregoing, the Individual Defendants and the Audit Committee Defendants each had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Marriott, including the content of its public statements with respect to the success of the due diligence and Integration process of Starwood, and the effectiveness of its cybersecurity and compliance with industry and regulatory norms, as well as the content of the statements the Company made to the market on those topics..

669. The Individual Defendants and the Audit Committee Defendants acted knowingly and intentionally, or in such a severely reckless manner as to constitute willful fraud and deceit upon Lead Plaintiff and the other members of the Class who purchased shares of Marriott's securities during the Class Period.

670. In ignorance of the false and misleading nature of the Company's statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market prices for shares of Marriott's securities, Lead Plaintiff and other members of the Class purchased shares of Marriott's securities at an artificially inflated price during the Class Period. But for the fraud, Lead Plaintiff and members of the Class would not have purchased shares of Marriott's securities at artificially inflated prices.

671. As set forth herein, when Defendants subsequently revealed adverse, previously undisclosed facts concerning the Company, the price of shares of Marriott's securities declined precipitously and Lead Plaintiff and members of the Class were harmed and damaged as a direct and proximate result of their purchases of shares of Marriott's securities at artificially inflated

prices and the subsequent decline in the price of shares of those securities when such facts were revealed.

672. By reason of the foregoing, the Individual Defendants and the Audit Committee Defendants are liable to Lead Plaintiff and the members of the Class as controlling persons of Marriott in violation of Section 20(a) of the Exchange Act.

## XIII. PRAYER FOR RELIEF

673. WHEREFORE, Lead Plaintiff, on behalf of themselves and the Class, respectfully pray for judgment against Defendants as follows:

(a) Determining that this action is a proper class action maintained under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, certifying Lead Plaintiff as the Class Representative, and appointing Labaton Sucharow LLP as Class Counsel pursuant to Rule 23(g);

(b) Awarding Lead Plaintiff and the Class compensatory damages against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial together with prejudgment interest thereon;

(c) Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including but not limited to attorneys' fees and costs incurred by consulting and testifying expert witnesses; and

(d) Granting such other and further relief as the Court deems just and proper.

## XIV. DEMAND FOR TRIAL BY JURY

Lead Plaintiff hereby demands a trial by jury of all issues so triable.

Dated: July 24, 2020

Respectfully submitted,

**LABATON SUCHAROW LLP**

By: *\/s/ Carol C. Villegas*

Carol C. Villegas
Mark S. Goldman
Theodore J. Hawkins
William A. Accordino Jr.
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
Email: cvillegas@labaton.com
Email: mgoldman@labaton.com
Email: thawkins@labaton.com
Email: waccordino@labaton.com

*Attorneys for Lead Plaintiff Construction Laborers Pension Trust for Southern California and Lead Counsel for the Class*

**CERTIFICATE OF SERVICE**

I, Carol C. Villegas, certify that, on July 24, 2020, I caused this document to be served on all counsel of record by filing it electronically via the CM/ECF system.

/s/ *Carol C. Villegas*
Carol C. Villegas